UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KATRINA BARRON, | ) |
| Plaintiff, | ) |
| | ) CAUSE NO: 3:11-cv-440 JVB |
| v. | ) |
| | ) |
| UNIVERSITY OF NOTRE DAME DU LAC | ) |
| d/b/a NOTRE DAME UNIVERSITY, | ) |
| Defendant. | ) |

APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT  1

# In The Matter Of:

*KATRINA BARRON, v.*
*UNIVERSITY OF NOTRE DAME DU LAC*

---

*KATRINA BARRON*
*January 10, 2014*

---



PO Box 122 ● Osceola, IN 46561
574.300.3885
office@michianareporters.com

*Original File 140110 Barron.txt*
*Min-U-Script®*

Page 3

```
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
            SOUTH BEND DIVISION

         Cause No. 3:11-CV-440


KATRINA BARRON,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
UNIVERSITY OF NOTRE DAME DU        )
LAC d/b/a NOTRE DAME               )
UNIVERSITY,                        )
                                   )
          Defendant.               )
- - - - - - - - - - - - - - -      )


     The Deposition of KATRINA BARRON

     Date:   Friday, January 10, 2014

     Time:   9:07 a.m.

     Place:  University of Notre Dame
             203 Main Building
             Notre Dame, Indiana

     Called as a witness by the Defendant in

     accordance with the Federal Rules of Civil

     Procedure and Rules of the United States

     District Court for the Northern District of

     Indiana, South Bend Division, pursuant to

     Notice.

REPORTED BY:
Before Melody M. Goodrich, CM
Notary Public, Cass County, Michigan
```

```
 1            I N D E X

 2      THE DEPOSITION OF
        KATRINA D. BARRON
 3

 4                              PAGE

 5 DIRECT EXAMINATION
      By Ms. Canton .....................4
 6

 7        E X H I B I T S

 8 DEFENDANT'S                  PAGE

 9  1 ................................14

10  2 ................................24

11  3 ................................28

12  4 ................................40

13  5 ................................51

14  6 ................................61

15  7 ...............................101

16  8 ...............................159

17  9 ...............................195

18 10 ...............................215

19 11 ...............................216

20 12 ...............................217

21 13 ...............................217

22

23

24

25
```

Page 2

```
 1 APPEARANCES:

 2

 3 MR. COLBY A. BARKES
      Blachly, Tabor, Bozik & Hartman
 4    56 Washington
      Suite 401
 5    Valparaiso, Indiana 46383
      219.464.1041
 6    cabarkes@lawyersonthesquare.com

 7 On behalf of the Plaintiff;

 8

 9

10 MS. DOREEN CANTON
      Taft Stettinius & Hollister
11    425 Walnut Street
      Suite 1800
12    Cincinnati, Ohio 45202-3957
      513.381.2838
13    canton@taftlaw.com
                and
14 MS. KATHLEEN K. BRICKLEY
      Office of General Counsel
15    University of Notre Dame
      203 Main Building
16    Notre Dame, Indiana 46556-5602
      574.631.6411
17    gencoun@nd.edu.

18 On behalf of the Defendant.

19

20

21 ALSO PRESENT:

22    Daniel J. Myers, Vice President and Associate
                  Provost for Faculty Affairs
23

24

25
```

Page 4

```
 1      COURT REPORTER: Is there any objection
 2   to a Michigan notary?
 3      MR. BARKES: No.
 4      MS. CANTON: No.
 5             KATRINA BARRON
 6   Called as a witness by the Defendant, having
 7   been first duly sworn or affirmed, was examined
 8   and testified as follows:
 9          DIRECT EXAMINATION
10 BY MS. CANTON:
11 Q  Good morning, Professor Barron.  As we just met,
12   I'm Doreen Canton, and I represent the university
13   in the lawsuit that you filed.  With me is Kathy
14   Brickley, from the Office of General Counsel, and
15   Dan Myers, from the Provost Office, and we're here
16   to take your deposition today.
17      Could you start by giving us your name and
18   address.
19 A  Katrina Deane Barron, 1097 Riverside Drive, South
20   Bend, Indiana.
21 Q  Have you ever had your deposition taken before?
22 A  No, I have not.  This is my first.
23 Q  Have you ever seen one?
24 A  No.
25 Q  All right.  Let me explain.  There's a few ground
```

Page 5

1  rules that will make the process go smoothly. I'm
2  going to be asking you questions about your
3  lawsuit. Your job is to answer them. If you
4  answer a question, we're all going to assume that
5  you understood it.
6    So it's important, if you don't understand it,
7  that you ask me to repeat it, rephrase it, explain,
8  whatever you need, so that you've got a question
9  you can understand. Will you do that?
10 A  Yes, I will attempt, to best of my ability.
11 Q  All right. Is there any reason why you won't be
12   able to answer the questions honestly?
13 A  I will.
14 Q  Okay. And if you need to take a break, you can
15   take a break at any time. You just say, can we
16   take a break, and we will. The only caveat is that
17   if a question is pending, go ahead and answer that
18   question, and then we'll take a break after that.
19 A  Okay.
20 Q  It's important to keep your answers verbal because
21   Melody has to take down everything that anyone says
22   today. So she won't be able to get a shrug of the
23   shoulders or nod of the head. Uh-huhs and huh-uhs
24   are also hard. So if you could say yes or no
25   clearly, then we'll have a clear transcript at the

Page 6

1    end.
2  A  Okay.
3  Q  All right. What did you do to prepare for your
4    deposition today?
5  A  I met with Mr. Barkes yesterday, and he handed me
6    just a few of the -- three documents, I guess; the
7    damages, the original complaint, I think. I'm not
8    exactly remembering the legal terms of each of
9    these. But just showing me that if I don't
10   remember some of the aspects of the case, I might
11   want to read or review those.
12 Q  Okay. And as we go through the day, we'll have
13   exhibits that the court reporter will mark, and I
14   think some of those will be the ones that you
15   discuss.
16     When you say "the damages," do you remember
17   what that was?
18 A  There was a page of damages that was prepared in
19   December that --
20 Q  Was that a letter that your attorney sent? Do you
21   remember that? Was it in a letter form?
22 A  I don't recall exactly the form, whether it was --
23   had a legal front like one of those or not.
24 Q  Okay.
25 A  But it was a list of damages that I was told you

Page 7

1    requested, that we prepared in December.
2  Q  All right. Well, we're going to start out, after
3    you learned -- after you learned in June of 2009,
4    that your application for promotion and tenure had
5    been denied -- so we'll go back to June of 2009.
6  A  I was told in May of 2009.
7  Q  May of 2009. Okay. What did you do that summer?
8    Summer of 2009.
9  A  Well, I did many things that summer. Could you be
10   more specific on the question.
11 Q  Did you teach somewhere? Did you --
12 A  No, I did not.
13 Q  Were you working on a grant or research somewhere?
14 A  My summers are normally spent working on my
15   research. That summer my research became why I was
16   denied tenure and uncovering several statistics
17   that I found very pertinent to understanding why I
18   was denied tenure.
19 Q  When you said your summers are usually spent doing
20   research, is that here in South Bend, or do you go
21   somewhere else?
22 A  I typically -- there's no typical. I do it part of
23   the time in South Bend, usually, part of the time
24   in California. I often have conferences. There's
25   conferences that have ranged from the United

Page 8

1    States, to China, to Japan, to -- no, not Japan in
2    the summer. I apologize. China, Europe.
3  Q  Did you start teaching then again in the fall of
4    2009, here at Notre Dame?
5  A  Yes. At the end of August 2009, I started my
6    regular teaching.
7  Q  And you taught through that whole academic year?
8  A  Yes, I did.
9  Q  Fall of '09 and spring of 2010?
10 A  Yes.
11 Q  Did you do anything after the May 2009 notice of
12   denial of tenure to find another job somewhere
13   else?
14 A  Yes. I started -- at that point I had to start
15   looking for a job. So I certainly notified many
16   people about the adverse decision and didn't -- and
17   then, in fall of 2009, started very seriously
18   putting all the materials together and the long
19   applications together and spending time applying
20   for jobs.
21 Q  Who did you notify? You said you notified many
22   people of the adverse decision. Who did you
23   notify?
24 A  People that I would need to write letters of
25   recommendation for my job search, such as my Ph.D.

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 5 of 108

Page 9

1    advisor and my postdoc advisor, collaborators, and
2    people in my field who would need to help me to
3    find a job.
4  Q  And then did you apply for other jobs?
5  A  I applied for many jobs, yes.
6  Q  And did you have any interviews?
7  A  I did have interviews.
8  Q  Where did you have interviews?
9  A  I had a phone interview at Roosevelt University. I
10   had an on-campus interview at the U.S. Naval
11   Academy.
12 Q  And did you have any job offers?
13 A  I was told that I would be offered a job from the
14   U.S. Naval Academy, by individuals there. But by
15   the time the offer was to come through, I'd
16   accepted the position at Max Planck and they -- I
17   was told that because I was going -- I had accepted
18   the position at Max Planck and I was asking them to
19   defer the job for one year, that they would want --
20   they did not want to hire me for that year, that
21   they would come back to me the following year.
22 Q  So is that something that -- if a research
23   opportunity comes along, is that fairly typical,
24   that you can defer --
25 A  Yes. You would normally be allowed to defer. And

Page 10

1    other people told me that it was not -- that the
2    issue was not Max Planck. It was -- they had heard
3    that I was filing with the EEOC. I was told that
4    by a person at the U.S. Naval Academy and by a male
5    professor in my department here at Notre Dame.
6  Q  Did you file an EEOC charge or take any legal
7    action against the U.S. Naval Academy?
8  A  No. This was against Notre Dame. They knew that I
9    was appealing the decision at Notre Dame and that I
10   would be -- I had planned to take legal action.
11 Q  When you say "they" knew you were appealing, is
12   that the U.S. Naval Academy?
13 A  The U.S. Naval Academy.
14 Q  And your understanding is that somebody at the
15   U.S. Naval Academy said that they didn't want you
16   because you had filed an EEOC charge against Notre
17   Dame?
18 A  That's my understanding, yes.
19 Q  But you didn't take any action against the
20   U.S. Naval Academy --
21 A  No.
22 Q  -- for that decision?
23 A  No.
24 Q  Okay. When was the first time, whether in person,
25   phone, email, any kind of correspondence, that you

Page 11

1    had any communication with Max Planck about the
2    possibility of going there for research?
3  A  When I was applying for jobs, as I needed a new
4    job, I applied to many places. And one of the
5    places that I was encouraged to apply to by Stephan
6    Stolz was the Max Planck Institute. He felt there
7    was a good chance I could have -- I would be
8    successful in getting at least a partial employment
9    there.
10 Q  Now, who is he?
11 A  Stephan Stolz is a professor in my department, and
12   he's German. He works at the Max Planck Institute.
13 Q  And do you remember about when that was that you
14   had that conversation with him?
15 A  It was fall 2009. I believe the application to Max
16   Planck was probably put in around October or
17   November of 2009. So it was between -- it was
18   probably -- it was between the end of August and
19   October, most likely.
20 Q  When you say "the application," what's the
21   application? What was that?
22 A  You put in a proposal for what research you would
23   like to do at the Max Plank Institute, what is your
24   proposed research. The Max Planck Institute
25   will -- for people at my level, they will provide

Page 12

1    support for anywhere from a week to a year.
2        And so, I applied for a full year of funding
3    and wrote a research proposal of what I would do
4    while I was there as a researcher. This is a
5    several-page document.
6  Q  All right. Now, do you have any documentation
7    other than your project proposal and the acceptance
8    letter from Max Planck? Do you have anything else?
9    Any other communication with them?
10       Did they -- you just don't talk to them at all?
11 A  Prior --
12 Q  You just --
13 A  Prior to being hired?
14 Q  Selected, right, or accepted.
15 A  Yeah. You just send the application. You don't --
16   I didn't talk to anybody there. At the time I
17   didn't know anybody there. I didn't communicate
18   with them, no.
19 Q  So you would just send your proposal?
20 A  You just send your proposal.
21 Q  And then did you have communication with them after
22   that, or is the next thing you get a letter from
23   them telling you that you have been accepted, so to
24   speak?
25 A  It was -- the next thing was the acceptance letter.

---

**Page 13**

1 Q  So no discussion with anybody over there?
2 A  (Witness shook head.)
3 Q  No interviews?
4 A  No.  They don't interview on these.
5        MR. BARKES: You're going to have to
6     speak up at the end of the sentence.
7     You're trailing off a little bit.
8        THE WITNESS: I'm sorry.  Thank you for
9     letting me know.
10       MS. CANTON: And the court reporter
11    will let you know too.
12 BY MS. CANTON:
13 Q  Okay.  All right.  And so you got the proposal in,
14    and you were accepted.  Do you remember when that
15    was?
16 A  December 2009, I got the letter, around then.
17 Q  All right.  And -- go ahead.  I'm sorry.
18 A  No.
19 Q  Did you accept?
20 A  I did.  I waited -- I did.  I did.
21 Q  When did you accept?
22 A  At one point I went and tried to find when I did
23    accept, and I don't recall.  I don't recall whether
24    they gave me a deadline or not.  But it was -- they
25    were waiting on my answer, and I was given December

---

**Page 14**

1     or January.  I don't recall exactly when.
2 Q  Did you send them a letter?
3 A  Email.
4 Q  Email?
5 A  Email.  At least the initial -- the initial
6     acceptance or declination was by email.  I don't
7     recall if there was hard copy of something or a fax
8     or -- I just don't recall.
9 Q  And you don't remember when that was?
10 A  Around December or January of 2009/2010.
11       (Defendant's Exhibit 1 marked.)
12 BY MS. CANTON:
13 Q  Okay.  I'm handing you what we've marked as
14    Exhibit 1, and just take a second and look at it.
15    This is a document that your lawyer produced to us.
16    Is this an email that you sent to Patricia
17    Clark?
18 A  Uh-huh.
19 Q  And who is Patricia Clark?
20 A  She is a professor in the Department of Chemistry
21    here at Notre Dame.
22 Q  Now, why did you -- had you accepted by this time;
23    do you remember?
24 A  No, I had not.
25 Q  Okay.  Why did you tell her these research awards

---

**Page 15**

1     are very prestigious?
2 A  Because they are.
3 Q  How are they prestigious?  Are they good
4     for your career?  Financial?  Research?
5 A  No.  Financially, they are terrible.  They're very
6     competitive.  Max Planck doesn't normally provide
7     funding for a full year to a researcher unless
8     their program is very well respected
9     internationally.
10 Q  Okay.  And did you cart your whole family to
11    Germany for a year?
12 A  I did.
13 Q  Did your children go to school there?
14 A  Yes.  My -- my daughter was preschool, but kind --
15    kindergarten, but my son did first grade there.
16 Q  And how did that work out?  Did they learn or enjoy
17    it or --
18 A  School was terrible.  It was very hard.
19 Q  How about your husband; what did he do while you
20    were there?
21 A  He full-time took care of the children.  First
22    grade is only from 8 in the morning till 11:30 in
23    the morning.  And in addition, I don't speak
24    German, and my husband speaks some German and
25    worked on his German and negotiated life.

---

**Page 16**

1        I mean, we -- we had to sign documents in
2     German.  We had to have interviews in German with
3     immigration officials, with schools, with -- and so
4     he had a full-time job through much of this.
5 Q  Were you full-time research while you were there?
6 A  Yes.
7 Q  Now, while you were doing the application, sending
8     emails, did you -- after you accepted in either
9     December or January, did you start making
10    arrangements to move there for a year?
11 A  We were hoping, actually, that something better
12    would come through, that we wouldn't have to go
13    through the process of moving to Europe.  So I -- I
14    remember holding off some.
15       In particular, I had applied to -- I wanted
16    to -- so I'm trying to recall, but I believe in
17    January at that point there was a point at which I
18    should have been hearing from more interviews.
19       I heard from IHES, another institute, that I
20    was not accepted.  I heard from the Institute in
21    Princeton, I believe, that I was not accepted.
22       At that point we were looking at Max Planck was
23    our only hope, and we were told that we needed to
24    start making -- because they give you no housing,
25    so we needed to start making some kind of

Page 17

1    arrangements to try and find housing.  So I
2    accepted and tried to start finding housing.
3  Q  And then was it after that, that the U.S. Naval
4    Academy gave you the offer, after you'd already
5    accepted?
6  A  I don't recall.  Oh, after -- gave me the offer?
7    I'm sorry.  I thought you were going to say gave me
8    the interview.  I don't recall when they offered
9    the interview.
10        It was not until well after that, February,
11    March, that the U.S. Naval Academy offered --
12    seemed serious, had given me indications that they
13    were serious about making an offer to me.
14  Q  Well, you said you were waiting -- looking for an
15    opportunity that might be better than going to
16    Europe for a year.
17        So at that point could you tell Max Planck,
18    forget it, I'm not coming, and take the job at the
19    U.S. Naval Academy?
20  A  No.  Once -- this was why I didn't accept the job
21    on, you know -- when I was -- I was flattered to
22    have the Max Planck option.  I was believed to have
23    the Max Planck option.  I did not accept it right
24    away, and I did delay accepting.
25        I apologize.  Could you repeat the question.

Page 18

1  BY MS. CANTON:
2  Q  What I'm trying to get at is if you didn't want to
3    go to Europe, why didn't you take the job with the
4    naval academy?
5  A  I didn't know I had a job with the naval academy.
6    I had no offer in hand, and Max Planck needed an
7    answer, and we needed to start considering what we
8    were going to be doing.
9        And I -- I believe at the time I had an
10    interview with the U.S. Naval Academy.  But they
11    typically bring six people into campus, so it was a
12    one-in-six chance that I would at that point, in my
13    mind.
14        So I accepted Max Planck at the point where I
15    felt like we needed to make a decision.
16  Q  Okay.  And then in the following year, June of
17    2010, you learned that your appeal had been granted
18    and you were going to be awarded tenure, correct?
19  A  Yes.
20  Q  Now, why didn't you say, Okay, great, Max Planck,
21    sorry, can I defer or -- and stay here?
22  A  Max Planck would not defer, and I had accepted, and
23    we had made arrangements with an apartment.  We had
24    made arrangements to rent our house.  We had
25    made -- I had -- I was on the verge of packing up

Page 19

1    my office.  I didn't know when I should pack up my
2    office or not.
3        Everything was set.  It would have been
4    financially a burden.  It would have been a slap in
5    the face to Max Planck.
6  Q  So it sounds like you were going to go there
7    whether or not you got tenure?  You felt committed
8    by that point?
9  A  I was committed, yes.  I had committed.  I had to.
10    I'm the sole breadwinner of my family, and I needed
11    a job, and I accepted the first job.
12  Q  So when you said it would be a financial burden,
13    had you already bought plane tickets?  Had you put
14    money down on your housing?
15  A  Yes.  We had made a -- I don't recall exactly when
16    we sent the deposit for an apartment in Bonn for a
17    full-year lease.  We had rented our house to a
18    family for an entire year -- our house here in
19    South Bend -- to a family from Israel.
20  Q  When did you do that; do you remember?
21  A  I don't recall.  But they moved in, in July or
22    August.  And we're talking this was June, so I
23    couldn't -- I certainly -- I certainly could find
24    that information if you wanted it.
25  Q  You're trailing off again.  She'll remind you.

Page 20

1  A  Thank you.
2        In addition, we had notified my --
3            MR. BARKES: There's no question
4    pending.
5        (Discussion held off the record.)
6            MS. CANTON: All right.  We can go back
7    on the record.
8  BY MS. CANTON:
9  Q  What were you going to say?  You said, "In
10    addition."
11  A  I'm sorry.  I've answered your question.  My
12    apologies.
13  Q  You said you had notified -- you said, "In
14    addition, we'd notified."
15  A  My children's schools.  We had made arrangements
16    with the school.
17  Q  Oh, okay.  That they weren't going to be there the
18    following year.  Okay.  All right.
19        Now, on June 15th -- maybe I should back up.
20    Well, this had to be.
21        You applied for the leave -- at Notre Dame, for
22    academic leave, after you learned you had been
23    granted tenure, correct?
24  A  Yes.
25  Q  Why did you wait so long to apply for the leave?

---

**Page 21**

```
 1  A  I was only notified that I had my position, I
 2     believe, June -- was it June 6th or 9th or around
 3     that time?  I was in California at the time.  I
 4     needed to sit down and meet with my chair, Bei Hu,
 5     when I got back from California.  This was only a
 6     few days later.
 7  Q  What I'm trying to understand is you didn't know
 8     whether you were going to get tenure or not.
 9     Right.  You made the plans to go to Germany.
10        But if you got tenure, you would need leave,
11     correct?
12  A  I was -- I asked my chair and Dean Crawford, both,
13     whether I could make any kind of arrangements in --
14     on the condition that I might be -- my appeal was
15     successful.  Bei Hu specifically said, No, you may
16     not apply for leave.  You have no position to apply
17     for leave from --
18  Q  Okay.
19  A  -- in no uncertain terms.  I asked.  Dean Crawford
20     and I went back and forth, and I believe you have
21     emails to this effect or something, that I wanted
22     at least some kind of bridge position
23     possibility -- males in my department had been
24     afforded this -- so that if a grant came through in
25     which I needed a U.S. position, that I would be
```

---

**Page 22**

```
 1     afforded the opportunity to keep that grant.
 2        And he delayed and said he would try and that
 3     he would get back to me.  So I tried multiple times
 4     to make arrangements.
 5  Q  Now, what did you mean when you said males had been
 6     afforded that opportunity?
 7  A  Males in our department who had accepted jobs at
 8     other places and were leaving the university, for
 9     jobs in Europe, had been given a courtesy
10     appointment -- appointment in name only, so that a
11     National Science Foundation or a National Security
12     Agency grant that they had applied for, they could
13     still accept, especially if they were then at some
14     point planning to come back to the United States.
15        If you are accepted on one of these grants but
16     do not have a position in the United States, you
17     must forego the grant.
18  Q  Okay.  Now, had they been denied tenure, or were
19     they just --
20  A  They were temporarily --
21  Q  -- leaving?
22  A  They were visiting at the time -- visitors at the
23     time, postdocs.
24  Q  Now, had you previously been a visiting professor
25     when you were at Notre Dame?
```

---

**Page 23**

```
 1  A  No, not at Notre Dame.
 2  Q  Okay.  So you applied for the leave.  Why did you
 3     not apply for leave with pay?
 4  A  I asked to apply for leave with pay.  I talked at
 5     length with Bei Hu about the possibility of doing
 6     this.  I informed him that other people had told me
 7     this was a standard thing, that the university
 8     often -- if the pay for a position such -- a
 9     prestigious position, such as Max Planck, does not
10     meet your salary that you have here at Notre Dame,
11     that the university will match.
12  Q  Make up the difference?
13  A  Make up the difference.  And I asked -- I said I
14     wanted to apply for that, and he said I could not.
15  Q  Did he tell you why you couldn't?
16  A  He may very well have said some -- some things.  I
17     don't recall exactly what.  It did not make sense
18     to me.
19  Q  But your recollection is he said you can't apply
20     for leave with pay?
21  A  Absolutely.  He was adamant about it.
22  Q  Okay.  And you don't remember why?
23  A  He said some words to the effect that under these
24     circumstances, I was not allowed to.
25  Q  So you applied for leave without pay?
```

---

**Page 24**

```
 1  A  And at this point I was due at Max Planck at the
 2     beginning of July and --
 3        (Defendant's Exhibit 2 marked.)
 4  BY MS. CANTON:
 5  Q  All right.  I see in Exhibit 2 you asked for your
 6     healthcare expenses to be covered.  Was that
 7     approved?
 8  A  That was approved.
 9  Q  And was the leave itself approved?
10  A  It was approved.
11  Q  Okay.  Which meant that you could come back after
12     the year?  You could come back after your year in
13     Europe?
14  A  Yes.
15  Q  Okay.  You're on official academic leave --
16  A  Yes.
17  Q  -- for this entire year.  Okay.
18        Now, do you remember, did you fill out any kind
19     of form?  Is there anything you have to do to get
20     leave officially, or do you just talk to Bei?
21  A  No.  There's a form, I believe, that one fills out,
22     and some supporting documents, CV, statement of
23     leave history.
24  Q  Do you have anything in writing from Bei Hu about
25     your request for leave with pay for the 2010/'11
```

---

**Page 25**

1 academic year?
2 A I may have asked him in an email. I may have not.
3 I do not recall.
4 Q What did you do to look through your emails to find
5 any documents related to your claims against the
6 university?
7 A I spent some time searching key words. I have lots
8 of emails, so I was -- I could have spent from --
9 you know, months doing that, so --
10 Q If you did get an email -- if this communication
11 about the leave with Bei Hu was via email, would
12 you still have it? Do you save your emails?
13 A I do save my emails. I may have it. I don't
14 recall if I had specifically searched for such an
15 email.
16 Q Okay. But as you sit here, you remember a
17 conversation with him as well where he -- you said
18 he told you "in no uncertain terms" --
19 A I spoke with him on more than one occasion, and I
20 sat in his office filling out the leave form and
21 discussed it that, in no uncertain terms, I felt
22 that I should be allowed to ask for leave with pay
23 or bridge funding, that this happens. And he said,
24 several times, No.
25 Q Now, can you go over his head and fill out the form

---

**Page 26**

1 anyway and turn it in?
2 A I need his signature on it.
3 Q So he's got to approve it?
4 A Yes.
5 Q Okay. And you said you couldn't have asked for a
6 deferral at Max Planck?
7 A No. There was no such thing as a deferral for one
8 of these visiting positions, to my knowledge.
9 Q And then what did you do for the year that you were
10 gone? Was it strictly research, or did you do some
11 teaching?
12 A It was research. I gave several research talks.
13 As a more senior professor there, I was told I was
14 expected to mentor postdocs and junior researchers,
15 which I attempted to do.
16 Q And you were paid 36,000 euro for the year?
17 A Yes.
18 Q Were you able to work on your research project and
19 make substantial progress on your research while
20 you were there?
21 A There were distractions, in terms of my son's
22 schooling in particular, and negotiating a move to
23 a foreign country and the language differences.
24 And I took German class, as was encouraged by Max
25 Planck, so these took away from my actual

---

**Page 27**

1 mathematical research.
2 Much of my beginning time there was spent
3 getting back up to speed on a research project that
4 I had had to abandon for 13, 14 months, including
5 where I was on that research program, what new
6 results had been published, had been posted on the
7 archives, had been done in the intervening months,
8 discussing with previous collaborators or people in
9 the field what had gone on for the 14 months or so
10 I didn't have the opportunity to work on.
11 Q What research project did you have to abandon?
12 A I had been working on a project on -- on twisted --
13 the construction of twisted modules -- the
14 construction and classification of twisted modules
15 for vertex operator superalgebras that are N=2
16 supersymmetric -- which is mathematical foundations
17 of N=2 supersymmetric/superconformal field theory.
18 Q And why did you -- what did you mean you had to
19 abandon it?
20 A I needed to apply for jobs. I needed to appeal the
21 Notre Dame tenure decision. I stopped doing that
22 research and started researching what I needed to
23 do to stay employed in the field of mathematics.
24 Q There was no way you could have kept doing it while
25 you applied for jobs?

---

**Page 28**

1 A I tried at times, but I had many, many
2 distractions. We're talking from May 2009 until by
3 the time we were settled in Germany, August 2010.
4 This was the period that -- from the time I stopped
5 working on it and I attempted to find research time
6 during that 14 months, but it was thwarted.
7 Q It was what?
8 A Thwarted.
9 (Defendant's Exhibit 3 marked.)
10 BY MS. CANTON:
11 Q Okay. I'm going to hand you Exhibit 3. That's a
12 several-page document, so take a minute to look
13 through it. You don't have to read the whole
14 thing.
15 A Oh, I'm sorry. I'm reading it. It's saying
16 exactly what I just said.
17 Q Yeah. Just look through it and tell us what it is.
18 A Oh. Yeah. Is there a date on this? This is --
19 that I wrote? Okay. I'm sorry. I have to kind
20 of --
21 Q I think the best clue is the first line, which says
22 "I am requesting paid leave for the 2014-15
23 academic year."
24 A So this was prepared by me then this past fall.
25 Q Fall of '13?

---

Page 29

1  A  Yes.
2  Q  Okay. All right. And the first four pages are a
3     Statement of Funding for Leave. So you wanted
4     leave for the upcoming academic year, correct?
5  A  Yes.
6  Q  And you have to tell them why you want it; is that
7     right?
8  A  Uh-huh.
9  Q  And then you've got a Report on Last Leave. It
10    says 2012-2014. Should that be 2012-2013?
11  A  Yes. I believe that that is -- on last leave, yes,
12    the 14 should be a 13.
13  Q  Okay. So let me just back up. After you were in
14    Europe for a year, you came back. And then did you
15    teach the fall of 2011/spring of 2012?
16  A  Yes, ma'am.
17  Q  All right. And then you were on a leave the
18    following academic year?
19  A  Yes, ma'am.
20  Q  Was that paid?
21  A  That was paid leave.
22  Q  Okay. And where did you go, and what did you do
23    that year?
24  A  That is the statement here. So I -- as it says,
25    I --

Page 30

1         MR. BARKES: What page are you
2      referring to?
3         MS. CANTON: It's the first page of the
4      Report of Last Leave.
5  BY MS. CANTON:
6  Q  Is that what you're looking at?
7  A  So I applied for three grants, and it was nice that
8     I was afforded the -- the opportunity to have time
9     to actually apply for these grants, and I received
10    one of the grants. I applied to three grants:
11    NSF -- National Science Foundation, National
12    Security Agency, and Simons Foundation.
13  Q  And you were awarded the Simons Foundation grant?
14  A  I was awarded the Simons Foundation grant. And I
15    had extremely good reviews for the other two
16    grants.
17  Q  Now, where were you physically during this academic
18    year? Are you here?
19  A  Most of the time I'm here. My children are in
20    school, so I'm limited in my ability to travel.
21    But I spent a week at the -- as one of the plenary
22    speakers at the Southeast Lie Theory Workshop in
23    Charleston.
24       I traveled to Prague and Varna and Dubrovnik.
25    I was invited to those three conferences, amongst

Page 31

1     others, to present research that I did during --
2     during that year.
3  Q  Were you at Cornell at all?
4  A  No. I had been asked to apply to go to Cornell. A
5     professor at University of Wisconsin, when I was
6     granted tenure, requested that I apply for an
7     award -- an award that is given to spend a year at
8     Cornell -- a semester possibly or a year. I do not
9     recall. But it was a prestigious award that she
10    thought I should apply for, and I applied but did
11    not get it.
12  Q  Okay. You didn't go to Cornell. So I am trying to
13    get up to speed where we are. 2012-2013, you're on
14    leave. All right. And then fall of 2013, did you
15    apply for leave again?
16  A  Yes, I did.
17  Q  For that whole academic year?
18  A  I'm sorry. For fall of?
19  Q  2013.
20  A  This application, which I'm applying for leave for
21    2014-2015, which has been denied.
22  Q  This has been denied?
23  A  It's already been denied.
24  Q  So for fall of 2013, this past academic year, you
25    were here?

Page 32

1  A  I had applied -- in fall of 2012, I applied for
2     leave for the -- for the -- for this year, for the
3     2013-2014 academic year. Similar document,
4     applied, and I was denied.
5  Q  And so you taught here that whole year?
6  A  This is this year, and I am here, and I am
7     teaching. Yes, I have two --
8  Q  Last semester you did as well?
9  A  Yes. I taught a class last semester, and I will be
10    teaching two classes starting next week.
11  Q  All right. Now, on the very last page of this
12    document, which is -- it's numbered page 3. It's
13    the third page of a part called Statement of Leave
14    Project. This, I assume, is what you would do if
15    you had been granted the leave? This is what you
16    wanted to work on?
17  A  Yes.
18  Q  And on the last page, who's the audience for this?
19    Is this the committee that --
20  A  This first goes to the committee -- the CAP,
21    Committee on Appointments and Promotions, in my
22    department.
23  Q  Now, is the Committee on Appointments and
24    Promotions, is that made up of professors from your
25    department?

Page 33

1  A  Yes.
2  Q  Only your department?
3  A  Yes.
4  Q  So they rule on it according to the department
5     leave policy?  They look at it, decide, and then
6     they either say yes or no?
7  A  Yes.
8  Q  Okay.  On the last page, you say, "While I was at
9     the Max Planck institute" --
10 A  Oh.
11 Q  Go ahead.  I'm sorry?
12 A  May I -- but at that point, it is my understanding
13    that it then goes up the chain of command to the
14    dean and the provost, and the final approval or
15    denial for that leave is via the Office of the
16    Provost.  I mean, that's the letter that I get
17    denying -- approving or denying.
18 Q  So do you know where along the way -- do you know
19    if it was the CAP that denied it or what level, or
20    do you just get a denial?
21 A  The -- the leave that I applied for in 2011, that
22    was -- that I got, I know my department --
23    actually, I don't know for sure.  Rumor has it
24    that -- rumor has it that they approved that leave
25    and they denied the other two.

Page 34

1  Q  Okay.  What do you mean "rumor"?  They don't tell
2     you, or you just get a letter from --
3  A  I just get a letter from the provost, and that
4     letter states that the -- in the denial, saying
5     that my leave does not meet the department
6     requirements.  But the leave they did approve for
7     2012-2013 didn't either, and they approved it.
8  Q  "They" being?  You're not sure?
9  A  Ultimately, the provost.  The letter is from the
10    provost.
11 Q  So just because the CAP approves it doesn't mean
12    it's going to get approved; is that right?
13 A  Absolutely.
14 Q  Okay.
15 A  Or just because the CAP denies it, doesn't --
16 Q  Doesn't mean it's going to be denied?
17 A  To my knowledge.
18 Q  Okay.
19 A  These are --
20 Q  All right.  Now, when you said the one you got --
21       MR. BARKES:  Try to speak out loud.
22       Don't just make faces and that kind of
23       thing.
24 A  To my knowledge.  I'm not told the inner
25    machinations of what happens.  This is usually kept

Page 35

1     confidential.
2  BY MS. CANTON:
3  Q  All right.  Now, you said that the prior leave that
4     you asked for that was approved, you said you
5     weren't entitled to that under the policy either?
6  A  Absolutely not.
7  Q  So was that some kind of extra or -- I mean, can
8     they make exceptions for some things?
9  A  Absolutely they can.  And they did.  And my
10    understanding, from what my department said, was
11    that they wanted to make an exception.
12 Q  Do you know why they said they wanted to make the
13    exception?
14 A  My understanding is that they felt that I had lost
15    research time.
16 Q  And then had you to be able to make it up?  Where
17    did you learn that from?  Who told you that?
18 A  Peter Cholak, for instance.
19 Q  On the last page of this document, the bottom
20    paragraph, you say, "Although while I was at the
21    Max Planck Institute I was able to resume my work
22    on these projects and make substantial progress,
23    this was only through the generosity of the Max
24    Planck institute."
25       Is that because they gave you the -- the

Page 36

1     research grant to be able to be there for a year?
2  A  (Witness nodded head.)
3  Q  Okay.
4        MR. BARKES:  Did you answer out loud?
5        MS. CANTON:  Oh, that's right.
6  A  Yes.
7  BY MS. CANTON:
8  Q  Okay.
9  A  Yes.
10 Q  And then during the leave we just talked about that
11    was approved, 2012-2013, you said you were able to
12    make substantial progress on this work, correct?
13 A  Yes.
14 Q  Now, I'll go back to the third page from the top,
15    because I just wanted to make sure I understand
16    where we are on research.  I've seen earlier
17    versions of this document where you say you lost
18    9.5.
19       But it looks like now, is it your position,
20    that you're five months' research time behind?
21 A  I think that this now -- I would have to go over
22    this.  Yes, the -- the 9.5 months, if you look at
23    the -- kind of one of the middle, short paragraphs
24    on page 3, it is 9.5 months minus 4.5 months.  That
25    4.5 months is taking into consideration the

Page 37

1  2012-2013 -- let me make sure I have my dates
2  right -- the 2012-2013 leave that I was granted,
3  paid teaching reduction, time for research.
4 Q  Well, if you're not teaching, then can't you spend
5  100 percent of your time on research?
6 A  Yes. But as an employee of the university now. So
7  as I'm teaching this year, or any year I'm employed
8  by the university and teaching, half my research --
9  half my time should be on my research now.
10 Q  And is that what's --
11 A  At any given time, going forward, the clock ticks
12  for my research program. And, for instance, when I
13  come up for promotion for full professor, I will be
14  expected to having done research, that 50 percent
15  time research.
16  So in a year in which I would be given teaching
17  relief, so my other 50 percent is not taken up with
18  teaching, I would only be using 50 percent of my
19  time making up past research and 50 percent of my
20  time --
21 Q  On current research?
22 A  -- on current research that I would be expected to
23  do if I were to -- when my -- any body of work of
24  mine is reviewed, they -- it's looked upon very --
25  scrutinized very much. What is your productivity?

Page 38

1  What is your level of productivity? How productive
2  have you been in research? What is the quantity of
3  your research? What is the level of prestige of
4  your research?
5  And so that 50 percent going on now, as I
6  continue at the university, I have an ongoing clock
7  ticking with the 50 percent that I should -- will
8  be expected to do.
9 Q  All right.
10 A  So I only have 50 percent of my time. I can spend
11  it on teaching or I could spend that making up my
12  lost research time.
13 Q  All right. So as you sit here today, where do you
14  believe you are on your research?
15 A  I have five months 100 percent time, 100 -- so five
16  months that would be spent -- during the school
17  year spent 100 percent on research. So if it was
18  only 50 percent research, then I would be -- I
19  would need ten months to continue my 50 percent
20  that I would be expected to do during the academic
21  year. To make up five months at only 50 percent
22  time, I would need ten months.
23 Q  Have you been able to make progress on it, in other
24  words, chip away, like -- do a little bit more or
25  get one --

Page 39

1 A  Well, for one thing, I strongly believe that I
2  should be given the time afforded my male
3  colleagues.
4  MR. BARKES: Let her finish the
5  question and then answer the question that
6  she asks.
7  THE WITNESS: Thank you.
8 A  I'm sorry.
9 BY MS. CANTON:
10 Q  And what do you mean you should be "given the time
11  afforded" your "male colleagues"?
12 A  Could you finish the question you were asking me.
13  MR. BARKES: You did.
14 Q  I think I finished it.
15  MR. BARKES: You can go ahead and
16  answer that.
17 A  Oh, are you -- okay. I'm sorry. What was the
18  question?
19 Q  You said, "I should be given the time afforded my
20  male colleagues."
21 A  Yes. I shouldn't have to go back and chip away at
22  lost research time and work harder in a set amount
23  of time. Am I supposed to not sleep or eat or --
24 Q  And what male --
25 A  I don't understand the question.

Page 40

1 Q  -- colleagues -- well, you said I should be given
2  the same time as my males, implying males get time
3  to make up lost research.
4 A  Males -- I believe that they would be or -- I don't
5  know if they -- the point is that they have not
6  lost the research time. I was lost -- I lost the
7  research time.
8 Q  Okay. So you're not --
9 A  The males did not lose research time.
10 Q  You're not thinking of a man in your position who
11  got to make up lost research time?
12 A  No.
13 Q  You're saying they didn't lose it to begin with --
14 A  Exactly.
15 Q  -- as far as you can tell? All right. All right.
16  I understand where you are with the research.
17  Now, let's go to -- you said you looked at
18  damages.
19  (Defendant's Exhibit 4 marked.)
20 BY MS. CANTON:
21 Q  Exhibit 4 is a lengthy document, one of the legal
22  pleadings in this case, and these are your
23  responses to the university's requests -- set of
24  interrogatories, questions that we've asked you.
25  Have you seen these before?

Page 41

1 A Yes, I have.
2 Q And if you go to the second to the last page, is
3 that your signature that you reviewed them and read
4 them --
5 A Yes, ma'am.
6 Q -- and that they're accurate? All right.
7 Let us go to question 7, which is on page 4.
8 Did you prepare this itemization of damages? Where
9 it says, "If I had been given tenure," it's written
10 in the first person. "I would have earned."
11 A The initial -- initially, I prepared a statement
12 that I gave to my lawyers, and this was, I believe,
13 to my knowledge, taken from -- verbatim from that
14 statement and put into this --
15 Q All right.
16 A -- document.
17 Q You say, "If I had been given tenure and stayed at
18 Notre Dame, I would have earned," and then you've
19 got the amount plus your retirement account. And
20 your salary in dollars was about $50,000.
21 Now, is that still your best estimate of the
22 difference in pay and retirement benefits for that
23 year that you were gone?
24 A I believe so, yes.
25 Q Now, as far as your Notre Dame salary, you were

Page 42

1 made whole and given a raise for what you would
2 have made if you had made tenure the year that you
3 originally applied for it; is that correct?
4 MR. BARKES: I'm going to object to
5 that by form. That's not the testimony up
6 to this point. You can go ahead and answer
7 it.
8 BY MS. CANTON:
9 Q Yeah. I just want to make sure there's no other
10 pay -- salary damages that you're looking for.
11 A That is correct.
12 Q Okay. So as far as your Notre Dame pay, that's
13 been fixed? That was fixed a couple years ago?
14 MR. BARKES: Same objection. You can
15 go ahead and answer that.
16 A The back pay from the year in which I had not been
17 given tenure, yes. This pay for the disparity in
18 my salary by going to Max Planck has not been.
19 Q Okay. What about your retirement credits? Has
20 that all been put in?
21 A For the back pay?
22 Q Yes.
23 A Yes. For the Max Planck year, no.
24 Q You didn't get any credit -- retirement credit for
25 that year?

Page 43

1 A No.
2 Q All right. Then going forward, have you gotten the
3 raises and benefits that you're entitled to?
4 A Yes, I believe -- to my knowledge.
5 Q All right. Now, do you remember when you filed
6 your EEOC charge and you were working with the EEOC
7 investigator on your case?
8 A Yes.
9 Q And did she tell you that the university was going
10 to fix that salary discrepancy?
11 A For Max Planck?
12 Q No, not for Max Planck. For the university.
13 A For the back pay?
14 Q Right.
15 A Yes.
16 Q Did you at that time say, Wait a minute, I've got
17 this year of Max Planck where I should get awarded
18 the difference? Did you ask about that?
19 A I was not told that at that time I should make any
20 claims for damages formally. I had -- I believe
21 that at some point during the 2010-11 academic year
22 we started in our discussions of what were the
23 damages.
24 Q Were you working with anybody at the university, as
25 far as putting the retirement credits back in or

Page 44

1 the back pay issues, or did that just pop up in
2 your check? Did anybody tell you, This is what we
3 were doing?
4 MR. BARKES: Object. That's compound.
5 But you can go ahead and answer if you
6 understand it. I lost it at some point.
7 A Could you please rephrase the question.
8 BY MS. CANTON:
9 Q Well, you said that they had gone back and given
10 you the back pay.
11 A Yes.
12 Q Were you working with anybody? Were you working
13 with your department chair, somebody in benefits?
14 A I was emailing with my department chair. And we
15 had several -- we had a series of email exchanges
16 that fall. In particular, for instance, they
17 wouldn't tell me what my salary would be.
18 I remember I was trying to apply for grants, in
19 September of 2010, when I was trying to apply for
20 grants and I couldn't apply. I couldn't put
21 together the application, because I didn't even
22 know what my tenured salary would be. They
23 wouldn't notify me. And I remember many exchanges
24 back and forth with my chair, When will I be
25 notified of my salary, because I had October --

Page 45

1   beginning of October deadlines for grants.  So I
2   remember this very well.
3       I just -- I had no idea how much I would be
4   paid, how much the raise would be.  And it was
5   around that time that I -- there was the discussion
6   of back pay.
7       And amongst some flurry of emails from around
8   September 2010 through October, I corresponded with
9   my chair quite a bit about what was that pay, then
10  what would have been the discrepancy.  And he
11  notified me at some point that it was -- I would be
12  given the back pay.  It would be deposited into my
13  account.
14 Q  Okay.  And did you at that point -- did you say,
15     Hey, Bei, what about the difference between Max
16     Planck and here, can I get that too?
17 A  Bei Hu was no longer chair.  That issue had been
18     settled.  I was compelled to sign a form saying I
19     accept this year of leave without pay on June 15th.
20 Q  And who was the new chair?
21 A  Matthew Gursky.
22 Q  Did you talk to him about it, see if he would --
23 A  I couldn't even find out my salary --
24 Q  -- do it?
25 A  -- from him for four months.  No.  No.

Page 46

1 Q  Okay.
2 A  I didn't have any -- I didn't know that I had any
3     legal standing with him to argue about it --
4 Q  All right.  So --
5 A  -- or that he -- that he was in the power to do
6     anything about it.
7 Q  Okay.  So, so far we've got the five months
8     ongoing, I guess, compounding research.  We've got
9     the 40,436.22 salary disparity for that year.
10     Okay.
11     Now, next you've got living, travel, and
12     shipping expenses.
13 A  Uh-huh.
14 Q  And this is for your entire family, correct?
15 A  Yes, it is.
16 Q  And do you have backup receipts for all these?  Did
17     you save them?
18 A  Yes.
19 Q  Did you give them to your lawyer?
20 A  I do not recall.
21 Q  All right.  And then it looks like you deducted the
22     income that you made by renting out your house here
23     in South Bend, correct?
24 A  Yes, we did.
25 Q  All right.  To come up with -- oh, let's see --

Page 47

1   $14,499.98?
2       MR. BARKES:  Where was this?  Oh,
3   sorry.
4       MS. CANTON:  In the middle of the page.
5 A  Oh, in the middle.
6 BY MS. CANTON:
7 Q  Yeah.
8 A  Yes.
9 Q  So it looks like you've got 25 -- some $25,000
10     worth of expenses for living, travel, and shipping,
11     yeah, and housing.  That comes up there.  You've
12     got the subtotal, 25,899.  And then, in the
13     paragraph, you say you rented your house out for
14     950 a month, which totals 11,400.  And then, in the
15     middle of the page, you've done the calculation.  I
16     want to make sure I've got that right.
17 A  Yes, ma'am.
18 Q  Okay.
19 A  That is what it says in the middle of the page,
20     yes.
21 Q  Next paragraph -- last paragraph, you say you had
22     to spend more money to go to a conference in
23     Alberta?
24 A  Yes, ma'am.
25 Q  Okay.  Do you have backup for that, of what you had

Page 48

1   to spend?
2 A  Yes.
3 Q  So you came from Germany to Alberta?
4 A  Uh-huh.
5 Q  And why could you not speak at the conference in
6     Richmond?
7 A  I -- I'm trying to recall.  The -- one reason is
8     that it was prohibitively expensive to go to two
9     conferences, paying for airfare to the United
10     States.  But there may have been other reasons I
11     had in mind at that time; for instance, the timing
12     of it, in terms of how long it would have taken me
13     to travel there.
14 Q  And your commitment to Max Planck, or you didn't
15     want to be away from your family that long, or --
16 A  I don't recall.
17 Q  Okay.  Now, would they pay for you to go to
18     conferences, or did you have to pay that yourself?
19 A  These two -- these two particular conferences I did
20     not have -- I had to use my own money to go to.
21 Q  Did Max Planck pay for you to go to any conferences
22     while you were there that year?
23 A  No, they did not.  But I was given travel money by
24     other conferences, if I recall correctly.
25 Q  Okay.  All right.  "Lost research time and loss of

USDC IN/ND case 3:14-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 15 of 108

Page 49

1  grant of monies." All right. Now, here this is
2  where you lose me. I think I understand the lost
3  research time, and we've just talked about that.
4      You say you're likely not going to get the
5  Simons grant, but you did get that, correct?
6  A   I --
7          MR. BARKES: Where are we referring?
8          MS. CANTON: First paragraph.
9          MR. BARKES: Okay.
10  A   I did not get the Simons grant the first -- at
11      least the first year I applied for it. I don't
12      recall whether there was a second year I applied
13      for it and I did not get it. There was a year that
14      I applied for it and I did not get it. This past
15      year I did get it.
16  Q   Okay. So you did get it. Now, what about the NSA
17      grant? Did -- it says, I lost summer salary --
18      this is the middle paragraph. "I also lost summer
19      salary and travel funds due to my rejection of NSA
20      grant renewal."
21  A   When I was denied tenure, I held a National
22      Security Agency grant that, among other things,
23      gave me a summer salary, one-month summer salary.
24      This grant ran through spring of 2010. During
25      May -- from May 2009 until August 2010, I was not

Page 50

1  working on the research that would have given me
2  the opportunity to be successful in getting a
3  renewal of that grant. So when I applied for the
4  grant again, it was rejected.
5  Q   Okay. Did they say why you were rejected?
6  A   I -- in that particular grant rejection, I do not
7      recall.
8  Q   Do you have any documentation from them that tells
9      you why?
10  A   Yes, I do.
11  Q   Did this grant require you to be somewhere, or did
12      you do the research from here?
13  A   It did not require me to be anywhere.
14  Q   Now, would the research grant, NSA, would they have
15      paid this salary?
16  A   This is the salary that I requested in subsequent
17      grant proposals, that if those grant proposals had
18      been successful, I would have been paid.
19  Q   All right. And then retirement account, they would
20      have put money in your retirement account?
21  A   The university requires us, with grants, to ask for
22      indirect costs. 52 percent of the grant -- around
23      52 percent of the grant is tacked on to what you
24      ask from the NSA or the NSF, which goes to the
25      university, and the university pays -- uses part of

Page 51

1  that to pay fringe benefits.
2  Q   All right. And then the grant would also give you
3      travel funds?
4  A   Yes.
5  Q   But as you sit here today, you don't remember --
6          MR. BARKES: Just to clarify, you said
7      yes?
8          THE WITNESS: Yes.
9  BY MS. CANTON:
10  Q   Yes?
11  A   With the travel funds, yes.
12  Q   Yes. And as you sit here today, you don't remember
13      why NSA rejected that grant?
14          MR. BARKES: That's -- I'm going to
15      object that that's not what her testimony
16      was. But you can go ahead and answer it.
17  BY MS. CANTON:
18  Q   Do you remember why they rejected it?
19  A   There were several rejections. I've applied for
20      the grant every year, and I do not recall from year
21      to year what the specific rejections were.
22      Although, in grant denials, it has been pointed out
23      that I have a gap in my research.
24      (Defendant's Exhibit 5 marked.)
25

Page 52

1  BY MS. CANTON:
2  Q   Handing you Exhibit 5. Is Exhibit 5 the CV that
3      you prepared in September of 2013?
4  A   It appears so, yes.
5  Q   What entity has said, in rejecting proposals, that
6      you have a gap in your research?
7  A   Specifically, there were words to that effect in an
8      NSF proposal rejection.
9  Q   All the grants that you've been awarded, except, I
10      guess, for the Simons one, are they all listed on
11      page 1?
12  A   Yes.
13  Q   So, let's see, you came to Notre Dame in 2001, is
14      that correct, fall of 2001?
15  A   That's correct.
16  Q   All right. The Association of Women Mathematicians
17      travel grant, was that while you were at Notre Dame
18      or before you got here, in the fall of 2001?
19  A   I don't recall. I believe it was before.
20  Q   All right. So that would mean you've had one, two,
21      three -- four grants since you've been here; is
22      that correct?
23  A   Yes.
24  Q   And how many have you applied for in 12 -- is it 12
25      years, 13 years?

Page 53

1 A  I don't know for certain. I would have to look
2    back at my records.
3 Q  Did you apply for any before 2009 that were
4    rejected?
5 A  Yes.
6 Q  Do you know how many?
7 A  I don't know how many without looking back at my
8    records. Several.
9 Q  Several rejections before 2009?
10 A  Certainly, yes.
11 Q  And do you remember what the reasons were for the
12    rejection?
13 A  Not specifically. Without going back and reviewing
14    the specific reviews, no.
15 Q  And then, on the second page of your CV, looks like
16    you've got one book that was published in 2003; is
17    that right?
18 A  Yes.
19 Q  And then, where it says "Papers in refereed
20    publications," and there's 2 through 13 --
21 A  Uh-huh.
22 Q  -- that is your publication history that grant --
23    grantors refer to when they say you've got a gap or
24    it's not productive enough or --
25 A  Yes. They also will sometimes consider preprints

Page 54

1    that are posted on the archive, the government
2    archive.
3 Q  And those are under "Papers submitted"?
4 A  Yes.
5 Q  Now, why do some of them just have a blank and not
6    your name? Were you not the primary author?
7 A  No. This is a template that was given to me by one
8    of my chairs, I believe Bei Hu, that, I believe, to
9    save space, if it's the same author as the one
10    above it, writes a blank.
11 Q  Oh, I see. So since Katrina Barron is number one,
12    then anything --
13 A  Below that is Katrina.
14 Q  -- is all you? Okay. I see 7, there's a couple
15    authors. I get it. Okay.
16        So you're the author on all of these, but you
17    just don't list them if there's more than one?
18 A  No, ma'am. I'm the author --
19 Q  The only author on the ones with the blanks?
20 A  I would have to go through and see what is the one
21    above. But, yes, it would appear so, that all of
22    the blanks -- unless it gets down to Keith Hubbard,
23    on page 3. All the blanks on page 2 and at the top
24    of page 3, under my papers, if it is a blank, it is
25    solely authored by me.

Page 55

1 Q  All right.
2 A  But as you see, under Keith Hubbard there are
3    blanks as well, following the format.
4 Q  So is it accurate then that there's been -- it
5    looks like -- 12 papers since you've been -- well,
6    let's see. No. '96, 2000, 2000, 2002. Number
7    9 --
8 A  Yes.
9 Q  -- "The notion of N=1," was that published -- that
10    was published while you were at Notre Dame,
11    correct?
12 A  Yes. All but -- all but papers 11, 12, and 13 were
13    published while I was at Notre Dame.
14 Q  All right. Nine -- nine papers, then, in about 13
15    years?
16 A  As of the date of this, yes.
17 Q  Are there any that should be added?
18 A  Yes, ma'am.
19 Q  Was that one of the ones under the "Submitted"
20    list?
21 A  No, ma'am.
22 Q  All right. How many --
23 A  Let me read the papers under the "Submitted," for a
24    second. No, ma'am. Neither of those have been
25    published yet. But if a paper's in preparation,

Page 56

1    some of those have been published or are in
2    revision to be published.
3 Q  So if we go down to 16, "Papers in preparation,"
4    which numbers have been published by now?
5 A  Paper 16 has been published under a slightly
6    different title.
7 Q  Okay. Any others?
8 A  Paper 18 has been -- is in a revision but will be
9    accepted -- I've been in touch with the editor --
10    editor in Japan for the International Journal of
11    Mathematics. That paper 18 will be accepted for
12    publication with revisions.
13 Q  So that really should be moved up to "Papers
14    submitted"? Is that its progress status right now?
15 A  Yeah. It's tentatively accepted for publication
16    pending minor revisions.
17 Q  Okay. Any others?
18 A  No. There are others that I'm in discussion with
19    an -- number 14, I have an offer from an editor of
20    a journal in Europe that would like to publish it,
21    and I've not revised it yet. I haven't had the
22    opportunity to revise it yet to submit it for
23    publication, but I plan to.
24 Q  So you've been a lot more productive since 2009,
25    more the latter half of your time at Notre Dame,

Page 57

1   than the first half; is that accurate?
2 A  I had quite a bit of momentum going into my tenure
3   year. That momentum screeched to a halt. Since
4   regaining my footing some, I hope to regain that
5   momentum completely --
6 Q  Is the department standard --
7 A  -- eventually.
8 Q  I'm sorry?
9 A  Eventually.
10 Q  Okay. Is it the department standard or is it kind
11   of expected that you should do -- try and do one
12   paper a year?
13 A  The average, I -- I would have to look at the
14   actual statistics for the publications of our
15   department, but the average is probably one to two
16   papers a year. But this varies greatly, depending
17   upon your field and depending upon the
18   publications.
19     For instance, some of my papers are quite long,
20   or they are a book. And it also matters greatly
21   whether it is in a prestigious journal or in a
22   not-as-prestigious journal. So it's not solely --
23 Q  It's not just quantity?
24 A  It is also quality.
25 Q  Now, you said something about your area.

Page 58

1 A  "And area."
2 Q  "And area." Are there areas in the math
3   department?
4 A  Yes, absolutely.
5 Q  Like, is there algebra and logic and different
6   areas?
7 A  Absolutely. And within those areas, there are
8   subareas and --
9 Q  And what area are you in?
10 A  I will go from top to bottom. I'm in mathematics.
11   Under mathematics I am in both algebra and
12   mathematical physics. Within that I study the
13   mathematical foundations of conformal field theory
14   and the representations of infinite-dimensional Lie
15   algebras and vertex operator superalgebras.
16 Q  Now, is there a group in your department of people
17   like you who do the same kind of thing, or are you
18   pretty much it?
19 A  There are mathematicians in my department. Then
20   there are -- is a group of algebraists and a group
21   of mathematical physicists, also topologists, that
22   overlap at that level with me. If we go down to
23   the branch of conformal field theory I do, no.
24 Q  Just you?
25 A  Just me.

Page 59

1 Q  Is there a little group that you belong to that has
2   like meetings every once in awhile, or are you on
3   your own pretty much?
4 A  We meet as a department. We meet for seminars. I
5   attend seminars in algebra, in mathematical
6   physics, sometimes with physicists. So these are
7   times we get together to discuss our research or
8   have a visitor outside the department who presents
9   their research.
10     We have a departmental colloquium which is
11   broadly at that level. I meet and talk with
12   Professor Stephan Stolz. We have overlap in
13   conformal field theory, string theory. His area is
14   way over in topology, and mine is way over here in
15   algebra. So we discuss things.
16 Q  Okay.
17     MR. BARKES: It's about 10:27. Can we
18   take a five-minute break?
19     MS. CANTON: Sure.
20   (Short recess taken.)
21 BY MS. CANTON:
22 Q  Back on Exhibit 5, which is your CV. We were on
23   page 2. The 2013 paper, is that one of the ones
24   that you said was a book-one article?
25 A  No, ma'am.

Page 60

1 Q  No. Which ones of the papers were books? You said
2   some of them were --
3 A  One of them is --
4 Q  -- almost books.
5 A  -- a book and is listed as such. The
6   "Communications in Algebra" paper, number 4, is
7   quite long, 40-something pages, versus a lot of
8   people have a ten-page paper or something.
9     And the 2000 -- number 6 is quite long. 8 is
10   on the long side, as is 9. These are -- these are
11   multiple -- long papers that it has actually been
12   suggested to me at times that I should have broken
13   them into multiple papers.
14 Q  Which one of these would you rank as being in the
15   more prestigious journals?
16 A  The book, that's one of the most prestigious. It's
17   a -- a booklet series. That's very prestigious.
18   Journal of Algebra is one of the -- we rank
19   journals A-star, A, B, C. The Journal of Algebra
20   and the -- the Journal of Algebra is very highly
21   ranked. That's number 8. The Journal of Pure and
22   Applied Algebra, some people would rank it as high.
23   Some people would rank it A, A-star, so number 7
24   and number 3.
25     And Communications in Mathematical Physics,

Page 61

1  paper number 10, is both in a very prestigious
2  journal, A-star journal, and is also cited in that
3  paper -- the research in that paper is cited in
4  many other publications that are very prestigious,
5  including the National Academy of Sciences.
6        (Defendant's Exhibit 6 marked.)
7  BY MS. CANTON:
8  Q  Give you Exhibit 6. Exhibit 6 is a notice that was
9     attached to correspondence we received from your
10    attorney in December. Is this what you were
11    talking about when you said you looked at something
12    from December? Was this attached to it, Exhibit 6
13 A  I'm sorry, ma'am, what was -- what is the question?
14 Q  This was attached to a letter that we received from
15    your attorney in December regarding damages.
16 A  Yes, ma'am.
17 Q  Is this what you looked at when you said you looked
18    at something from December regarding damages?
19 A  Yesterday, no. I did not see -- look at this
20    yesterday.
21 Q  Okay. What is this?
22 A  This is an example of statements that -- a
23    statement that was put in writing by the NSF and --
24    let me read through it to make sure. I don't see
25    where it says -- they specifically say, "However,

Page 62

1  the investigator's research output has been
2  relatively modest (although several preprints have
3  recently come out)."
4        I had been -- I had suspected, or there had
5  been comments made in past NSF, NSA reviews, that
6  led me to believe or actually said statements like
7  this, that this gap in my research, the output in
8  recent years, was being considered as a very
9  detrimental factor and one of the main detrimental
10 factors, if not the detrimental factor, to my NSF
11 or NSA reviews being accepted -- grants being
12 funded.
13 Q  Let's go back and look at Exhibit 5, your CV.
14    Where is the gap?
15 A  The gap is that my last publication is in 2000 --
16    let me look -- is in 2010. This Proceedings is
17    just a short paper that was submitted from a
18    conference in 2011. So one would expect at this
19    point that I would have papers in 2012 and 2013, or
20    more in 2011.
21 Q  Did you not do any research at all from May of 2009
22    to June of 2010?
23 A  It's hard to keep a mathematician from doing some
24    research. I tried at times. There was a point in
25    the summer when I was away from the university and

Page 63

1  I didn't have access to speaking to people and --
2  that I tried to sit down and work on, specifically,
3  this N=2 stuff, that I'm coming out with the papers
4  now.
5        But it was just, you know, a week or -- at the
6  most. The only other research I recall doing
7  during that 2009 -- May 2009 to August 2010 was I
8  had a paper accepted for publication in
9  Communications in Algebra maybe, paper number 4.
10       So there was -- I remember -- I recall
11 distinctly that paper number 4, I had galley proofs
12 from the publisher that I needed to review, and it
13 was at a time when Davis was asking me to do this
14 and do that, and I barely had time to just go
15 through the proofs, you know. The publisher sends
16 you galleys of what the paper will look like in the
17 journal, and I needed to read through them
18 carefully to make sure there were no typographical
19 errors that needed -- it was quite a lengthy paper.
20 So I struggled, very hard, to find time just to go
21 through the galley proofs of that paper.
22       The paper -- I don't recall the paper in the
23 Journal of Pure and Applied Algebra as being an
24 issue, but that may be because it was only a
25 16-page paper, I believe.

Page 64

1  Q  Now, there's also a gap between '04 and '07. Is
2     that mentioned as well, when you said people
3     comment about your research record? Would they
4     expect a paper a year?
5  A  I was on maternity leave for two semesters during
6     that year, and that is -- the department is
7     supposed to take into consideration the birth of
8     two children, in addition, colleagues. And in
9     reviewing grants outside the university, one would
10    hope would take into consideration that during that
11    time I had two maternity leaves and I had two
12    children. Both were delivered by C-section. Both
13    were too old -- advanced maternal age at that time
14    and so -- does that answer your question?
15 Q  Have you applied for an NSF grant before this
16    number 1303022?
17 A  You're referring to Exhibit 6, ma'am?
18 Q  Correct. Had you applied -- ever before applied to
19    NSF for a grant?
20 A  Yes, I had. Most years I applied to an N -- for an
21    NSF grant.
22 Q  And had any of those been granted?
23 A  I -- not since I've been at Notre Dame. I was
24    granted an NSF postdoc prior to coming here.
25 Q  All right. Now, you said somebody at NSF suggested

Page 65

1    to you it was because of a gap in your research.
2    Did you speak to somebody who told you that?
3  A  I have in front of me on Exhibit 6 that the
4    research output has been relatively modest, and I
5    assume that means as of late, and this was given to
6    me this past year -- well, in 2013. So I -- I have
7    a statement that I feel specifically points to
8    that.
9        However, I have talked to many people who sit
10   on review panels for the NSF, for the NSA, who have
11   mentioned to me multiple times that this is hurting
12   my chances for getting a grant. These include
13   people in my field, people outside my field, people
14   within my department, people outside my department,
15   people who have reviewed my grants. They're not
16   supposed to say -- I mean, it's confidential --
17   but --
18 Q  When you say "this is hurting," what's "this"?
19 A  The lack of -- the gap in my research record,
20   starting with 2010 --
21 Q  Well --
22 A  -- starting with papers published 2010, meaning
23   that they had been submitted prior to me being
24   denied tenure.
25 Q  Could you read this -- when they say, "The

Page 66

1    investigator's research output has been relatively
2    modest," could you read that as it's been modest
3    throughout her career at Notre Dame?
4  A  I have not -- this grant, which was written in fall
5    of 2012, was specifically -- I was specifically
6    supposed to refer to publications in the last five
7    years -- five years prior to that. So the entire
8    grant was premised on my research output in the
9    previous five years.
10 Q  And is that in some kind of instructions that you
11   got or --
12 A  Yes. For instance, when you put in a CV, you are
13   to list publications -- there's multiple wording in
14   the NSF grant proposal guide that instructs you
15   upon such issues.
16 Q  If you applied most years and were denied every
17   time, why would you think you would get it this
18   year?
19 A  This year my -- all of the panel reviews were
20   excellent or excellent to very good. Typically,
21   that would get -- get -- garner a grant. In
22   addition, this year there were -- there was another
23   summary page that they said that several of the
24   reviewers pushed very hard for me to -- that I
25   should be given the grant.

Page 67

1        In addition, the previous year, I was put on a
2    extended cycle with them, hoping to fund that
3    grant, the year previous to this one. And it
4    wasn't until -- so normally I would -- you would
5    hear in March whether the grant was approved or
6    denied, and they strung it out, still considering
7    the grant, hoping to find funding for it, through
8    May.
9        So I had -- I had -- you know, my research
10   had -- my momentum had picked up prior to me being
11   denied tenure. I feel that based upon that
12   research, that I had been doing -- I had had very
13   favorable -- very favorable NSF reviews, and I had
14   gotten an NSA grant just in the year -- in the
15   couple of years prior to going up for tenure.
16 Q  When was that? Oh, the NSA grant. Okay.
17       Now, did you get anything from NSF besides this
18   one piece of paper?
19 A  Yes, ma'am.
20 Q  And those are letters from the individual panel
21   members?
22 A  Yes, ma'am.
23 Q  Where are those? Did you give those to your
24   lawyer?
25 A  I do not recall.

Page 68

1  Q  Okay. And your recollection of what the panel
2    members said was that the work was good and you
3    should get a grant?
4  A  They recommended it for funding, yes, ma'am.
5  Q  Are you aware that there's four different
6    categories? You see the second to the last
7    paragraph, it says, "The panel places the proposal
8    in the 'Not Recommended for Funding' category." Do
9    you see that?
10 A  Yes.
11 Q  Are you aware that there's four different
12   categories?
13 A  I'm trying to remember what categories there are.
14   No, ma'am, I don't know that -- I don't know what
15   the categories are. I don't recall at this point.
16 Q  But there are categories; you know that?
17 A  There are categories.
18 Q  Okay. And "Not Recommended for Funding" is the
19   lowest possible category; isn't that right?
20 A  Yes.
21 Q  Okay.
22 A  And I believe, specifically, that with excellent
23   and very good, I would never have been put in the
24   "Not Recommended for Funding" category if the
25   comments about my research -- if those comments

Page 69

```
 1      about my research output had not dramatically
 2      affected the proposal.
 3   Q  But it was the panel that put you in this category,
 4      correct?
 5   A  Yes, ma'am.
 6   Q  The panel members who reviewed it?
 7   A  To my knowledge.
 8   Q  Did you ever talk to any of those panel members
 9      about your grant or the denial of it?
10   A  No, ma'am.  I have no idea who those panel members
11      are.  It's a blind review.
12   Q  Okay.
13   A  From my side, blind.
14   Q  Did you ask Max Planck Institute if you could defer
15      your research grant for that year?
16   A  There's no mechanism for doing that.
17   Q  So you didn't do it?  You didn't ask them?
18   A  I might have talked with -- I discussed with
19      Professor Stolz at length at different times the
20      procedures for applying, the situation, and he may
21      have said during one of those conversations -- or
22      it may have been in the -- there may be a statement
23      in the actual application procedures themselves to
24      this effect.
25   Q  He's the professor at Notre Dame?
```

Page 70

```
 1   A  Yes.
 2   Q  Okay.  But I want to know if you had any
 3      communication with anybody at Max Planck about the
 4      possibility of deferring it for a year.
 5   A  No.
 6   Q  All right.  Continuing along, let's go back to 4.
 7      We talked about the summer NSA grant.  We've talked
 8      about all your expenses.  We've talked about lost
 9      research time.
10          In the middle paragraph, you say, for example,
11      "Even a Simons Collaboration travel grant, which
12      provides 7,000 per year, will likely reject my
13      application because of the gap in my research
14      activity."
15          That's the one that you did get this year,
16      correct?
17   A  Yes.
18   Q  Okay.  Good.  All right.  Then we go to your
19      reputation in the mathematical and general academic
20      community.  How does anybody outside of Notre Dame
21      know that you were denied tenure or why you were
22      denied tenure?
23   A  I had to go on the job market.  I had to apply for
24      jobs in the fall of 2009.  I needed letters of
25      recommendation from people in my field.  Many of
```

Page 71

```
 1      those people had already written -- knew I was up
 2      for tenure.  They had written letters in support of
 3      my tenure case.  I believe there were 12 outside
 4      letters from various people in my field.  And I
 5      needed to explain to them why I was applying for
 6      jobs and why it was -- I was not applying for a
 7      visiting position.  I was not -- you know, I was in
 8      desperate need for employment starting May 2010.
 9      And so, you know, one must explain one's situation
10      when applying for jobs.
11   Q  Do you have to say why?  Did you tell them why you
12      didn't get tenure, or is it just enough to say I
13      was turned down?
14   A  The people -- there's no turned down.  There's
15      either you got -- either you have a job and it's
16      permanent and it's tenured, or you're fired.
17      That's the way it works in the United States.
18   Q  Right.  But do you have to tell -- for example,
19      these people that you asked for references, did you
20      have to say it was because of my research or it was
21      because of my teaching?  I mean, did you have to
22      give them --
23   A  I told them -- in fact, I gave them Dean
24      Crawford's -- I felt it necessary to give them Dean
25      Crawford's letter explaining that it was supposedly
```

Page 72

```
 1      because of my teaching, that it was because of my
 2      teaching that I was denied tenure, in particular,
 3      because these people would be questioning why I was
 4      denied tenure.
 5   Q  Max Planck, did they know that you were denied
 6      tenure when you applied for that position?
 7   A  I am -- I do not know.  That was a visiting
 8      position.  It's not -- they have no permanent
 9      positions.  So I felt I didn't -- and it would be
10      not unusual for somebody with tenure to apply for a
11      year there.  So I did not feel the need to --
12   Q  Tell them?
13   A  -- mention it to them.
14   Q  Okay.  You say your reputation in the mathematical
15      and general academic community was severely
16      damaged.  Why do you say that?
17   A  It's an enormous black mark to be denied tenure.
18   Q  Has anything -- has anybody said anything to you?
19      Has anybody -- does anybody --
20   A  Absolutely.  They've questioned why in the world
21      would I be denied tenure?  They're very
22      incredulous.  When I -- I use Dean Crawford's
23      letter to -- and a professor -- letter that
24      Professor Smith wrote to me.  I used that with
25      several senior people in my field in the community
```

Page 73

1 to bring home the point that it was not because of
2 my quality of my research, the quality of my
3 teaching, the quality of my performance.
4 Q   What was Professor Smith's letter?
5 A   Professor Smith had been assigned in maybe 2008 or
6 around that time to be my teaching mentor, and so
7 he had observed many of my classes. I'd worked --
8 and he was also on the Committee of Appointments
9 and Promotions when my case was heard.
10      It was -- I needed a letter attesting to my
11 teaching ability, which is a standard letter that
12 you would need in applying for jobs, and he agreed
13 to write that as my teaching mentor, as a person
14 who had observed my teaching, as a person who could
15 personally attest to the high quality of my
16 teaching. And I believe in that letter he also
17 attested to the fact that my department unanimously
18 deemed my teaching as meeting or exceeding the
19 standards necessary to get tenure, as did my dean.
20      And he, as a senior and well-respected person
21 in the community, wrote that -- attested to the
22 fact that the denial was, in his opinion -- I don't
23 know what the letter says. Some wording to the
24 effect of that it was -- did not make sense, in
25 terms of my abilities.

Page 74

1 Q   In his opinion of your abilities or his observation
2 and judgment?
3 A   His observations, his judgment of being a faculty
4 member here at Notre Dame for 20-something, 30
5 years. I don't know. Thirty years.
6 Q   All right. So the way it works is your
7 committee -- CAP, that's members of your
8 department, correct? Is it everybody who's tenured
9 in the department?
10 A   Now it is. But at that time it was a six-member
11 elected body.
12 Q   So when you say my department recommended me and
13 approved me and thought my teaching was fine, that
14 was CAP --
15 A   Yes.
16 Q   -- your department? Okay. Then it goes to the
17 dean. The dean approved it. And then it was
18 denied at the next level, the provost?
19 A   As far as what people have told me. I am not
20 supposed to be privy to any of this. It is a
21 private chain of command. But from what people
22 have told me and from what my dean has told me.
23 Q   That's your understanding --
24 A   Yes --
25 Q   -- of how it works?

Page 75

1 A   -- that's my understanding.
2 Q   Okay. All right. Other than what we've talked
3 about as far as NSF -- this NSF grant, any other
4 job, grant, article, book, anything you can say, I
5 did not get that because I didn't get tenure?
6      Leaving aside that it might be embarrassing or
7 it might be a black mark or people might wonder
8 about you. Is there --
9 A   Every single time I send a paper to a journal for
10 publication, every single time I apply for a grant,
11 you know, there's -- I am 100 percent aware that I
12 am being judged through certain lenses, certain
13 perspectives, and that mark that I was denied
14 tenure.
15 Q   Do you want to take a break?
16      (Short recess taken.)
17      MR. BARKES: You want to have her read
18 that back, the question.
19      MS. CANTON: Sure.
20      (Record read.)
21 A   Yes, there are other aspects of my career;
22 invitations to speak at conferences, invitations to
23 sit on review panels. There are many facets of my
24 professional and my personal life that could be
25 affected.

Page 76

1 BY MS. CANTON:
2 Q   All right. Let's back up to -- you were saying
3 before the break that when you apply for grants,
4 that you're being judged because you didn't get
5 tenure, and then that was reversed and you did get
6 tenure.
7      How would -- the people who are reviewing the
8 grant applications, how do they know whether you
9 did or didn't get tenure?
10 A   My field is very small. Anybody who would be an
11 expert enough to review one of my grant proposals
12 would likely have heard that I was denied tenure.
13 Q   Would they have heard that you were then granted
14 tenure after you appealed?
15 A   They would probably surmise that from --
16 Q   Because you're still here, and you send the CV?
17 A   Because I'm still here. But I get questions of,
18 What did you do?
19 Q   From grant --
20 A   From people in my field. I don't know who sits on
21 the grant panels. Those are -- I'm not given that
22 information. I don't know those names. They're
23 not allowed to tell me.
24 Q   So we have no idea what they think because we don't
25 know who they are?

Page 77

1 A   I know that many of the principal -- most of the
2     principal people in my field, I see them at
3     conferences.  I -- some of them I -- I see them as
4     part of my general job or correspond with them.
5 Q   All right.  Well, let's see if we can talk about
6     concrete things that you can actually put your
7     finger on.  Because it sounds like we don't know
8     who approves these grants or who grants them.  It's
9     just an anonymous panel.  So we don't know what
10    they're thinking, and you haven't talked to any of
11    them.
12 A   Well --
13 Q   Or have you?
14 A   -- they have made statements of some things.
15 Q   Correct.  But they haven't said you're not getting
16    this grant because you didn't get tenure and then
17    you did get tenure?
18 A   No.  But they point to the gap in my research.
19 Q   All right.  And then you said -- so that's grants.
20        And then you said conferences.  What's happened
21    as far as conferences that you attribute to the
22    initial denial of tenure?
23 A   There have been several conferences that I would
24    have expected to be invited to that I was not
25    invited to.

Page 78

1 Q   What's the first one?
2 A   There was one in Heidelberg, Germany.
3 Q   When was that?
4 A   I believe in 2011.
5 Q   Had you ever been invited to that conference
6     before?
7 A   It's not a recurring conference.
8 Q   This was a one-time --
9 A   One-time.
10 Q   -- conference?  All right.  And why do you say you
11    would have expected to be invited?
12 A   It was very closely related to my field of
13    expertise.
14 Q   Are you invited --
15 A   It was -- other people who, if they were invited to
16    a conference, I would typically be invited to a
17    conference or at least given a -- if not invited to
18    speak, at least asked to attend.
19 Q   So it's not the kind of conference where you could
20    just sign up; you have to be invited?
21 A   I was not aware of the conference at all until it
22    was a month before the conference, and I'd already
23    made travel arrangements, and I would not have been
24    able to attend even if I had been asked at that
25    point.

Page 79

1 Q   So when you say you weren't invited, you weren't
2     invited to speak, or you weren't invited to come at
3     all?
4 A   I wasn't invited to come at all.  I wasn't told
5     about the conference.  People junior to me, people
6     in my field least senior to me, and I was
7     shocked that I was not told about it.
8 Q   How is one typically told about conferences?
9 A   One usually gets an email from the organizers,
10    either asking you to speak or informing you that
11    the conference is going to be on, so if you know of
12    graduate students or postdocs who should be invited
13    to attend or -- or others that would like to
14    attend, please let --
15 Q   So --
16 A   -- please let the organizers know.
17 Q   So if you had known about it, you could have
18    attended --
19 A   Yes.
20 Q   -- if you paid and went?  Okay.  Do you have any
21    knowledge why you weren't invited?  I mean, was it
22    somebody forgot to put you on the email list?
23    Somebody said, Don't invite her, she's horrible?  I
24    mean, do you know why --
25 A   I do not have any concrete, specific evidence.

Page 80

1 Q   Any other conferences that you feel you should have
2     been invited to but weren't?
3 A   I'm sure there are others, but I would have to -- I
4     can sit and think, if you want.
5 Q   That's the one that comes to your head?
6 A   It's the one that was most prominent in my mind.  I
7     was in Germany at the time, for instance, when --
8     just before the conference was given.
9 Q   So it would have been easy for you to go to if you
10    knew about it, right, if you were in Germany?  You
11    were in Germany at the time of the conference?
12 A   Just before the conference.  I could have either
13    extended my stay in Germany, or I could have -- I
14    knew the area well enough that it would have been
15    easier for me to travel there.
16 Q   Okay.
17 A   There were a couple of conferences in China.  I
18    don't remember specific dates or specific times.
19    And also that my -- they might have -- some of them
20    have been in Hong Kong or Taiwan.  There were also
21    conferences in Japan.
22 Q   And were you not invited to them at all or not
23    invited to speak?
24 A   I was not invited at all.  I was not even sent an
25    email, courtesy email, to have my graduate student

Page 81

1    or somebody be able to attend.
2  Q  And do you know why you weren't invited?
3  A  I have no specific email saying, We didn't invite
4    you because you were denied tenure, but --
5  Q  Did you hear that from anybody?
6  A  Every conference I go to, people in my field ask
7    me, What happened?  What's going on now?  Tell me
8    the story again.  Tell me -- I heard from this
9    person that you were denied; was that true?
10 Q  And what do you say?  Do you tell them the story,
11   or do you just say --
12 A  Sometimes I do.  Sometimes I don't.  Sometimes --
13   if it's somebody who was not involved in writing a
14   letter of recommendation for me or -- or that I
15   needed to advocate for me on the job market or I
16   need very much to understand -- them to understand
17   that I didn't do something horrible, then I say,
18   Oh, I have tenure -- I'm tenured at Notre Dame.  So
19   there's a range between explaining what happened in
20   detail to, Nope, I have tenure --
21 Q  Okay.
22 A  -- depending upon the person I am speaking to.
23 Q  You said review panels.  You thought you weren't
24   invited to be on review panels.
25 A  Certainly I was not invited to be on review panels

Page 82

1    while I was trying to get tenure.
2  Q  So the year from May of '09 --
3  A  The 2009 to 2010.
4  Q  May 2009 to June 2010, you weren't invited to be on
5    any review panels?
6  A  I've never been invited to be on a review panel.
7    But specifically, once you get tenure, you will
8    often be invited.  There are several people in my
9    department who have sat on review panels and have
10   made statements to me that they won't invite you.
11 Q  Who said that to you?
12 A  Claudia Polini.  Peter Cholak may have made some
13   comment to this effect.  There are others that I
14   don't recall specifically who.
15 Q  And now let's take Professor Polini first.  Did she
16   say she knows for a fact that such-and-such review
17   panel didn't invite you because you were initially
18   denied tenure?
19 A  No.  Her statement would have been to the effect
20   they -- meaning NSA or NSF -- would not ask you to
21   review -- be on a review panel.  They're less
22   likely to invite you to be on a review panel if you
23   don't have tenure yet.
24      So there was a year where if I had gotten
25   tenure a year earlier, I might have been asked.

Page 83

1    But if there's questionable issues about your
2    standing within the field or your standing within
3    mathematics because you didn't get tenure, then --
4    and she -- we had -- we've had discussions to this
5    effect.
6  Q  Now, is she the professor in your department who
7    started the same time you did?
8  A  Yes.
9  Q  And she got tenure a year early?
10 A  Yes.
11 Q  Do you feel like your standing in the field isn't
12   as high quality as it was before you were denied
13   tenure, even with all these publications in
14   progress and that you've published in the last few
15   years?
16 A  I feel like my -- my standing in the field has been
17   dealt a tremendous blow.  I feel that my standing
18   in the field in maybe the last year in which I've
19   been able to begin publishing again and
20   rehabilitate my publishing record helps.
21 Q  How long does it take from the time you submit a
22   paper until they tell you whether it's going to be
23   published or not, or until it's -- is it --
24 A  I've had one paper that was accepted within six
25   days.  I've had other papers that have been being

Page 84

1    reviewed for three years.  It varies dramatically.
2  Q  The 2013 one, how long did that one take; do you
3    remember?  That's your --
4  A  The 2013 --
5  Q  -- top paper on your list.
6  A  -- was for a conference proceedings.  The paper was
7    given to the editor, Vladimir Dobrev, in, I
8    believe, September of 2011, there or about.
9  Q  And it doesn't get published until 2013.  Okay.
10   How about the number 3?  The one in the Journal of
11   Pure and Applied Algebra, published in 2010.
12 A  That was first submitted -- it was first submitted
13   to Letters in Mathematical Physics and went through
14   several revisions.  They said they would publish it
15   pending revisions.  It was probably initially
16   accepted by Letters in Mathematical Physics maybe
17   in 2008, some -- I don't recall exactly when, but
18   quite a bit prior to that.
19      But I went around with Letters in Mathematical
20   Physics with the review process that was not to my
21   liking.  And after, I believe -- I believe in 2009,
22   I removed the paper from consideration and reviews
23   with Letters in Mathematical Physics and sent it to
24   the Journal of Pure and Applied Algebra, and it was
25   accepted within two or three months.

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 24 of 108

Page 85

1 Q  And then how about number 4?
2 A  Number 4, I don't recall.  I believe it was
3     submitted to Communications in Algebra.  That was
4     quite a lengthy process of -- I don't know that the
5     review -- the review for the referee reports -- so
6     these go to an editor, and the editor sends it to
7     referees, one or two outside referees, maybe more,
8     depending on the journal.  The referees read it.
9     They get back to the editor.  It goes through
10    revisions.
11        The Communications in Algebra paper, I believe,
12    was done in 2008 or some -- earlier, but it was
13    either in the -- it was definitely in the
14    publishing process.  The publisher took quite a
15    long time.  I believe it was accepted for
16    publication in 2000 -- early in 2009 and then it --
17    I can't remember whether the review process was
18    lengthy on that one or not, too.
19 Q  When you say they go through revisions, is that
20    revisions you have to make?  They send it back to
21    you and you make revisions, or do they make
22    revisions?
23 A  No.  You revise -- the referee can accept the paper
24    outright, as is; they can reject the paper
25    outright; or they can accept the paper pending

Page 86

1     certain modifications that the author --
2 Q  Author makes.
3 A  -- would make.
4 Q  Okay.  All right.  We talked about grants.  We
5     talked about conferences.  We've talked about
6     review panels.  And this all goes to Exhibit 4,
7     where we were talking about damages and your
8     reputation in the mathematical and general academic
9     community.
10        And I just want to make sure we've covered all
11    the ways you think that it's affected you, the way
12    you get invited to conferences, get invited to
13    panels, get your grants approved.
14        Anything else that you can think of?
15 A  I stand up in a conference presenting my research,
16    and I'm asked questions about what happened at
17    Notre Dame rather than focusing on my research at
18    times.
19 Q  Now, is this at conferences where you're
20    presenting?
21 A  At conferences where I'm presenting.
22 Q  Okay.  So you're in the middle of giving your
23    presentation?
24 A  Not in the middle, but --
25 Q  Afterwards?

Page 87

1 A  Afterwards or before, there's times when I want to
2     talk about mathematics with somebody and I --
3 Q  Asked about Notre Dame.
4 A  Asked about Notre Dame.
5 Q  When was the last time that happened?
6 A  The last conference I was at in Dubrovnik.  It was
7     the main topic of conversation.  Is that the last
8     conference?  I think that's the last conference.
9 Q  That was this past summer?
10 A  Yes.
11 Q  And somebody came up to you --
12 A  I've spent quite a lot of time talking with Jim
13    Lepowsky about it.
14 Q  And who is he?
15 A  He is a senior mathematician at Rutgers and my
16    Ph.D. advisor.  I talked at length with Yi-Zhi
17    Huang.
18 Q  Let's stick with Mr. Lepowsky.  Did he say,
19    Katrina, I want -- I mean, this has been a couple
20    years now.  Have you ever talked to him about it
21    before?
22 A  Yes.  I've talked to him every time I've seen him.
23 Q  Does he keep bringing it up?
24 A  He does.  He's concerned about how it affected my
25    research, my family, me.  He's concerned about the

Page 88

1     environment I have at Notre Dame currently.  He's
2     concerned to understand issues surrounding the
3     discrimination against women in mathematics
4     broadly.
5 Q  You mean in the field in general, not just at Notre
6     Dame?
7 A  Absolutely.  Yeah.  He's a member of the
8     American -- the Association of Women
9     Mathematicians, and he -- he is concerned about the
10    issue.
11 Q  Okay.  Well, it sounds like he's concerned.  But, I
12    mean, does this upset you that he wants to talk
13    about this and that he's concerned about you?
14 A  It was very frustrating during this conference.  I
15    was excited that at this conference he would be
16    there.  I wanted to talk about a paper that is
17    being considered for publication in a journal in
18    which he is an editor and Huang is a senior editor,
19    and that paper has been there for three years.  And
20    I wanted to talk about that paper and whether it
21    was going to be out of the review process, whether
22    I was even going to get another referee report, did
23    it -- I had gotten one referee report, revised, and
24    I wanted to talk about that.  I wanted to talk
25    about math.

Page 89

```
 1 Q  And which paper is that?  Is that one of the ones
 2    that's submitted?
 3 A  The paper in question that is under review by
 4    Yi-Zhi Huang and Jim Lepowsky is paper 15, and it
 5    was posted on the archives originally in 2008,
 6    so --
 7 Q  Now, do you say to him -- after you talk about
 8    Notre Dame and women and math and all, do you say,
 9    Okay, now let's talk about my paper --
10 A  Yes.
11 Q  -- or -- and does he do that?
12 A  He brushes me off.  He says something minor about
13    it.  We were interrupted by other people, sometimes
14    other people asking about the issue of me being
15    denied, people like Antun Milas, people like Drazen
16    Adamovic, people who are very important in my field
17    for my getting papers published, for my reputation.
18 Q  Now, you named three people.  Were they at
19    Dubrovnik as well?
20 A  Yes.  Antun Milas and Drazen Adamovic were the
21    organizers of the meeting.
22 Q  And what did -- or Professor Milas, what did he say
23    to you?
24 A  I was there for a week.  What did he say -- maybe
25    five days, six days.  There was lots of -- he and I
```

Page 90

```
 1    discussed, along with Drazen Adamovic, a paper of
 2    mine that had been rejected from Communications in
 3    Mathematical Physics, and Drazen informed me that
 4    he had been a referee for that paper and was
 5    shocked and was wondering why it was not appearing
 6    in Communications in Mathematical Physics, because
 7    he gave it a very favorable review.  And we
 8    discussed the editor of that journal and why it
 9    would have been rejected, and my issue of me being
10    denied tenure came up, and me being a woman came
11    up.  And it was suggested that get a male
12    co-author.
13       And surrounding that, the issues of my troubles
14    at Notre Dame factored into the -- the very issue
15    of that paper being rejected from Communications In
16    Mathematical Physics despite Drazen's favorable
17    review.
18 Q  So did he tell you that, that that's what happened?
19 A  Yes.
20 Q  And he knows that from the other people on the
21    panel?
22 A  This was not a panel.  This was a paper being
23    considered for publication in one of the top
24    prestigious journals, and he was the referee for
25    that paper.  Normally I wouldn't know who the
```

Page 91

```
 1    referee is, but at this meeting he told me he was
 2    the referee.
 3 Q  So if he recommended it, who has the authority to
 4    have it not go forward?
 5 A  Professor Kawahigashi, from Japan, is the editor
 6    for Communications in Mathematical Physics who
 7    generally oversees.  It was he that rejected it, on
 8    the basis of the second referee's report, which was
 9    negative -- short and negative.
10 Q  And do you know who the second referee was?
11 A  No, I do not know.
12 Q  You don't know.  And did the professor who was
13    telling you this, did he tell you who the second
14    one was?
15 A  No.  But he was surprised.
16 Q  He was the first one?
17 A  He was surprised it would be given a negative
18    review.  And in response to that, the question of
19    my standing, the question of my denial of tenure,
20    was discussed.
21 Q  So is he saying that the editor in China or the
22    second referee --
23 A  Japan, Kawahigashi.
24 Q  The editor in Japan or the second referee told him
25    that the reason your paper was not published was
```

Page 92

```
 1    because you're a woman or because you didn't get
 2    tenure at Notre Dame?
 3 A  He did not say that they told him that
 4    specifically.  He wondered if that was the case.
 5 Q  Ever any discussion about the merits of the work
 6    itself?
 7 A  He thought it was wonderful, groundbreaking.  He
 8    has since come to me and said that he's aware of
 9    two journals and he would like me to -- following
10    the revisions he suggested in his referee report,
11    submit it to him for publication in a journal that
12    he's editor for.
13 Q  So he supports you, it sounds like, your
14    Ph.D. advisor?
15 A  No.  This is Drazen Adamovic.
16 Q  Oh, okay.
17 A  He's a junior person at my level --
18 Q  And where is he?
19 A  -- a young male.  University of Zagreb in Croatia.
20 Q  So are you going to submit papers to him?
21 A  Yes, and we plan to work together.  He's very
22    sympathetic.  He believes that -- he recognizes how
23    I've been dealt these blows that have --
24 Q  Okay.
25 A  -- hurt my research program --
```

Page 93

1  Q  Any other --
2  A  -- and my reputation.
3  Q  Any other comments or panels, conferences, things
4     that you feel like you should have been invited to
5     or should have had accepted, that haven't been?
6  A  There's -- not specifically, not that I recall at
7     this time. I'm sure that there are many of them.
8  Q  Okay.
9  A  I'm just not recalling at this point.
10 Q  All right. Then you go on -- again, this is back
11    to Exhibit 4, at the bottom of page 6. You say
12    you're certain -- if you had been given Honors math
13    major courses, upper-level courses, you're certain
14    you would have won a teaching award by now or would
15    win one in the future. What does that mean?
16 A  I'm sorry, what page are we on?
17 Q  It's page 6, very last paragraph, still going
18    through your damages calculations here.
19 A  In comparison to individuals such as Jeff Diller,
20    if I had been given the same courses he was given
21    to teach during my time at Notre Dame, I'm quite
22    confident I would have been given a teaching award
23    at this point, as he has been given.
24 Q  Now, is he in your same area? Does he teach the
25    same courses?

Page 94

1  A  He does not teach the same courses at the graduate
2     level, but at the -- any undergraduate courses, we
3     would normally be qualified to teach the exact same
4     courses, barring one or two.
5  Q  So are you saying if you'd been given the same
6     undergraduate courses --
7  A  Or -- or the same courses, you know. If it was a
8     300- or 400-level course that he was given in his
9     area, if I had been given the comparable 300, 400
10    comparable course in my area.
11 Q  Okay. And why do you say you're certain you would
12    have won an award?
13 A  Because my scores on TCEs and CIFs and student
14    reports for classes at comparable levels to his,
15    above the 100 level specifically, are extremely
16    good. In particular, if I had been able to teach
17    at the -- teach the math majors and the Honors
18    majors courses, my record amongst those students,
19    including my record recently of teaching Honors
20    students in a graduate course, show that I excel
21    well above most faculty in my department.
22       In addition, there was a student who put me up
23    for a teaching award prior to me being given
24    tenure. She wrote a lengthy recommendation.
25    However, I was not eligible for this award because

Page 95

1     I would have needed to have tenure at that point.
2  Q  So this was during the year your appeal was pending
3     that she nominated you, or before?
4  A  I believe, yes.
5  Q  So you weren't eligible --
6  A  Or, no, I'm sorry. I miss -- I misheard or
7     misthought your question. Could you repeat. This
8     was --
9  Q  When did the student put you up for the award?
10 A  I am not -- this was prior to me being denied
11    tenure, that she had written the Office of the
12    Provost or wherever these things go. She
13    subsequently sent that -- upon learning that I had
14    been denied tenure, she sent a copy of that to the
15    provost during -- either the summer or fall of
16    2011.
17 Q  So she nominated you before you were denied tenure?
18 A  Yes.
19 Q  Okay. And what happens when you get nominated?
20    How long does it take before you get selected?
21 A  I have no idea about this process. I don't know
22    what the process is.
23 Q  Then she found out you didn't get tenure?
24 A  Yes.
25 Q  And so she sent a copy to the provost --

Page 96

1  A  Yes.
2  Q  -- of her nomination of you?
3  A  Yes. She was --
4  Q  And then what happened?
5  A  She was very upset. This was just her volunteering
6     to send this to the provost, when she found out
7     that I had been denied tenure on the basis of
8     teaching. She -- I had many students write the
9     provost. There were many students that wrote the
10    provost protesting the decision.
11 Q  Did you ask them to write?
12 A  I did -- I did not ask them to write. And sometime
13    during the summer of 2009, I sent an email to all
14    the students I had taught over the last two years,
15    using the LISTSERV for those classes, explaining to
16    them that I had been terminated by the university
17    on the basis of my teaching and that whether they
18    agreed with this decision or not, they were free
19    to -- my understanding was that the university
20    values feedback from the students and that it would
21    be appropriate for them to send feedback to
22    either -- either positive or negative, to the
23    provost and/or the president and/or cc'ing my dean,
24    department chair, and undergraduate chair.
25 Q  All right. And then you said you were told you

USDC IN/ND case 3:13-cv-00440-JVB-CAN document 71-1 filed 10/29/14 page 27 of 108

Page 97

1  weren't eligible for the award that the student had
2  nominated you for?
3  A  That is correct.
4  Q  How did you --
5      MR. BARKES: Can we, real quick,
6  clarify the chronology of that, though,
7  that question, where you informed -- at
8  what point were you informed? Was it
9  before or after you were denied for tenure?
10      THE WITNESS: When I -- after I sent
11  the email out to the students, this student
12  wrote back to me. So this was after I was
13  denied.
14      She wrote back to me saying -- in an
15  email, I believe -- or maybe I met with her
16  in person. I don't recall. I included
17  this letter, by the way, in my appeal, so
18  you have -- it was sent to the provost. So
19  you guys have a copy.
20      But she informed me at that time, so
21  sometime in spring -- my apologies. Summer
22  2009 or fall 2009, she informed me that in
23  fact she had put -- this was the first I
24  had heard that she had put me up for a
25  teaching award and it was -- I think she

Page 98

1  told me, if I recall -- she may have told
2  me that she found out then that I was
3  ineligible or may have gone to the provost
4  website to see what the eligibility
5  requirements for teaching awards were or
6  what was the process. I'm not -- I don't
7  recall specifically which one of those it
8  was.
9  BY MS. CANTON:
10  Q  Okay. But you concluded that, that you weren't
11  eligible?
12  A  Yes.
13  Q  And you didn't get the award?
14  A  No.
15  Q  Have you been nominated since; do you know?
16  A  I don't know. Many of these nominations are done
17  by people who have gotten the award before, and I
18  am not sure how they -- exactly how they make their
19  decisions.
20  Q  Does -- everybody who gets good teaching scores,
21  does everybody get a teaching award?
22  A  No. But people who get consistently high TCEs or
23  CIFs. And I believe, for instance, my CIFs, to
24  date, are -- I would expect that they would be at
25  the level of at least making it conceivable that I

Page 99

1  would be nominated for an award.
2  Q  Okay.
3  A  And this is including the fact that I was teaching
4  in what were deemed the hardest courses to get high
5  scores in; not teaching portfolios comparable to my
6  male peers, but deemed more challenging.
7  Q  And do you get a salary increase with the teaching
8  awards?
9  A  Once salary is determined, you know, in a process
10  that we are not privy to, but from comments that
11  people have made to me in the past, certainly a
12  teaching award would -- in the past would have
13  given an increase in salary. Higher TCEs would --
14  have given an increase in salary. I believe now
15  there's an exact formula for determining salary
16  increases. At one point it was just at the
17  discretion of the chair.
18  Q  Is your point about the teaching award, that
19  nobody's nominated you because you initially were
20  denied tenure, or you've been nominated but you
21  haven't been picked because you were initially
22  denied tenure?
23  A  I look at adverse teaching assignments that I was
24  given, in particular in comparison to my male
25  peers, such as Jeff Diller, meant -- have meant

Page 100

1  that I needed to work harder and the bar was higher
2  for me in comparison to if my teaching assignments
3  had been fair and equitable.
4  Q  So you're saying, If I had different courses, I
5  would have got different scores, I would have got
6  better scores; therefore, somebody maybe would have
7  nominated me for an award?
8  A  I would have had more nominations. Somebody did
9  nominate me for an award.
10  Q  Okay. You would have had more nominations. And
11  maybe you would have been selected --
12  A  Yes, ma'am.
13  Q  -- for the award?
14  A  In addition, on my dean's report every year, which
15  is partly what salaries are based on, those TCE
16  scores or CIF scores, those scores go on that
17  report every single time.
18  Q  In your annual evaluation?
19  A  We don't have a -- it's not really an annual
20  evaluation. It's a dean's report that we prepare
21  to tell the dean what we had done in the past year.
22  Q  You prepare it yourself?
23  A  Yes.
24  Q  And then you attach the grid or the chart that
25  shows all your scores for all your classes?

| | Page 101 |
|---|---|

1  A  No. There's just a box on the front page, and the
2     first question's asked: What courses did you
3     teach, what were your teaching scores?
4  Q  Scores. Okay. All right. I think I understand
5     that. All right. Now, let's see, where are we?
6     Okay. Let's -- that might be it as far as damages.
7     Let me just check my list here.
8           MS. CANTON: Can we go off the record
9        for one second.
10         (Short recess taken.)
11  BY MS. CANTON:
12  Q  Let's move on to talk about other damages. Same
13     exhibit, Number 4, the big thick one. Only we'll
14     move this time to our question number 9, which is
15     on page 7.
16         (Defendant's Exhibit 7 marked.)
17  BY MS. CANTON:
18  Q  I'm handing you Exhibit 7. Let's do this first for
19     the background. Exhibit 7 is the complaint that
20     was filed to get the lawsuit started. You said you
21     looked at that yesterday, right?
22  A  Yes, I believe so. Yes.
23  Q  And it's in numbered paragraphs. And if you could
24     turn to paragraph 70, which is at the bottom of 10.
25     Second sentence, you say, "Barron has suffered

| | Page 102 |
|---|---|

1     humiliation, general mental pain and anguish,
2     embarrassment to her name, character and
3     reputation, and decreased employability."
4           MR. BARKES: Can I raise an objection
5        generally to this portion of the damages,
6        that we have a stipulation regarding
7        specific mental injury. But other than
8        that, you can go ahead and answer.
9  BY MS. CANTON:
10  Q  Okay. We've talked about the -- I think you've
11     told us about the embarrassment that you've felt
12     when you go to these conferences and people ask you
13     about --
14  A  Amongst researchers in my field, I haven't
15     specified the embarrassment that I feel within my
16     department day-to-day, but --
17  Q  Okay. We'll talk about that. Tell us about that,
18     the embarrassment day-to-day in your department.
19         Now, this is the department that supported you
20     for tenure, correct?
21  A  Yes.
22  Q  Okay. What's the embarrassment day-to-day in your
23     department?
24  A  There are -- there's a feeling that my teaching was
25     poor, that I feel is -- that people make comments

| | Page 103 |
|---|---|

1     on that are -- I feel is not correct. And then
2     there are questions as to what I did to get tenure.
3  Q  Let's talk about number one first, the feeling that
4     your teaching was poor. Why do you say that?
5  A  I was denied tenure for my teaching, which is known
6     within the department. The belief is that I must
7     be -- must have done horrible things within the
8     classroom, been an awful teacher, by some people,
9     in particular, that compare -- point to certain
10     individuals as to how could you get -- how could
11     they get tenure and you not --
12  Q  Who's made --
13  A  -- in a disparaging way.
14  Q  Who's made disparaging comments that your teaching
15     is poor?
16  A  Peter Cholak.
17  Q  And what is his -- is he chair, assistant chair,
18     peer?
19  A  He is now -- he is now -- he serves on CAP often.
20     He is now, I believe, either undergraduate or
21     graduate chair. I don't recall which.
22  Q  Who's the chair of the department now?
23  A  Mei-Chi Shaw.
24  Q  Matt Gurski was the predecessor?
25  A  Yes.

| | Page 104 |
|---|---|

1  Q  And who's the assistant chair?
2  A  Now -- the associate chair, do you mean?
3  Q  Associate chair.
4  A  I believe there's only the position of associate
5     chair, and that is Juan Migliore.
6  Q  And he's had that position for awhile?
7  A  For awhile.
8  Q  Peter, what comments did he make?
9  A  He's made comments surrounding the notion that his
10     scores were -- when he was up for tenure, his
11     scores were so low that he, you know -- he's
12     surprised that -- I have to think of what he said.
13     We talk often. And he -- he's said comments such
14     as, you know, Your scores must have been really
15     horrible to not get tenure, and he means in
16     comparison to his. I mean, he gave me his scores
17     at one point.
18         But disparaging remarks about my teaching,
19     suggestions that maybe now I have tenure but I
20     won't get promoted to full professor unless my --
21  Q  Is that what Peter said?
22  A  Yes. Unless my scores are very good. Well, my
23     scores are very good.
24  Q  So he said maybe you won't get tenure -- won't get
25     full professor?

Page 105

1  A  He's made several comments about me not making full
2     professor.
3  Q  Unless your scores are really good?
4  A  About my TCEs or about my NSF grant.
5  Q  You said you talked to him often. Do you -- is he
6     a friend or colleague?
7  A  He's a colleague. He's -- we're at faculty
8     meetings together. He's -- he's -- he seeks me out
9     to talk with me sometimes.
10 Q  Have you ever reported his comments to anybody?
11 A  When I first arrived at the university, Peter
12    Cholak was very harassing towards me and Claudia
13    Polini, and Claudia filed a sexual harassment
14    complaint against him, I believe. I never did.
15    I -- when Bill Dwyer became chair, we watched a
16    video on sexual harassment, and afterwards he came
17    to my office and asked if I had ever been subject
18    to sexual harassment. And I believe at that time
19    I -- I told him that there had been a professor in
20    the department who had been -- his behavior had
21    been wildly unacceptable and that -- but that
22    Claudia had filed a complaint against him and Peter
23    had toned it down.
24 Q  When was his behavior towards you wildly
25    unacceptable?

Page 106

1  A  My first few years in the department, first -- the
2     first year or two. Claudia had to teach a course
3     with him, and so she got more of it than I did.
4     But --
5  Q  What did he do to you?
6  A  He would make comments about our clothes, make
7     comments about how we looked, make -- be generally
8     flirtatious rather than professional, talk about
9     how excited he was that there were two women in the
10    department -- two young women.
11 Q  Okay. Did you report to anybody these comments
12    that you're not going to get full professor unless
13    you get better scores, or you're not going to get
14    grants?
15 A  No, I have not.
16 Q  Who else has made comments to you in the
17    department?
18 A  Karsten Grove has made comments.
19 Q  Now, who is he?
20 A  He's a chair professor in my department. So he's
21    full professor, with quite a lot of pull and power
22    within the department.
23 Q  And what did he say?
24 A  He's made comments such as, I don't know what you
25    did to get tenure but it worked, in a very

Page 107

1     condescending, suggestive way.
2  Q  Anything else he's said besides that?
3  A  Comments -- other times comments similar to that.
4  Q  He doesn't know what you did to get tenure but it
5     worked?
6  A  Yeah, implying that my case wasn't overturned on
7     its merits.
8  Q  Did he say that, or is that what you take from what
9     he said?
10 A  The comments like that and surrounding that, that
11    he made, were of that nature, yes.
12 Q  What else -- what exactly did he say?
13 A  I mean, the background of this is that he knew I
14    was appealing. We had conversations when I was
15    appealing. The general consensus by all the people
16    in my department was there's never been anyone who
17    won an appeal outright and this was a hopeless
18    thing for me to try to do, no matter how
19    meritorious my case was.
20       And when I was given tenure, the feeling was
21    that it was not through the merits of my case, that
22    it was -- so he made comments during my appeal that
23    this wouldn't work, that any actual evidence I was
24    giving within my appeal, which he was given copies
25    of -- he knew exactly what I was handing over --

Page 108

1     that this was not enough for the university to
2     actually -- you know, might win a lawsuit or
3     whatever but it was not -- they wouldn't give me my
4     job back. And that's when I was given tenure.
5       There's been comments by him, such as, I don't
6     know what you did. I mean, he knows exactly what I
7     did but -- so I've asked him what does he mean by
8     that? He goes, Well, you must have done something.
9  Q  So he said "you must have done something"?
10 A  Yeah. He said this even -- he came to visit at Max
11    Planck, and he said it during tea at Max Planck in
12    front of other people in Germany.
13 Q  Anything else that Karsten has said, Karsten Grove?
14 A  I'm sure there's other things that he's said that
15    I'm not recalling right now. I mean, we did talk
16    at length, as I said, when I was appealing.
17 Q  Anybody else who's made derogatory comments?
18 A  Yeah. General -- Matthew Gursky has been very
19    flippant and condescending towards me, specifically
20    when I tried -- I tried to get wording in some of
21    our departmental documents about how travel will
22    factor into somebody's assessment when they come up
23    for tenure, and I wanted specifically to ensure
24    that if somebody had travel restrictions due to a
25    Family Medical Leave, such as a maternity leave,

Page 109

1  that that would be taken into consideration. I
2  wanted it stated in our department documents.
3      And he was, like, Well, we would never do
4  something like that. We would never consider
5  someone's tenure review case or promotion review
6  case and not take into consideration something like
7  that.
8      And I said, Yes, you would. It has happened in
9  the past. And he said, What do you mean? And we
10  went into a discussion of our case. And he was very
11  flippant about, Well, your case was different kind
12  of comments.
13      And I was trying to make the point that how
14  would it be different than some hypothetical woman
15  who was -- we would hire now who would have a child
16  and take -- or appendicitis and take a Family
17  Medical Leave, you know, that this could happen all
18  over again. It has happened in the past.
19      And he was flippant several times about my
20  case, and then said, Well, you got your job back
21  anyway, what do you care, comment. And his
22  demeanor and his dismissiveness and his tone and
23  his -- I don't remember the exact wording, but the
24  wordings that he used in -- in -- in viewing my
25  bringing up such an issue and my -- I think he used

Page 110

1  the words, using such a thing against the
2  university, it worked in your case, type of thing.
3  Q  Was this a one-on-one conversation you had with
4     him?
5  A  Yes, this was.
6  Q  Okay.
7  A  But I did report it to my dean. I did talk to Dean
8     Crawford about it because at the time I was making
9     some attempts to advocate -- by trying to advocate
10     for chairs to be advised as to the Family Medical
11     Leave policies, advised to treat -- to follow the
12     academic articles under those policies.
13      I think I sent a copy of the toolkit to Dan
14     Myers, and I gave one to my dean. And so this was
15     at a time -- and so I spoke to my dean and my -- my
16     concerns of how Matt Gursky was shrugging off
17     something that had happened in the past, in terms
18     of discriminatory statements made in our department
19     and disparaging of research.
20      And at that time, during my conversations with
21     the dean, I believe I mentioned his -- I don't
22     recall exactly what I said, but I mentioned his
23     tone.
24  Q  Matt Gursky's tone?
25  A  Matt's tone and general condescension towards me as

Page 111

1  well.
2  Q  Now, have you had any other incidents like that
3     with Matt Gursky?
4  A  I recall during faculty meetings bringing up things
5     and him being very dismissive of me. I don't
6     recall specific instances in which I felt I -- I
7     felt that he specifically was remarking on -- in
8     terms of the merits of my being given my tenure.
9     But he certainly has been -- taken a condescending
10     tone.
11  Q  How many people in the department, approximately?
12  A  Do you mean regular, tenured faculty?
13  Q  If you say the math department, what does that
14     mean? Does that mean tenured, nontenured, adjunct?
15  A  The math department, in general, could mean
16     everything from the undergraduate support people we
17     have in our office to -- employed in our office, to
18     full professor.
19  Q  If you have a faculty meeting, you say he's been
20     dismissive in a faculty meeting. How many faculty?
21  A  That depends if you're counting postdocs or
22     visitors. I'm not trying to be evasive, but just
23     trying to get you a number.
24  Q  Just a ballpark.
25  A  I believe there's 35 faculty that are tenured or

Page 112

1  tenure-track.
2  Q  Okay.
3  A  And we have visitors and post docs, graduate
4     students, staff.
5  Q  Anybody else besides Peter and Karsten?
6  A  Karsten.
7  Q  Karsten. Anybody besides those two who have made
8     derogatory comments?
9  A  May I ask a question of my counsel?
10  Q  Yeah. We can take a break. Yeah.
11  A  But, actually, this -- this is a question of the
12     university, actually.
13          MR. BARKES: What do you want to ask?
14     (Discussion held off the record.)
15          MR. BARKES: She wants to know whether
16     or not she is divulging things that were at
17     CAP meetings under --
18          THE WITNESS: Under confidentiality.
19          MR. BARKES: And it would be their
20     objection to raise. So the answer is yes.
21          MR. MYERS: Are these things you
22     observed or heard about?
23          THE WITNESS: Sitting in a CAP meeting.
24          MR. MYERS: You are on the CAP?
25          THE WITNESS: I'm on the CAP now.

Page 113

1      MR. MYERS: Okay.
2      THE WITNESS: In fact, we consider
3   tenure cases.
4      MS. CANTON: Just give us a second.
5   (Short recess taken.)
6      MS. CANTON: Let's go back on the
7   record.
8 BY MS. CANTON:
9 Q   We were asking you about comments. You said that
10   there was this feeling in your department that your
11   teaching was poor and people made disparaging
12   comments. You told us about Peter's comments and
13   Karsten's comments, Matt Gursky's attitude. And I
14   asked you if there were any more, and then you
15   asked about CAP.
16      So, that's fine. Go ahead and tell us what you
17   were going to tell us about CAP.
18      MR. BARKES: Do we have to designate
19      now that we're making it subject to the --
20      or is the whole -- I would think the whole
21      thing is subject to the agreement regarding
22      confidentiality.
23      MR. MYERS: I don't think we need
24      anything.
25      MS. CANTON: I don't think we need it.

Page 114

1      We're fine. Yeah.
2      MR. BARKES: Okay.
3 A   So I am allowed?
4 BY MS. CANTON:
5 Q   Yeah. Uh-huh.
6 A   Notre Dame General Counsel is telling me that I
7   can. Okay.
8      One of your comments, it wasn't just Matt
9   Gursky's attitude. He did make comments. So there
10   are many -- there are several comments surrounding
11   certain personnel issues.
12      For instance, we hired a female mathematician
13   with tenure as a spousal hire. Except for every
14   time her case was discussed, it was -- people did
15   this (indicating), when they said "spousal,"
16   because she's not a spouse. She's unmarried. And
17   this was -- she was hired in -- in 2012. So this
18   was shortly after, you know, I had just been denied
19   tenure, Karen Chandler has been denied tenure, and
20   then we're hiring a woman with tenure.
21      So this was a position created for her because
22   she's in a romantic relationship with a professor
23   in engineering.
24 Q   Okay. Let me back up. Karen Chandler, when was
25   she denied tenure?

Page 115

1 A   Around 2004.
2 Q   Oh, okay. So that was way before you?
3 A   2004, 2005.
4 Q   Okay. I thought -- the way you told it, I thought
5   it was after you were denied tenure. So she was
6   denied tenure.
7      When did Claudi -- Claudia Polini, when did she
8   get tenure?
9 A   Maybe a year after or two years after Karen. I'm
10   not -- I don't recall exactly. 2005, 2006 maybe.
11 Q   It was before you were up -- before you applied?
12 A   Yes.
13 Q   Okay. So Karen was denied. Claudia got it. Any
14   other women granted or denied between --
15 A   There's only -- there's only been two women that
16   have ever gone through a normal tenure process and
17   gotten tenure in the history of the department.
18 Q   And was that Knight, Susan Knight?
19 A   Julia Knight, in 1981.
20 Q   So Julia Knight, 1981. All right. So why do you
21   say this position -- who created the position for
22   her in math?
23 A   I believe it's a joint appointment with, I believe,
24   electrical engineering. It was created -- I don't
25   know -- by Dean Crawford and Dean Kilpatrick, the

Page 116

1   Dean of the College of Science and the Dean of the
2   College of Engineering, or -- and in consultation
3   with the provost, is my understanding.
4      And we were -- we were told that they tried to
5   hire her in applied math, who -- and applied math
6   said that she was unqualified. It's my
7   understanding that one of her outside letters said
8   she was unqualified for the position.
9 Q   All right. So somebody just says, Math department,
10   you have to take this lady with tenure?
11 A   We had a vote, and the math department voted,
12   because it cost us no money, and they voted yes.
13   Some people didn't vote. Some people voted no. I
14   don't recall the exact vote. But --
15 Q   But it was enough to hire her?
16 A   Enough to hire her with -- with tenure. I believe
17   she has a lower teaching load and --
18 Q   Okay. All right. Any other comments by members of
19   your department about you and your situation?
20 A   In comparison to Roxana Smarandache, yes. So
21   there's been very -- several comments. See, you
22   just didn't know the right person to sleep with in
23   order to get tenure; comments such as Karsten
24   Groves, I don't know what you did to get tenure.
25 Q   Who said you didn't know the right person to sleep

Page 117

```
 1    with?
 2 A  It might have been Peter Cholak. I'm sure he made
 3    comments. I'm sure Peter Cholak made comments
 4    about this. Claudia Polini specifically said, "Now
 5    everyone in our department is going to question how
 6    we got tenure."
 7         Did I say -- I'm sorry. I'm getting tired.
 8    Did I say everyone in our department? I meant to
 9    say everyone, not just people in our department.
10    She made comments to this effect.
11         Sergei Starchenko has made comments about what
12    women do to get tenure.
13 Q  What did he say?
14 A  I don't recall specifically, but it was --
15 Q  Do you remember when he made the comment or where?
16 A  I don't recall specifically.
17 Q  Was anybody else there?
18         MR. BARKES: Did you actually answer at
19         any point what was said? Do you recall
20         what was actually said or -- by Sergei.
21    BY MS. CANTON:
22 Q  By Sergei.
23 A  I don't recall exactly what he said.
24 Q  Was anybody else there?
25 A  You know, there were several times where, you know,
```

Page 118

```
 1    we have tea, guys sit around the table and banter,
 2    and it may have -- I've certainly heard comments
 3    during such banter, usually people like Sergei,
 4    Peter Cholak.
 5         Peter Cholak definitely at one point was
 6    explaining to me, in front of one of his postdocs,
 7    how -- what I really needed to have gotten tenure
 8    was a penis, and there was discussion about penis
 9    size. That comes to mind.
10 Q  Well, it sounds like --
11 A  That is not atypical of discussions.
12 Q  Well, it sounds like Peter's made the most
13    egregious comments. Did you report them to anyone?
14 A  No, I have not.
15 Q  Okay. Anything else in your department?
16 A  You know, Matt Gursky did -- in the hiring of
17    Roxana Smarandache, made comments during a faculty
18    meeting about -- or maybe it was right after the
19    fact -- about what one has to do to get a woman
20    tenured at Notre Dame -- a woman hired with tenure
21    or tenure at Notre Dame. I don't know exactly what
22    he said. And this was right after the meeting in
23    which we were discussing the fact that the
24    university was creating this position for this
25    woman because of who she's sleeping with. Their
```

Page 119

```
 1    words, not mine.
 2 Q  There was what?
 3 A  Their words, not mine.
 4 Q  And so Matt said -- what did Matt say that you have
 5    to do to get a female hired with tenure? Did he
 6    say? You said he questioned it.
 7 A  I don't think he said exactly what, but --
 8 Q  Did he say the university created a position for
 9    this woman because of who she's sleeping with?
10 A  It was discussed at length, several times, in this
11    faculty meeting, about that this was not one of our
12    lines, this was not our department position, she
13    was not being considered under a normal application
14    process, she was a spousal hire, which is a
15    (indicating) -- quotes each time, meaning she
16    wasn't a spouse.
17         And there was discussion about how she could be
18    a spousal hire if she wasn't married and why were
19    they not married and were they going to get
20    married.
21         And the question was? I'm sorry, could you
22    repeat it.
23 Q  What Matt said, what Matt's comment was.
24 A  Regarding?
25 Q  Regarding what -- you said Matt questioned what one
```

Page 120

```
 1    has to do.
 2 A  Yeah, so -- so several times it was brought up that
 3    they're making this position for her as a woman and
 4    it was not under a normal application procedure
 5    where we would look at -- where we reviewed -- we
 6    didn't advertise the position. We did not review
 7    files.
 8         It was a tenured position created for her by
 9    the deans of the College of Science and the College
10    of Engineering that would cost us no money, that
11    the provost -- the deans and the provost were
12    putting up the money.
13         This went through a lot because we didn't want
14    it to cost money within the department, and if it
15    was a position of ours, we would have wanted to
16    advertise it and declare candidates.
17         And so, in the course of this long discussion,
18    he often rolled his eyes, Spousal (indicating), and
19    They want her. And at some point he made comments
20    to the fact that, This is what you have to do to
21    get a woman on, you know, This is what you have to
22    do to get a woman -- to get tenure.
23 Q  Did you vote for her? Were you eligible to vote?
24 A  Yes.
25 Q  Did you vote for her to come?
```

## Page 121

1 A   No.  I voted against it.

2 Q   But somehow she got enough votes to join the

3      department?

4 A   Yes.  She's very good friends with other people in

5      the department.  She was a graduate student of

6      Notre Dame.  This is when she started this affair

7      with this professor, I believe, I've been told,

8      while she was a graduate student.

9         So she had -- she was well known in the

10     department, and there are other Romanians in the

11     department, and so I think that this -- it was

12     these -- these people who supported her in the

13     vote.

14        But there was quite a lot of discussion about

15     where this money came from and we have it for

16     something else.

17 Q   And it had to be for her, for her position?

18 A   It was only for her.

19            MR. BARKES:  You get quiet again.

20            Speak up.

21 A   It was only for her.

22 BY MS. CANTON:

23 Q   Just go a little bit longer.  Finish up this line

24     about your department and make sure I understand

25     all of your derogatory or disparaging comments that

## Page 122

1      you felt in your department because of the initial

2      denial of tenure and the comments.

3         Any other comments that people have made?

4 A   Yes, there are other comments.  There's a guy who's

5      up for renewal, third-year renewal, who has taught

6      one course at the 100 level, and he got a low score

7      in his CIFs.  But his research is very good.  He

8      was just -- his -- huge number of papers.  He has

9      ICM -- invitation to speak at the International

10     Conference of Mathematicians.  He's at the level

11     where his peers at other places have gotten tenure

12     long ago, and we were worried about losing him.

13     And so they're trying to -- there was a discussion

14     as to whether we should put him up for tenure.

15        And I made comments that I would be very

16     concerned about putting him up for tenure, as --

17     and one of the main points being that he has low

18     teaching evaluation scores, and --

19 Q   Now, has he only taught one class?

20 A   He's taught many classes, but he's only taught one

21     class at the 100 level.

22 Q   One undergraduate.  100 level, okay.

23 A   He was given other courses for math majors, areas

24     in his field, the typical male -- the male typical

25     teaching load.

## Page 123

1 Q   Now, are all his CIF scores low or just the one for

2      the 100-level class?

3 A   They're not -- not great and not enough to offset

4      this very low 100-level score.

5 Q   Okay.  So you were talking --

6 A   So I voiced my concerns that he would not be

7      granted tenure because, according to what we've

8      been told, you have to have -- in cases of women, a

9      woman who was recently denied, who had a score --

10     average score of 3.9 that was denied, and he had

11     a -- he has like a 2.7 or something on this course.

12     And I was concerned that he would be denied tenure

13     if we put him up on the basis of his teaching.

14        At that point several people grumbled.  They

15     said, No, no, no, that's a really good score for a

16     course like that.  That's a very hard course to

17     teach.  For that score, it's wonderful.

18        And this is -- I have other instances of how

19     such a low score for a guy is really good.  And I

20     made another comment, and there were several

21     comments in the room -- I mainly remember Alex

22     Himonas saying, This is plenty high to get tenure.

23     And I said, You know, we've had cases in the past

24     in which people were denied tenure for scores

25     better than this or comparable to this.

## Page 124

1         And they opposed it, and then somebody

2      pooh-poohed it.  Yeah, but you have your tenure

3      now.  And I don't know who -- it was -- I don't

4      know who exactly made the comment.  It was behind

5      me in the room, that there were several comments

6      made that I was out of line in pointing this out.

7 Q   Who said you were out of line?

8 A   Several times people said, We're not discussing

9      whether he's going up for tenure.  We're discussing

10     third-year renewal, after I would make a comment

11     like that.  And I would say, Oh, okay, if we're

12     just discussing third-year renewal, then we should

13     discuss his CIFs going forward at another meeting.

14        And then somebody else -- one of the other

15     professors in the room would bring up, Yes, but we

16     should really be considering him for tenure, not

17     for third-year renewal, and they would start to

18     ensue again a discussion about putting him up for

19     tenure.  And I would make a comment again about,

20     But with the teaching, this -- I worry the score is

21     too low.  And there was at least two times that I

22     was -- and it was not the person chairing the

23     meeting, Mei-Chi.  It was somebody just shouting

24     out of the back.  "We're not considering tenure."

25     I think Brian Hall might have said it at one point,

Page 125

1 that I -- implying that I was out of line
2 discussing whether his scores were high enough to
3 get tenure, even though -- being shut down, even
4 though it was not I who had opened the discussion
5 again.
6 Q Was -- when you said there was just another person
7 denied tenure because of low scores, were you
8 talking about yourself?
9 A I believe Karen Chandler was as well.
10 Q Hers was also low teaching scores?
11 A Yes.
12 Q You know that for --
13 A She -- she was told that verbally by the chair.
14 Q And then did she appeal?
15 A She didn't.
16 Q What happened to her? Did she go somewhere?
17 A She went to a visiting position at University of
18 Riverside, and then several other visiting
19 positions. And now I think she's unemployed -- or
20 unemployed in terms of a mathematical
21 professorship.
22 Q Okay. All right. Have we exhausted your memory as
23 far as comments made by people in your department?
24 A No. No. But there are many other instances in
25 which if it wasn't being shut down or eye-rolling

Page 126

1 or, you know, I mean -- there are many other
2 instances.
3 There is a case -- this was -- these were
4 comments made by, for instance, Nancy Stanton, her
5 opinion of what -- the opinion of the males in my
6 department. So she's pointed out at times my
7 complaint to her.
8 So we had a professor coming up for tenure who
9 had an NSA grant that was the exact same grant that
10 I had. And when I went up for tenure, there was a
11 math -- a professor, Sam Evens, who complained that
12 my grant wasn't good enough to get tenure. And
13 then, when David Galvin was up for tenure, Sam
14 wrote his research review and also in the meeting
15 praised the fact that he -- that this male coming
16 up for tenure had an NSA grant.
17 And Nancy made comments, "Yes, well, but in
18 Sam's eyes, David has an NSA $35,000 grant as a
19 male and you have an NSA $35,000 grant as a female.
20 Q That's what Nancy said to you?
21 A She made that comment to me. I was very frustrated
22 in this meeting in terms of the praise that Sam
23 Evens had given towards David Galvin versus the
24 disparaging remarks he had made toward me.
25 Q Was David Galvin up after you?

Page 127

1 A Yes. In addition, Nero Budur was up with a grant
2 that was less prestigious and less money per year,
3 and, again, this person praised his grant record.
4 In addition, the male professor had gaps -- it
5 was brought out that he had gaps in his travel,
6 that he had not spoken at many conferences or
7 spoken at many prestigious venues. And when it
8 came up in the meeting that he was -- when it was
9 questioned why there was these gaps in his travel,
10 it was explained away, and then it was considered
11 not an issue, that his travel was fine.
12 And I -- again, I talked to Nancy Stanley and,
13 I think, Claudia Polini also about this, and they
14 said, Well, of course. He's a guy.
15 Q How do you get along day-to-day with most people in
16 the department? Do you get along with them okay?
17 A Fine. Yeah.
18 Q Yeah. Okay.
19 A I -- yeah. Fine.
20 Q All right.
21 MS. CANTON: Let's take our break.
22 (Luncheon recess taken.)
23 BY MS. CANTON:
24 Q We are still working on your interrogatories, which
25 is Exhibit 4. That's the big, thick one with the

Page 128

1 clip.
2 And we got to this, and then we got
3 sidetracked. It's on page 7. And that question
4 number 9 is about physical, mental, emotional
5 distress. For reference, if you go to the
6 complaint, which is Exhibit 7, it's what we started
7 talking about before. Yeah.
8 A 70.
9 Q 70, on page 10. And we started to talk about
10 embarrassment to your name and character and
11 reputation. So I want to go back to the general
12 mental pain and anguish, emotional-type distress.
13 Did you see any doctor, psychiatrist,
14 psychologist, counselor, social worker, any
15 healthcare professional about any mental or
16 emotional injuries that you claim Notre Dame
17 caused?
18 THE WITNESS: Am I supposed to answer?
19 MR. BARKES: We have a general
20 objection regarding mental injury that
21 we've stipulated to, but you can answer it.
22 A No.
23 BY MS. CANTON:
24 Q Okay. Good. Then that's easy. Let's go to
25 number 10 -- I'm sorry, on Exhibit 4. We asked you

Page 129

1      to identify everybody who has knowledge about your
2      claims. This is Exhibit 4, again, your responses.
3      And then it goes from page 7 to page 41, with a
4      list of names of individuals.
5        First of all, of all those people, did you ask
6      any of these individuals to be a witness for you in
7      your lawsuit?
8 A   Yes.
9 Q   Okay. Let's go through them and tell me which ones
10      that you have asked to be a witness.
11 A   Ani Aprahamian.
12 Q   Which page are we on?
13 A   Page 8. Ani Aprahamian.
14 Q   Okay. And what does she know about your claims
15      against the university?
16 A   She was Katherine Zieman's investigator, so she
17      was -- she was under some of the same -- working
18      under some of the same conditions as Julia
19      Douthwaite, who was the investigator for my appeal
20      and has told me -- or has told Katherine Zieman,
21      who told me, things such as, you know, she felt
22      that Katherine Zieman wasn't given her report, or
23      reasonable summary of her report, by Don
24      Pope-Davis, wasn't given the report in a timely
25      manner; and so I -- led me to believe that possibly

Page 130

1      the same thing is true with Julia's report in my
2      case, for instance.
3 Q   Did Ani Aprahamian work on your case at all?
4 A   No. But she has been -- especially since this
5      happened -- has been a mentor towards me and talked
6      to me quite a lot about the discrimination she's
7      experienced at Notre Dame; that women -- the
8      climate, environment, supportive of me, and making
9      sure that I have someone to go to, to --
10 Q   Okay. Other than what you've told her, do you know
11      that she knows anything about your -- your claims?
12 A   There was talk within the physics department -- I
13      talked with physics individuals, such as Antonio
14      Delgado, is one person who's made disparaging
15      comments about me, and other people within physics.
16      And, for instance, it was through physics that I
17      found out that.
18        And I believe it was Chris Kolda that told
19      me -- maybe it was Ani; but I know they discussed
20      my case quite a bit. And so at times I've been
21      told.
22        So Ikaros Bigi sat on the PAC, the advisory
23      committee --
24 Q   Who was that?
25 A   Ikaros Bigi.

Page 131

1 Q   Okay. He's in math?
2 A   He's in physics. And so it was through physics
3      that I heard that my TCEs were discussed, my course
4      loads at the 100 level were discussed, and I know
5      that individuals within physics were discussing
6      this case, and I believe Ani was one of these
7      people who was interested in my case and trying to
8      find out what had happened, why.
9 Q   I'm confused. Was Ikaros on your CAP or --
10 A   The PAC. If you're dyslexic, you should not work
11      here.
12 Q   Okay.
13      There's the CAP, which is a department --
14 Q   Your department?
15 A   -- Committee on Appointments and Promotions. And
16      then there's the PAC, which is the Provost Advisory
17      Committee.
18 Q   Okay. And so Ikaros told Ani --
19 A   Somebody. I don't know if it was Ani or not. I
20      never asked Ani. I never -- I never pried as to
21      who got this information from -- from who. I
22      assumed it was because --
23 Q   And what --
24 A   I actually --
25 Q   And what you heard was that your TCEs were

Page 132

1      discussed at the PAC meeting?
2 A   Yes.
3 Q   Anything else that you heard?
4 A   That my -- that it was commented on, the large
5      number of courses I was teaching at the 100 level.
6 Q   Okay. Now, what happened -- department was
7      Katherine Zieman in?
8 A   Medieval Studies, English, I guess. I don't know.
9      Medieval Studies.
10 Q   She also did an Appendix A appeal?
11 A   Yes.
12 Q   And what happened with her appeal?
13 A   It was upheld. She was determined by Ani
14      Aprahaman, as the investigator, that she
15      experienced discrimination -- gender discrimination
16      at such a level that -- that likely affected the
17      outcome of her case.
18 Q   And did Ani tell you that?
19 A   This was in a statement I -- Katherine showed me
20      Dr. Davis' letter to her saying that the Appendix A
21      appeal was upheld. The only way an appeal is
22      upheld is by determination of gender
23      discrimination. The wording I just used is
24      actually from the --
25 Q   Appendix A process?

1 A  -- Appendix A wording, that an Appendix A appeal is
2     upheld only if discrimination occurred of such a
3     magnitude.
4 Q  That it could have affected the decision?
5 A  That it likely affected the decision.
6 Q  Okay.
7         MR. BARKES: Both of us are trailing
8     now.  I'm missing the ends of both of your
9     sentences.
10         THE WITNESS: Goodness.  We're going to
11     be like this (indicating) soon.
12         MR. BARKES: You're following her.
13         THE WITNESS: I'm sorry.  Please, keep
14     nudging me.
15 BY MS. CANTON:
16 Q  So what happened to Katherine?  Is she still here?
17 A  She was -- she negotiated to go up again after
18     three years.  She -- in exchange -- it was part of
19     a settlement to drop her EEOC complaint, I think,
20     that she would -- she made an arrangement to be --
21     have her case reheard after three more years.
22         In particular, just her -- her research was not
23     in question, as in my case.  It was only her TCEs
24     and CIFs.  And so she would go up after three
25     years -- this is my understanding, that after three

1     years, she would go up with her -- with more CIF
2     data after three years that would be reviewed, and
3     a determination as to whether her teaching met the
4     level deemed necessary for tenure would be --
5 Q  Has that three years passed yet or --
6 A  Yes, it has.
7 Q  And what happened?
8 A  She was denied tenure again.
9 Q  And then did she appeal that?
10 A  No.  She did not.  She -- I know she considered it.
11     I know she talked to the EEOC, but I think in the
12     end she did not.
13 Q  And so do you know where she is now?
14 A  She's in London.  She is either at Cambridge -- I
15     think she's at Cambridge.
16 Q  Teaching?
17 A  Research mainly, I think.  I'm not sure.  I'm
18     not -- she's --
19 Q  Now, was her issue the same as yours, in that she
20     believed she was assigned to lower-level courses
21     that tend to garner lower scores?
22 A  In her department, it's -- my understanding is that
23     it's more of an issue of she was a medievalist and
24     students needing certain -- needed certain English
25     courses involving Old English; Beowulf, you know,

1     Ivanhoe -- I don't know what they teach, but that
2     sort of thing -- and that there was a consideration
3     for her field of expertise being an area that
4     students are not as jazzed about as, for instance,
5     her male colleague who taught Victorian novels.
6 Q  Okay.  Do you know if her scores got better over
7     those three years?  What -- did she ever tell you
8     what happened?
9 A  I believe that they did get -- they did improve.  I
10     know her department was very happy with her,
11     unanimously supported her in tenure -- getting
12     tenure, both times, and her dean supported her.
13     They were happy with her teaching.
14 Q  But she didn't -- she didn't get it?  It was --
15 A  No.  The provost denied it.
16 Q  All right.  So anything else with Ani as far as
17     what she knows about your case?
18 A  Nothing that I could think of right now.
19 Q  Okay.  Have you talked to --
20         MR. BARKES: Have we gone through each
21     one of these?  You can review those if
22     we're going over -- make sure.
23 Q  Okay.  Uh-huh.  My question now is:  I just want to
24     know the ones that you've talked to and said, Will
25     you be a witness for me.

1 A  Yeah.  Ani, I -- yeah.  Okay.  Yeah.
2         MR. BARKES: With that question in
3     mind, do you want her to flip through and
4     say I have, I haven't?
5 BY MS. CANTON:
6 Q  Did you ask Heidi?
7 A  Yes.  I actually spoke on the phone to Heidi
8     Ardizonne.
9 Q  Just one time?
10 A  Yes.  Do I say where?  I found out where she was,
11     and I called her.
12 Q  All right.  What did you ask her to testify about?
13 A  To testify -- I didn't -- I just asked if she would
14     be a witness.
15 Q  Okay.  And what did she say?
16 A  I told -- brought her up to date on what I was
17     doing.  She said, Sure.
18 Q  Okay.  What does she know about your case?
19 A  We -- when I was denied, I met with her a couple
20     times because she had been denied at that point, a
21     year before me, and she gave me some information
22     about the appeals process, what happened to her in
23     her appeals.  She filed two appeals.
24         What was the question again?  I'm sorry.
25 Q  What she knows about your case; not her case, your

**Page 137**

1  case.

2 A  I told her a lot of the details of what I knew at

3  the time. This would have been probably fall 2009.

4  I probably met with her around that time first to

5  tell her specifics of my case and specifics of how

6  I should write my appeal --

7 Q  Okay.

8 A  -- at times.

9 Q  Would she know anything other than what you've told

10  her about your case?

11 A  She knows about the general gender climate at Notre

12  Dame.

13 Q  Okay. And she was denied, and you said she

14  appealed twice?

15 A  She made -- she put in two appeals, the same as I

16  did: A regular appeal; and Appendix A appeal

17  alleging procedural error and gender

18  discrimination. And her Appendix A appeal was

19  denied, and her regular appeal was upheld on the

20  basis of procedural error. But she feels that

21  she's -- she had a case of gender discrimination.

22 Q  Did she pursue it?

23 A  She did. When she learned that Katherine Zieman

24  and I were filing with the EEOC, she said, Well,

25  maybe I should too, and she did file with the EEOC.

**Page 138**

1 Q  And is she now a professor at St. Louis University?

2 A  Yes, she is.

3 Q  Did you ask Linda Austern to be a witness?

4 A  No, I did not.

5 Q  Gail Bederman?

6 A  I don't know if I used the terms, Would you be a

7  witness. I did -- I know I talked -- I talked to

8  her only once, and I informed her that I -- I

9  was -- my situation, that I had appealed and I won,

10  and that I was still pursuing my case, and that

11  I -- what did she know about past cases of gender

12  discrimination at Notre Dame.

13     And she -- I might have at that time asked if

14  she would be a witness or not, but she went on

15  about discrimination she had experienced,

16  discrimination she had seen experienced,

17  discrimination that's rampant, but that she had

18  washed her hands of it, that she couldn't deal with

19  it anymore, it's too much.

20 Q  And is that the only time you talked to her in

21  2011, this one call, you said?

22 A  Yeah. She -- yes. Yes.

23 Q  And she's still here --

24 A  Yes.

25 Q  -- as far as you know?

**Page 139**

1 A  Yes.

2 Q  Okay. Was the only time you talked to Linda

3  Austern when you called her in 2009 about hiring a

4  lawyer?

5 A  I don't know if I called her or emailed her. I

6  might have emailed her. But, yes.

7 Q  Contacted her?

8 A  Yes. I just asked her about a lawyer.

9 Q  All right. Doris Bergen.

10 A  I may have emailed her. I don't remember. What's

11  it say?

12 Q  Last sentence says, "I emailed Professor Bergen but

13  did not receive a response."

14 A  Oh, yes. Okay. That's --

15 Q  Have you got a response --

16 A  No.

17 Q  -- since you filled this out?

18 A  No.

19 Q  Okay. And she left in 2006, is what your

20  understanding was?

21 A  This is what was reported.

22 Q  Left Notre Dame?

23 A  Reported to me by somebody else, yes.

24 Q  So she doesn't know anything about your case?

25 A  Again, I believe she knows about the general way

**Page 140**

1  women have been treated historically at Notre Dame;

2  tenure denial, other discriminatory acts.

3 Q  All right. Kathleen Biddick, it looks like she

4  left in 2005 for Temple?

5 A  Uh-huh.

6 Q  Anything else she knows other than general --

7 A  No.

8 Q  -- the way women were being treated or denied

9  tenure?

10 A  No.

11 Q  Okay.

12 A  And both of these people would have had dealings

13  with, I think, for instance, Provost Burish --

14 Q  Do you know --

15 A  -- and his treatment.

16 Q  Okay. Do you know any details about that?

17 A  No.

18 Q  Okay. Maureen Boulton, have you contacted her

19  since you wrote this?

20 A  No.

21 Q  Do you know if she knows -- has any involvement in

22  your case whatsoever?

23 A  No. I mean, other than, again, the general climate

24  on campus, past and ongoing.

25 Q  Rhonda Brown, you say you haven't contacted her.

Page 141

1    Is that still the case?
2  A  I may have -- I don't recall. I never got a
3    response, if I did. I may have emailed her.
4  Q  It looks like she was around in the early 2000s.
5    So, again, she doesn't know anything about your
6    case, does she?
7  A  Certainly while I was on campus and while I was
8    being discriminated against, in terms of many
9    facets of my case, including my teaching
10   assignments, she was on campus. She would have
11   known about hiring of the -- you know, rates of
12   hiring and how we were treated and --
13 Q  All right. Nero Budur, you talked about him
14   earlier.
15 A  Uh-huh. He was just promoted to tenure this past
16   year.
17 Q  Okay. Is that why you've listed him, because he
18   got tenure?
19 A  No. At this time he was up for tenure. He hadn't
20   gotten tenure. I think I listed everyone in my
21   department, I believe.
22 Q  Okay. Did he ever say or do anything that you
23   thought was discriminatory or derogatory towards
24   you?
25 A  Not that I recall. But he could testify, for

Page 142

1    instance, to the teaching assignments he was given.
2    He is in algebra, which is related to my field. He
3    could testify as to what types of assignments he
4    was given versus what types of assignments I was
5    given. He was allowed to teach the first-year,
6    basic algebra course as a tenure-track professor,
7    while I was not, for instance.
8  Q  Have you ever talked to him about your lawsuit?
9  A  Possibly in passing.
10 Q  Have you ever said, you know, Can you -- can you
11   talk about your assignments versus my assignments?
12   Have you got into that level of detail?
13 A  No. His assignments were a matter of record, so I
14   didn't -- didn't have to go to him to ask him for
15   his specific teaching assignments.
16 Q  All right. And then Steven Buechler?
17 A  Buechler, I think it is.
18 Q  Buechler. He was the chair?
19 A  Uh-huh.
20 Q  And was he the chair --
21        MR. BARKES: Is that a yes?
22 BY MS. CANTON:
23 Q  Yes?
24 A  Yes.
25 Q  Okay. All right. Was he the chair when you

Page 143

1    started?
2  A  Yes.
3  Q  And then he was the chair for a few years after
4    that?
5  A  Yes.
6  Q  All right. And you say, "He repeatedly told me
7    that it was necessary to show I could get scores."
8    Tell me about your discussion with him about your
9    course assignments.
10 A  Every year, at least once, we would -- he would sit
11   down with me and discuss what it -- what would be
12   necessary to get tenure, how he viewed how I was
13   doing, and he recommended what courses I should
14   teach. He repeatedly gave these numbers of -- of
15   needing to get average above -- regularly above a
16   3.0, preferably 3.2, advising me. I -- advising me
17   as to what courses I should --
18 Q  Teach?
19 A  -- he recommended that I teach, he recommended --
20   he would recommend to the associate chair for me to
21   teach.
22 Q  How do the courses get assigned?
23 A  The associate chair ultimately assigns them, with
24   approval from the chair. How that decision is
25   made -- I mean, we're asked every year what would

Page 144

1    we like to teach. But there are wheelings and
2    dealings behind the scenes amongst various
3    professors and -- people make recommendations.
4    People ask for changes. There's various things
5    that are done --
6  Q  How many courses --
7  A  -- by tenured people, by and large.
8  Q  Not by tenure?
9  A  By tenured people.
10 Q  By tenured people.
11 A  Senior people.
12 Q  How many courses are we talking about that the
13   faculty has to teach in any given semester?
14 A  Most tenure-track and tenured faculty teach three
15   courses a year, meaning one one semester and two
16   another semester. Chaired professors only teach
17   two courses a year. There's senior chair
18   positions.
19 Q  One each semester?
20 A  Yes, typically.
21 Q  And then overall, to accommodate all the students,
22   how many courses does the math department have
23   to -- I mean, are we talking like 20, 50, a
24   hundred? How many?
25 A  I wouldn't know. There's -- you know, just at

Page 145

1     the -- virtually every student -- freshman who
2     comes onto campus sits in -- takes a math course,
3     and that's by and large taught through the math
4     department. These people would know better than
5     me.
6 Q  The numbers -- I mean, have you ever been involved
7     in figuring out -- it sounds to me like a big
8     puzzle: How are you going to teach all these
9     courses with these people? Who's here and who's
10    not here, who's visiting, who's on sabbatical?
11 A  It's a big headache, I've heard.
12 Q  To figure it out, okay. Do you have any reason to
13    think that Professor Buechler discriminated against
14    you personally?
15 A  Yes, I do.
16 Q  And why do you believe that?
17 A  He repeatedly told me that I needed to teach these
18    courses where -- and he repeatedly told Karen
19    Chandler, word for word, the same thing. And he
20    repeatedly recommended that we specifically teach
21    these certain 100-level courses, ones that garnered
22    lower scores.
23     I have been told that at the same time or
24    during his tenured chair, he told different things
25    to the male professors. For instance, Dave

Page 146

1     Nicholls, who was hired the same year as I was, he
2     said that Steve Buechler was more forgiving for his
3     low scores in 100-level courses and did not stress
4     that he should teach 100-level courses to the same
5     magnitude that I was told.
6 Q  And Dave told you that?
7 A  Yes.
8 Q  Okay. Now, you said he knew they garnered lower
9     scores, the classes that he assigned -- or that he
10    recommended that you take?
11 A  I didn't know that, but -- at the time that this
12    was going on but in -- in September of 2009, I
13    found some faculty meeting minutes from fall 2004.
14    Now, Bill Dwyer had just taken over as chair, but
15    he immediately called a faculty -- one of his first
16    actions as chair was to -- was this faculty
17    meeting. I was on maternity leave so I did not --
18    I was not there.
19     But in the meeting minutes, he starts off
20    picking four courses out of I don't know how many
21    we teach, but you get the number, and it's a lot,
22    you know, so maybe -- I don't know but just only
23    four courses at the freshman -- only four courses
24    of all the courses that we teach in the math
25    department, that are a problem for the math

Page 147

1     department, that they garner lower TCEs, and he
2     wants -- regular faculty does not teach them
3     anymore, not even tenured people.
4 Q  You say -- you mean now?
5 A  This was in 2004.
6 Q  Oh, so regular faculty didn't teach them in 2004?
7 A  They did. He didn't -- he wanted to propose that
8     we give the burden for these courses to people we
9     would hire that would be specialists in teaching,
10    teaching specialists, not a regular faculty like we
11    are. They're called Special Professional
12    Faculty -- SPF, I think, we refer to them as -- to
13    take over these four courses, to take over the
14    teaching of these four courses.
15     And these four courses, I found out in 2009 --
16    I read these minutes -- were the four courses that
17    Buechler had repeatedly recommend that I teach. I
18    find it impossible to believe that in -- in fall of
19    2004, Chair Dwyer thought that this was an
20    emergency, dire need for the department, that
21    Buechler did not know that these were problem
22    courses.
23 Q  Do you know what the four courses were?
24 A  The four courses were at that time called 125 and
25    126. I know for sure. And I believe the others

Page 148

1     were 119 and 120. 120 was definitely one of them.
2     And I believe the other course number is 119, but I
3     would have to check on the actual course number.
4     Our numbers have since been changed, because
5     nothing can be made easy. So the new numbers are
6     different. But at that time that's what they were
7     called. I'm kind of flipping through to see if I
8     have it.
9 Q  Did you and Karen Chandler teach all of those --
10    all of these four courses every year?
11 A  I taught from this list every year except for my
12    first year here, when I taught two other 100-level
13    courses. Karen often taught from this list. I
14    didn't -- it was hard for me to find all the data
15    on her actual teaching.
16     But I know, for instance, we both taught a
17    course -- one of the courses from one of this list
18    one semester. We were both moved into it after
19    shuffling around of the teaching schedule.
20 Q  So when you say "every year," you mean to this day,
21    every --
22 A  No. Up until I came back with tenure.
23 Q  So you haven't taught those courses since?
24 A  I have not taught them since.
25 Q  All right. Now, my question was -- and I think you

---

Page 149

1   misunderstood or I didn't say it right -- there's
2   four courses?
3 A  Yes.
4 Q  Is there only one of each of those four courses
5   taught every year, and you and Karen taught them --
6 A  No. No.
7 Q  -- or there are like ten of each?
8 A  So these are these multi-section courses. So
9   typically there would be anywhere from four to six
10  or fewer or a little more.
11 Q  Of each class or total?
12 A  Of each of those. There would be four to six
13  people overall teaching on such a course each
14  semester.
15 Q  So there would be between 16 and 36 -- or 24 --
16  between 16 and 24 actual classes that somebody had
17  to teach?
18 A  Yeah. Uh-huh.
19 Q  So who's teaching the others if you're teaching one
20  and Karen is teaching one?
21 A  They're meted out amongst the faculty, and I was
22  always told that my male colleagues were also
23  teaching these courses, particularly males who they
24  are on the tenure track. And there's such a large
25  number of courses that I thought that was -- I

Page 150

1   believed my chairs to be --
2 Q  Well, it would have --
3 A  -- to be telling the truth.
4 Q  It would have to be males teaching them if there
5   were so few females.
6 A  Not tenure-track.
7 Q  Not tenure-track. How many --
8 A  And not tenure-track at the rate that the females
9   were teaching them. In fact, their comments, for
10  instance, from Professor Kolda in physics, that
11  when he -- he was the one that questioned, that led
12  me to even look into this issue. He looked at
13  my -- my teaching and he said, Why are you teaching
14  all these 100-level courses in the summer of '09?
15  He was bowled over. And he said that this was
16  disgusting to him, that the senior people in my
17  department should be teaching these hard-to-teach
18  courses and that they would peddle these off on
19  junior made him sick to his stomach.
20 Q  Now, Professor Buechler recommended you take these,
21  correct?
22 A  Repeatedly.
23 Q  Okay. And then, who was the chair -- or let me
24  stick with him for a minute. So why -- why do you
25  believe that he assigned these to you, these

Page 151

1   classes? Because you're a woman --
2 A  You should ask him.
3 Q  -- or do you? I mean, do you believe he assigned
4   them to --
5 A  I absolutely believe he did, as the chair. Karen
6   Chandler and I and Claudia taught these courses at
7   a much higher rate.
8 Q  I know that that's been established. But at the
9   time he made these assignments, do you think he
10  said, I'm going to give Katrina Barron all these
11  classes because she's a woman and I want her to get
12  lousy scores and I don't want her to get tenure?
13 A  That certainly is a possibility.
14 Q  Well, do you believe that?
15 A  It's hard for me to know what goes on in his head.
16  I've been told by Chris Kolda, who is now the chair
17  of the physics department, that there's no way that
18  a chair could not see that he was destroying my --
19  that he was unfairly burdening me.
20 Q  Okay. Any other reason you think that
21  Professor Buechler --
22 A  I think that people like Dave Nicholls, who was
23  hired in the same position I was, the same year I
24  was -- if a male professor gets a high score in a
25  100-level course, high enough, they don't have to

Page 152

1   teach it again. If a male, like Dave Nicholls,
2   gets a low score in the 100-level course, you
3   should take them out and have them teach 300 --
4   200-, 300-, 400-level courses and then put them
5   back in after awhile --
6 Q  Now --
7 A  -- to say -- to ensure that they will have a good
8   record, going up for tenure. This has been stated
9   in multiple faculty meetings to me before and after
10  this -- this -- my tenure denial, and that is said
11  when it is a male teaching that course.
12      Repeatedly Buechler, Alex Himonas said -- made
13  comments about mine, I should be getting higher
14  scores than that. Why am I not getting higher
15  scores than that? Alex says, These courses are
16  easy to teach. You should be getting higher scores
17  than this.
18      They've made comments about they know I care
19  about the students. Steve Buechler made comments.
20  He made a comment in, I think, a letter in writing
21  about how much I care about the students.
22 Q  Did he tell you -- now, was it Buechler who told
23  you -- at one point your scores were really bad,
24  right?
25      I think somebody wrote rock bottom or really

Page 153

1    bad. Was that under Buechler's tenure?
2  A  That was when I was coming back from maternity
3    leave and --
4  Q  The first time or the second time?
5  A  The first time.
6  Q  Okay.
7  A  The second time. Excuse me.
8  Q  The second time.
9  A  The second time. I was coming back from maternity
10   leave. I had a very hostile environment with
11   Professor Dwyer, with Bill Dwyer, about my
12   maternity leave. We had gone back -- repeatedly
13   back and forth, about them taking away a year
14   extension of the clock because I took maternity
15   leave. And I repeatedly made a request for certain
16   courses and was repeatedly denied and repeatedly
17   denied. And both Bill Dwyer and Alex Himonas at
18   the time kept referring to my time off for my
19   maternity leave.
20       I tried to get a 200-level course repeatedly.
21   They told me that I could not teach two sections of
22   that course, that that wasn't done. When I showed
23   them evidence that men had been allowed to do this,
24   they told me, No, that we don't do this, we very
25   rarely do this.

Page 154

1       So under Bill Dwyer and Alex Himonas, I was put
2    into this knowingly adverse teaching environment.
3  Q  So it was under Bill Dwyer. When did he become the
4    department chair?
5  A  In fall -- starting fall 2004.
6  Q  And Alex Himonas, when was he the chair?
7  A  He was associate chair.
8  Q  Associate chair.
9  A  I -- you know, I think -- I don't recall when -- he
10   took over for Alan Howard. Alan Howard was
11   associate chair when I was first hired and for like
12   the -- sometime around after my first year or
13   second year or -- 2001, 2002, something around
14   then, he took over as associate chair, Alex Himonas
15   did, from Alan Howard.
16 Q  All right. So it was under Bill Dwyer and Alex
17   Himonas that you believe that the discriminatory
18   assignments started?
19 A  No. The discriminatory assignments started under
20   Buechler prior to that, but you mentioned one
21   particular semester in which my scores were rock
22   bottom --
23 Q  That was under --
24 A  -- and that was an assignment given to me, by Bill
25   Dwyer and Alex Himonas, coming back from maternity

Page 155

1    leave. That would have been fall -- spring 2007.
2  Q  All right. I want to make sure I've exhausted
3    everything that you can think of as far as
4    Professor Buechler. Anything else he said or did
5    that you believe --
6  A  I feel like he did -- yeah, there's plenty. He --
7    he had been very -- made lots of statements to me
8    verbally about my scores not being out of the
9    ordinary, my scores not being out of the ordinary
10   for these courses, my scores being better than he
11   could get, about how the TCEs were not a good
12   indicator of many aspects of teaching.
13       But then starting in -- starting -- when he
14   wrote this first review letter -- that conversation
15   was similarly fairly supportive in his wording to
16   me. But then when he wrote me this actual letter,
17   it was pointedly negative and twisting of our
18   conversation and twisting of my words.
19       MR. BARKES: Are you done? You can
20   also refer to the exhibit we're referring
21   to.
22 A  Oh. In addition, Professor Buechler himself had
23   made statements to me concerning the TCEs that are
24   in direct opposition to statements that I found in
25   the notes from Faculty Senate meetings on TCEs, for

Page 156

1    instance, telling me how -- how my scores of, you
2    know -- that I needed to have these scores above
3    3.0 and a score at -- such as 2.999 or something, I
4    could just be being dinged for something I'm doing,
5    suggesting I was -- had a mannerism in class or
6    something that was causing the students to lower
7    their TCEs scores.
8       Then in the Faculty Senate meeting he would
9    make comments like up to 0.3, the TCEs are
10   meaningless. There's statistical errors in these,
11   that they should not be considered of meaning.
12 Q  And he said that in a faculty meeting?
13 A  He said this -- okay. He said it in a faculty
14   senate in 2003, 2004 academic year. He was telling
15   the faculty senate that these TCE numbers were
16   meaningless for at least up to 0.3 difference. In
17   addition, at that time issues such as TCEs carry
18   gender bias. At that time there was a 19 -- report
19   that -- internal report that Notre Dame had done
20   showing that, particularly at the freshman level,
21   there can be gender bias against female
22   professors --
23 Q  Okay.
24 A  -- which I'm sure he was aware of, and he certainly
25   was aware of these issues.

Page 157

1 Q   How are you sure he was aware of that?
2 A   Well, in the faculty senate meeting they discussed
3     this.  They discussed gender bias in the TCEs.
4     They discussed the meaningless of -- the disparity
5     between the -- the numbers I was getting on TCEs
6     and the numbers that he wanted me to get.
7 Q   Was he -- do you know he was at the Faculty Senate
8     meeting that they talked about?
9 A   Yeah.  This is actually a statement he made, that
10    the TCEs are meaningless for at least up to 0.3
11    difference.  That was a statement he made,
12    according to the minutes of that meeting.
13 Q   And you found those minutes?
14 A   And then --
15 Q   -- while you were doing the research for your
16    appeal?
17 A   I'm not exactly sure when I found these minutes;
18    then or subsequently, after.
19 Q   Okay.  Do you have any knowledge that any of the
20    students in your classes evaluated you poorly
21    because of your gender?
22 A   I believe so.  They made comments.  I've had
23    comments with students comparing me to Luna
24    Lovegood, making comments of my hair, my dress, my
25    not wearing -- wearing knee socks with a dress

Page 158

1     rather than hose, very gender-specific comments.
2 Q   Do they make comments about what male professors
3     wear; do you know?
4 A   I -- I've discussed -- I discussed this, especially
5     when I first came to Notre Dame, because I was
6     shocked at the number of personal comments that the
7     students made.  And one professor who only ever
8     taught one or two courses at the 100 level, because
9     he -- he told me he refused to teach them after
10    this.
11        I'm like, How do you refuse?  Can I -- tell me
12    how to refuse.  He's the only one that ever said
13    anything.  But he -- and I did discuss this with
14    quite a few males.  And he -- I remember it because
15    it struck me that this was the only time that their
16    clothing was commented on.  And one student said
17    they didn't like his glasses.
18 Q   Okay.  So other than what you've got written here
19    about Professor Buechler, any comments that he made
20    to you that you believe were gender based?
21 A   I believe his -- the way he wrote this -- the way
22    he attacked me in this letter for working with, in
23    particular, Chongying Dong, this first letter of --
24    I guess it would have been May 2004, is my guess.
25        He made comments about my research program

Page 159

1     without having any knowledge of my research
2     program.  And I showed this to many -- to several
3     people in my field and to several people in the
4     department who were quite shocked that he would
5     make such specific comments of who I should work
6     with in my research when he knows nothing about my
7     research program, and that he would -- he would --
8     that he made it out that I was not doing my own
9     research, that it was not my own research program,
10    when, in fact, if you put my -- you know, we were
11    commenting on how many papers in my CV are
12    single-authored by me.
13        If you put this against most men in my
14    department, you would have fewer single authored
15    papers.  Now, this was -- I was -- most people I
16    show this to are particularly taken back that he
17    would --
18        (Defendant's Exhibit 8 marked.)
19 BY MS. CANTON:
20 Q   Well, let's look at Exhibit 8 and see if this is
21    the letter that you're talking about.
22 A   Yes, it is.  Okay.  Yes, May 2004.
23        Comments such as "...that Lepowsky has planned
24    for the two of you."
25        MR. BARKES: There's no question

Page 160

1     pending.
2        THE WITNESS: I'm sorry.
3 BY MS. CANTON:
4 Q   All right.  So what is it that you find offensive
5     in this letter?
6 A   I, and people I've shown the letter to, find it
7     very odd, the wording, that would be atypical for
8     academia -- anyplace in academia, and that he
9     would -- for instance, he says, "You remarked that
10    you had planned to spend part of your leave at
11    Rutgers working on projects that Lepowsky has
12    planned for the two of you," is a completely false
13    statement.  It reads as if Lepowsky is running the
14    program and he has research that he is helping me
15    with.
16 Q   Okay.  Did he strongly encourage you to spend some
17    time at another school; for example, Wisconsin?
18 A   Yes, he did.  This is another statement that was
19    quite odd and out of the ordinary for a chair and
20    somebody who is not privy to where it would be good
21    to spend time at.  It stood out to me, and I
22    believe it stood out to -- I've showed this letter
23    to Lepowsky -- actually stood out to him and other
24    people in his department.
25        Because I had mentioned it because I had been

Page 161

1    invited to give a lecture at Wisconsin. So he knew
2    I was going to Wisconsin. And it smacks of
3    meddling at a level that he wouldn't have done
4    under normal circumstances.
5  Q  All right. Was there a conflict between Lepowsky
6    and Kac --
7  A  Kac?
8  Q  -- some kind of academic dispute?
9  A  Yes, there's an ongoing conflict.
10 Q  So your point is you were offended by this, and you
11   don't think he would have done it to a male?
12 A  Absolutely.
13 Q  Okay. Do you know whether he's ever given any kind
14   of advice like this to a male professor?
15 A  I'm pretty confident that he's not, to my
16   knowledge, written reviews like this. No, he has
17   not.
18 Q  And have you looked -- have you seen all his
19   written reviews?
20 A  No, I haven't. I base that on talking with Dave
21   Nicholls, who was given a review the same year as
22   well, and showing it to other people within my
23   department and outside my department.
24 Q  And what is it about this letter that you believe
25   is discriminatory, based on your gender?

Page 162

1        MR. BARKES: She's asked and answered
2        that partially. But you can go ahead and
3        answer for additional --
4  A  Again, I repeat, assuming that the senior male
5    professor, that I was going -- that I had a
6    research project going with was the one who had
7    planned it for me, not seeing that most of my
8    papers are single-authored and that -- and remarks
9    such as, for instance, including that I should not
10   work with Dong. This is Chongying Dong. Dong has
11   never been an advisor of mine. He's not -- you
12   know, he's a well-known, senior, male professor in
13   my field, and most people feel like if he would be
14   willing to work with me, then I -- of course, I
15   should work with him.
16       The tenor and the -- being that I -- just even
17   suggesting that I should not work with these four
18   people with -- implying that my research doesn't
19   stand on its own when most of my author -- my
20   papers are single-authored, and the papers that I
21   did have Dong and Mason were known to be a large
22   portion of my work, to be very prestigious and
23   ground-breaking due to my contribution.
24 Q  All right. Anything else --
25 A  This be would be known if he asked anybody.

Page 163

1  Q  Okay.
2  A  In addition -- yes. I'm sorry. What was the
3    question?
4  Q  You said "in addition." Is there something else in
5    this letter?
6  A  I believe his statement, "Turning to teaching, you
7    expressed some frustration at the fact that your
8    TCE scores haven't improved over the semesters," I
9    believe he turned that statement around. The
10   frustration was in my teaching assignments, in
11   repeatedly having to teach these 100-level courses,
12   that he was recommending again that I teach 125 and
13   126. At that time I didn't know those were the
14   hard courses. But the previous year he had
15   recommended that I teach that.
16       But then I was yanked out of the 126 portion
17   and put into 120, which was a change of course
18   chairs. I expressed frustration that I was being
19   bounced around where I was teaching under -- I
20   didn't have autonomy for my course. I was bounced
21   around teaching under this chair, then that chair,
22   this chair, that chair, under senior male
23   professors that dictated to me what I should be
24   doing, how I should be doing it.
25       Karen Chandler and I were both moved into that,

Page 164

1    I believe, spring 2003 section of 120. This is
2    often the -- oftentimes the case -- the only cases
3    I know of women -- anybody having their assignment
4    switched at the last minute are women, and we were
5    switched into this course, so that I did not get to
6    continue on with the students that I had built a
7    rapport with.
8        These types of things I was -- had discussed
9    with him. These were things that I had brought --
10   that I was frustrated about in terms of the
11   assignments I was being given. And for him to
12   write the sentence, "Turning to teaching, you
13   expressed some frustration at the fact that your
14   TCE scores haven't improved over these
15   semesters" --
16 Q  Is that not accurate? You hadn't expressed that
17   frustration?
18 A  No, it is not accurate, in that the frustration was
19   over my TCE scores per se.
20 Q  Is it accurate that you didn't know until the
21   summer of 2009 that there were these certain
22   courses that tended to garner lower student
23   evaluations?
24 A  In fact, I didn't know it until September of 2009.
25   In fact, when I found those meeting -- minutes of

Page 165

1 that meeting, in which those were discussed, I
2 wrote Don Pope-Davis petitioning to add those to my
3 regular appeal which had already been -- had to be
4 turned in, and he denied my request to append
5 those. Because I thought those minute meetings
6 were so important, so revealing, that I wanted them
7 appended to my regular appeal. And he denied my
8 request.
9 Q  They did get appended to the Appendix A appeal,
10 though, right?
11 A  My Appendix A appeal had not been turned in yet so
12 I turned them in with my Appendix A appeal.
13 Q  You put them with them. So you didn't know those
14 particular courses tended to garner lower scores,
15 could, and I guess you didn't know about that 1990
16 study that said that there could be some gender
17 bias in some classes?
18 A  No.
19 Q  So is it accurate then that you never said to any
20 chair or any associate chair, You're giving me
21 these classes because I'm a woman and --
22 A  No. I never --
23 Q  -- I'm protesting that?
24 A  I never said that, but I questioned repeatedly
25 whether it was normal that I be teaching this

Page 166

1 number of 100-level courses.
2 Q  Okay.
3 A  And I was repeatedly told, yes, you are teaching no
4 more 100-level courses than is typical on the
5 tenure track.
6 Q  And did Mr. Buechler tell you that?
7 A  Mr. Buechler told me this. Bill Dwyer told me
8 this. Alex Himonas told me this. Even after I
9 compiled my data and I showed it to people, they're
10 like, oh, we all teach a lot of 100-level courses.
11 Q  Anything else with Mr. Buechler before we move on?
12 A  I'm sure there are other things that I could point
13 to. But if you would like to move on, we can.
14 Q  Well, as you sit here today, do you remember
15 anything else that he said or did that you think
16 was discriminatory based on your gender?
17 A  I feel that he repeatedly -- he talked about having
18 a teaching mentor. I said I was -- would be
19 wonderful to have a teaching mentor. He never
20 assigned me a teaching mentor. Whereas at this
21 time, people like David Nicholls did have senior
22 male professors overlooking their teaching, and
23 Buechler was well aware of this.
24    He repeatedly told me that I should look to
25 Alex Himonas' teaching -- people to follow as

Page 167

1 teaching mentors, even though he knew that there
2 had been problems with Pit-Mann Wong when Karen
3 Chandler and I taught with him.
4 Q  What were the problems?
5 A  At one point I sought refuge in Steve's office
6 because Pit-Mann Wong was yelling at me, and I was
7 afraid he was going to hit me.
8 Q  When was that?
9 A  This was in the spring 2003. Because I turned in a
10 cheater at the end of the course that we were
11 teaching. We had a student cheating, and he was
12 very angry at me. He was very angry at Karen
13 Chandler. He was furious that I followed the
14 faculty handbook and turned the case over to the
15 Honesty Committee.
16 Q  And what did Professor Buechler do when you ran
17 into his room to get away from him?
18 A  He helped calm me down, and he helped walk me
19 back -- he walked me back to my office to get my
20 books because I needed to teach and I was afraid of
21 Professor Wong.
22    In addition, at that time I --
23 Professor Buechler knew that we'd had complaints
24 from the students that Pit-Mann Wong was going over
25 the exam for the students in his section before --

Page 168

1 the day before the exam, was going -- working the
2 problems in the actual exam on the board before --
3 the day before the exam, and that Karen and I had
4 had problems with this, that we had complaints from
5 students, that we had berated often, wildly
6 unacceptable, by Pit-Mann Wong. And for him to
7 then say Pit-Mann Wong could be your teaching
8 mentor and suggest him as a mentor or to have even
9 allowed Alex Himonas to move me into that course
10 when nobody else would teach it, Karen and me, I
11 felt, was very discriminatory.
12    And, in fact, after Bill Dwyer became chair and
13 he had asked me if there had been -- if I had
14 experienced sexual harassment, I mentioned the
15 episodes with Pit-Mann Wong, and it was my strong
16 feeling that Pit-Mann Wong should not be given any
17 oversight over junior faculty women or postdocs or
18 graduate students.
19 Q  Did that happen?
20 A  No, it did not.
21 Q  Did you ever report anything that
22 Professor Buechler did or said that you thought was
23 discriminatory? Did you ever report that to
24 anyone?
25 A  No. I -- it would -- it would have -- I was told

Page 169

1  by many people to keep my head down, to never
2  report anything. I was told this by an outside
3  mentor that I was assigned by the university.
4  Q  Who was that?
5  A  George Lopez.
6  Q  Where is he from?
7  A  He was in the Kroc Center for Peace Studies.
8  Q  Okay. Did you tell him that you had concerns that
9  Mr. Buechler was making decisions based on your
10  gender?
11  A  I -- at that time I complained to him -- to George
12  Lopez about my teaching assignments, about teaching
13  these 100-level courses, about not having autonomy
14  over my courses, about my complaints to Buechler
15  about my course load and I wanted to teach more 200
16  and 300 level courses and courses in my specialty.
17  George Lopez had actually, when we first were
18  put together, warned me that he saw many red flags,
19  just looking at me as being a woman in my
20  department, junior woman with very few other women,
21  and that I should be wary. At the time I didn't
22  think that I needed to be wary, but this was -- I
23  don't remember if it was prior to the Pit-Mann Wong
24  incident or -- this letter, I believe, was -- that
25  I expressed that opinion prior to this -- to this

Page 170

1  letter.
2  Q  Did he say what the red flags were?
3  A  Mentioned lots of older senior male professors in
4  my department, with me being a younger junior
5  woman. Specifically I remember him -- this was in
6  an email. I found this email just recently.
7  Anyway -- yeah.
8  He -- I remember him using the term red flag,
9  being a junior woman, there being many senior
10  males, being fewer women in my department, that
11  these he would normally consider red flags at Notre
12  Dame.
13  Q  Did you ever go back to him and tell him anything
14  about gender discrimination?
15  A  After I found this letter, I ran into him, and I
16  told him about this letter. This was this past --
17  this was maybe about a year ago or sometime in
18  2012. And I should have listened to his letter
19  better.
20  And then we met sometime this past year, maybe
21  this past summer, for coffee, and I told him about
22  what had happened.
23  Q  And what did he say?
24  A  He was shocked. He -- that I -- you know, that
25  such things are still occurring, but not surprised.

Page 171

1  We discussed Claire Chow, who I had dealings with
2  and he had dealings with in the Kroc Institute, who
3  had been fired -- attempted to be fired, and I had
4  helped her and advised her, and then he asked me
5  the name of my lawyer because he felt like, you
6  know -- I don't know for what reasons -- but he
7  felt that Notre Dame was being discriminatory in
8  many aspects.
9  Q  Now, where is the Kroc Center? Is it on campus?
10  A  Yes.
11  Q  Okay.
12  A  It's --
13  Q  You said external, but it's external to your
14  department?
15  A  External to my department. There was a program for
16  mentoring, and I wanted an outside mentor with
17  advice for -- people kept talking to me about there
18  are little tricks you can do for Notre Dame
19  students to get higher TCEs and -- Alex Himonas
20  kept telling me, tell them you will give them all
21  As. Wong, he obviously had his way of helping the
22  students cheat.
23  I wanted good advice, that I felt was good
24  advice, and so I signed up for the mentoring
25  program through Notre Dame. It's an official

Page 172

1  program. And they assigned George Lopez to me. I
2  didn't pick him.
3  Q  And was that helpful for you, that relationship?
4  A  It was not really. We discussed teaching a lot,
5  but the differences between -- and this was what I
6  found when I discussed it with many other friends
7  of mine outside my department. Typically the women
8  I knew were in arts and letters or biology. And
9  the circumstances under which they were teaching
10  were just so drastically different than mine, in
11  terms of the autonomy they were given over their
12  courses, the course materials, the course -- pacing
13  of the course, which I didn't have problems with
14  courses in which I was given that autonomy. My
15  TCEs and CIFs were high and have only gotten
16  higher.
17  It was these 100-level courses where there were
18  multiple sections under a course chair who dictated
19  what you did. And so advice -- I took advice. I
20  died my hair darker. I wore more dresses. I wore
21  more makeup.
22  Q  Who gave you that advice?
23  A  Many people.
24  Q  You mean other faculty?
25  A  Other faculty.

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 46 of 108

**Page 173**

1 Q   Claudia Polini, she started the same year as you.
2     Did she have to teach those lower -- the 100-level
3     courses?
4 A   Yes, she did.
5 Q   And how did she do score-wise?
6 A   I believe her scores were good, not -- I know that
7     she was frustrated at times with not getting higher
8     scores than she was.  She'd expressed frustration
9     with me on getting high scores on these 100-level
10    courses and what were the guys going to get these
11    high scores.  But she generally got high -- got
12    reasonably higher scores.
13 Q  So how did she get up for tenure a year early?
14 A  Claudia, she was -- she was more years outside of
15    her Ph.D. when she came to Notre Dame than I was.
16    And she's a rock star researcher.  She had multiple
17    offers from Purdue, Rutgers.  I don't know where
18    else.  Better than other men that they had tenured,
19    and everyone knew that she was well above what was
20    necessary to get tenure and that they should tenure
21    her before she got frustrated and left.
22 Q  All right.  I think after this, the next evaluation
23    you got was from Professor Dwyer.  But before we
24    move to him, I want to make sure there's nothing
25    else about Professor Buechler that you recall.

**Page 174**

1         MR. BARKES: Are you referring to from
2     the letter or --
3         MS. CANTON: No, no.
4 BY MS. CANTON:
5 Q   Just what you remember, anything you believe is
6     discriminatory.
7 A   Well, for instance, I know that Professor Buechler
8     supported chew's promotion to tenure in the
9     2011-2012 academic year.
10        And I was told that Professor Xu almost didn't
11    get appointed for his third-year renewal in our
12    department because of the scores that he got on a
13    course that we -- we were teaching at the same time
14    and that after Zhiliang Xu got those low scores, he
15    was taken out of teaching 100-level scores.
16        Buechler did not require him to teach any more
17    100-level courses.  I believe he taught two total,
18    and he was -- and I believe his scores were very
19    low, and he was promoted to tenure under Buechler.
20 Q  Now, have you seen his scores, or is this just what
21    you've heard?
22 A  This is just what I've heard.
23 Q  Okay.  Anything else with Buechler that you
24    remember?
25 A  I believe that, for instance, Buechler knew of

**Page 175**

1     Peter Cholak's scores and what Peter Cholak's
2     scores at the 100 level were prior to going up for
3     tenure, and he knew that mine at that point were,
4     on average, higher than Peter Cholak's.
5 Q   Okay.
6 A   I believe this because Buechler was -- he was on
7     the CAP, I believe, at the time.  I also was told
8     by several people, including Dennis Snow and Nancy
9     Stanton, that Professor Buechler was aware of the
10    admonitions that the dean had given when Peter
11    Cholak went up for tenure.
12        The dean had told then Chair Alex Hahn, and
13    senior members of the department, to not put junior
14    faculty into 100-level courses.  I was told this
15    after I was denied tenure.
16 Q  Do you remember who told you that?
17 A  Dennis Snow said this to me.  Nancy Stanton said
18    this to me.
19 Q  Are they both in the math department?
20 A  Yes, they are.
21 Q  So Dennis Snow and Nancy Stanton told you that the
22    prior dean had told --
23 A  Dean Castellino, I think it was.
24 Q  Had told the prior chair --
25 A  Alex.

**Page 176**

1 Q   -- don't put junior faculty in 100-level courses?
2 A   Yes.
3 Q   Okay.  We'll take a break after we finish with
4     Professor Buechler.  You said you repeatedly asked
5     him, Why am I getting so many courses -- why am I
6     getting so many 100-level courses, and you were
7     repeatedly assured that -- that you weren't, is
8     that --
9 A   I don't know that I said the phrase, Why am I
10    getting these.  I more phrased it as I would like
11    to teach 200 level, 300 level, 400 level courses
12    for math majors, courses for Honors majors, courses
13    in my specialty, courses that I had been given as a
14    postdoc which I had been very successful at
15    teaching, getting very high teaching evaluations.
16    I wanted to teach those.  Why am I not being given
17    those?
18        And his rebuttal was, we all teach a lot of
19    100-level courses or you need to teach these, show
20    that in these 100-level service courses you can
21    consistently get above a 3.0.
22 Q  Okay.  So if we just go with Buechler, because
23    that's who we're on, he didn't say you're getting
24    assigned 100-level courses at the same rate as the
25    males?

Page 177

1      MR. BARKES: I'm going to object that
2      that mischaracterizes her previous
3      testimony.
4      MS. CANTON: No. I'm not miss --
5  BY MS. CANTON:
6  Q  I'm asking. Did he say that or not?
7  A  He didn't say those words. He said, in response to
8      my -- my general I would like to teach courses at
9      the higher level, as you're not teaching -- we all
10     teach a lot of calculus, everyone has to teach a
11     lot of these 100-level courses, characterizing it
12     as the men had to teach similar -- similar teaching
13     prior to tenure.
14 Q  Okay. Anything else you can remember that he
15     actually said when you would ask him about I want
16     to teach higher level courses?
17 A  There was a point where I wanted to teach Honors
18     courses, and he confirmed that I had to go through
19     Frank Connolly to do that, that he would not meddle
20     in Frank Connolly's decision to not let me teach
21     Honors courses.
22 Q  Who is Frank Connolly?
23 A  Frank Connolly is a professor in my department and
24     he just retired, and he ran the Honors -- math
25     Honors program by and large.

Page 178

1  Q  So did you go talk to him?
2  A  I did talk to Frank Connolly.
3  Q  And what did he say?
4  A  He told me that -- Well, we'll see, he said.
5      Because I kept putting down these courses in my
6      requests to teach courses, and I was wondering why
7      I -- why I was being given courses that weren't
8      even on my list of courses s that I wanted to
9      teach.
10     And he said, well, let me talk to Alex Himonas.
11     Well, let's see how you're doing in the service
12     courses. We'll have to see.
13 Q  The service courses are the 100-level courses?
14 A  By and large, yes. Also 200 level. When the
15     people kept saying service courses, I kept asking
16     to teach Calculus III, 200 level Linear Algebra,
17     200 level specifically. Because coming in as a
18     postdoc, I had done very well teaching and is
19     helping design a metric calculus course, second
20     year course, and so when she kept saying service
21     course, service course, I questioned why not a 200
22     level service course.
23 Q  Okay.
24 A  I was never given a 200 level service course, by
25     the way.

Page 179

1  Q  To this day?
2  A  No. When I came back after being denied tenure and
3      getting my job back, I was given a 200 level
4      course.
5  Q  Let's move on to Provost Burish. You state that
6      "The basis for his decision to deny me tenure was
7      TCE/CIF scores in the 100-level courses." Did he
8      put that in the letter that he sent to you?
9  A  No.
10 Q  What did he say in the letter?
11 A  His letter didn't say a reason.
12 Q  Did you ever get a reason?
13 A  As per university policies, was allowed to ask Dean
14     Crawford for a letter with a written reason, which
15     I did, but the day after I was denied, Dean
16     Crawford told me verbally that it was my teaching.
17 Q  Okay.
18 A  And then in his -- Dean Crawford's written letter,
19     which it's my understanding that that is reviewed
20     by the Office of the Provost and General Counsel's
21     Office, I was told he stated that it was my
22     teaching.
23 Q  Okay. So why do you say it was your teaching in
24     the 100-level courses?
25 A  Because in -- those were by far my lowest TCEs.

Page 180

1      The rest of my teaching, I was told by Buechler and
2      by Dwyer, was very good. I had been told by
3      members of the department of physics, in
4      particular, people that -- Chris Kolda had wanted
5      to know what was going on, why I did not get it.
6      And from statements he made, I was told that in the
7      PAC the discussion was my TCE in the 100 levels.
8  Q  So are you saying that all your non-100-level TCEs
9      were good?
10 A  I was told by my chairs that, yes, they were plenty
11     high enough to get tenure.
12 Q  But you know what they were, don't you? I mean,
13     don't you get -- you get them every year?
14 A  Yeah. I think my lowest was a 3.43 on a zero to 4
15     scale.
16 Q  For the non-100?
17 A  Yeah.
18 Q  Okay. All right. So somebody told you that at the
19     PAC somebody said that you had a lot of courses at
20     the 100 level?
21 A  I was told there was a discussion that I seem to
22     have been given a lot of the courses at the 100
23     level, and Chris Kolda subsequently told me that
24     when -- so it was Chris that insisted that I go and
25     look at other people's teaching records in my

Page 181

1     department prior to going up for tenure in the
2     summer of 2009.
3         And the first person I asked was Jeff Diller,
4     and I realized that I had -- and I got just a few
5     more examples, and I realized that what I'd been
6     being told was wrong, and I started compiling the
7     statistics.
8         I went back and talked to Chris, and Chris said
9     that he had lunch with members of the physics
10    department in which they were discussing my case,
11    and Ikaros Bigi was very interested in hearing that
12    there was gender disparity in the statistics I was
13    gathering.
14 Q  And he's the one who was on the PAC who told Chris
15    that they had talked about your 100-level scores --
16 A  Uh-huh.
17 Q  -- at the PAC meeting?  Okay.  Why do you say he,
18    himself, knew that TCEs might carry gender bias?
19    This is the Provost Burish.
20 A  I believe this has come up in multiple senate
21    meetings, academic council meetings.  There was an
22    entire overhaul of the TCEs.  Burish himself had
23    said the TCEs were an unreliable method of
24    gathering data and, thus, they were revamping the
25    way teaching was evaluated, and they were moving to

Page 182

1     this ACPET guidelines and a whole other metric, the
2     CIFs, by which to measure teaching.
3         So he had made multiple statements and sat in
4     on multiple meetings in which people -- I know
5     Kathleen Eberhard sat in on that -- meetings to
6     revamp the ACPET guidelines, and minutes of those
7     meetings I'm sure the provost had.
8         She clashed multiple times with Dennis Brown
9     about whether -- about the degree to which there's
10    gender bias in the TCEs, whether there's gender
11    bias in the new method that they're going forward
12    with, the CIFs.
13 Q  When was this -- when was this change?
14 A  We stopped doing the TCEs -- come on, help me out.
15        MR. BARKES:  They can't answer for you.
16 BY MS. CANTON:
17 Q  Before you went up for tenure, was it?
18 A  Yes.
19 Q  Okay.
20 A  So my last year -- so the first year we went to
21    CIFs was 2008-2009 academic year.
22 Q  Okay.  Now, this system covers -- this gender study
23    that you found from '99, we're talking the whole
24    university?
25 A  Uh-huh.

Page 183

1 Q  And we're talking every class and every professor,
2    all TCEs, all --
3 A  I don't know the methodology of the study.  In
4    fact, I was told that the woman who oversaw the
5    study was frustrated that not more information from
6    the study was given.
7 Q  Who was that?  Or who told you that?  Okay.
8 A  I don't recall.
9 Q  So there's some general knowledge floating around
10    there that there might be some gender bias in these
11    scores?
12 A  No.  There was an actual report in 1999 saying that
13    there were patterns of gender and racial bias.  In
14    fact, uncovering those 1999 meetings led me to do
15    an analysis of my own scores based on issues --
16    patterns of gender bias that are -- some that are
17    talked about in academia in general, but some that
18    I had never heard of because they're -- to my
19    knowledge, they're unique to Notre Dame.
20        And so that's what led me to look at that
21    gender issue within my TCEs.  It was kind of
22    interesting.
23 Q  And do your own study?
24 A  Yes.  Of just my own scores, is what I had.
25 Q  Okay.  All right.  You say, "I believe

Page 184

1     Provost Burish has made statements to Patricia
2     Maurice and possibly Jean Ann Linney that may show
3     he recognizes that women..." -- what are these
4     comments?  What do you know about these comments?
5 A  Patricia Maurice emailed me when I was in Germany,
6     because I had been asked to help with a case of a
7     woman denied tenure, Jen DuBois.
8 Q  Over at Notre Dame?
9 A  Here at Notre Dame, in the Department of Chemistry.
10 Q  It sounds like you've helped or corresponded with a
11    lot of other women in different departments who
12    have been denied tenure.
13 A  Now, yes, I have.
14 Q  So she emails you while you're in Germany?
15 A  Telling me how she felt that Jen had been
16    discriminated against, that she herself has been
17    discriminated against in the past, in ongoing
18    discrimination.
19        She called me a year ago, frantic about the
20    discrimination she was experiencing by being yelled
21    at by members of her college.  She informed me that
22    she had been in a meeting with Provost Burish --
23    she and others have told me he meets periodically
24    with women as part of some settlement of some other
25    lawsuit.

Page 185

1    So this was a required sit-down with women,
2  senior women on campus, to help improve the
3  environment with women, retention and promotion of,
4  with women.
5    At this meeting, which -- where there were six
6  or so senior female professors at the university,
7  they were discussing such issues as women who take
8  maternity leave. And she told me something to the
9  effect -- she wrote in this email -- I have the
10 email someplace -- comments that Burish had made to
11 her -- to the room regarding whether women who
12 choose to get pregnant while on the tenure clock --
13 I believe these were her words -- that if they
14 decide to take -- they should be advised by senior
15 women that if they decide to take advantage on --
16 of maternity leave policies, that even though these
17 maternity leave policies are on the book, if they
18 use them, they are likely to -- their senior male
19 colleagues are likely to question their commitment
20 to the job.
21 Q  Okay. So this is what Patricia told you that
22   she --
23 A  Patricia, yeah.
24 Q  -- Patricia heard the provost say?
25 A  Yes. And she told me in this letter that -- or

Page 186

1  subsequent email, that she knew of women who would
2  be willing to testify that the -- that this is what
3  they heard as well.
4  Q  Was she at the meeting?
5  A  She was at this meeting.
6  Q  Okay. You've talked about the courtesy
7  appointment, appeals process. Anything -- did he
8  ever say anything to you personally that was
9  discriminatory?
10 A  Tom Burish?
11 Q  Correct.
12 A  No.
13 Q  Is it possible that you could get low scores
14   because the students really don't think you're a
15   good teacher? I mean, is that possible?
16    Or if you get low scores and you're a woman or
17   minority, is it only because of your gender or
18   race?
19    MR. BARKES: I'm going to object to
20   that as to form. It's confusing. You can
21   go ahead and answer.
22 Q  If you understand. What I'm trying to get at is I
23   know there's this study --
24 A  TCEs are a very complicated metric. In my case
25   these are being filled out by 17- to 19-year-old

Page 187

1  students who like math or don't like math, who
2  think women can't do math or can do math, who have
3  all sorts of opinions and biases. They are given
4  no -- this is the first time that they're being
5  asked to evaluate a teacher. All of these TCEs,
6  they're done quickly, in class. The students spend
7  five, ten minutes, (indicating).
8    There are all sorts of factors that could be
9  going through the heads of a 17- to 19-year-old who
10 is at the end of a long semester. They usually do
11 this the last week of classes, before their final
12 exam. Going through their head as to what
13 motivates them to give good scores or low scores.
14 There's all sorts of studies on this.
15    Almost all studies will say something to the
16 effect that they will form an opinion within the
17 first five minutes of walking into a class and that
18 their opinions don't change dramatically from that.
19 Q  Okay.
20 A  Also studies that show that if you have them fill
21   out a survey holding a Coke, they will give lower
22   scores than if you have them fill out the survey
23   holding a cup of coffee.
24 Q  Cup of coffee?
25 A  Coffee. That they would -- are filling these out

Page 188

1  on the first five minutes of me walking into a room
2  for a math class or the temperature of the room or
3  the --
4  Q  All right. Anything else with Professor Burish
5  other than what you have here or what we've talked
6  about? Provost Burish, I should say.
7  A  I would point out that it is my understanding that
8  Provost Burish was there with a unanimous decision
9  from my CAP, support from my chair, support from my
10 dean, and a very contentious provost advisory
11 committee meeting.
12 Q  And is that based on what you heard from Chris in
13 physics?
14 A  Uh-huh.
15 Q  Okay.
16 A  And members of my CAP and dean talking about their
17 level of support of me.
18 Q  And then he didn't support you?
19 A  It was him that had the next level of decision.
20 Q  It stopped with him?
21 A  Yes.
22 Q  Okay. Kathleen Cannon, does she know anything
23 other than general discrimination against women and
24 a hostile environment?
25 A  I was told by Patricia Maurice that Kathleen Cannon

Page 189

1  has a letter in her possession from the Luce
2  Foundation putting the Department of Civil
3  Engineering on probation for a hostile environment
4  to women.
5 Q  Okay.
6 A  And that she had called Patricia Maurice to a
7  meeting, a luncheon, with a representative from the
8  Luce Foundation, and the purpose of the meeting was
9  to work on -- it was an on-site visit required by
10  the Luce Foundation to try and assess whether the
11  hostile environment was no longer hostile.
12 Q  Karen Chandler, is she at Harvard, or is she at
13  Nova Scotia?
14 A  She was out of Harvard. Her Ph.D. is from Harvard.
15  She's now living in Nova Scotia.
16 Q  So this email here that says Harvard, that's not
17  right?
18 A  I believe she still has a courtesy email account
19  through Harvard.
20 Q  Okay.
21 A  And at that time I have emailed her on that
22  account, and it has worked. It worked last year,
23  anyway.
24 Q  Does she have any knowledge about any of the facts
25  of your particular case? I know we've talked about

Page 190

1  her case.
2 A  Yes, she does. She and I had discussed, after she
3  was denied tenure, the reasons for her denial.
4      Oh, you asked about my case. I'm sorry. After
5  I was denied tenure, I emailed her to let her know
6  what had happened. I also emailed her letting her
7  know that I had found out that the teaching loads
8  that we were being given were not as Buechler was
9  represented them to us, including her teaching, and
10  that there was my finding -- I gave her -- I think
11  I told her -- because at the time I didn't know if
12  she could still pursue -- pursue --
13 Q  An appeal?
14 A  -- an appeal or something, if she learned new
15  information. So I think I asked her, Do you want
16  me to tell you more, you know, once you know
17  this -- I don't know if you have 180 days or 300
18  days to act on it. I now understand that she
19  wouldn't have been able to anyway, but I asked her
20  if she wanted more information.
21      At that time I don't think that we discussed
22  much more of anything. I did talk to her last year
23  and asked her if she had old correspondences and
24  records and what she was told -- I wanted to
25  recollect what she was told by Buechler, and she

Page 191

1  recounted to me much verbatim what he had told me,
2  about you need to have above a 3.0 in these
3  100-level courses, et cetera, et cetera.
4 Q  All right. Peter Cholak, you talked about his low
5  TCE scores. Talked about Roxanne. I'm assuming
6  you didn't ask him to be a witness in your case.
7  Do you recall?
8 A  No. I mean, I -- I -- I don't know if I mentioned
9  to him that I was being told to give a list of
10  witness and -- witnesses, and he was on it, this
11  list, as far as what I -- I don't remember --
12  recall if I told him that or not.
13 Q  All right. Frank Connolly, I think we've talked
14  about him as well. He's the one who you asked
15  about the Honors courses?
16 A  (Witness nodded head.)
17 Q  Okay. Dean Crawford. Just don't read this yet.
18  Just tell us what, from your perspective, if
19  anything, he did or said that you believe was
20  discriminatory.
21 A  He actually was very supportive of me appealing my
22  case.
23 Q  Okay.
24 A  But many of the men in my department were. But
25  then --

Page 192

1 Q  You talked to him about what was the reason, and he
2  told you it was the teaching, and he gave you the
3  letter, correct?
4 A  Yes.
5 Q  Okay. And we talked about the courtesy adjunct
6  position?
7 A  He was the one that also told me that despite what
8  Don Pope-Davis had told me, my -- my case was not
9  even on the agenda for this April PAC meeting.
10 Q  Did you ever get the adjunct position?
11 A  No.
12 Q  That was never worked out?
13 A  No. And I was very frustrated over that. I didn't
14  understand why he was not being more forthcoming.
15 Q  Anything he did that you thought was -- I'm sorry.
16  Anything he said -- did he say any comments to you
17  that were discriminatory?
18 A  No. He was very supportive, by and large. He was
19  supportive when I went in and complained about Matt
20  Gursky's demeaning comments to me and thought this
21  toolkit for trying to prevent future discrimination
22  was great, but then he did nothing about it. So --
23  other than that.
24 Q  All right. Anything else with Dean Crawford?
25 A  No.

Page 193

1  Q  Hilary Cunningham, looks like she's been gone since
2     the late '90s, and you haven't contacted her --
3  A  No.
4  Q  -- is that correct?  Okay.  Jean Dibble, is she
5     still here?
6  A  Yes, she is, as far as I know.
7  Q  All right.  She said there's a huge need for Notre
8     Dame to be sued for its discrimination against
9     women.  Your particular case, was she involved in
10    your case at all?
11 A  No.
12 Q  Have any -- anything, other than what you've told
13    her, does she know about your case?
14 A  No.
15 Q  Okay.  We've talked about Professor Diller.  And
16    when you say "He said that the assessment of my
17    teaching," that was for your application for
18    promotion and tenure?
19 A  For promotion to tenure, yes.
20 Q  And he said it was similar to what he wrote for
21    Richard Hind?
22 A  Yes.
23 Q  Julia Douthwaite, now, she worked on the Appendix A
24    appeal with you, correct?  She did the
25    investigation?

Page 194

1  A  She didn't work with me.  She never actually talked
2     to me.  She said she didn't want to talk -- or she
3     didn't say, but she avoided talking to me.  She
4     lives down the street from me and she -- when I've
5     tried to discuss aspects of the case with her,
6     she's --
7  Q  She hasn't talked to you about it?
8  A  No.
9  Q  So you don't know what she did or what she found
10    or --
11 A  I know that she was -- she put in a report and
12    the -- there were four points of that report that
13    were supposedly from summarization of that report,
14    but I was never given a copy of that report, so I
15    don't know exactly what was in it.  She's made
16    statements to make me think that she thought I was
17    given a copy of the report.
18       When I asked if -- when I told her that I was
19    being asked to give witnesses and I was putting her
20    down, she said to me, Well, you know how I feel
21    about your case.  And I don't know -- I don't
22    remember exactly what I said but, you know, I --
23    all I know is that there were these four points
24    that supposedly Don Pope-Davis broke out in his
25    letter to me that were four points gleaned from her

Page 195

1     report, summarizing that my -- my case should be
2     reheard with four extra pieces of data regarding my
3     teaching.
4        (Defendant's Exhibit 9 marked.)
5  BY MS. CANTON:
6  Q  All right.  Professor Barron, this is Exhibit 9.
7     See if that's what you are talking about.  Make it
8     easier.
9  A  Yes.
10 Q  So this is the letter you got from Donald
11    Pope-Davis telling you the outcome of both of your
12    appeals, correct?  Because you did a regular appeal
13    and an Appendix A appeal?
14 A  Yes.
15 Q  All right.  And there's a separate university
16    committee on appeals that looks at academic
17    freedom, personal bias, or procedural error, and
18    they didn't find anything.  Is that -- now, do you
19    have any knowledge -- any more knowledge about that
20    than what's in this paragraph?
21 A  Yes.  I was told by the EEOC in some
22    correspondence, I believe it was, and that Notre
23    Dame sent to the EEOC -- I learned that -- I
24    believe I learned this around spring of 2011, that
25    the committee -- the regular appeals committee,

Page 196

1     from the time they were given my report, my appeal,
2     to the time of determination was made, was
3     something like two weeks, which I found quite
4     shocking.
5  Q  Quick.  Okay.
6  A  Well, five-member committee to even get together
7     and meet, let alone the Office of the Provost xerox
8     the report, get it to each member of the committee,
9     have them write their reports -- my appeal was
10    (indicating) --
11 Q  Voluminous?
12 A  Yes.
13       MR. BARKES:  You have to speak out
14       loud.
15 A  Oh, I'm sorry.  I'm holding up -- it was large --
16 BY MS. CANTON:
17 Q  Like 2 inches?
18 A  -- but it was very --
19 Q  Okay.  So they found nothing as far as personal --
20    what was the personal bias that you allege; do you
21    remember?
22 A  Gender discrimination.
23 Q  Okay.  So it was the same as what you did with
24    Appendix A.  Okay.
25 A  Virtually, yes.  And this was a committee of five

Page 197

1    senior male professors.
2  Q  Did you argue academic freedom?
3  A  No.
4  Q  Or procedural error?
5  A  No.
6  Q  Okay. All right.
7  A  Oh, I have to admit -- amend that answer. I do not
8    recall. I may have said certain things about
9    procedural error.
10  Q  Okay. All right. And then, second, your appeal
11    based on sex discrimination was reviewed. The
12    reviewer suggested that your case be remanded.
13    That's Julia, right?
14  A  Yes.
15  Q  To determine whether -- the recommendation with
16    reconsideration of additional evidence in your file
17    currently in your file be considered to determine
18    whether discrimination on the basis of sex may have
19    affected your case.
20    And so that was all the information that you
21    collected -- that you had worked on all summer and
22    presented to Julia, correct?
23  A  (Witness nodded head.)
24  Q  And so --
25  A  I presented it to the Office of the Provost.

Page 198

1  Q  And then she got it and she reviewed it. Okay.
2  A  I assume.
3  Q  And so, then now he's saying, I'm instructing your
4    department to rehear, and these are the four things
5    you're talking about?
6  A  Yes.
7  Q  And, actually, it turned out there was some
8    confusion about the process, and it really wasn't
9    supposed to go to your department. So that level
10    was skipped?
11  A  I -- by the way, this is the Office of the Provost.
12    So ultimately Burish would have oversight of this,
13    but this was through Don Pope-Davis. There was
14    evidence that they were trying to manipulate the
15    Appendix A appeals process.
16    At this point they had already failed to follow
17    the court-mandated Appendix A appeal process.
18    There were statements made to me by Don Pope-Davis
19    and by Ann Tenbrunsel --
20  Q  Who was that?
21  A  -- who was assigned to my case as a -- as a
22    monitor --
23  Q  Okay.
24  A  -- that they were treating this as a regular
25    appeal. There are -- there are -- there were

Page 199

1    attempts at this point for the -- on the part of
2    the provost office to get rid of the Appendix A
3    appeal.
4    There is a statement that was put into the
5    academic articles saying that they wanted to amend
6    Appendix A in favor of the new appeals process.
7    And several women on campus, including Delores
8    Frese, made it clear, in no uncertain terms, that
9    she would -- that this process was part of an EEOC
10    case against -- settlement of an -- Doris Frese
11    versus the university, that this Appendix A appeals
12    process was court-mandated and should -- should
13    remain as such.
14    But as this was going on, there were attempts
15    by the Office of the Provost to not follow this
16    court-mandated procedures -- procedure. They did
17    not appoint a committee of nine people, a standing
18    committee, at the beginning of that academic year.
19    That was to be the Appendix A appeal committee.
20    For instance, they gave me a different list of
21    possible nine reviewers than they gave Katherine
22    Zieman. This attempt to run this through my CAP
23    rather than the PAC was part of this attempt to
24    undermine the Appendix A appeals process.
25  Q  What's the point of that? I mean, why would they

Page 200

1    do that?
2  A  The regular appeals process is purely voluntary,
3    purely up to what Notre Dame decides to do. It can
4    be changed from year to year. It could be done
5    away with --
6  Q  Right. But I'm trying --
7  A  -- so there could be no appeals -- they could end
8    it so there could be no appeals process for, for
9    instance, women who have been discriminated
10    against.
11  Q  Or minorities or --
12  A  Or minorities.
13  Q  -- any kind of discrimination?
14  A  Yes. But there is in place, thank goodness --
15  Q  Well, what would you -- yeah.
16  A  -- a process for women who have been discriminated
17    against, and that's the Appendix A appeals process.
18    And it was very disconcerting that they were not
19    following what is in the academic articles, which
20    was -- they were contractually obligated under
21    my -- under the academic articles, in terms of my
22    employment, to do, and my understanding as part of
23    the court-mandated previous settlement for gender
24    discrimination.
25  Q  Now, eventually it was followed. Was it done

Page 201

1    properly?
2 A  After much time. For instance, they had me prepare
3    material for the CAP, repeatedly. They made me
4    play this game of -- I call it game of phone, you
5    know, where you -- I was only supposed to talk to
6    Ann Tenbrunsel, who would talk to Don Pope-Davis,
7    and who would confer with -- and the message would
8    get (indicating).
9       And only at the -- only after Katherine Zieman
10   and I made clear that we were going to hold them to
11   this and that we were going to file with the EEOC,
12   then they began to follow --
13 Q And when you say "they" --
14 A  -- the procedures that they should have.
15 Q Who is it that -- you said "they" attempted. You
16   said --
17 A  Okay. And this -- I should go back to my question
18   about did Provost Burish do anything discriminatory
19   or against me.
20      So this was my dealings with Don Pope-Davis,
21   but he is an associate provost, working under
22   Thomas Burish, and I find it hard to believe that
23   Provost Burish was not aware of the dealings of his
24   Associate Provost Don Pope-Davis throughout this.
25 Q So let's just say they did screw up and weren't

Page 202

1    following the right process. Do you attribute that
2    to incompetence, laziness, ineptitude, intentional
3    discrimination?
4 A  I believe that they were intentionally trying to
5    manipulate the process so that women would not have
6    as many venues to appeal, and that under the
7    appeals process they could manipulate the case
8    further.
9       I believe that they did not like the fact that
10   the EEOC ultimately has the ability to request the
11   records for all Appendix A appeals filed as per
12   that settlement. I believe the university is not
13   keeping records, in fact, as they are required to
14   do as part of that settlement, as it says that the
15   Office of the President must keep records of all
16   Appendix A appeals filed, I believe, something to
17   this effect.
18      I believe they're not doing this. And I
19   believe that they're not doing it because they want
20   to only have this voluntary appeals process that
21   does not have court oversight --
22 Q Okay.
23 A  -- and that can be manipulated. In addition, I
24   would like to add that, to my knowledge, no one has
25   ever gotten their job back through a regular

Page 203

1    appeals process, only through the Appendix A
2    appeals process.
3 Q Now, why do you think that they -- the provost, and
4    anybody else -- is doing this intentionally to
5    manipulate the system so women don't have an avenue
6    of appeal? What's the basis for your belief?
7 A  Oh, that I believe that they're doing that? Oh, I
8    have evidence that they're doing that. I mean, the
9    evidence is that they put out this letter.
10      I believe there was something posted on the
11   Watch LISTSERV by Jackie Smith when they first were
12   trying to change the voluntary appeals process, but
13   also try and get rid of the Appendix A appeals
14   process.
15      And Delores Frese was notified by members of
16   the faculty that they were trying to get rid of the
17   Appendix A appeals process and, I believe, had
18   meetings here in the main building over the fact
19   that they were trying to get rid of the Appendix A
20   appeals process.
21      So it's not my -- these are the facts that I've
22   laid out for you, that, for instance, they amended
23   the academic articles. The academic articles were
24   amended. I have the statement here at some point.
25      So after -- since, I don't know, 1981, there

Page 204

1    was the Appendix A appeals process. But around
2    this time --
3 Q Around 1981 or --
4 A  No. In -- around 2008 --
5 Q Two thousand -- okay.
6 A  -- there was a statement put into the academic
7    articles. The academic articles were changed, if
8    memory serves. In a statement --
9       MR. BARKES: Real quick, the question
10      is what evidence does she have that they're
11      doing it or why?
12 BY MS. CANTON:
13 Q Why do you believe it's discriminatory, just to --
14   you said to shut down women's appeals and
15   manipulate the system.
16      MR. BARKES: So why is it
17      discriminating that they're doing that?
18      MS. CANTON: Why does she believe it's
19      discriminatory.
20      MR. BARKES: To change the system?
21      MS. CANTON: Yeah.
22      MR. BARKES: Okay.
23 A  I believe it's discriminatory and undermining a
24   past court settlement between Delores Frese and all
25   women similarly situated, which included me, in the

KATRINA BARRON, v.
USDC IND case 3:12-cv-00440-JVB-CAN document 71-1 filed 10/29/14 page 54 of 108
UNIVERSITY OF NOTRE DAME DU LAC

KATRINA BARRON
January 10, 2014

Page 205

1     EEOC versus Notre Dame, in a finding that there was
2     a pattern of discrimination, that Notre Dame should
3     afford these women this avenue of appeal. I
4     believe that that action in and of itself --
5  Q  Has there ever been a time when there has not been
6     a way for women to appeal a denial of tenure?
7  A  Yes. Prior to Delores Frese suing with the EEOC.
8  Q  So as long as you've been here, there's been a way
9     to appeal; is that right?
10  A  Yes.
11  Q  Okay. And do you believe that you're bound -- you
12     are part of some class that signed something back
13     in 1981? You think you're bound by --
14  A  Oh, I --
15          MR. BARKES: That calls for a legal
16     opinion. You can go ahead and answer.
17          MS. CANTON: She said --
18          MR. BARKES: There was a lot of legal
19     opinions in this whole part of it.
20  A  Now, I can't find this statement. It's in here
21     somewhere.
22  BY MS. CANTON:
23  Q  You said "that includes me." I want to know why
24     you're included.
25  A  I believe that includes me, women who are being

Page 206

1     denied promotion to tenure based on their gender.
2  Q  Okay. Okay.
3  A  I didn't look through this. It's in here
4     someplace.
5  Q  That's okay. Ultimately the process was followed
6     after some --
7  A  But it was --
8  Q  -- wrangling back and forth --
9  A  It was not wrangling. It was months of my time.
10  Q  -- back and forth with them?
11  A  Uh-huh. Preparing documents for them, my CAP,
12     dealing with my CAP --
13  Q  Okay.
14  A  -- unnecessarily. In fact, I -- specifically on
15     this issue I filed retaliation charges because I
16     felt it was retaliatory.
17  Q  Against you personally?
18  A  Yes.
19  Q  Okay. All right. Anything else with Julia
20     Douthwaite?
21  A  No. I see her walking her dog.
22  Q  Jennifer DuBois.
23  A  Yes. Dubois.
24  Q  Jennifer --
25  A  What about Jennifer?

Page 207

1  Q  Have you talked to her and asked her to be a
2     witness?
3  A  I emailed her when I was asked to put together a
4     list of witnesses, and to catch up with her, how
5     she's doing. And she said, absolutely, she would
6     be willing to testify about her experience of being
7     denied tenure, the hostile environment she
8     experienced within her department at Notre Dame.
9  Q  Does she have any knowledge about your experience?
10  A  She -- I told her about my -- I sent her my appeal
11     at one point, I think, when I was advising her and
12     helping her through the appeals process. So she's
13     seen all sorts of aspects of my case.
14     In particular, I thought that the -- that I
15     had -- after she had told me that she was
16     frustrated with her teaching assignments, that she
17     was frustrated with the hostile environment, her
18     TCEs -- CIFs were being used, viewed, I then gave
19     her information about my experience with the
20     discrimination I experienced in my teaching
21     assignments and that she should feel free to use
22     any comparisons or ideas that I had in terms of
23     analyzing the data or supporting information of the
24     data in the 1999 report on gender and racial bias
25     and the TCEs and things like that I sent her.

Page 208

1     And we had an email exchange back and forth
2     about the similarities between her case and mine,
3     similarities and dissimilarities.
4  Q  And was her appeal denied?
5  A  Yes, it was.
6  Q  And then she left. And is she now at Stanford
7     Research Institute?
8  A  I believe now she's tenured at University of
9     Montana or Montana State University. She had had a
10     long-standing offer of tenure from them. I did
11     find this statement in the Appendix A appeal. It
12     is on page -- if you would like --
13  Q  What page is it on?
14  A  On Exhibit 4, it's on page 21. It's the first full
15     paragraph at the top of that page. This should be
16     a quote from the Appendix A appeals. It was
17     amended to say, "A member of the teaching and
18     research faculty would alleges that a decision
19     against reappointment, promotion, or promotion to
20     tenure of that faculty member is a product" -- I
21     don't know if this was copied wrong or something,
22     but it's something to this effect -- "of
23     discrimination on the basis of sex will proceed
24     with an appeal as outlined in Appendix A to these
25     articles unless Appendix A is amended in favor of

Page 209

1    the procedures established by the provisions of
2    this subsection."
3        And then it proceeds to talk about a different
4    appeals process, in which your case goes back to
5    CAP, et cetera, et cetera. I don't know
6    specifically.
7  Q  Where is that?
8  A  That's not on here. I'm just referring to that
9    one.
10 Q  Oh, okay.
11 A  But the pertinent part being "unless Appendix A is
12   amended in favor of the procedures established by
13   the provision of this subsection," and then it
14   describes the regular voluntary appeals process.
15 Q  When you say "voluntary," it's voluntary in that
16   it's in the articles and can be taken out at any
17   time?
18 A  Yes.
19 Q  Do the faculty have any input into what goes into
20   the articles? Are there committees that --
21 A  Yeah, there's committees. There's -- I don't know
22   how -- you should ask these -- I don't know how --
23   the academic articles are at times amended. We're
24   told they're going to be amended.
25       There is input from the faculty that is taken

Page 210

1    into consideration. But ultimately, I believe, the
2    Office of the Provost and Office of the President
3    have ultimate -- or maybe it's Academic Council --
4    I don't know -- have ability to --
5  Q  Revise them?
6  A  -- revise them.
7  Q  Okay. Professor Dwyer, did he say anything? Let's
8    do comments first.
9        Did he say anything to you that you believe was
10   discriminatory?
11 A  Oh, yes. He said I was taking away this year
12   extension of my tenure clock because I took
13   maternity leave.
14 Q  So you -- when you were hired, you said you
15   could -- they told you, you could have an
16   extension?
17 A  Typically, a professor -- and I was hired under
18   these circumstances. I was given a three-year
19   appointment, at which point I went up for a
20   third-year review, to see if I was on track to make
21   tenure. And on approval of your third-year
22   renewal, you're given a year sabbatical leave with
23   the option of stopping the tenure clock, meaning
24   instead of going up in your sixth year, you go up
25   in your seventh year, I believe, if I have those

Page 211

1    numbers correct.
2  Q  Okay.
3  A  And every male that went up before me was afforded
4    that, and I was told upon hiring -- it was a major
5    fact in me accepting the Notre Dame job over
6    another offer, this sabbatical, and I wanted to
7    make use of that.
8  Q  Now, did you -- at first you only took one semester
9    for maternity leave, is that right, for your first
10   child?
11 A  Yes.
12 Q  So you did like a one semester, or you wanted to
13   stop the clock for a year?
14 A  I wanted to stop the clock for maternity leave, as
15   afforded me under the academic articles for one
16   year, and the one year for the sabbatical leave
17   that I was -- but that the men in my department had
18   gotten and I wanted.
19 Q  And so what did he say? Did he say you've already
20   had time? So what did he say?
21 A  He said that they weren't doing that anymore.
22 Q  "They," the department?
23 A  That the dean had decided to do away with this.
24 Q  Do you know if that's accurate or not?
25 A  I don't know. I only know that I was promised it

Page 212

1    upon hiring, that other people my year -- hired my
2    year were given it. And when I argued with him
3    that I -- this was the agreement as part of my
4    hiring, other people had gotten it, the guys in my
5    department were given this year going up -- extra
6    year, he kept saying, It's because you took
7    maternity leave. And then he amended it. It's not
8    because you took maternity leave, it's because of
9    the timing of your maternity leave. Which I
10   responded that I --
11 Q  What does that mean?
12 A  -- couldn't very well time my maternity leave.
13 Q  Did that eventually work out, after you took the
14   second leave?
15 A  No.
16 Q  No?
17 A  No. If I had only had one child, I would have
18   still just been given the same number of years as
19   my male colleagues. However, I had a second child,
20   and for that child I stopped the tenure clock, and
21   you're only allowed to stop the tenure clock twice.
22       So in the end, I had what -- all the time that
23   I was afforded under the academic articles.
24 Q  Anything else with Professor Dwyer, as far as
25   comments?

**Page 213**

1 A  I remember him being very -- kind of cool and
2     condescending to me when he would come into my
3     office, asking me, after this sexual harassment
4     video, if I had ever experienced sexual harassment
5     at Notre Dame. I felt it was -- it had been a
6     mistake to tell him, by his reaction, by his -- and
7     this was things about Peter Cholak and Wong, which
8     I felt were important -- especially the Pit-Mann
9     Wong aspect -- important aspects about how women
10    were being treated within the department. It was
11    not -- he did not receive this criticism well.
12        He often referred to my maternity leaves as
13    semesters off, and I would often correct him. He
14    was not receptive to me at a faculty meeting when I
15    brought up the issue that in our dean's report,
16    which determines salary, we're not allowed to put
17    conferences invited to but unable to attend, not --
18    you know, specifically for medical reasons.
19        I brought this up at a faculty meeting, I
20    believe, in the fall of 2007. I believe the fall
21    of 2007. I specifically brought this up because I
22    had been invited to several prestigious conferences
23    around the time -- one of them during the week I
24    gave birth. I was invited to speak at the Erwin
25    Schrvdinger Institute in Vienna, and I sent my

**Page 214**

1     graduate student. But I was not allowed to put
2     down on my dean's report either that I had been
3     invited or that I sent my graduate student -- in
4     fact, it was taken out by our secretary -- as well
5     as other invitations in Edinburgh and a wide
6     variety of speaking engagements.
7         And I suggested that we allow people to put at
8     least some minimal number of these in. Spring of
9     2010, I was met with laughter and derision,
10    widespread, amongst my colleagues, and at which
11    point I said, Oh, come on, if you had appendicitis
12    and couldn't attend a plenary lecture you had been
13    invited to give at the International Congress of
14    Mathematicians, wouldn't you want credit of this?
15        Bill Dwyer said, I think we need to move on and
16    quashed it. Not a couple months later, he wrote my
17    yearly review, in which he passed on comments from
18    a member of CAP disparaging my research, with the
19    only evidence given the restricted nature of my
20    outside speaking engagements.
21        I met with him after this and recalled to him
22    the reason my travel during the four years in
23    question was covered in the written letter was
24    restricted in nature, calling to him that I had two
25    children at the time, via C-section, and that I had

**Page 215**

1     complained to him in person and in a faculty
2     meeting that I had many prestigious speaking --
3     outside speaking invitations that I was not able to
4     go to because I was actually in labor at the time,
5     3,000 miles away, or recovering from major
6     abdominal surgery or in the late stages of
7     pregnancy and the travel restrictions.
8         I asked how he could possibly -- anyway, I
9     comment -- we had a discussion about how this would
10    have -- could seriously be used as a point to
11    disparage.
12        (Defendant's Exhibit 10 marked.)
13 BY MS. CANTON:
14 Q  This is Exhibit 10. Now, the last one we had was
15    from Professor Buechler. Let's see. Dwyer. Oh,
16    no, sorry. I didn't give you the right one. Hold
17    on one second here.
18        What's the date on the one I gave you?
19        MS. CANTON: Okay. So we need this one
20    next.
21        MR. BARKES: Do you want to have her
22    identify that one real quick, since you
23    have it marked.
24        MS. CANTON: No. Let's go off the
25    record for one second.

**Page 216**

1         (Discussion held off the record.)
2  BY MS. CANTON:
3  Q  Exhibit 10 is chronologically the next evaluation.
4         MR. BARKES: Are we back on?
5  A  2007 is the one I was referring to.
6  Q  All right. 10. Will you give me that other one
7     back. That one, thanks. Because -- now, the real
8     10 is dated October 10, 2004. This is the first
9     one you got from Professor Dwyer.
10        Is this the one you're talking about, where he
11    commented about your absences and what the CAP
12    members noted?
13 A  No.
14 Q  Okay. In this one they noted that you only
15    published one paper in '04. Do you remember
16    getting this one from him?
17 A  Yes.
18 Q  Did you ever prepare any written responses to these
19    annual evaluations?
20 A  No. I -- in retro -- I know -- I now advise people
21    to do so if they disagree with them, and I wish I
22    had for Buechler's, in particular, and others.
23    But --
24        (Defendant's Exhibit 11 marked.)
25

Page 217

1 BY MS. CANTON:
2 Q  I'm going to hand you 11, which is the next one
3     from Professor Dwyer.  Take a look at it and tell
4     us if this is the one you're referring to.
5 A  No, it is not.
6 Q  This one isn't either?
7 A  No.
8 Q  Okay.  Was it something other than an annual review
9     that he did this in, or do you recall it being in
10    an annual review?
11 A  No.  It was at the 2007 one.
12 Q  2007.  All right.  Let's just -- so we keep them in
13    order, let's do the next one.
14     (Defendant's Exhibit 12 marked.)
15 BY MS. CANTON:
16 Q  Is Exhibit 12 another evaluation, this one also
17    from Professor Dwyer from --
18 A  Yes, it is.
19 Q  -- from September of '06?
20 A  Yes, it is.
21     (Defendant's Exhibit 13 marked.)
22 BY MS. CANTON:
23 Q  Okay.  Here is Exhibit 13.  So this must be it.
24    Now, the evaluations don't start until after you're
25    there three years; is that right?

Page 218

1 A  That's right.
2 Q  That's why they start in '04.  Okay.
3 A  They weren't required to do them.
4 Q  For the first three years?
5 A  Prior to that.
6 Q  Now, is Exhibit 13 the letter you were telling us
7     about, where he wrote about the -- that CAP was
8     concerned about your absences or your lack of
9     travel or --
10 A  Yes, this is the one.
11 Q  And can you just point to us and show us what it is
12    that you objected to.
13 A  This concern -- this concern is reinforced -- they
14    had mentioned a concern about limited scope of my
15    research but never had any evidence.  And I have
16    objected to him verbally many times, asking what
17    their basis for that statement was, the statement
18    Your research is limited in scope.
19     This was the first time that they never came up
20    with a basis for that, and my understanding is the
21    sole basis of this concern is reinforced by one CAP
22    member's observation that your outside
23    presentations are restricted in venue.
24     "Six of the last eight have been at Rutgers or
25    at Santa Cruz.  Some committee members continue to

Page 219

1     worry that your research may not garner the kind of
2     support from a broad selection of outside referees
3     that is necessary for a successful tenure case."
4 Q  Is it accurate that six of the last eight were at
5     Rutgers or Santa Cruz?
6 A  Of the ones I was able to travel to because I was
7     not giving birth or under travel restrictions due
8     to the birth of two children during that time.
9 Q  And Rutgers is where you did your Ph.D. work?
10 A  Yes.
11 Q  And then Santa Cruz is where you worked after
12    that --
13 A  My postdoc.
14 Q  -- doing your research?
15 A  And I have collaborators at both places, as well as
16    a supportive environment for child care and having
17    an infant or two small children.
18 Q  All right.  So your concern with this is that, Wait
19    a minute, I was invited to some but I couldn't go
20    to them because of my maternity?
21 A  Exactly.
22 Q  All right.  We were talking about Professor Dwyer.
23    Any other comments that he made to you?
24     MR. BARKES: Go back and review -- go
25    back and refer to that exhibit that we were

Page 220

1     discussing, Exhibit 4.
2 A  Yes.
3 BY MS. CANTON:
4 Q  I mean, we can all read that.  I just want to get
5     your recollection of things he said to you.
6 A  Yes.  Well, there are several points, both when he
7     was chair and after chair.  One of the points was
8     this arranging what my teaching was like after my
9     second maternity leave and my trying to negotiate
10    several times to teach Linear Algebra, a 200-level
11    course, or -- or Calc III, I think I had mentioned,
12    some 200-, 300-level course that was still
13    multi-section, so I would only have two preps.
14     And his -- his and Alex's comments that this
15    was an unusual request, that this -- they couldn't
16    do -- they couldn't accommodate such a request.  I
17    pointed out that Professor Richard Hind and Jeff
18    Diller had been accommodated, and Xiaobo Liu had
19    been accommodated such requests despite, you know,
20    two of them have no -- no children, let alone
21    coming back after a maternity leave, and that they
22    had been afforded this.
23 Q  Was this in the spring of 2006, or was this in the
24    spring of --
25 A  No.  This was in the fall of 2006, coming up to the

Page 221

1  spring of 2007, what would I teach in the spring of
2  2007. So this was discussions prior to that, about
3  what should I be assigned to teach.
4  Q  Okay.
5  A  I remember him -- I believe he -- I recall him --
6  either him or Alex Himonas -- but certainly be
7  under the knowledge of Dwyer, saying you shouldn't
8  teach new preparation for coming back from
9  maternity leave, which was an accommodation I
10  wasn't asking for, while refusing to accommodate
11  what I was asking for, which was just one prep,
12  being two sections of the same course.
13  Q  So you wanted two sections of the same course?
14  A  Yes.
15  Q  Okay.
16  A  And there was back-and-forth with Professor Dwyer
17  and Alex Himonas about whether I could teach this
18  125, 126, which Professor Buechler and
19  Professor Dwyer had suggested I teach, because, in
20  their opinion, I got very good TCEs verbally. They
21  would say this to me, that I got very good TCEs for
22  this course at times, they said. And me saying if
23  I can't possibly teach a 200- or 300-level course,
24  then I want to teach the 125, 126, 100-levels, and
25  then Alex saying, No, no, no, no, we can't put you

Page 222

1  in this course.
2      And I was very -- there were many remarks at
3  the time, around this assignment, about my out
4  of -- he made a comment at one point about my -- my
5  taking advantage.
6  Q  Who's "he"?
7  A  Professor Dwyer. I don't recall whether it was
8  regarding my maternity leaves or -- no, I'm sorry.
9  That was regarding my maternity leave and the
10  stoppage of the tenure clock. He used the term
11  taking advantage for something that should have
12  been afforded me for bearing a child, under the
13  academic articles.
14      He was condescending, rolling his eyes at my
15  requests when I -- back and forth about trying to
16  teach one prep at a higher level than 100.
17  Q  This is for the spring of '07?
18  A  Spring of '07.
19  Q  And this is Dwyer you're talking about?
20  A  And subsequently I was given a teaching assignment
21  with a chair that was not coordinating, not a chair
22  I'd ever taught with before, and not -- someone who
23  is not typically given a chairmanship of a course
24  like that, along with two visitors who were known
25  to cause trouble with -- to cause troubles within

Page 223

1  the courses they were teaching.
2  Q  Now, what --
3  A  And -- and to -- and, of course, that was on the
4  list of the four courses that Professor Dwyer
5  himself had called a meeting for in 2004 suggesting
6  that no regular faculty, let alone junior faculty,
7  be given these courses on a regular basis.
8  Q  So you got two of those courses in the spring of
9  '07?
10  A  Yes.
11  Q  Now, when do you put in your requests for -- do you
12  put in for every semester, or do you do it for the
13  academic year?
14  A  Normally you do it in the -- in January -- late
15  December, early January for the next academic year.
16  But at that time I did not -- I was not pregnant
17  this academic year, and so I had been given some
18  assignment that then was changed or was -- one
19  semester I was not teaching because I had maternity
20  leave, and then the next semester we reconsidered
21  what I should be teaching. I don't recall what I
22  was -- it may be here, what I was assigned to
23  teach.
24  Q  So late December, early January of 2006, you would
25  have put in for the next academic year?

Page 224

1  A  Yes. Wait. Can you please repeat the --
2  Q  When would you have put in your requests for the
3  academic year during which you took maternity
4  leave?
5  A  It would have been January 2006.
6  Q  Okay. All right. And whatever you put in for,
7  when it got around to it, you couldn't teach it in
8  the fall because you weren't there in the fall,
9  right?
10  A  That's correct.
11  Q  So somebody had to figure out who was going to
12  teach it? They had to make up the schedule, and
13  somebody had to get those courses?
14  A  Yes.
15  Q  So then you want to come back in the middle of the
16  semester --
17  A  I was --
18  Q  -- or the?
19  A  I was required to come back.
20  Q  You come back in the middle of the academic year,
21  when the schedule's already made up for that whole
22  academic year, right?
23  A  Yes. So I'm not exactly sure when the discussion
24  took place for what I would be teaching spring
25  2007. I don't recall.

---

**Page 225**

1 Q   Okay.
2 A   I say here someplace.
3 Q   Either one of them, Professor Himonas or
4    Professor Dwyer, did they say, We can't do this,
5    we've already got the schedule figured out, we're
6    going to have to put you here or there?  I mean,
7    did they tell you why they were giving you the
8    courses that they did?
9 A   No.
10 Q   No explanation?
11 A   Several times they said -- in terms of me asking
12    for one prep for a 200-level course, they said that
13    they did not do that, they didn't normally let
14    people do that, which was false, because they let
15    Richard Hind and Jeff Diller and Liu do it.
16 Q   Did you know that at the time?
17 A   I believe I knew at least one of them --
18 Q   And so did you say --
19 A   -- but I don't recall.  I did argue -- I did say
20    definitely at one point that I found -- I'm not
21    sure if it was specifically with Linear Algebra,
22    but I know there was a course -- it may have been
23    Statistics -- that I specifically pointed out, and
24    I'm pretty sure it was Richard Hind that was
25    teaching it because I remarked that he had no

---

**Page 226**

1    reason to be specially -- because they kept
2    referring to this as a special accommodation.  And
3    I had an example that it was just one of my male
4    colleagues who had asked to do this and they said,
5    Sure.
6 Q   And when you pointed that out, what did either one
7    of them say?
8 A   Well, we don't normally, it's a special request, we
9    just can't this time.
10 Q   Anything else with Professor Dwyer?
11 A   After he stepped down as chair, there were several
12    things that he did that were very annoying,
13    upsetting to me.  I spoke to my husband about it.
14       I -- he made cute little gestures to me.
15    This -- I often had to come into a seminar slightly
16    late because I taught across campus right before
17    the seminar, and he knew this.  I specifically
18    approached him, because the first time I came in
19    late, he did this (indicating).
20 Q   Crossing of his fingers?
21 A   Crossing a finger, shame, shame, shame on you for
22    coming in late gesture to me.  And I explained to
23    him after that, that I was -- I had to come in
24    late.  But he continued to do it.
25       And he made smirky comments to me occasionally.

---

**Page 227**

1    For instance, when I was passing him in the hall
2    one time, he made some joke comparing me to Sarah
3    Palin, which I found particularly offensive.
4 Q   What did he say?
5 A   It was short -- it was not that long after I had
6    had -- he'd stepped down as chair, during which
7    time I had had multiple conversations with him
8    about my pregnancies, my travel, lack of travel
9    during my pregnancies.
10       When I brought up this travel comment and, you
11    know, what -- was I supposed to go to Vienna and
12    have my baby during the conference in Vienna, he'd
13    make jokes about it.  So this kind of joking.
14 Q   What did he say?
15 A   It was during the fall 2008 Presidential Election,
16    and he and Larry Taylor were making disparaging
17    comments about Sarah Palin.  And they saw me coming
18    down the hall, and they said, well, there goes a
19    Republican woman, let's ask her her opinion of
20    Sarah Palin.
21 Q   Did you hear what they were saying about Sarah
22    Palin?
23 A   They were making comments on her intelligence and
24    her many pregnancies.
25 Q   What did they say?

---

**Page 228**

1 A   Something about -- I don't recall exactly what.
2    Snippets of it.
3 Q   And they asked you what you thought of Sarah Palin?
4 A   Yes.
5 Q   And what did you say?
6 A   I did not respond.
7 Q   All right.  Anything else with Professor Dwyer?
8 A   He apologized to me later about that, and he said
9    he felt horrible about it, the Sarah Palin comment.
10    This was after I was denied tenure, so --
11 Q   Did you talk -- did you go back and talk to him
12    about it?
13 A   He came to my office after I'd been denied and
14    wanted to say he was sorry.
15 Q   Spring of 2010, did he just bring up the Sarah
16    Palin thing, or did you remind him about it?
17 A   I brought it up.
18 Q   And did he say, sorry, I didn't mean to offend you
19    or --
20 A   He said he felt awful about it --
21 Q   Okay.
22 A   -- and he apologized.
23 Q   Anything else?
24 A   He apologized for the discrepancy in gender -- the
25    discrepancy in the teaching with respect to gender.

## Page 229

1  At that point I -- this was August or September of
2  2009, and I hadn't found the faculty meeting
3  minutes from 2004 that he prepared, presided over,
4  and I never have brought that up with him, that he
5  was -- at that point he acted like he had no
6  idea -- he had no idea that this was detrimental to
7  me, and he apologized. And I accepted his apology.
8      But a month later I found that faculty meeting
9  minutes from 2004 with him stating, huge problem
10  for our department, so much of a problem, for the
11  first time we were going to hire special
12  professional teaching faculty for these four
13  courses that were harming our department --
14 Q  That --
15 A  -- in terms of the low TCEs that they garnered.
16 Q  But that didn't happen, did it, as far as these
17  special faculty? They weren't hired?
18 A  They were hired. We hired two of them.
19 Q  When were they hired?
20 A  I don't know if they started maybe in 2005 and they
21  were -- we have two of them. They're still on our
22  faculty, and they were given one of the set of
23  courses, 119, 120, to teach. But I was still --
24  even after they were hired, I was still given the
25  other two courses.

## Page 230

1      I was made course chair. I was begged to teach
2  that course up until I was denied tenure. And only
3  after I was denied tenure did one of the special
4  teaching faculty take over that course. And since
5  then --
6 Q  Who since then?
7 A  -- one of the special teaching faculty has -- is
8  now -- has now taken over that course and revamped
9  it and spends -- you know, she was hired
10  specifically to focus all of her time on teaching.
11 Q  Who begged you to take over that class as chair?
12 A  Juan Migliore, assistant chair.
13 Q  Did he tell you why they wanted you to do --
14 A  They need me for this course, I'm the only person
15  that knows the online homework, I'm the only person
16  that can run this course, to the ability that the
17  department wants it run.
18 Q  And did you say okay?
19 A  No. I went back and forth with him saying that I
20  had been promised repeatedly, for instance, the
21  graduate algebra, which I had never been allowed to
22  teach until the year I came back from -- after
23  being denied tenure.
24      And there was a long negotiation when I would
25  be promised to teach what, if I just agreed to

## Page 231

1  teach this 125, 126 again. That's the old number,
2  not the new number, but -- you know. And I
3  remember one of the negotiations that I made -- but
4  there was -- I was trying to, you know, get at
5  least some other course. And I was -- you know,
6  this was before tenure, so I'm --
7 Q  So did you ultimately agree to do it in exchange
8  for whatever they said you could have?
9 A  I didn't have much choice. I --
10 Q  So you said okay?
11 A  I either said okay -- something to the effect, If
12  you're not willing to give me any of the other
13  courses that I've requested -- I am not -- there's
14  different years that he asked me to do this, and
15  one of the years I definitely -- I negotiated to
16  teach the -- a promise, a gentleman's agreement, he
17  put it, to teach the first-year basic algebra,
18  graduate algebra.
19 Q  Was this in writing, these negotiations?
20 A  I remember having some email. Most of it was
21  verbal, but --
22 Q  Let me go back to Mr. Dwyer. You said -- or
23  Professor Dwyer. You said he apologized to you.
24  What did -- in 2009, you had this conversation with
25  him.

## Page 232

1      What did you say to him and what did he say to
2  you?
3 A  He claimed he had no idea that he was giving me
4  more 100-level courses than the guys, that -- I had
5  compiled the statistics, showed him the statistics.
6  And I said, How could you not know? It was your
7  job to know.
8      From statements that Chris Kolda had made to
9  me, it was impossible for a chair to not know this
10  and his utmost responsibility to ensure that junior
11  faculty were given the support that you would
12  expect in order to be successful in their job.
13 Q  Did the chair assign the courses?
14 A  The chair had oversight of these courses. And from
15  my understanding, Chris Kolda said that it was
16  egregious mismanagement -- I don't think that he
17  said that, actually. I think that he always went
18  back to it was impossible for him to know -- to not
19  know.
20      MR. BARKES: Can we take a break or --
21      MS. CANTON: Yeah, that's fine.
22      (Short recess taken.)
23  BY MS. CANTON:
24 Q  Professor Barron, we've been at this awhile, all
25  day. We don't have much time left. It's very

Page 233

1   unusual for somebody to list 150 witnesses, and
2   we're obviously not going to have time to go
3   through them.
4        We might have to ask the court for -- to extend
5   the time, because typically the rule is seven
6   hours, unless the parties agree or the judge says
7   okay.  With all these witnesses, it's pretty much
8   impossible to do it in seven hours.
9        But what I want to do is not go through every
10  one, but just have you tell me of your
11  recollection, is there anybody else who has direct
12  knowledge of your case, who can come in and say, I
13  heard this, I saw that, as it relates to your case,
14  not their own case?
15 A  There's George Lopez, who did make that email --
16  send those statements to me warning me.  So I would
17  add him.
18 Q  So when you say "add," you mean he's in addition to
19  all the others on here?
20 A  Yes.
21 Q  He's not on here?
22 A  No, he's not.  I --
23 Q  Okay.  All right.  And you said you recently found
24  that email from him?
25 A  Yes.

Page 234

1 Q  Have you given that to your lawyer?
2 A  I don't recall.
3        MR. BARKES: We'll get it.
4 A  I don't recall.
5        MS. CANTON: Okay.  Yeah, we'll send
6        a -- there's been a lot of things that have
7        come up that we need to ask for, and we'll
8        put that all in writing.
9   BY MS. CANTON:
10 Q  Then I'm going to go through them quick.  You tell
11  me as we go through, because I don't -- at this
12  point I don't want to know about people who you
13  told about your case or people who have their own
14  case.
15       This case is about you.  And so I want to know
16  if any of these people can add evidence to support
17  your claims of discrimination against the
18  university.  Your claims, not theirs.  Matthew
19  Dyer?
20       MR. BARKES: As we go through them,
21       standing objection; it calls for a legal
22       opinion as to which ones --
23       MS. CANTON: No.  I don't want a legal
24       opinion.
25       MR. BARKES: -- as to which of them

Page 235

1   would have relevant information, because I
2   would actually go on the record, pattern of
3   practice.  Some of these people do have
4   relevant testimony that would be admissible
5   under certain circumstances.
6        So I would say other than that, if you
7        want her to identify people who have direct
8        evidence regarding discrimination, then
9        that -- that would be fine.
10       MS. CANTON: Right.  Exactly.
11       MR. BARKES: Clarify that.
12  BY MS. CANTON:
13 Q  Only -- you know, I don't want to know about
14  Susie's case in 1993 or anything like that.  I
15  mean, that's never going to come into this case
16  because it's so long ago, different department,
17  different people.  It's --
18 A  But the same chairs --
19       MR. BARKES: You don't have to argue
20       with her.
21 Q  No.  No.  I'm talking about people in other
22  departments, psychology and chemistry, and all
23  these others.
24       Who is Matthew Dyer?  He's in your department,
25  right?

Page 236

1 A  Uh-huh.
2 Q  Does he have any knowledge of any comments that
3  were made to you, or did he make any comments that
4  were discriminatory?
5 A  He likely has knowledge about why I was not given
6  certain upper-level courses in algebra, why I was
7  not given the basic algebra, graduate algebra,
8  first-year course.  He and Sam Evens, is now my
9  understanding, often discuss these things and made
10  recommendations to various people, so he would have
11  knowledge of that.
12       He may have knowledge of this -- he was the
13  chair in this spring, 2007.  The course that I
14  taught, which you had mentioned I got rock bottom
15  TCEs, the chaotic year -- chaotic semester, he was
16  the chair of that course.  However, he -- everyone
17  treated me as the chair.  They came to me with the
18  problems.
19       And I had complained to him at one point during
20  that semester that why was he not monitoring
21  whether one of the other professors was showing up
22  for his class or showing up for his exam, because
23  one of the other visitors was just not showing up,
24  and I was covering his class for him.  And why
25  was -- and I questioned why he was not doing that

Page 237

1  and why he was not picking up the exams and making
2  sure there was someone there to proctor them.
3 Q  Did he say anything discriminatory towards you?
4 A  He acted at that time as if, well, you seem to be
5  doing fine doing this, which I felt as a junior
6  faculty member was inappropriate, highly
7  inappropriate for him to push this burden off on
8  me.
9 Q  Did he say anything discriminatory to you?
10 A  Not specifically.
11 Q  Have you talked to him about your case?
12 A  No.  His wife has come to me with -- she teaches in
13  the department.
14 Q  In the math department?
15 A  Yes.
16 Q  Kathy Eberhard, psychology, I think we talked about
17  her.  This was another denial of tenure case?
18 A  Yes.
19 Q  Does she have any knowledge about your case other
20  than what you've told her?
21 A  Other than what she's -- I've told her, we've had
22  multiple discussions about her case and the
23  similarities with my case.  So she has knowledge
24  that there are patterns that contribute to both of
25  them.

Page 238

1 Q  Did she tell you that she negotiated to go up for
2  tenure again in three years?
3 A  Yes.
4 Q  Okay.  Do you know anything involved in the
5  nondisclosure agreement about her case?
6 A  I just know that she has a nondisclosure agreement
7  that she signed in order to be able to go up again.
8 Q  Did she tell you that?
9 A  Yes, she did.
10 Q  Did she tell you what was in the agreement?
11 A  No, she did not.
12 Q  All right.  Samuel Evens, did he say anything
13  discriminatory to you or about you?
14 A  He's been very condescending to me.  He outright
15  told me when I came onto campus that he didn't want
16  me teaching courses in algebra.  He was also -- did
17  the same thing at first to Karen Chandler, I
18  believe.
19     He -- I was told that he is the person who made
20  the comments about my lack of travel while I was
21  pregnant.  And so after the CAP had met about my
22  case, I got an email from him asking the birthdays
23  of my children.  It's my understanding that he made
24  an agreement to vote in my favor -- it's my
25  understanding that he disparaged my NSA research

Page 239

1  grant as not being good enough and argued with
2  members of CAP what was the basis for this, what
3  was the basis for his belief that my NSA was not an
4  adequate grant.
5     I'm also told that he made disparaging remarks
6  in the CAP meeting about my research program, and
7  there was an argument concerning that, that the CAP
8  wanted to know how his arguments fit in with the
9  many letters -- letters recommending I be promoted
10  to tenure from outside, people in my field.  There
11  were like 10 or 12 letters.  I don't even know how
12  many, and I don't know from who, from the top
13  leaders in my field who knew more about my
14  research.
15     And I'm told that Karsten Groves and Francois
16  Ledrappier and Brian Smyth and Stephan Stolz and
17  Claudia Polini questioned why Sam was making these
18  disparaging comments which directly contradicted
19  people whose knowledge about my field of research
20  was more substantial than his and on what he was
21  basing these disparaging comments.
22     It is my understanding that they were -- I was
23  told that he was hostile towards my tenure case
24  initially.  He was also very hostile towards Karen
25  Chandler's tenure case.  He was condescending to me

Page 240

1  on multiple occasions.  He had made the comments
2  about my travel.  And specifically I was told that
3  there were members of CAP that felt like he was
4  biased against me.
5 Q  You got this information from Chris who talked to
6  somebody on CAP?
7 A  No.  I got this information from all the members of
8  CAP, Brian Smyth, Francois Ledrappier, Karsten
9  Groves, Stephan Stolz, Claudia Polini, cobbled
10  together from various once of those at different
11  times.
12 Q  Did he say anything to you personally about your
13  travel?
14 A  After the CAP meeting, which I -- my understanding
15  from what members of CAP told me, was 100 percent
16  favorable, that in the end all six members voted
17  that they were in favor of me being given tenure.
18     He asked to meet with me about my teaching in
19  the future, and he made -- he had met with me in
20  the past and had this attitude of, well, you're not
21  going to be around for so long.
22     And in this meeting after the CAP meeting was
23  unanimous -- and I've been told by many people that
24  there had never been a unanimous cap vote, that
25  there was -- supported by the chair and dean as

Page 241

1    they thought mine would be, that was then
2    overturned at the level of the provost at that
3    time.
4        He met with me. I believe this was in December
5    of 2008, around about that time, saying, Well, I
6    guess you're going to be around for awhile. And I
7    said, Oh, isn't that good news. And he goes, Well,
8    I guess we should figure out now what you're going
9    to teach. And from his tone, he was not happy
10   about this, from his tone.
11 Q Was he one of the ones -- he was one of the ones
12   who voted for you?
13 A He did vote for me, but I was told that he
14   basically traded his vote for me not getting to
15   teach like basic algebra and certain other courses,
16   that I not be considered a person in my field.
17 Q Do you know why he didn't want you to teach
18   algebra? You said he didn't want you to teach
19   algebra classes from the time you got there. Do
20   you know why?
21 A From the time I arrived and from the time Karen had
22   arrived, we both felt that Sam didn't want to
23   consider us as equals in terms of being able to
24   teach courses in his field. He didn't want to
25   consider us as competent researchers in his field.

Page 242

1        He -- Claudia Polini said she felt the same
2    thing from him, actually, all three us. We're all
3    three close to his field.
4  Q Did you ever get any explanation from him or
5    anybody else why he didn't want you to teach
6    algebra?
7  A Not directly, no.
8  Q Or indirectly?
9  A Yeah, very condescending tone to me that he didn't
10   use, for instance, with George McNinch, a junior
11   male faculty member in my field. I'm talking
12   field, second level (indicating) --
13 Q Okay.
14 A -- from before, from our previous.
15 Q All right. Did George teach algebra courses?
16 A Yes, he was allowed to teach algebra courses. He
17   was given the first-year, graduate basic algebra to
18   teach.
19 Q And when did he start at Notre Dame?
20 A Slightly before I did. In the late '90s, '98
21   possibly, around 1998.
22 Q All right. Looks like the math professor --
23 A Leonid Faybusovich.
24 Q -- he's told you that he was convinced that it's
25   discrimination; is that right?

Page 243

1  A Yeah. He walked in my office (indicating).
2  Q Did he tell you why he was convinced of that?
3  A No. He rambled on for awhile. He said -- yes, he
4    said some things. I don't recall exactly what. He
5    was very -- he's a very large, forceful guy, and he
6    was very angry, not at me but at the department.
7    And kept saying, It's incredible. It's incredible.
8        And this was shortly after I had compiled these
9    statistics that I had gathered and the guys had
10   started to give me of what they had taught and some
11   TCEs, and I had started -- I started showing
12   several people.
13       And he had seen the statistics, and he had --
14   he was basing it on what I was showing people from
15   my appeal documents. From his general comments, I
16   assume that that's what he was basing his
17   opinion -- his statements on.
18 Q All right. We're still only up to the Gs -- or the
19   Fs here. I'm trying to short-circuit this.
20       Anybody who made a comment to you or about you,
21   you're not getting tenure because you're a woman,
22   we're not giving her tenure because she's a woman,
23   we don't want her to get tenure because she's a
24   woman, we're going to give her these lousy courses
25   because she's a woman and won't get tenure?

Page 244

1    Anything like that from anybody?
2        MR. BARKES: Object to form. You can
3        go ahead and answer that.
4  A I was never directly threatened to my face, You
5    will not get tenure because you are -- I will not
6    support you in tenure because you're a woman.
7  Q Have you --
8  A Nobody put it succinctly like that.
9  Q Did anyone tell you that they'd heard anyone say
10   that, if they didn't say it directly to you?
11       Did somebody else, Patricia or somebody else
12   say, I heard Dwyer say, I'm going to give her these
13   courses, she's not going to get tenure because
14   she's going to get bad reviews?
15 A Patricia -- you bring up Patricia Maurice. She
16   said that she strongly believes that Burish himself
17   made a statement, knowing of discrimination against
18   women by senior male faculty, which would include
19   himself, questioning the -- a woman's commitment to
20   her job if she were to take -- to make use of the
21   maternity leave policies, along with tenure clock
22   policies, in the academic articles.
23 Q Any comments about you specifically in your
24   application for tenure?
25 A That would include me in his statement about junior

Page 245

1     women.
2 Q   All women?
3 A   Junior women who have children -- choose to have
4     children while on the tenure track and use these
5     policies. And I did have two children, and I did
6     take maternity leaves and Family Medical Leave, so
7     that would include me.
8 Q   And this was the comment that Patricia said she
9     heard Provost Burish make to the senior women?
10 A  Yes.
11 Q  Okay. Any other comments about you in particular?
12 A  You know, Steve Buechler did say specific
13    statements about his worries about me getting
14    tenure if I were to both take a maternity leave and
15    take the sabbatical leave that was afforded me.
16 Q  And did he explain --
17 A  And he said this in a very -- I now know what --
18    this exchange we had. He was trying to get me to
19    not take my promised sabbatical leave immediately
20    after my maternity leave. And he never -- his
21    statements, I felt, were, You won't get this, you
22    won't do that, your teaching record will be like
23    this, your teaching record will be like that.
24        And I refuted everything he was saying because
25    I pointed out that, actually, no, his comments were

Page 246

1     directly in opposition to what -- how many courses
2     I would be teaching, how many courses I would be
3     being considered over.
4         And it was this nature of certainly if -- you
5     know, not said outright, I wouldn't support your
6     tenure case if you're going to take off this much
7     time.
8 Q   What did he say? What was his concern if you took
9     another year after being gone? He didn't think
10    you'd have enough classes, enough scores?
11 A  He said I wouldn't have enough classes -- I would
12    not have enough classes that I would have taught,
13    which was wrong. I would have had -- it would have
14    been -- if I didn't get an extension of the tenure
15    clock, it would be one class; and if I did get an
16    extension, I would teach two more classes. So it
17    would have a longer record. He was making
18    statements that were just blatantly false and
19    grasping at --
20 Q  Okay.
21 A  -- in a way that made it feel -- and, you know,
22    there were statements that Bill Dwyer had said as
23    well about taking advantage of the leaves that I
24    should have been afforded --
25 Q  What --

Page 247

1 A   -- under standard policy.
2 Q   Go back to Buechler. What did he say? You said he
3     said you won't have enough classes. What else did
4     he say? If you can remember.
5 A   I may have statements in here. Where is Buechler?
6     I believe it was Buechler. Yeah. I remember -- I
7     put this in here on page 43. "He tried to talk me
8     out of taking the year sabbatical leave I had been
9     promised upon hiring as a whole year because I was
10    taking maternity leave."
11        MR. BARKES: 43?
12        THE WITNESS: Yes.
13 BY MS. CANTON:
14 Q   You say, "My calendar notes a meeting with Steve
15    around 4 o'clock on Wednesday, May 5th, 2004." Do
16    you still have those notes?
17 A   I have my calendar, but it just notes the meeting.
18    I mean, it just --
19 Q   Do you have notes of what happened at these
20    meetings?
21 A   No.
22 Q   So how did you reconstruct all of these meetings?
23 A   Many of them stand out in my mind. And around this
24    time, when I was seven months pregnant and I was
25    being talked to in certain ways by members of my

Page 248

1     department, I remember them clearly, and I recall
2     this one written here.
3         So we discussed -- I discussed why would -- why
4     is he recommending me take this -- not take this
5     semester off when my male colleagues took -- took
6     two semesters, and he gave completely bogus
7     reasons. He said comments -- like when I said the
8     others took two semesters off, the others were
9     given the sabbatical leave, he made comments to the
10    effect of talking about me having a baby, he
11    doesn't think this is a good idea and --
12 Q   What's not a good idea, to have a baby or take
13    three semesters off in a row?
14 A   Three semesters off in a row.
15 Q   Now, do you get a whole semester off when you have
16    a baby or just six weeks?
17 A   You get a one-course teaching reduction, which
18    means one semester you don't teach, the next
19    semester you teach two courses versus teaching one
20    semester -- teaching one course one semester and
21    two the other.
22        But routinely, you know, the idea would be that
23    you would have a full maternity leave off, or
24    Family Medical Leave in the case of -- for
25    instance, Karen Chandler had a medical leave, but

1  in reality they expect you to be doing research.
2  And when they say "off," he talked about this as
3  being off in terms of people would say you have
4  this semester off of teaching, meaning you're doing
5  research.
6      And I had statements made to me that I
7  should -- you know, how was your research leave,
8  rather than maternity leave or your semester off.
9  And I know Karen Chandler, there were issues people
10 in the department had about her because she took a
11 two-year medical leave because she had a brain
12 tumor. And there were comments in CAP about her
13 lack of productivity over the years. She'd had
14 surgery in Boston, rehabilitated, and --
15 Q  Do you do -- well, did you do research when you
16 were off, in quotes? That semester not teaching,
17 did you continue to do research, or do you --
18 A  I did continue to do research. But, you know, up
19 until I had the baby, I had a reasonable level of
20 productivity. But after the baby -- one of my --
21 one of my semesters was completely after the baby
22 was born, so I'm sleep deprived. I don't remember
23 that semester.
24 Q  So that -- that semester you had the baby, and then
25 you had the whole semester off of teaching?

1  A  I took a maternity leave, having -- having had a
2  baby.
3  Q  What I'm trying to figure out -- what was --
4  A  My first child was born in the middle of July by
5  C-section, and I had recovery, and then I was --
6  Q  So did you have the fall --
7  A  I --
8  Q  So the baby was born in July of --
9  A  2004.
10 Q  2004.
11 A  My first child.
12 Q  And so did you have fall of 2005 off?
13 A  I had maternity leave.
14 Q  You had maternity leave. But most people get six
15 weeks maternity leave.
16 A  Under the academic articles, I was given --
17 Q  You get the whole semester?
18 A  -- twelve weeks. And I believe it says that you
19 can be given other duties -- this, that, and/or the
20 other -- during -- during this time.
21 Q  How long is a semester?
22 A  Fourteen and a half weeks, 15 weeks. Oh, it
23 depends on whether you count breaks. So it would
24 span further because of spring break and -- spring
25 break and --

1  Q  Okay. So is that accurate, you'd be off then from
2  the time you had the baby in July through -- not
3  teaching -- through the end of the year, the
4  calendar year, if you had that leave the fall of
5  2005?
6  A  I was not required to go in and teach a class for
7  12 weeks. Thus, as is typical, the department
8  gives that full semester off of teaching, not
9  requiring you to teach.
10 Q  All right. And then when was your next child born?
11 A  My next child was born on October 17th, 2006.
12 Q  So did you work up until October 16th, or did you
13 take from the beginning of that academic year?
14 A  I had a one-course teaching reduction, so I didn't
15 teach a course. I did attend faculty meetings. At
16 that time I was doing research. I was -- I did --
17 I remember I had a referee report for an article in
18 a journal that I was finishing up in the hospital.
19 Q  Okay. All right. So we were talking about Dwyer's
20 comments about --
21 A  Buechler's comments.
22 Q  Buechler's comments suggesting that it might not be
23 good to take three semesters off in a row, correct?
24 Okay.
25 A  And he was -- yes.

1  Q  Okay. All right. Any other comments about you,
2  your leave, your tenure application, discrimination
3  towards you, that you recall?
4  A  I'm sure there -- I'm sure there are many things.
5  Could you be more specific.
6  Q  Can you think of any, as you sit here, of any
7  comments that were made directly to you or that
8  directly related to the denial?
9  A  You had mentioned earlier who had made remarks
10 concerning how did I get tenure and this was before
11 during the lunch break. And it had -- I remember
12 Professor Antonio Delgado has joked to me or ripped
13 me many times and in front of other faculty. So,
14 what did you do to get tenure? Yeah, I got tenure
15 the -- the usual way or the normal way. Because he
16 was given tenure slightly after I was given tenure,
17 a year or two after I was given tenure. I got
18 tenure -- what did he say?
19     At one point he was making these comments
20 during a PTO back-to-school picnic, in front of
21 parents that my children go to school with. My
22 husband's president of the PTO, and we were
23 organizing this.
24 Q  Did he have anything to do with the -- your tenure
25 decision?

UNIVERSITY OF NOTRE DAME DU LAC

Page 253

1  A  No.
2  Q  Was he involved in any of the committees?
3  A  No. This was per your question, other people who
4     had made demeaning remarks. There was also Tom
5     Gresik, who has made comments to me about, How did
6     you get your tenure back -- how did you get your
7     tenure, what did you do to get -- get your job
8     back.
9  Q  Who is he?
10 A  He's a professor in the economics department, and I
11    know him because I was faculty representative of
12    the math department in 2009 -- 2009-2010 academic
13    year, and he was the chair of the academic senate.
14 Q  How do you get to be the representative for your
15    department on the faculty?
16 A  I was elected by --
17 Q  Elected by the department?
18 A  Yes. I was elected prior to being denied tenure.
19 Q  Prior to what?
20 A  Prior to being denied tenure.
21 Q  Did Alex Himonas make any discriminatory comments
22    to you?
23 A  Yes.
24 Q  What were they?
25 A  Oh, you're a woman, you're nurturing toward these

Page 254

1     students, come on, you can get high TCEs, it's
2     easy.
3        It would be hard for me to recall all the types
4  of comments Alex Himonas makes. He's said comments
5     like, These guys, I can understand it would be
6     hard, but for you -- he's very chummy, very chummy
7     with me, with Claudia. He comes to us with -- you
8     know, he has some problems with who to teach what
9     course, that nobody else wants to teach. And he
10    called Claudia at 2 a.m. in the morning one time,
11    and we've both commented that he would never have
12    done this to anybody else.
13 Q  Do you know if he ever did that to anybody else?
14 A  I do not know for sure. I do not monitor his
15    behavior, but I've never heard of him doing it to
16    anybody else.
17 Q  And he was the associate chair before Bei Hu?
18 A  Bei was chair one year, wasn't he?
19 Q  Was Alex --
20 A  Before Bei and Juan Migliore. He was -- Alex
21    Himonas was associate chair for several years --
22 Q  Okay.
23 A  -- prior to me being given tenure.
24 Q  Anything else that you can think of, any other
25    comments that he made that were discriminatory?

Page 255

1  A  He refers to Claudia and me as "you girls" or "you
2     women" and then goes on some rant. He has a
3     pattern of -- like I said, you know, when it's a
4     guy who has this -- a low score in this 100-level
5     course, this is a good score for this course, these
6     are hard courses to teach. Like for this young man
7     who's up for tenure renew -- for third-year
8     renewal, these are excellent scores, these are
9     hard. But if it was me or Karen, it was, come on,
10    this should be easy for you to get higher scores
11    than this. This -- you just tell the students --
12    you -- he's very flippant at making comments about
13    how we should just be nurturing towards the
14    students and we'll get these high -- these high
15    scores. He is this -- he'll say something like, he
16    is this ugly Greek guy and can get these high
17    scores, then we certainly should be able to get
18    (indicating) high scores. He makes all sorts of
19    comments.
20 Q  Any others you can think of?
21 A  I'm sure that there are others.
22 Q  Okay. Bei Hu, did he support your case for tenure?
23 A  Yes, he did.
24 Q  Did he ever make any discriminatory comments to
25    you?

Page 256

1  A  No, he didn't.
2  Q  Any problems with the courses you were assigned
3     when he was the associate chair?
4  A  No. In fact, I seem to recall being pleasantly
5     surprised at the courses I was assigned when he
6     became associate chair, if my recollection serves.
7  Q  How about when he was chair? Because he was chair
8     after he was associate chair, right? And that's
9     when Juan Migliore became associate chair.
10 A  Yes. In particular, I remember I -- I believe that
11    it was Bei Hu who put me in this 300-level algebra
12    course that I wanted to teach.
13 Q  When was that?
14 A  I taught that course in, I believe it was, spring
15    2009. It was around spring two thousand --
16    possibly spring 2009. I would have to look at my
17    records to check for sure.
18 Q  Juan, any discriminatory or sexist comments by him?
19 A  He's made comments about we always felt like you
20    were the type of person that would do well in these
21    courses.
22 Q  Did he say why? Is this you -- you personally,
23    you, Katrina Barron?
24 A  Yes.
25 Q  Why did he say he thought you'd do well?

Page 257

1 A   I didn't press it.  A lot of times I didn't press
2     these questions because I felt that -- I mean, this
3     was pre-tenure, and I needed these people's support
4     in order to get tenure.
5 Q   Did he ever tell you that he thought you handled
6     those classes well?
7 A   Yes.  And he'd make comments that he thought I was
8     the type of person -- he -- he did make comments
9     that I had gotten very high TCE scores in these
10    courses and there are very few people that he could
11    put in these courses that could get TCEs at this
12    level.
13        Alex Himonas had made this comment to me as
14    well.  At one point I asked him -- I was having a
15    conversation with me and went through a litany of
16    people:  Katrina, I can't put this person, this
17    person, this person in these 100-level courses, it
18    would be a disaster, horribly low TCEs.  You --
19    these kinds of comments.  That was Alex Himonas.
20        You mean about Juan Migliore.  Let me think
21    more about Juan.  And I must impress upon -- I
22    would like to make the point that many of these
23    people -- I don't know for sure, but I'm pretty
24    sure -- Juan Migliore, Alex Himonas, people on CAP
25    were at this 2004 -- fall 2004 faculty meeting in

Page 258

1     which these four courses were discussed as
2     garnering low TCEs and needed to be taken over by
3     special professional teaching faculty.
4         And none of these people at any time gave me
5     any inclination that when they were putting me into
6     these courses, that they -- they knew these facts
7     that had been presented.
8 Q   Do you believe that either Alex or Bei or Juan
9     assigned you those courses knowing that they got
10    lower scores and you're a woman --
11 A  Absolutely.
12 Q   -- and you're going to get lower scores?
13 A  Absolutely.  They knew that I would get lower
14    scores being in those courses, I believe.  They sat
15    in on that 2004 meeting.  They made comments during
16    the meeting.  They subsequently assigned those
17    courses to me.
18 Q   And do you believe --
19 A  How could they not know?
20 Q   Do you believe they assigned them to you because of
21    your gender?
22 A  I believe that they have a bias in believing that
23    somehow women are -- and, again, Alex Himonas has
24    made comments to this effect, about women
25    dealing -- about women -- I think he's made the

Page 259

1     comment specifically, women dealing well with these
2     freshmen students.  They've made comments to me
3     about the number of students they see in my office
4     hours, how my office hours are full with these
5     young freshmen students.
6 Q   Why is that?  Do you know why your office is full
7     with the young freshmen students?
8 A   Well, typically, if you're teaching one of these
9     100-level courses, they're larger courses than
10    other courses of the 200 and especially 300 and 400
11    levels.  So at times I had 85 students versus 10 to
12    20 students in other courses.
13        In fact, Dennis Snow pointed out that I should
14    make the point at some point that I was being
15    overburdened because I was teaching more students
16    than other faculty.
17        So you have more students to deal with.  They
18    are freshmen.  They need a little bit more
19    handholding.  They tend to come to more office
20    hours if -- unless you are one of these professors
21    who shuts -- who doesn't have office hours or
22    doesn't appear for their office hours, which we do
23    have that happen.
24        And I had many students make comments to me
25    about -- to the effect of either we're -- they tend

Page 260

1     to look to women as the mom that they're missing
2     from home.
3 Q   The students tell you that?
4 A   One student, in particular, I believe, wrote this
5     in a letter to the provost, that I was like her --
6     a mother figure to her.
7         So they even specifically have made comments
8     on -- this one particular letter, I recall, and
9     other comments, and I believe that there's a large
10    tendency for the students to look to female
11    professors in that role, especially at the freshman
12    level.
13 Q   Any other comments by either Alex or Bei or Juan?
14 A   Comments pertaining to what I just spoke of?
15 Q   Any other comments you can think of.
16 A   Pertaining to Bei Hu or Alex Himonas in particular?
17 Q   Correct.  Or Juan.  Comments that they made
18    regarding your gender that were discriminatory, in
19    your belief.
20 A   Alex Himonas made a comment to me at one point that
21    he was struck by the fact -- this is after I was
22    denied tenure -- that nobody came -- nobody was
23    pushing him as an advocate for me; that the junior
24    men, if he put them in a certain course, he would
25    have Frank Connolly, he would have whoever come and

1  want a change. And it -- in looking -- discussing
2  why he was given these courses.
3      And he commented that he felt like nobody in
4  the department cared, that people -- that people
5  were not advocating for me to teach these -- these
6  courses that he needed to put somebody into.
7  Q  Now, did he tell you he thought that was a function
8  of your not being in one of the groups that
9  advocate for each other?
10 A  No. In fact, at one point he mentioned -- he made
11  statements that just oftentimes I could come to
12  you -- I could go to you or Claudia to put in this
13  course, and it was Claudia that he -- the other
14  person that he would go to.
15 Q  Claudia did fine in these courses and got tenure a
16  year early, right?
17 A  She was research-wise much better than the -- most
18  of the men in our department.
19 Q  But she did fine in those courses and she got
20  tenure a year early?
21 A  She tended to get higher scores. I talked to her
22  about it at one point. She said she plays up the
23  fact that she's Italian and Catholic.
24 Q  So she did get higher scores, right, in those
25  courses?

1  A  She said that it's one of the things she's found
2  that could get higher scores. I don't know her
3  specific scores, actually.
4  Q  You don't know whether they were good, bad, or
5  indifferent?
6  A  I knew at one time. I haven't committed it to
7  memory, but --
8  Q  And she got tenure a year early?
9  A  She did.
10 Q  Now, there were -- during the time that you were on
11  the tenure track and right before you applied to be
12  granted tenure with promotion, there were three
13  chairs, Buechler, Dwyer, and Bei Hu; is that right?
14 A  During the time frame before I was up for tenure?
15 Q  Right.
16 A  Yes.
17 Q  Because Matt Gursky didn't come until afterwards?
18 A  That's correct.
19 Q  So there's three chairs. And then there were
20  also -- well, there were four associate chairs.
21  The one guy who was only there a little while, what
22  was his name?
23 A  Alan Howard.
24 Q  Alan Howard. Okay. And then there was Alex
25  Himonas, Bei Hu for just a little while, and then

1  Juan. So we're talking three chairs, four
2  associate chairs.
3  A  I believe so, yes.
4  Q  Do you believe that those seven people, who either
5  assigned you courses or oversaw the process of
6  assigning the courses, intentionally assigned you
7  the courses that they did because you're a woman
8  and, therefore, they didn't want you to succeed at
9  Notre Dame?
10     MR. BARKES: I'm going to object as to
11     form. You can go ahead and answer, if you
12     can.
13 A  I believe that gender bias affected the actions
14  that they took.
15 BY MS. CANTON:
16 Q  So let me go back to my question. Do you think
17  that they discriminated against you, they gave you
18  those courses -- all those seven people assigned
19  you the courses they did so that you wouldn't
20  succeed at Notre Dame, you wouldn't get tenure?
21 A  In my opinion -- from the actions and statements of
22  Steve Buechler and Bill Dwyer, along with
23  statements that other people have made about the
24  level of support Bill Dwyer held for me when I was
25  first hired and within the department, I believe he

1  did not want me to succeed. I believe both
2  Buechler and Bill Dwyer did not want me to succeed
3  in getting tenure.
4  Q  Because of your gender?
5  A  I believe it is because of my gender.
6  Q  Okay. For the reasons that you've given us today?
7  A  Those and others that I might have neglected to
8  remember during the course of today.
9  Q  Okay. And then what about the other five, Alan,
10  Alex, Bei, Juan and -- well, just those -- just
11  four because Bei kind of overlapped. He did both
12  jobs. Bei, Alan, Alex, and Juan.
13 A  I believe that their actions may have been colored
14  by their knowledge that Buechler and Dwyer did not
15  support me.
16 Q  And why do you believe that?
17 A  Statements that they -- that, for instance, Alex
18  Himonas had said, when he said nobody was
19  advocating for me. That includes the chairs.
20  Statements that I made to him and to Juan telling
21  them -- in emails and in person that Buechler had
22  recommended I teach such-and-such or Dwyer had
23  recommended I teach such-and-such and those being
24  courses that they knew were not going to garner
25  high TCEs for me.

---

Page 265

1    I believe that that was a strong signal to them
2  that I was being marked for -- not being mentored
3  or supported at the level that, in particular, my
4  male colleagues in the department had been
5  monitored and supported at.
6  Q  So do you believe that Alan and Alex and Bei and
7    Juan also did not want you to succeed at Notre
8    Dame?
9        MR. BARKES: Object. That's actually
10         asked and answered.
11  A  I will not --
12        MR. BARKES: You can go ahead.
13  A  I wouldn't include Alan Howard in that. And what
14    was the question?
15  BY MS. CANTON:
16  Q  Well, actually, it wasn't answered, because you
17    said -- you said two people, but then you didn't --
18    you kind of forgot about the other four. So I'm
19    following up.
20  A  I do not have any feeling or evidence that Alan
21    Howard or Bei Hu steered me towards courses that
22    they knew would garner low TCEs.
23  Q  But you think that Alex and Juan did?
24  A  Yes.
25  Q  Because you're a woman and because they didn't want

---

Page 266

1    you to succeed?
2        MR. BARKES: Object to that as asked
3         and answered, as to those two people. You
4         can go ahead and answer it if you can.
5  A  I certainly believe that their personal biases
6    affected their actions in assigning me those
7    courses.
8  BY MS. CANTON:
9  Q  When you say their personal bias, personal bias
10    against you?
11  A  No. I think they both like me personally. I think
12    personal bias as a woman.
13  Q  So gender discrimination?
14  A  Gender discrimination.
15  Q  For the reasons that we've talked about today?
16  A  Yes. And in addition to other reasons that I may
17    have neglected to recall.
18  Q  All right.
19        MS. CANTON: Let's take a quick break.
20        (Discussion held off the record.)
21        MS. CANTON: Just a couple more, and
22         we'll stop for the day.
23  BY MS. CANTON:
24  Q  I want to follow up on that comment that you said
25    Patricia told you that she heard Provost Burish

---

Page 267

1  make about -- that negative comment.
2  Q  Did he say there would be -- I just want to
3    make sure I understand. She told you that he said
4    that if a woman took maternity leave and wanted to
5    stop the tenure clock, there would be, what -- what
6    did he say would happen?
7  A  He made a general reference to what a woman would
8    be afforded in the academic articles and under
9    employment law, and I'm trying to recall the exact
10    wording in the email. I may not be recalling the
11    exact wording.
12        To my recollection -- but it's in the email --
13    the gist of it was that it would be -- their senior
14    male colleagues would likely view it as a lack of
15    commitment to the job, specifically when they came
16    up for promotion. I believe the words "when they
17    came up for promotion" were in there --
18  Q  All right. So he wasn't threatening that he was
19    going to make any negative consequences --
20  A  No --
21  Q  -- for you?
22  A  -- but he is a senior faculty.
23  Q  So in his opinion, he was saying males could hold
24    that against them?
25  A  Are likely to.

---

Page 268

1  Q  Are likely to hold it against them; that's your
2    recollection?
3  A  And he was telling these women to not -- to advise
4    junior women not to take maternity leaves and not
5    to stop the tenure clock. And, in fact, this has
6    happened since these comments were made.
7        Women -- Patricia Maurice, for instance,
8    advised Jen DuBois specifically. After Jen had her
9    first child and felt hostility within her
10    department, she did not take even a maternity
11    leave, let alone stop the tenure clock for her
12    second child.
13  Q  Do you know of any woman who did take maternity
14    leave and stopped the clock and got tenure?
15  A  Yes, I do.
16  Q  So it does happen sometimes?
17  A  (Witness nodded head.)
18  Q  Father Jenkins -- I forgot to ask you. Because
19    he's the ultimate decision-maker, right? Any
20    knowledge that he didn't grant you tenure because
21    of your gender?
22  A  No knowledge. I do feel like, as overseer of
23    employment at the University of Notre Dame, and
24    considering the long record of discrimination of
25    women in -- at Notre Dame, but, in particular, in

---

**Page 269**

1  mathematics and the STEM fields, meaning science --
2  Q  Technology?
3  A  -- technology -- help me out here -- engineering
4     and mathematics, that I would certainly hope that
5     in many of these cases of women in engineering and
6     the sciences, that he would take a special interest
7     and step in.  And so my extreme displeasure that he
8     has not more often.  And, in fact, it's gone the
9     other way.  Provost Burish has abdicated his
10    responsibility to even review cases if they are
11    stopped at the department level.  If there's a case
12    that stops at the department level, he doesn't even
13    review it.
14        And in my opinion they're abdicating
15    responsibility in reviewing and what has already
16    been recognized as a problem with the retention and
17    promotion of women on this campus and other
18    statements regarding that we would hope to better
19    the university in that respect.
20        So in that regard he made no personal
21    statements against me, but he certainly could have
22    at any point seen the few numbers of women we have
23    in the College of Science and the Department of
24    Mathematics, the problems with promotion and
25    retention, past discriminatory and ongoing

**Page 270**

1  discrimination, reviewed the case.
2        MS. CANTON: All right.  We are done.
3     Thank you.
4        MR. BARKES: We will read.
5     (Deposition concluded and Witness
6        excused at 5:22 p.m.)

**Page 271**

1                    CERTIFICATE
2        I, Melody M. Goodrich, a Notary Public, in
3     and for the County of Cass and State of
4     Michigan, do hereby certify there appeared
5     before me on Friday, January 10, 2014, KATRINA
6     D. BARRON, who was previously affirmed or duly
7     sworn to testify the truth, the whole truth, and
8     nothing but the truth to questions propounded at
9     the taking of the foregoing deposition in a
10    cause now pending and undetermined in said
11    court.
12        I further certify that I then and there
13    reported in machine shorthand the proceedings at
14    the said time and place; that the proceedings
15    were then transcribed from my original shorthand
16    notes; and that the foregoing typewritten
17    transcript is a true and correct record thereof.
18        IN WITNESS WHEREOF, I have hereunto set my
19    hand this 24th day of January 2014.
20
21            *Melody M. Goodrich*
22    _____
23    Melody M. Goodrich
      Notary Public, State Of Michigan
24    Residence:  Cass County
      My Commission Expires:  4-11-14
25

**Page 272**

1                    ERRATA SHEET
2        DEPOSITION OF:  KATRINA D. BARRON
3           Date:  January 10, 2014
4
5  Page    Line         Change          To      Reason
6  ____|____|_____|_____|_____
7  ____|____|_____|_____|_____
8  ____|____|_____|_____|_____
9  ____|____|_____|_____|_____
10 ____|____|_____|_____|_____
11 ____|____|_____|_____|_____
12 ____|____|_____|_____|_____
13 ____|____|_____|_____|_____
14 ____|____|_____|_____|_____
15 ____|____|_____|_____|_____
16 ____|____|_____|_____|_____
17 ____|____|_____|_____|_____
18 ____|____|_____|_____|_____
19 ____|____|_____|_____|_____
20 ____|____|_____|_____|_____
21 ____|____|_____|_____|_____
22 ____|____|_____|_____|_____
23 [ ]  PLEASE CHECK HERE IF THERE ARE NO CORRECTIONS.
      RETURN ERRATA SHEET WITH SIGNATURE PAGE
24    BY:  March 3, 2014
25

Page 273

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

Cause No. 3:11-CV-440

KATRINA BARRON,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
UNIVERSITY OF NOTRE DAME DU        )
LAC d/b/a NOTRE DAME               )
UNIVERSITY,                        )
                                   )
          Defendant.               )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    )

JOB NO.   140110

     I, KATRINA D. BARRON, state that I have read the

foregoing transcript of the testimony given by me at my

deposition on January 10, 2014, and that said

transcript constitutes a true and correct record of the

testimony given by me at said deposition except as I

have so indicated on the errata sheets provided herein.


_____          _____
KATRINA D. BARRON                      DATE


                Michiana Reporters
                  P.O. Box 122
              Osceola, Indiana 46561
                  574.300.3885

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

Cause No. 3:11-CV-440

KATRINA BARRON,                          )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )
                                         )
UNIVERSITY OF NOTRE DAME DU              )
LAC d/b/a NOTRE DAME                     )
UNIVERSITY,                              )
                                         )
          Defendant.                     )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _           )


     The Continued Deposition of KATRINA BARRON

     Date:    Tuesday, March 11, 2014

     Time:    1:02 p.m.

     Place:   University of Notre Dame
              203 Main Building
              Notre Dame, Indiana

     Called as a witness by the Defendant in

     accordance with the Federal Rules of Civil

     Procedure and Rules of the United States

     District Court for the Northern District of

     Indiana, South Bend Division, pursuant to

     Notice.

REPORTED BY:
Before Melody M. Goodrich, CM
Notary Public, Cass County, Michigan

Page 275

```
1   APPEARANCES:

2

3   MR. COLBY A. BARKES
        Blachly, Tabor, Bozik & Hartman
4       56 Washington
        Suite 401
5       Valparaiso, Indiana 46383
        219.464.1041
6       cabarkes@lawyersonthesquare.com

7   On behalf of the Plaintiff;

8

9

10  MS. DOREEN CANTON
        Taft Stettinius & Hollister
11      425 Walnut Street
        Suite 1800
12      Cincinnati, Ohio 45202-3957
        513.381.2838
13      canton@taftlaw.com
            and
14  MS. KATHLEEN K. BRICKLEY
        Office of General Counsel
15      University of Notre Dame
        203 Main Building
16      Notre Dame, Indiana 46556-5602
        574.631.6411
17      gencoun@nd.edu.

18  On behalf of the Defendant.

19

20

21  ALSO PRESENT:

22      Daniel J. Myers, Vice President and Associate
            Provost for Faculty Affairs
23

24

25
```

Page 276

```
1               I N D E X

2        THE CONTINUED DEPOSITION OF
                KATRINA BARRON
3

4                                        PAGE

5   CONTINUED DIRECT EXAMINATION
        By Ms. Canton .............................277
6

7                   *   *   *

8          E X H I B I T S

9   DEFENDANT'S      DESCRIPTION       PAGE

10  Exhibit 14 ...................................361

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 277

1          KATRINA BARRON
2   Called as a witness by the Defendant, having
3   been first duly sworn or affirmed, was examined
4   and testified as follows:
5          CONTINUED DIRECT EXAMINATION
6   BY MS. CANTON:
7   Q   Good afternoon, Professor Barron.  We meet again
8       for part two of your deposition.  And I know you
9       want to finish it today, as we do, so let's try and
10      be efficient.  I'm going to try, and I know you
11      will too.
12          I thought if we just keep in mind your two
13      claims.  I just reviewed the complaint again.  Your
14      two claims basically are that you were assigned
15      100-level courses because of your gender and that
16      you were denied tenure because of your gender.
17          So I want to ask you, as we go through these
18      witnesses that we didn't finish the last time,
19      what, if anything, these individuals know about
20      your claims.  I know a lot of them have their own
21      stories about their tenure or something that's --
22  A   Patterns --
23  Q   -- extraneous.
24  A   Patterns of discrimination.
25  Q   Right.  So -- but let's talk about what happened in

Page 278

1   your case and your claims against the university.
2       I'm going to give you Exhibit 4 again.  This is
3   where -- that's the one we were looking at when we
4   left off.  And you don't necessarily have to follow
5   it, but we got up to the Gs on page 21.  And I
6   particularly want to ask you about people in the
7   math department.
8       So the first one is David Galvin on page 21.
9   You just said he's in the math department.  He's up
10  for tenure.  He's been at Notre Dame for six years.
11 A  He has since come up for tenure and gotten tenure.
12 Q  Does he, to your knowledge, have anything to add to
13  your claims, any knowledge of your claims?
14 A  He knows that he held the exact same grant as I did
15  when he went up for tenure.  When I went up for
16  tenure, my grant was characterized as not good
17  enough for getting tenure.  The Provost's Advisory
18  Committee came back to -- requesting that I give
19  them NSF reviews, when this was a funded program
20  through the NSA -- through the National Security
21  Agency.
22      Whereas when he went up for tenure, the very
23  same person who had said -- in the department, and
24  others who said that my NSA grant was not
25  sufficient for tenure, praised his NSA grant as

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 74 of 108

Page 279

1   being sufficient for tenure.
2       When I was up, the Provost's Advisory Committee
3   came back questioning that research and why it
4   wasn't funded through the NSF and requested that I
5   turn over my -- my confidential NSF reviews.
6       Whereas when he went up for tenure with the
7   exact same monetary amount, the exact same type of
8   grant, having also applied for the NSF and also
9   having been denied for the NSF but funded through
10  the NSA, he was not asked to provide his NSF
11  reviews.
12 Q  Who was the person who said yours wasn't good
13  enough but his was?
14 A  Sam Evens.
15 Q  And he was on the CAP committee, correct?
16 A  Yes.  And then for David Galvin, we had an open
17  CAP.  Sam Evens helped prepare his documents, and
18  in those documents, and as part of the CAP
19  proceedings for David Galvin, praised the fact that
20  David Galvin had an NSA grant.
21 Q  And that was at a meeting that you attended?
22 A  I was in that room.
23 Q  Did anybody ever explain to you why they wanted
24  additional information for your grant?
25 A  It was explained to me that there was questions as

Page 280

1   to whether my research was of the caliber to garner
2   outside funding or garner an NSF grant.
3  Q  And who said that?
4  A  I don't recall.
5  Q  Now, obviously you weren't at the CAP committee for
6   your own case, correct?
7  A  No, I was not.
8  Q  What about Sam Evens, was he?
9  A  He was a member of the CAP, and he was the person
10  who disparaged my NSA grant.
11 Q  And did -- who told you that?
12 A  I -- all the other members of the CAP affirmed that
13  this was the case.
14 Q  Anything else about David Galvin, other than his
15  grant was good enough and yours wasn't, that you
16  can think of?
17 A  Not that I can recall right now.
18 Q  How about Misha Gekhtman?
19 A  Misha Gekhtman, uh-huh.
20 Q  And Department of Mathematics as well?
21 A  He's the current chair.
22 Q  What do you believe he knows about your claims?
23 A  He can affirm that, from his point of view, my
24  teaching was excellent.  He was undergraduate chair
25  when I was denied tenure.  And when the students --

Page 281

1   when I emailed former students of mine to give
2   feedback to the provost or the president about how
3   they -- what they felt about me being denied tenure
4   due to my teaching, I suggested that they also cc
5   Misha Gekhtman, the undergraduate chair.  And so he
6   received many of those letters as well, partly to
7   document what the students were saying.
8  Q  Anything about the assignment of your classes, your
9   courses?
10 A  No.  And, in fact, since Misha Gekhtman has been
11  chair, I have been able to teach a quite different
12  pallet of courses, courses in my specialty, courses
13  I have been not denied the opportunity to teach, a
14  new graduate course which has now been made a
15  consistent offering, as of a few weeks ago, in the
16  department because of how well it was run, how well
17  received it was.
18      And now I have been given the opportunity to
19  start teaching Honors courses, which the typical
20  male peers of mine had been given the opportunity
21  to teach at least once but often on a regular
22  basis; whereas when I was tenure-track, I was never
23  allowed to teach such courses.
24 Q  Did you request to teach the Honors -- any Honors
25  courses?

Page 282

1  A  Repeatedly.
2  Q  Who did you ask?
3  A  Frank Connolly.  I asked Professor Buechler, my
4   chair when I first came.  I asked Professor Dwyer,
5   the chair after Professor Buechler.  I asked
6   Professor Himonas, who was associate chair.  I
7   asked Juan Migliore who was associate chair.
8       And I was often sent to Frank Connolly, and I
9   many times requested to work with Honors students
10  with Frank Connolly --
11 Q  And --
12 A  -- through Frank Connolly.
13 Q  What did Frank Connolly say when you asked?
14 A  "We'll see."  He made questionable -- he questioned
15  my teaching ability.  Since then Jeff Diller --
16  Frank Connolly has retired, and Jeff Diller is now
17  over -- taking over that program and has asked me
18  to develop a new course for the Honors students.
19 Q  What did Professor Buechler say when you asked him
20  about teaching Honors courses?
21 A  He repeatedly said that I needed to get
22  consistently above 3, preferably 3.2 on the TCEs in
23  the service courses for non-math majors, in order
24  to be able to teach those courses.
25 Q  What did Professor Dwyer say?

Page 283

1 A  I don't recall specifically. He also repeated this
2     line of I need above a 3.0, preferably 3.2 in
3     service courses. I don't recall exactly what he
4     said about my -- my requests about Honors courses.
5     I don't recall at this time.
6 Q  Professor Himonas?
7 A  I have to talk to Frank Connolly. He would say,
8     "You have to talk to Frank Connolly. There's
9     nothing I can do."
10 Q  And what about Juan Migliore?
11 A  Same thing.
12 Q  Have you talked to Professor Gekhtman about your
13    particular case?
14 A  There were many times when I spoke to him about
15    my -- or he was in the room, during tea or
16    something, when I was pursuing my appeal. If
17    memory serves, he was on the CAP when the Office of
18    the Provost tried to send my file back to my CAP,
19    rather than reviewing it themselves.
20       And I recall speaking to him, if memory
21    serves -- him and Peter Cholak, about whether they
22    wanted to participate in -- in an order from the
23    Office of the Provost that was in violation of the
24    court-mandated procedures of the Appendix A in our
25    academic articles.

Page 284

1        And then I believe it was he and/or Professor
2     Cholak that drafted a letter to the Office of the
3     Provost and possibly the General Counsel -- I'm not
4     sure -- wanting to ensure that they weren't being
5     asked to violate a federally-mandated procedure.
6 Q  Do you know what happened with that -- what
7     happened with that letter?
8 A  At that point -- and then shortly after that, I
9     filed with the EEOC as well, I believe -- the
10    Office of the Provost decided that they maybe
11    should start following those court-mandated
12    procedures, and I believe they did.
13 Q  How about Karsten Grove?
14 A  He was a member of the CAP who originally heard my
15    case, reviewed my case for tenure.
16 Q  Have you talked to him about your lawsuit?
17 A  I talked to him about my appeal and gave him a copy
18    of my appeal, to see if -- what parts of it were
19    accurate. And he gave me feedback, saying that it
20    was accurate in terms of -- at that point I was
21    sometimes guessing what went on in CAP. But -- and
22    I wanted verification from members of CAP as to
23    whether what had been told to me was correct or
24    not. He verified that.
25       He also commented on that he found the most

Page 285

1     unconscionable action against me was how I was
2     denied extension of my tenure clock under
3     Professor Dwyer when I had my first child. I was
4     denied the extension for my child as well as for
5     the sabbatical leave. I was forced to only do --
6     get one extension. And he thought that that was --
7     well, he made some comment of that being something
8     in my appeal that jumped out at him as particularly
9     discriminatory.
10       But he also is one of the people who's made
11    this comment several times, this kind of -- of -- I
12    don't know what you -- you know, he read my appeal.
13    He knew my appeal. And yet he has -- and he was
14    supportive of aspects of it. But he still says, "I
15    don't know what you did to get your job back, but
16    it sure worked."
17       And, in particular, him saying that after
18    certain developments within my department, about a
19    woman getting tenure for aspects that are not
20    related to her quality of work, I have found
21    particularly offensive.
22 Q  And that was Roseanne?
23 A  Roxana --
24 Q  Roxana.
25 A  -- Smarandache.

Page 286

1 Q  I remember we talked about her last time.
2       Does Professor Grove know anything about the
3     assignments that were made, your course
4     assignments?
5 A  I don't know whether he knows or not. I have not
6     spoken to him, to my recollection, specifically,
7     but he may very well have made comments on those
8     aspects of my appeal. But I don't recall
9     specifically.
10 Q  All right. Matthew Gursky, he was the chair before
11    the current chair?
12 A  Yes.
13 Q  Okay. Any knowledge he has regarding your course
14    assignments?
15 A  I'm sure he has knowledge of -- of the general
16    procedures for course assignments, how mine might
17    compare with others. But he was not involved in
18    that process per se.
19 Q  Because he came after your tenure?
20 A  Yes. And I don't know that he held any advisory
21    positions in which he was specifically involved,
22    but he may have known knowledge behind the scenes.
23    I don't know.
24 Q  Have you talked to him about your lawsuit?
25 A  I've talked to him specifically about my concerns

Page 287

1    that under our new guidelines for assessing tenure,
2    that within the College of Science we've stressed
3    for the -- for the math department, we've stressed
4    that people should be -- a major portion of their
5    assessment is their outside speaking engagements
6    prior to going up for tenure, the nature of them
7    and the prestige of them. And I -- I was very
8    concerned that this specifically take into
9    consideration those instances in which individuals
10   are -- have to turn down outside speaking
11   invitations due to medically -- especially
12   medically-related travel restrictions.
13        And he was -- he was very unreceptive. And I
14   tried to press it. He -- and he was not receptive
15   to putting anything in the document, putting
16   anything in department files that would make --
17   that would ensure that we carefully take into
18   consideration such things as pregnancy that would
19   prevent a woman from traveling to a prestigious
20   speaking engagement and, thus, not be considered
21   when she went up for tenure, such as had happened
22   in my case.
23 Q Would it work the same way for a male professor who
24   had some kind of illness and couldn't travel?
25 A Yes. In fact, I -- when -- when many people in my

Page 288

1    department trivialized what I was saying or laughed
2    at it in a department meeting when I brought it up,
3    I specifically said that, you know, a male
4    professor should get credit for having an ICM
5    invitation -- invitation to the International
6    Congress of Mathematicians -- even if he were
7    unable to go because of appendicitis or something.
8    And it was laughed at as if that -- that would
9    never happen.
10        Since then, we are actually putting an
11   assistant professor up for tenure because he was
12   just invited to give an ICM lecture. He has not
13   traveled to it yet. And we're putting him up for
14   early tenure because he was invited to give an ICM
15   lecture.
16        Whereas, when I was going up for tenure, I was
17   not allowed to put in my invitation to the Erwin
18   Schrödinger Institute in Vienna, my invitation to
19   the University of Edinboro, even the fact my
20   graduate student went in my stead to the University
21   of Vienna. Well, he went, but he was not able to
22   give the plenary lecture I was invited to, so it
23   was not counted towards my record.
24        And I was trying to ensure that for women, when
25   they were invited to prestigious lectures, even if

Page 289

1    they had not gone yet or were not able to go, that
2    they -- that would be counted. It certainly is
3    being counted for this young man who's been
4    invited.
5 Q  Who is that?
6 A  Gábor -- and I will mispronounce his last name. It
7    is, I believe, a Hungarian last name. It's S-Z --
8    Székelyhidi. I apologize very much for not knowing
9    how to pronounce his last name, but I've never
10   really gotten it.
11 Q  That's okay. That's fine. Anything else with
12   Professor Gursky as far as your course assignments?
13 A  Not that I recall specifically about course
14   assignments.
15 Q  Alexander Hahn, also in the math department?
16 A  Yes.
17 Q  He's the one you complained to about Professor
18   Pit-Mann Wong, right?
19 A  One of the people, yes, that I --
20 Q  Okay.
21 A  He had been -- yes. Sorry.
22 Q  What does he know, if anything, about the way your
23   courses were assigned?
24 A  I had complained to him several times. He -- when
25   I first arrived, I believe he was still Director of

Page 290

1    the Kaneb Center or at least he had been Director
2    of the Kaneb Center, which is the center for
3    teaching and excellent [sic] at the university.
4        So I had been -- and I knew he cared about
5    teaching, and I had been -- I care greatly about
6    teaching too and had spoken to him about teaching
7    issues.
8        I had spoken to him about teaching Honors
9    courses because I know that he had been involved in
10   the Honors program in various ways at times. He
11   pointed me to Frank Connolly. I know that he had
12   allowed certain individuals -- I can't remember
13   exactly which professor. I believe it might have
14   been Sergei Starchenko. But it was one of the
15   professors that I listed in my supplementary
16   documents I gave to PAC in 2010, the Professors A,
17   B, and C in that document.
18        One of them had only been -- had only been
19   assigned or -- a large portion of their assignments
20   at the 100 level had been a course which Alex Hahn
21   had designed, which was a course I would have been
22   interested in teaching. I had spoken to him about
23   teaching that. He said that he was very, very
24   careful about who to choose about teaching that
25   course and they would have had to have demonstrated

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 77 of 108

Page 291

1    excellence in the service courses.
2        And so I remember having talked to him about
3    that when I first came to the university. And so
4    it had jumped out at me when I was doing my
5    research for my appeal, that he had -- that this
6    was not true, that he had allowed another junior
7    male professor to teach that course without having
8    demonstrated this -- these high levels of the TCEs
9    that I was being asked to provide.
10 Q  And who was the junior male professor?
11 A  That's what I'm trying to --
12 Q  Is that Sergei --
13 A  -- recall.
14 Q  -- maybe? Okay.
15 A  It is in the documents that I sent -- as I said,
16   that I had prepared under the guidance of Don
17   Pope-Davis -- under the existence of Don
18   Pope-Davis -- to prepare for PAC to re-hear my
19   case.
20 Q  All right. Anything else with Professor Hahn,
21   Alexander Hahn?
22 A  As is noted, Professor Dennis Stowe [sic] -- Snow
23   and Professor Nancy Stanton have since verified
24   that when Professor Hahn was chair, he was told by
25   Dean Castellino to avoid giving junior faculty

Page 292

1    100-level courses, that it was setting them up for
2    tenure denial because these courses are very
3    difficult to teach and they're very likely to
4    sometimes garner low TCEs and they will weaken a
5    candidate's case for tenure, often. And this was,
6    in particular, after Peter Cholak had come up for
7    tenure.
8  Q  So you're saying that Hahn was told to avoid giving
9    junior-level faculty the low-level courses?
10 A  Yes.
11 Q  Okay. But he didn't -- didn't assign your courses,
12   did he?
13 A  No. But he had been -- he had been chair
14   immediately prior to my being hired. I had spoken
15   to him about my own teaching assignments. He
16   certainly, with a junior faculty who was concerned
17   about excellence in teaching and concerned about
18   doing well in these 100-level courses, would have
19   had every opportunity to mentor or to do the right
20   thing in terms of -- of intervening in a junior
21   faculty's teaching assignments, as he had done for
22   male faculty.
23 Q  Now, what do you mean Snow and Stanton verified?
24   Who is Snow?
25 A  Dennis Snow is a professor in the math department.

Page 293

1  Q  And what did he verify?
2  A  He told me that just a couple years prior to my
3    being hired, that Alexander Hahn, as chair, had
4    reported to the -- I believe to the whole
5    department -- we should ask Dennis Snow and Nancy
6    Stanton specifically -- but that they had been
7    told, I believe, by Alex Hahn, that Alex had been
8    told by Dean Castellino to avoid giving 100-level
9    courses to junior faculty.
10 Q  And Nancy Stanton told you the same thing?
11 A  She told me the same thing.
12 Q  Okay. All right. Anything else with Alexander
13   Hahn?
14 A  Other than that I had -- I'm sure there are other
15   things, one being that I had come to him very
16   concerned over the mismanagement of one of the
17   100-level courses I was teaching under Pit-Mann
18   Wong, his failure to take into consideration our
19   comments on a badly prepared exam, his bullying of
20   me and Karen Chandler to not turn in a cheater, and
21   that I was concerned.
22       And I thought that he, as a professor on campus
23   who had helped start the Kaneb Center for teaching
24   and excellence, would be receptive to my concerns
25   about this course, and I had some discussions about

Page 294

1    that.
2        He asked me to send a copy of, in particular,
3    this one exam that we were concerned about, and
4    then he -- he never -- I don't recall exactly what
5    happened after that, but I know that he did not in
6    any way intervene, you know, in terms of involving
7    me in any intervention.
8  Q  Brian Hall.
9  A  Yes.
10 Q  Also in the math department?
11 A  Yes.
12 Q  Have you talked to him about your lawsuit?
13 A  Yes. In addition, he may have been the -- he may
14   have been the one that was -- that taught this
15   course of Alexander Hahn's. It was either him or
16   Sergei Starchenko who at the 100 level, prior to
17   going up for tenure, had been given this -- this
18   course of Alexander Hahn's to teach, this Math in
19   Architecture.
20 Q  What did you talk to him about?
21 A  About -- well, prior to the lawsuit, I talked to
22   him about how -- about my frustration with the
23   100-level courses, in not having my own control
24   over them. And we had had a conversation about how
25   much we use multiple choice exams and that I felt

Page 295

1  the students didn't get as much feedback as they
2  deserved on this way that we grade. And he had
3  agreed with me wholeheartedly and said that he
4  refused to teach such courses for that very reason.
5      And I asked, "How do you refuse to teach such
6  courses?"
7      And he says, "I've just said I don't want to
8  teach them, and I have not been given them to
9  teach. And I've been given upper-level courses,
10  where I have control over my own courses, and I
11  don't have to give multiple choice exams."
12      And so this was either during the time Buechler
13  was chair or Dwyer. I don't recall which. I
14  believe it was -- Alex Himonas was associate chair.
15  And I remember talking with Alex Himonas about this
16  and how was it -- when I had complained about the
17  nature of not being able to design my own exams or
18  grade my own exams, so that I gave the students
19  more feedback, how it was that I was continually
20  put in these courses and someone like Brian Hall
21  was not.
22  Q  And what did Alex Himonas say?
23  A  I don't recall.
24  Q  Did you ever refuse to teach a class like Brian
25      Hall did?

Page 296

1  A  I was assigned courses. And when I talked to
2      Professor -- Professor Hall, I said, "We're
3      assigned our courses. I've tried to refuse to
4      teach a course. I've tried to say I would rather
5      teach such-and-such course or such-and-such
6      course."
7      But as a junior faculty, who was going to come
8      up for tenure and be judged on my performance
9      within the department, in particular service to the
10      department, in particular my role as facilitating
11      the needs of the department, I didn't see how I
12      could possibly just say I'm not showing up for
13      class.
14      "If you give me this, I'm not going to show up
15      for class." I didn't -- I couldn't say that. So I
16      was assigned these courses.
17  Q  Okay. And you say he's the Professor C in your
18      documents?
19  A  Yes.
20  Q  Okay.
21  A  And it is either him or Sergei Starchenko who
22      got -- who taught this one course and then was
23      allowed to teach upper-level courses rather than
24      the 100-level. And as you see, I say he got a
25      3.11, but this was not a general service course.

Page 297

1  This was not one of the hard-to-teach courses. And
2  it was not above the 3.2 that, even after I got
3  above 3s on my 100-level courses, I was told I need
4  to get above a 3.2.
5  Q  And he eventually did get tenure, correct?
6  A  He got tenure, and then he even got promoted to
7      full professor without having to teach these
8      service courses.
9      And we -- again, supposedly people have been
10      told that they must show that they can consistently
11      teach these service courses and that their teaching
12      would be -- that their teaching must be at a
13      certain level of excellence and even above that to
14      make full professor.
15      And I believe he is a prime example of a male
16      professor that has not had to indicate that and not
17      only got promoted to associate professor, but then
18      got promoted to full professor without having
19      taught even one service course, I believe, at the
20      associate professor level.
21  Q  Ever, not even one; is your understanding?
22  A  I don't think so --
23  Q  Okay.
24  A  -- if I recollect correctly. I would have to look
25      at the specifics, but I believe that to be the

Page 298

1  case.
2  Q  Now, did you have any role or any vote in him
3      getting promoted or getting tenure?
4  A  No.
5  Q  You weren't on any of those committees?
6  A  No. It's only the -- the promotions are determined
7      by faculty that are above the rank of the faculty
8      that's up for promotion.
9  Q  That's up for -- okay.
10  A  But he was up for promotion to full professor at
11      the same time my case -- at around the same time my
12      case was heard for promotion to associate
13      professor.
14      So his teaching excellence and how it was
15      determined, I think, should be compared to -- and
16      his teaching record for going up to full professor
17      should be compared to my teaching record around the
18      same time, by the same personnel, being determined
19      whether my teaching was excellent or not.
20  Q  Other than talking to him about your frustration
21      with the lower-level classes, have you talked to
22      him about your lawsuit?
23  A  I don't know about the lawsuit per se. I talked to
24      him about my appeal. He certainly thought that I
25      was -- my case looked strong to him. He helped

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 79 of 108

---

**Page 299**

1  prepare my -- the research report for my case,
2  assessing my body of research as an internal
3  member, and then helping decide what external --
4  who would be the external letter writers for my
5  case.
6  Q  Qing Han.
7  A  Qing Han.
8  Q  Also in the math department, correct?
9  A  Uh-huh.
10  Q  And you say you taught together.  What, if
11  anything, does he know about how your classes were
12  assigned?
13  A  In terms of actual assignments, I don't know what
14  he knows or not.  We taught together, and he
15  gave -- he was the course chair for a 100-level
16  course that I taught, and we got along quite well.
17     He was -- allowed me to take over much of the
18  duties of course chair, and then I became course
19  chair.  He also routinely showed me his teaching
20  evaluations so that I knew that somebody like him,
21  who was considered an excellent teacher within the
22  department and was being given the position of
23  course chair, was getting comparable TCEs to me --
24  to mine.
25     My TCEs -- I guess they were CIFs at this

---

**Page 300**

1  point; I don't remember -- were consistently high
2  for that autonomy I was provided -- that autonomy
3  and respect that I was provided when working with
4  him.
5  Q  Have you talked to him about your lawsuit?
6  A  In passing but, no, not in any detail.  He had
7  given me quite a lot of his statistics for my
8  appeal and was supportive in my appealing.  He knew
9  what kind of concern for teaching I -- I provided
10  and what kind of dedication and support I gave to
11  the courses that we taught together being
12  successful.
13  Q  All right.  Another math professor, Richard Hind --
14  A  Uh-huh.
15  Q  -- who was promoted, you say, in 2007 or so.
16  A  Yeah.  Sometime about then.
17  Q  Have you talked to him about your lawsuit?
18  A  I don't believe so.
19  Q  What kind of information did he give you during
20  your appeal?
21  A  He gave me his -- some of his TCE data prior to
22  when he went up for tenure.
23  Q  So do you believe he'd be supportive of your
24  claims?
25  A  I believe he has been, yes.

---

**Page 301**

1  Q  Any other information that you think he has?
2  A  Not specifically that I can think of at this time.
3  Q  Julia Knight, she's a female professor in the math
4  department?
5  A  Uh-huh.
6  Q  Does she have tenure?
7  A  She was the first woman to be given tenure
8  subsequent to the Frese lawsuit regarding women at
9  Notre Dame not being given tenure.
10  Q  Is she the first in the math department?
11  A  In the math department.  My apologies.  I meant in
12  the math department, yes.
13  Q  Okay.  Have you talked to her about your lawsuit?
14  A  Yes.  In fact, she was one of maybe two or three
15  people in the entire department that was -- about
16  the lawsuit, no.  About my appeal.
17     I spoke to her about my appeal, and she's the
18  only person who was outright very hostile toward
19  me.  And she is one of maybe three people who did
20  not congratulate me when I did get tenure.
21  Q  Do you have any interaction day-to-day with her?
22  A  I do, on a regular basis.
23  Q  Do you have a collegial relationship?  What is your
24  relationship?
25  A  I try to be professional and cordial to her.

---

**Page 302**

1  Q  And is she professional and cordial back?
2  A  She certainly was not when I told her I was
3  appealing my tenure decision.
4  Q  What did she say when you told her that?
5  A  She denied that there was any possibility that I
6  could have been denied tenure on the basis of my
7  teaching assignments.  She insisted that if -- I'm
8  trying to recall what she said.
9     When I pointed out that I was learning that
10  women were being assigned 100-level courses at a
11  rate much higher than men, she said, "That can't be
12  true."  She said, "You're just saying this because
13  you took maternity leave, and you were on the
14  tenure clock longer than" -- and "you're
15  misrepresenting the statistics."
16     This -- this -- and she had not looked at the
17  statistics.  I offered to give her the statistics.
18  She yelled at me when I said, I feel -- I worry
19  that we are failing in our mentoring of junior
20  faculty, and particularly women, after looking at
21  the types of courses they were assigned, and had
22  made some statement to that effect, and she -- she
23  yelled at me.
24  Q  What did she say?
25  A  I don't know if I can recall.  I was in the gym,

---

Page 303

1    and she was just very emotionally upset and
2    incredulous that I had made such a statement.
3 Q  Now, have you talked to her since that conversation
4    about your --
5 A  As I said -- I've said, I've had quite a lot of
6    dealings with her, and I have tried to avoid
7    anything that might cause her to yell at me or be
8    upset with me. I have tried to be very
9    professional, very -- I felt like I was very
10   professional when I talked to her in the gym and
11   was bringing up a -- she has been a graduate
12   director of our program ever since I've been at
13   Notre Dame.
14       And I have been -- I spoke to her wanting to
15   convey to her something that I felt our department
16   was -- needed attention to in order for our
17   department to be successful, in order for our
18   department to not discriminate against women.
19       And even such things as that I have tried to go
20   to other people in the department when I'm
21   concerned about how we are -- we are handling the
22   mentoring of our graduate students or our junior
23   faculty. I've tried to avoid those types of things
24   that I would prefer to be able to talk to the
25   graduate director about and, instead, have even

---

Page 304

1    talked to people like Peter Cholak, who is not
2    receptive either but doesn't yell at me, in order
3    to facilitate and just give feedback to how to
4    better our program.
5 Q  Any -- you've got her on your list. Any other
6    information you think she has about your case
7    against the university?
8 A  No. But since -- I mean, there is -- I was quite
9    taken back by her reaction to me filing -- to this
10   conversation -- conversation -- this interaction we
11   had at the gym.
12       And I talked to several other people in my --
13   in the university who had been supportive of me,
14   and I know that Julia has been here for a long
15   time. And I was shocked at the reaction I got from
16   people like Valerie Sayers and Jill Godmilow and
17   women on campus who have been involved in the PAC
18   or on appeals committees and how --
19          MR. BARKES: Can I stop you real quick.
20   I think the question was other than that.
21          THE WITNESS: Oh, other than that.
22 A  Well, this -- I was getting to the --
23          MR. BARKES: Okay.
24 A  -- the point that I believe she has been hostile
25   towards -- in fact, I was told she was hostile and

---

Page 305

1    adamant in another woman's appeal, that she should
2    not -- that appeal should not be successful, and
3    this woman, even though several -- most of the
4    committee had felt like she had a case, that her --
5    that she did deserve tenure, that Julia was adamant
6    that she not be given tenure.
7       And I have gotten feedback since then, from
8    other people, about Julia Knight being incredibly
9    un-supportive or unopen-minded about any kind of
10   fair-minded way of appeals cases for women who have
11   claimed gender discrimination.
12 Q  Was the other woman that you said -- you said that
13   Julia said she shouldn't get tenure, was that
14   somebody in the math department?
15 A  No.
16 Q  Okay. François Ledrappier.
17 A  Ledrappier.
18 Q  Ledrappier. Also in the math department. Have you
19   talked to him about your lawsuit?
20 A  The lawsuit per se, I don't recall.
21       Many of these people I've talked about -- about
22   things such as recovering my lost research time.
23   So I should amend some of my past comments that I
24   certainly have talked to many of these people about
25   that -- that -- that I was pursuing, in particular,

---

Page 306

1    recovering my lost research time.
2       And I believe I have talked -- if memory
3    serves, I've talked to François about this.
4 Q  Do you believe that François Ledrappier has any
5    information about your claim that you were assigned
6    lower-level courses because of your gender?
7 A  He expressed shock at -- I remember -- at the
8    notion that I would be denied tenure for this. He
9    was on the CAP that saw my -- that reviewed my
10   case, my original tenure case. He thought my
11   packet looked very good, and he was in
12   particular -- he said to me several times he wished
13   that he could get teaching scores even close to
14   mine.
15 Q  All right. And how -- he can verify that
16   Professor Evens disparaged your grant because he
17   was in the CAP meeting?
18 A  Yes, I believe he can. Yeah.
19 Q  Have you talked --
20 A  Yes, he has -- yes, he can.
21 Q  -- to him about?
22 A  Yes. He -- I recall I gave him, when I was writing
23   my appeal, preliminary versions of it. There
24   were -- there were some people who advised me about
25   putting in some of the statements Sam Evens had

---

Page 307

1   made into my appeal and some that hadn't, but I
2   remember giving -- when I gave the version in my
3   appeal to those members of CAP, I had put in at
4   least some of those statements of Sam Evens because
5   I wanted to verify whether they were correct or
6   not.
7      And I believe that he had verified those
8   statements.
9 Q   And --
10 A   And, by the way, about the NSA -- NSA grant, I --
11   even prior to being denied tenure, I had been -- I
12   had talked to Ledrappier and others about this
13   request from the PAC for my NSF reviews. So he
14   was -- there were conversations that were had, if
15   you were asking about specifically the comments
16   about my NSA grant, even prior to me being denied
17   tenure.
18 Q   You say after you were denied tenure and discovered
19   the gender disparity, he suggested it might have
20   been because you're a native English speaker.
21      Did you go to him and say, Look, I discovered
22   this gender disparity?
23 A   Oh, yes. I -- once I had gathered enough
24   statistics to really see that there was -- that
25   what I had been being told about my teaching

Page 308

1   assignments in comparison to what would be a normal
2   assignment, and that they weren't and, in
3   particular, they were not if one looked at gender,
4   I was -- I was shocked. I was -- and I was showing
5   them to everybody who would look at them. So I
6   certainly showed them to François.
7 Q   And did he say he's never assigned 100-level
8   courses?
9 A   I think he -- I think it is true that he was never
10   assigned a 100-level course. But he was also hired
11   with tenure into a chaired position. So I wouldn't
12   necessarily compare him to my situation as a woman
13   coming up for tenure.
14      I tried to very carefully in my statistics only
15   take male professors who -- at the assistant
16   professor level, prior to going up for tenure,
17   as -- to compare apples to apples.
18      So his particular case would never -- I would
19   not have shown those statistics. Although, on the
20   advice of Chris Kolda, who is now chair of the
21   physics department, he suggested that I do note, in
22   general, teaching assignments for the past five
23   years, of who taught what, just to show because,
24   you know, he was stating as an associate chair
25   that, you know, these -- these statements that

Page 309

1   junior faculty should not teach 100-level courses,
2   that just showing at any given period of time to
3   what degree junior faculty women were teaching
4   these courses versus the senior men, like François
5   Ledrappier who was not being asked to have the
6   service to the department, he -- Chris Kolda felt
7   like I should include those statistics. So those
8   were included.
9 Q   And did he say that maybe it was because you were a
10   native English speaker?
11 A   He did.
12 Q   "And that for the younger students this was
13   important." Do you think that had anything to do
14   with the assignments?
15 A   I countered that it was -- you know, if you
16   specifically looked at Brian Hall, who is a native
17   American English speaker, or Jeff Diller, that
18   Brian Hall and Jeff Diller are some of the extreme
19   examples of not having taught at the 100-level,
20   except for maybe one or two courses, and they are
21   both American native English speakers, and so I --
22   I wanted to point that out.
23 Q   Okay. All right. Next is Jean Ann Linney. Did
24   you talk to her about your appeal or your lawsuit?
25 A   No, I did not. But Patricia Maurice told me that

Page 310

1   she was in the room when the provost made these
2   comments about women and whether they should take
3   maternity leaves or take advantage of family
4   medical leaves.
5      So Patricia Maurice -- there were other women
6   that she -- women that she mentioned that were in
7   that room, that would also verify what she heard.
8   But I -- I didn't pin down exactly who those other
9   women were. But it was -- she indicated it was
10   quite a few then.
11 Q   Did you ever talk to Jean Ann Linney about that
12   comment that the provost made?
13 A   No.
14 Q   Did she have anything to do with your appeal or
15   your course assignments?
16 A   I do not know to what degree she might have been
17   privy to aspects of my appeal. She certainly had
18   been -- as, I believe, a member of the
19   administration, had overseen appeals in the past.
20 Q   The next, another math professor, Liu.
21 A   Xiaobo Liu.
22 Q   Okay. What does he know about your lawsuit?
23 A   Specifically, I don't know.
24 Q   Have you talked to him about your appeal or your
25   lawsuit?

Page 311

1 A   I did. I had asked him for his TCEs and record
2     prior to going up for tenure, and I believe he
3     provided those to me when I was appealing my case.
4 Q   Have you talked to him about your case since then?
5 A   Not that I recall.
6 Q   Any other reason you can think of why you listed
7     him?
8 A   I believe he is another -- another person that
9     evidence has shown he was not given 100-level
10    courses, and specifically those hard-to-teach
11    100-level courses, at the rate that female -- at
12    the rate he would have been given if he were female
13    or that other female were given.
14 Q   Okay. All right. Let's skip to -- because some of
15    these we did do. Gerard --
16 A   Misiolek.
17 Q   -- Misiolek, again, a math professor. What, if
18    anything, do you believe he knows about your
19    lawsuit?
20 A   I believe he gave me his teaching records, some --
21    some -- at least what he had of his past teaching
22    and his TCEs. Some of the guys gave me TCEs and
23    some didn't. So I don't recall if he did or not,
24    actually.
25        I should amend some of my past comments that

Page 312

1     some of them gave me spotty information, but most
2     of them at least gave me their teaching record,
3     exactly what courses had they taught, and that he
4     was one of those.
5        And he is another example of someone who could
6     attest to him being in the same -- when he was in
7     the same position as I was, pre-tenure, to being
8     assigned courses at the 100-level at a lower rate.
9        I believe he, I believe Xiaobo Liu, I believe
10    these other -- Richard Hind would attest that they
11    were given more often courses that they had
12    actually requested and that they did not have to go
13    and bend over backwards in order to get a
14    preferential teaching schedule.
15 Q   Have you talked to him about that?
16 A   I believe when I -- he -- I showed him or spoke to
17    him about the statistics that I had gathered,
18    regarding the disparity in teaching assignments, so
19    I spoke to him about that, and --
20 Q   And do you believe he'd be supportive of your
21    claims?
22 A   Oh, yes. He's been support -- most of these
23    individuals were shocked at looking at what
24    teaching I was given in comparison to the teaching
25    they were given, these junior faculty -- male

Page 313

1     faculty, such as Gerard Misiolek or Xiaobo Liu or
2     Brian Hall or --
3 Q   Did any of them say they believed that you were
4     given those courses because of your gender?
5 A   Most people have acknowledged that there was clear
6     discrimination -- gender discrimination and I had a
7     case of gender discrimination, yes. I mean --
8 Q   And when you say --
9 A   -- some of them have not been as forceful as Leonid
10    Faybusovich, who has been -- who was appalled and
11    yelling he was so upset. But, yeah, most of them
12    have thought that the department acted shamefully.
13 Q   Have you talked to Liviu Nicolaescu --
14 A   Yes.
15 Q   -- about your lawsuit?
16 A   Yes.
17 Q   When was the last time you talked to him about your
18    lawsuit?
19 A   The last time, I don't know. I try to forget
20    myself there's a lawsuit, and I try and just go
21    about my business professionally within the
22    department. So I don't bring it up.
23        I -- he knows that I am -- I believe he knows
24    that I am still pursuing the damages to -- to
25    rectify the damages to which I have been subjected

Page 314

1     to.
2        He was very supportive of me in my appeal,
3     giving me feedback on my appeal on his -- you know,
4     expressing his -- that it was incredulous that
5     he -- you know, given his teaching record, that I
6     was subjected to the teaching record I had been
7     given.
8        And, for instance, he has this TCE score of
9     2.92, and the department wanted to put him up for
10    early tenure. Whereas when I was up for tenure, I
11    had many scores above that.
12 Q   Did he get early tenure?
13 A   Yes, he did.
14 Q   Annette Pilkington, is she also a professor in the
15    Department of Mathematics?
16 A   She's a teaching professional specialist. She's
17    one of the teaching professional specialists that
18    we hired to teach these four hard-to-teach courses
19    that had been identified by Professor Dwyer --
20    Chair Dwyer, in 2004.
21        She had specifically asked that I not -- well,
22    she was worried about retaliation if I put her down
23    as a witness.
24 Q   Did you talk to her about being a witness?
25 A   I did.

Page 315

1 Q   And what did you tell her you wanted her to be a
2     witness for?
3 A   She was very concerned that -- well, for instance,
4     she has -- she contacted me in January 2011, asking
5     if I had the name -- you know, who was my lawyer,
6     as she was being -- felt like she was being given
7     dis -- not just worse teaching assignments than the
8     male peer that was hired when she was hired, but a
9     larger teaching load.
10        And I asked her to give me evidence of this,
11    and she sent me what she had been teaching and what
12    Professor Lim, Arthur Lim, had been teaching, and
13    these were -- this was a male and a female
14    professor that were hired at the same time, under
15    the same position, and they had not only different
16    assignments, with Annette teaching the lower-level
17    courses within the 100-level and the larger
18    classes, but also she was being given a larger
19    load, both for teaching and for advising.
20 Q   And then did she go and talk to Professor Gursky?
21 A   Yes.  I helped her craft a statement to
22    Professor Gursky and --
23 Q   And they worked it out?
24 A   Yes.  She's since come to me and been worried again
25    that they're going to try and pressure her to teach

Page 316

1     more than Arthur Lim, and she -- she is also very
2     concerned about any kind of retaliatory action
3     against her for speaking out.  She was --
4 Q   So she's saying that even though they're both in
5     this exact -- were they both hired to teach these
6     hard-to-teach courses?
7 A   The exact same courses at the exact same time.
8 Q   Okay.
9 A   And, in particular, in those same meeting minutes
10    from September 2nd, 2004, it was specified that the
11    special professional teaching specialist would not
12    be given more than a two-course load per semester,
13    that there was concern within the department that
14    these -- that these new positions we were asking
15    them to fill, to take on these hard-to-teach
16    courses, that they would be taken advantage of as
17    another category of faculty, and that they would be
18    overburdened with the amount of teaching.  And it
19    was specifically said that they would not teach --
20    we would not do this and, thus, they would teach a
21    2/2 teaching load.
22        And she -- I was shocked to find out when she
23    emailed me in January of 2011, that she had been
24    teaching a higher teaching load than this, and
25    Arthur had not been or was not at that time.  I

Page 317

1     don't recall the exact statistics.  I can look them
2     up, though.
3 Q   Was she ever given any explanation for why there
4     was a difference?  Was there any rationale for it?
5 A   Not that I know of.  But she -- she was put back to
6     what should have been her assignments shortly after
7     that.  She's commented that things got better for a
8     while, but now she is again worried that she's not
9     being given the same teaching load as her male
10    colleague.
11 Q   And is that still Professor Lim?
12 A   Yes.
13 Q   Has she gone back to the department chair to talk
14    about it; do you know?
15 A   I don't know.  And I hope that she's right, but she
16    doesn't get retaliated against.
17 Q   Shaw, Professor Shaw.
18 A   Mei-Chi Shaw.
19 Q   Yes.  You say it's your understanding that she
20    believes that you were given bad teaching
21    assignments.
22        Did you talk to Professor Shaw about your
23    teaching assignments?
24 A   Yes, I did.  And when I told her about what I had
25    uncovered with the gender disparity, she was

Page 318

1     quite -- she wanted to tell me about her own
2     experience of when she came here with -- with
3     tenure but with the understanding that she thought
4     she would go up for full professor, especially when
5     she was being given a prestigious NSF grant and
6     these sorts of things.  And she said that her
7     promotion to tenure was delayed because she was
8     given this course, this 100-level course, Finite
9     Math -- which is, by the way, coincidentally, some
10    30 years later -- 20-something years later, still
11    the course that Annette Pilkington, who we were
12    just talking about, is being given at a much higher
13    rate than Arthur Lim and being given a larger
14    number of sections.  And she specifically had
15    complained about Finite Math.  So I guess some
16    things stay the same.
17        Mei-Chi Shaw had been being given this
18    hard-to-teach course at that time, supposedly the
19    hardest one to teach, many people have said,
20    repeatedly and was being told that she could not be
21    put up for full professor because she wouldn't make
22    full professor because her TCEs were too low.
23        At that time Andrew Sommese was chair of the
24    department and argued with her as to whether that
25    is a hard-to-teach course and argued with her on

Page 319

1   whether her TCEs should be higher than what they
2   are.  Somehow he kept thinking she should be able
3   to teach this course and get higher TCEs.  "She
4   should."
5       So she challenged him to teach the course, and
6   he got much lower TCEs than her.  And only then,
7   and after then putting her in other course
8   assignments and her getting higher TCEs -- as she
9   had many times impressed upon her [sic] that she
10  could if she were just given another teaching
11  assignment other than Finite Math -- she got higher
12  TCEs, and she was put up for full professor, and
13  she was promoted.
14      So she was very adamant that she tell me this
15  story and that this was a pattern within our
16  department, and I would like to -- to support that
17  story with saying that this Finite Math course has
18  been the one given to special professional teaching
19  specialists ever since we've hired them.
20 Q  Did you have to teach Finite Math?
21 A  No, I did not have to teach Finite Math.
22 Q  And do you know when Professor Shaw received
23      tenure -- or she was hired with tenure?
24 A  She was hired with tenure.  It was her promotion to
25      full professor.

Page 320

1 Q  Brian Smyth, professor in the math department, have
2      you talked to him about your claim that your
3      assignments were gender-based?
4 A  Yes.
5 Q  When did you talk to him?
6 A  Multiple occasions.  We had -- he had been assigned
7      as my teaching mentor after I had complained that
8      the chairs kept saying they were going to assign me
9      a teaching mentor and never did.
10      So in 2008, I believe, they assigned me Brian
11      Smyth as my teaching mentor, and he was quite
12      supportive and attended many of my classes and
13      thought I was doing a great job.  He was on the
14      CAP.  He was outraged when I was denied tenure and
15      told him that it was because of my teaching.  He
16      was outraged when I showed him the teaching
17      assignments I had been given in comparison to the
18      men.
19      He has stated that even when he was assigned to
20      be my teaching mentor, he -- he was confused as to
21      why I didn't have a teaching mentor before that.
22      He was confused as to why I had been given these
23      teaching assignments.
24      He verified that Professor Sam Evens was
25      hostile towards my tenure case.  He has made

Page 321

1   multiple statements indicating that he believes
2   that there's widespread discrimination at the
3   university in general.
4 Q  Gender discrimination?
5 A  Gender discrimination.
6 Q  Okay.  Anything else you believe he has knowledge
7      of?
8 A  I'm sure he has knowledge about many things.
9 Q  Regarding your case.
10 A  I'm not sure.  I don't know.
11 Q  Dennis Snow is also in the math department; is that
12      right?
13 A  Uh-huh.
14 Q  All right.  Have you talked to him about your
15      lawsuit?
16 A  Yes.  In fact, he was, likewise -- he said that he
17      had tried to talk with the chair several times
18      about the disproportionate teaching, in terms of
19      some professors teaching more -- many more students
20      than other professors, and had pressed upon the
21      chairs that they needed to look at this, they
22      needed to make sure that assignments were being
23      given equitably.  Now, he didn't specifically say
24      as regards to gender, but in our conversation he
25      seemed to indicate that.

Page 322

1       In addition, he was appalled that Buechler and
2   Dwyer had put me in these 100-level courses at this
3   level when they very well knew that Dean Castellino
4   had told the department not to put junior faculty
5   in these 100-level courses, that have them teach
6   one or two until they got even a reasonably high
7   TCE and then take them out, such as they had done
8   with Liviu Nicolaescu or Brian Hall or Jeff Diller.
9       And he gave me -- he gave me some data -- he
10  had been keeping data on previous teaching
11  assignments.  So I -- I was able to use some of his
12  old data, to piece together the prior teaching
13  assignments from that.
14 Q  Did his data relate to large classes or
15      difficult-to-teach classes?
16 A  He had been -- he had been keeping track of who
17      taught what, mainly to make his point that some
18      faculty were teaching many more students, larger
19      courses than others on a routine basis, and
20      mentoring and handling more students without any
21      acknowledgment of that.  And that's why he was
22      keeping the data.
23      But he thought that some of it would be --
24      would help me -- would show, in addition, that it
25      was -- it was women who were being given these

Page 323

1  prior to getting tenure.
2  Q  All right. Nancy Stanton, is she still a professor
3      in the math department?
4  A  Yes, she is.
5  Q  All right. And she's tenured as well?
6  A  Yes. She was hired -- she was hired with the
7      understanding that she would go up for tenure the
8      year that she came here, and so she went up for
9      tenure basically as soon as she arrived, and she
10     was granted tenure.
11 Q  All right. Are you saying that's -- you say she
12     didn't go through a normal tenure review process.
13     Is that unfair --
14 A  No. That's --
15 Q  -- or --
16 A  No. I just wanted to make sure that it was known
17     that she did not -- she does not have data that
18     pertains to the gender disparity data because she
19     did not -- or the normal tenure rate data because
20     she did not -- she was under this special hire
21     where she would -- was essentially promised tenure
22     upon arrival but not officially given it until the
23     end of that academic year.
24 Q  Now, why would somebody be hired with the promise
25     of tenure the year they got there? Do you have to

Page 324

1  be a superstar?
2  A  Yeah, pretty much. You know, very, very highly
3      qualified, more senior professors, that the
4      department is trying to attract, would be given
5      such an offer, especially if they had multiple
6      outside competing offers.
7  Q  Have you talked to her about your lawsuit?
8  A  Yes.
9  Q  And what have you talked about?
10 A  She was given a copy of my appeal. She -- she
11     spoke to me about such things as wanting to tell me
12     about Dean Castellino telling Alex Hahn, and the
13     rest of the department being informed of that, that
14     they would not put junior faculty in these
15     100-level courses, and many other conversations
16     we've had in support of, you know, my appeal and
17     issues relating to my tenure denial, issues
18     relating to my lawsuit, in terms of trying to gain
19     back some of the damages that I incurred.
20 Q  Is she supportive of you; do you believe?
21 A  Yes.
22 Q  You said that Julia Knight and only a few others
23     were not supportive and didn't congratulate you.
24     Who were the others?
25 A  Matthew Gursky. He just didn't congratulate me and

Page 325

1  has been pretty, like I said, unreceptive to my
2  having any kind of input as to how to make the
3  environment for women better in the department.
4      And then I believe there may have been one
5  other person. I can't recall right now who. Well,
6  Steve Buechler never congratulated me.
7  Q  That's okay. Keep going.
8  A  I'm sorry. And I don't recall who else at this
9      time.
10 Q  Other than Julia Knight, is there anybody else in
11     the department who's been, what you would call
12     outright hostile, like she was?
13 A  No.
14 Q  No. Okay.
15         MS. CANTON: All right. Let's go off
16     the record. We'll take a break.
17     (Short recess taken.)
18 BY MS. CANTON:
19 Q  All right. Professor Barron, let's go back to
20     Professor Snow.
21 A  Okay.
22 Q  When did he tell you that he was keeping statistics
23     on course assignments?
24 A  Sometime around the summer of, I guess that would
25     have been, 2009. I'm sorry, my years -- my years

Page 326

1  are messed up.
2  Q  Well, think of it in terms of events then. Was it
3      after you filed your appeal?
4  A  No. It was when I was preparing my appeal
5      documents.
6  Q  Okay.
7  A  I was looking for statistics, and I was
8      systematically going around and talking to most
9      professors in the department, and he was one of
10     them.
11 Q  And did he give you a copy of the statistics that
12     he had compiled?
13 A  He gave me some electronic files. He sent them to
14     me.
15 Q  And what was in the electronic files?
16 A  Data on who had taught what, by and large,
17     specifically for some of the earlier years, where
18     we didn't have -- I couldn't look up things online,
19     you know, before we had the online course
20     information, and so he was -- he had collected
21     that, who had taught what.
22         And, in particular, Karen Chandler, I didn't
23     have her information. And at that time I was
24     reluctant to contact her directly because -- for
25     various reasons, and he had -- he had that

## Page 327

1    information.

2  Q   When you say the early years, do you remember how
3       far back his data went?

4  A   His -- I don't recall. I could give you a copy of
5       the data. But it started in the -- at least in the
6       mid to late '90s, I believe. Again, I would have
7       to look at it.

8        But it, for instance, even covered -- it
9       specifically covered the 2000s, when I had first
10      come, the early 2000s. I believe the online data I
11      only had starting 2005 or something like that,
12      so --

13 Q   And what was -- when you say it was assignments,
14      what were his categories, or what did he compile?

15       Was it every class that every professor in the
16      department taught?

17 A   I believe so. It was not in a nice form. It was
18      just, you know, person and then course numbers -- a
19      year, person, course numbers, something like this.

20 Q   And did he tell you what he did with that data at
21      any given time?

22 A   He had approached the department, he had approached
23      chairs, to try and discuss equity in teaching
24      assignments, in terms of who was teaching large
25      courses versus small courses.

## Page 328

1  Q   Now, are the large courses all lower level?

2  A   They tend to be lower level, and this is why he
3       thought his data might pertain to me, in terms of
4       what he -- he felt was a disparity.

5  Q   All right. And did he tell you what chairs he
6       talked to or he would approach with this
7       information?

8  A   He seemed pretty adamant that he had been bringing
9       this up for years. He mentioned "years." But I
10      don't recall if he said specifically, but it seemed
11      that this had been a -- an important issue that he
12      had brought up to multiple chairs, in the past and
13      recently.

14 Q   When you prepared your appeal and you had the chart
15      showing the percentages of professors who taught
16      the lower-level courses and, say, Professor X you
17      had 20 percent and another professor you had
18      6 percent and another one had, you know, like you,
19      way higher, where did you get the raw data from for
20      all -- for that?

21 A   Well, there are two, kind of, piece -- sets of
22      data. There's one that is just prior -- prior to
23      going up for tenure, what did people teach, and I
24      tried to go back as far as was, you know -- I
25      started with more recent and going back, but I

## Page 329

1    stopped at one point.

2        And so that was largely first put together by
3       me going back and looking online for what I had
4       taught, what some people had taught in the past,
5       but then mainly going back and asking the
6       individual guys who had been on the tenure track at
7       Notre Dame and had come up for tenure. In
8       addition -- who had already come up for tenure, and
9       had been here for a while, what they had taught.

10       So that was their reporting to me their own
11      statistics that they had -- I have emails.
12      Sometimes I went and talked to someone in their
13      office.

14       The more junior guys, who had come while I was
15      there or prior to that, I have more information of
16      my own on that. And then some of the holes I did
17      fill in with Professor Snow's data.

18 Q   Now, you say you had your information. Had you
19      been keeping information, or was this
20      retrospective?

21 A   There are online course -- course informations,
22      class lists, and you can go back and see who taught
23      in certain years. But they only started that -- I
24      don't know. 2005, maybe, it goes back to. So
25      that's online, that I can access as a professor,

## Page 330

1    and I can look and see who's taught what.

2        And so for males that were currently on the
3       tenure track, I could look and see their entire
4       history via that.

5        But for men who had already come up for tenure,
6       it didn't give data back far enough, and I had to
7       go ask them individually. So that's that one set
8       of data that says who taught what prior to going up
9       for tenure.

10       And then there's -- it was more of the
11      supportive stuff in the back of my appeal that I
12      put together at the request of Professor Kolda --
13      he thought it was pertinent -- to look at over the
14      past -- I think it was the past five years from
15      when I was denied, who -- who have -- of all
16      faculty, including professors -- full professors,
17      associate professors, tenured, not tenured -- who
18      taught what and how many courses at the 100-level,
19      because he was pretty adamant that there was a
20      systematic effort to burden junior faculty, in
21      particular junior women, versus full professor
22      faculty, with these 100-level positions, as he
23      thought that data was significant.

24       And so for that I just went back to the
25      database that's online --

Page 331

1  Q   The online database?
2  A   -- for all faculty and --
3  Q   And before that it was anecdotal or emails based on
4      the professors' recollections of what they had
5      taught; is that right?
6  A   Yeah.  I mean, most -- most of us keep records.
7      For instance, we have our TCEs going back to
8      whenever, and so you can -- but it's personal, and
9      only you might have those records or a course chair
10     or something.
11         And, in fact, I had requested many pieces of
12     information from the Office of the Provost to help
13     fill out those statistics more.  When my appeal was
14     successful and my case was being reheard by the
15     Office of the Provost, I was asked to actually
16     include all sorts of data that I didn't have.  And
17     I made repeated requests to the Office of the
18     Provost for that data, if they were going to rely
19     on my -- on me to prepare what Julia Douthwaite
20     said should be included in my case.
21         And he repeatedly refused and repeatedly told
22     me that, no, I needed to prepare this -- these
23     documents for PAC without this data, even though it
24     was supposed to be on that data.  So --
25 Q   All right.  I know you said that Professor Snow

Page 332

1      told you this when you were preparing your appeal,
2      as best you can recollect --
3  A   Recollect.
4  Q   -- recollect, right?  Okay.
5         How long had he been keeping the information
6      for; do you know?
7  A   I think you had asked that, and I'm -- I would have
8      to look at the data.
9             MR. BARKES:  Real quick, did you ask
10         how long he had been keeping it?
11            MS. CANTON:  Right.
12 BY MS. CANTON:
13 Q   Do you know how long he'd been keeping it?
14 A   It seemed for quite some time.
15 Q   Had he ever come to you and said, Hey, Katrina, I'm
16     keeping these statistics, and you're really getting
17     the short end of the stick here, you know, you --
18 A   No.  For one thing, I didn't have a lot of
19     interaction with him.  He was never assigned as a
20     teaching mentor for me.  He was -- we had a
21     collegial relationship.  But I don't know that he,
22     in particular, was aware that I was repeatedly
23     asking my chair to teach more upper-level courses
24     and more courses in my field of expertise.  He's
25     not in my --

Page 333

1  Q   Area --
2  A   -- my subarea.
3  Q   -- or group?
4  A   Yeah.
5  Q   All right.  Nancy -- I think we -- I think you told
6      me what you knew about Nancy Stanton.  She's
7      supportive of you, correct, to the best of your
8      knowledge?
9  A   Uh-huh.
10 Q   Okay.  Sergei Starchenko.
11 A   Sergei Starchenko.
12 Q   Sergei Starchenko, is he still in the math
13     department?
14 A   Yes, he is.
15 Q   He gave you his TCE scores when he was
16     tenure-track?
17 A   Uh-huh.  And his teaching data.  And so he was one
18     of these comparative professors.
19 Q   Comparative to you?
20 A   Yeah.  That when I was attempting to comply with
21     the requests -- repeated requests of the Office of
22     the Provost to give statistics that I didn't have,
23     I tried to get some more from the individuals.
24         And I -- they were meager, the statistics I was
25     able to get, but he was one of them that -- that

Page 334

1      was a good -- I thought a comparison to show the
2      disparity between his treatment while he was on the
3      tenure track and the treatment that I experienced.
4  Q   Other than asking him for his TCE scores, have you
5      talked to him about your appeal or your lawsuit?
6  A   I certainly talked to him about my appeal.  I'm
7      sure I discussed with him, as I did with many
8      people in the department, when the Office of the
9      Provost was refusing to follow the court-mandated
10     procedures of the Appendix A appeal.
11         And I do not recall whether he was on CAP or
12     not, but he was often on CAP, and he is -- I know
13     that he was concerned about what the Office of the
14     Provost was up to.  And so I spoke with him about
15     that.
16         I had spoken to him and many others about
17     filing with the EEOC.
18 Q   And what did he say about filing with the EEOC?
19 A   I don't recall.
20 Q   All right.  Professor Stolz, still in the math
21     department?
22 A   Stolz.
23 Q   Stolz.  Still in the math department?
24 A   Yes, he is.
25 Q   Okay.  Did he ever assign courses to you?

---

### Page 335

1 A    No. He's in topology, and so he is in a different
2      field than I am. Although, he did -- I know he's
3      very interested in my research, especially certain
4      aspects of it, and had -- had, I imagine, some
5      dealings with me teaching several graduate-level
6      topics courses that are very high upper-level
7      graduate courses, specifically because he wanted to
8      learn certain aspects of my research, and sat in on
9      a couple of my courses.
10 Q   All right. And after you gathered up your
11     statistics, did you talk to him about them?
12 A   Yes, I did.
13 Q   And what did he say?
14 A   He gave the party line that my chairs had given,
15     was that we all teach a lot of 100-level courses,
16     most of the courses that we teach are service
17     courses, and we all have to teach a lot of these
18     courses.
19         And when I impressed upon him that, no, I had
20     been teaching these at a much higher rate than
21     anybody else and that so had Karen Chandler, as
22     well as Claudia Polini, he expressed shock and
23     dismay, it seemed, but --
24 Q   Shock and dismay at what the result was?
25 A   Yes. And he -- I don't know that I actually ever

### Page 336

1      showed him the specific statistics. He -- because
2      part of his -- shock and dismay, I don't know. He
3      seemed incredulous too and -- and he's not the type
4      of person who's ever going to get involved in -- in
5      who's teaching 100-level courses or care. And so I
6      did not pursue exactly what he meant by his
7      comments.
8 Q    Any other knowledge that Professor Stolz has about
9      your claims of gender discrimination?
10 A   He was on the CAP, so he can verify what
11     Professor Evens said about my NSA grant and that
12     the Office of the Provost came to me after the
13     first hearing of my case, in spring of 2009,
14     requesting that I give them my confidential NSF
15     reviews for this grant that was fully funded
16     through the NSA.
17 Q   What do you mean when you say he -- he knew that
18     others in the department -- or he and others in the
19     department had done the same thing in Karen
20     Chandler's case?
21 A   Well, he -- because he was one of the people who
22     had supported me being hired and was sitting in on
23     my course, talking with me about my research, I had
24     talked to him several times, especially during my
25     early years there, about wanting to teach 200-,

### Page 337

1      300-, 400-level courses, as well as the basic
2      graduate algebra course.
3          And he had repeatedly told me this notion that,
4      "Well, you know, you have to spend many years
5      teaching at the 100 level." You have to -- this
6      kind of -- "I don't know anything about teaching
7      assignments."
8          He had been involved in Karen Chandler's -- the
9      review of her tenure case. He and many of the
10     other people that we're talking about here, I mean,
11     of course, were also involved in Karen Chandler's
12     case, in her -- the review of her teaching, the
13     review of her time at the department.
14         And he had never -- despite repeated complaints
15     on the part of me and, I believe, of Karen Chandler
16     too -- especially after she was denied tenure -- he
17     never looked into whether I really was being given
18     appropriate teaching assignments.
19 Q   This is Professor Stolz?
20 A   Yes.
21 Q   Did you ask him to do anything?
22 A   I expressed my concerns. He expressed I was being
23     given, you know, normal teaching assignments. He's
24     a senior chaired professor in my department. It
25     did not occur to me that he never went and actually

### Page 338

1      checked.
2          It did not occur to me that Bill Dwyer and
3      Steve Buechler didn't actually go and check that
4      what they were saying to me was actually true
5      and -- or that they were outright lying to me.
6      I -- they were senior professors in my department
7      that I trusted to be telling me the truth.
8 Q    And you said this was early in your career here
9      that you talked to him?
10 A   Quite a lot, yes. And if there was anyone who I
11     looked to as a mentor, in terms of my junior
12     position, it was he -- him that I had expected, you
13     know, would -- would mentor my time at the -- in
14     the department since he had so fully supported
15     my -- my hiring and had sat in on my classes, had
16     come to speak to me often about my research.
17 Q   Now, after you had this conversation with him, when
18     you gathered your statistics and he said, as you
19     said, the party line, has he -- did he ever look at
20     the statistics? Did he ever come around?
21 A   No.
22 Q   You haven't talked to him about it since?
23 A   I have -- I have talked to him since then
24     specifically about Frank Connolly and my teach --
25     my mentoring certain individuals in the Honors

Page 339

1    program.  So it did come up.  This was just a few
2    weeks ago.
3  Q  What did he say?
4  A  He was very angry.  He was dismayed when -- I've
5    been having problems with Frank Connolly not
6    supporting a student who is working with me, who is
7    an undergraduate Honors major, who is applying for
8    graduate schools right now.
9        Frank Connolly has been quite hostile towards
10   me because this young man chose to work with me.
11   He chose to spend the summer and got funding from
12   the College of Science to work with me, rather than
13   who Frank Connolly wanted him to work with.  And
14   Frank Connolly has refused to throw his support
15   behind this very gifted young student.
16       And I told Stephan Stolz what I had learned,
17   and Stephan Stolz got very angry that Frank
18   Connolly did not see that this young student was
19   extremely gifted and certainly was -- deserved
20   Frank Connolly's support.  But Frank Connolly did
21   not support this young man for certain awards
22   within the department and outside the department,
23   for the Goldwater fellowship, for the NSF
24   Fellowship.
25       And we had a long discussion about my history

Page 340

1    with Frank Connolly in the department and how I
2    have not been allowed to teach Honors majors and
3    that I think this is just an extension of -- of him
4    not supporting this young mathematician because
5    he's working with me.
6        And Stephan Stolz agreed, in light of this --
7    he talked to Frank Connolly about it.  He found out
8    that -- you know, Stephan Stolz had several of
9    these students and can compare them -- I'm sorry,
10   did I say -- Stephan Stolz has several of these
11   students, to compare exactly how they are, and
12   decided to intervene in terms of contacting
13   graduate schools to support this graduate student's
14   applications, because we -- he became worried that
15   Frank Connolly had not written him as strong a
16   letter as he should have for his graduate
17   applications.
18       So -- and I had tried to tell the student to
19   have Stephan Stolz write it instead, and he chose
20   Frank Connolly.  And so this has been ongoing for
21   the last year.  And we had a discussion about it a
22   couple weeks ago, involving Stephan Stolz writing
23   several graduate programs, also writing the
24   undergraduate chair to impress upon them that this
25   student -- Mitchell Falk is his name -- should be

Page 341

1    put up for an award for the department and was well
2    above these other people that Frank Connolly had
3    been supporting.
4        And in this conversation, he apologized to me
5    for Frank Connolly's behavior.  He -- and when I
6    said, you know, "He's kept me from teaching in the
7    Honors program," Stephan Stolz said, "I know."
8        And we also discussed at length that Frank
9    Connolly was retiring, and I discussed at length
10   whether I should be accepting Honors program
11   students and supervising their senior theses if
12   senior male colleagues are not going to support
13   those students because they're working with me.
14 Q  So you are teaching in Honors programs now?
15 A  I am not.  I have never taught an Honors course.  I
16   am now developing a course for teaching next
17   year, now that Jeff Diller is running it and has
18   asked me to.  But I -- I was -- we have -- the
19   senior Honors -- the Honors students, in their
20   junior year, are supposed to pick an advisor to
21   work on a senior thesis, and it is their choice who
22   to pick.
23       And this young man, even well before his junior
24   year, even in his sophomore year, approached me
25   because he wanted to learn about string theory and

Page 342

1    conformal field theory, which is my area of
2    expertise, and he started working with me and has
3    worked with me for the last two years as a -- on an
4    informal basis, reading -- reading courses, just
5    extra time that I put in to supervise his senior
6    Honors thesis and work over the -- over the last
7    summer, we got a grant from the College of Science
8    for him to work with me and my graduate student.
9  Q  And you're going to teach this Honors course next
10   year?
11 A  Next spring, spring of 2015, I was asked to develop
12   a new Honors course by Jeff Diller.
13 Q  Larry Taylor, math department?
14 A  Yes.
15 Q  All right.  Other than this Sarah Palin comment
16   which we talked about the last time, anything else
17   you believe that he has knowledge of regarding your
18   claims of gender discrimination?
19 A  You know, I -- I'm sure he could attest to the fact
20   that there -- that -- well, he was chair of the
21   department for a while, and he could probably
22   attest to what degree the chair has oversight over
23   assigning teaching and guiding junior faculty
24   through the tenure process.
25 Q  Now, he hasn't been a chair since you've been

Page 343

1    here --
2  A  No.
3  Q  -- has he?
4  A  Huh-uh.
5  Q  Have you talked to him specifically about your
6     claims?
7  A  Again, I'm sure that I -- when I was appealing, I
8     talked to him about the internal department
9     problems.  Many of these people I've also talked
10    about external department problems -- external
11    problems to the department, but I don't recall
12    specifically what.  Just general things regarding
13    the teaching disparity.
14       He also -- when I was trying to prepare this
15    extra data that the Office of the Provost was
16    expecting me to prepare and I didn't have, and I
17    was trying to get creative with what data I did
18    have, he gave me his teaching -- his TCEs for when
19    we had taught together.
20       So we had taught together a couple of times.
21    He gave me his TCEs, and he gave me -- I'm not sure
22    if it was him, or who it was, had suggested to me
23    that I look at who -- who -- and it may have been
24    him.  Because I looked at -- since I didn't have
25    the data they wanted, but I did have this data of

Page 344

1     Qing Han, Larry Taylor, some people I had taught
2     with and then gone on the next semester -- so two
3     semesters in a row -- teaching with them under the
4     same chair, to see how many students moved from
5     their course, their sections, to my sections via,
6     you know, word of mouth, Oh, she's very, very good,
7     you should -- you know, and I remember that he gave
8     me his TCEs and his -- and his data on how many
9     students were in his section the first semester
10    versus the second semester.
11       And I was able to -- I gave some statistics,
12    that I compiled to the PAC, showing to what degree
13    students move in to my section from one semester to
14    the next versus move out of somebody like Larry
15    Taylor's or Qing Han's sections.  And, in addition,
16    I think I looked at how that compares to our TCE
17    scores and this sort of thing.
18  Q  Did he have statistics on students moving in and
19    out of classes or switching between first and
20    second semester just for him or for other
21    professors as well?
22  A  No.  He just had his -- his statistics for the
23    number of students, I believe, and then I had my
24    statistics for the number of students in each
25    semester.  So I put those together.

Page 345

1  Q  Did you get similar data from any other professors
2     about students moving, transferring?
3  A  With Qing Han, I did.  And I -- I do not recall
4     whether I found -- whether I tried to uncover any
5     other data.  It would have been much easier for
6     them just to give me the data that was being asked
7     for.
8  Q  When you say "they," you mean the provost?
9  A  Yeah.
10  Q  All right.  And when you -- okay.  Let's go back to
11    Larry, for a second, with the classes.  Did you
12    teach the same courses as he did?
13  A  This is when we taught the exact same course with
14    the exact same book and the exact same syllabus.
15  Q  Same course; same book; same syllabus.  How about
16    same day?
17  A  Same exam; same days.
18  Q  Same times?
19  A  Back-to-back.  Or pretty much, yeah.  And with Qing
20    Han.
21       I believe this was the relevant data that Julia
22    Douthwaite has said that the Office of the Provost
23    should have been comparing my teaching with people
24    who had taught the same course, but they were
25    talking about -- you know, this is comparable males

Page 346

1     who had taught the same course as I had, how do my
2     TCEs compare to their TACs and CIFs.  This was --
3     I'm not -- I wasn't making up this data.  It was
4     what Julia Douthwaite, as part of my appeal, had --
5     had discovered, as part of her investigation, was
6     one of the points which the Office of the Provost
7     should have -- should look at in assessing my
8     teaching.
9       And I was told to write these documents to
10    prepare for PAC under the guidelines that Julia
11    Douthwaite had laid out, except for I didn't have
12    any data.  So I took the data that Larry Taylor and
13    Qing Han had given me, which was the most
14    comparable data that I had.
15  Q  As far as comparables who were teaching at the same
16    time -- same time period you were, same courses?
17  A  Not the exact same time period.  I mean, these
18    are -- these are multi-section courses where we --
19    we offer it at 9 o'clock --
20  Q  Oh.  I didn't --
21  A  -- 10 o'clock, 11 o'clock --
22  Q  I'm sorry.  I should have been more clear.  I
23    didn't --
24  A  -- of the same semester.
25  Q  -- mean, like, time of the day.  I meant, yeah,

Page 347

1    time of the year.
2  A   I apologize.
3  Q   Okay.
4  A   The same semester; using the same exams; same
5      grading of exams.
6  Q   Okay.
7  A   And from one semester --
8          MR. BARKES: Hey, there's no question.
9          MS. CANTON: No. That's okay. Hold
10     on.
11 BY MS. CANTON:
12 Q   So it was same semester, same course, same book,
13     same syllabus, same days, but not the exact same
14     times?
15 A   Yes. But -- so we're all jumbled around from one
16     semester to the next semester as to who's teaching
17     at what time. But from -- so one semester is
18     Calculus I, and there -- they take the course. And
19     then they have the ability to rearrange their
20     schedule for semester number two in order to take
21     the professor that they prefer, and there's quite a
22     lot of jockeying, and there's quite a lot of
23     whispering as to who's the best lecturer in the
24     class.
25 Q   And is there any possible reason why they would

Page 348

1      want to switch professors other than I think this
2      professor's better than that professor or I heard
3      this professor is better?
4  A   They usually have wide latitude to arrange their
5      schedules like that, especially as freshmen. And
6      you usually will see that certain professors have
7      very, very low enrollment, certain have very high.
8          For instance, my two courses of Linear Algebra
9      had to have increased enrollment because of the
10     number of students who wanted to take my class
11     versus the other three instructors.
12 Q   So do they add a section or just put more students
13     into the classes?
14 A   They moved me into a larger room because there was
15     so much interest in my class.
16 Q   All right. Let's talk about Ann Tenbrunsel. She
17     was the monitor for your appeal, correct?
18 A   She was assigned as something called a monitor, but
19     there is no such thing as a monitor for an Appendix
20     A appeal. And I questioned why I had a monitor.
21     And Don Pope-Davis repeatedly told me that in
22     appeals, we have monitors. And I said, "This is
23     not a regular appeal. This is an Appendix A
24     appeal."
25         He says, "The precedent has been that we've

Page 349

1      always had a monitor for Appendix A appeals." But
2      this is not true.
3  Q   What, if anything, did Ann Tenbrunsel do for you
4      during your appeal? Did you have any interaction
5      with her?
6  A   I tried to tell her many times -- because Don
7      Pope-Davis was telling me that I should go through
8      her and not directly ask him things, and I
9      expressed worry that this was going to cause -- I
10     called it a game of phone, where the message gets
11     (indicating) -- you know, there are intermediaries
12     with the message. I questioned why she was being
13     assigned at all.
14         She was adamant that -- I questioned why she
15     was -- so Don Pope-Davis had told her to help me
16     prepare documents for the CAP. I questioned why am
17     I preparing documents for the CAP. I prepared some
18     documents and sent them to my CAP members. She
19     admonished me that I should not have given those --
20     that information to the CAP. She admonished me
21     that I -- anything should go through her and that I
22     needed to censor those documents and take out
23     information which I thought was relevant to my
24     case.
25         I then questioned her, why -- "What is your

Page 350

1      role in my case? Why are you acting on behalf of
2      my case?"
3          And she kept coming back with the regular
4      appeals procedures. And I kept saying, "This is
5      not a regular appeal. This is an Appendix A
6      appeal, and there's a court-mandated process, and
7      it clearly states that these documents should go
8      back to PAC, not CAP."
9          When she continued to ask me to not discuss
10     issues with my CAP, including someone who was
11     writing letters for me for my job applications,
12     that I should not speak with them and that I needed
13     to censor material and that my -- my case was being
14     treated as a regular appeal because it was a
15     regular appeal and these sorts of things, I asked
16     that she be removed from my case.
17         And I -- this was at the time where my CAP was
18     also writing a letter, and we were all wondering
19     why -- why, why, why are we not following
20     court-mandated procedures. I was in fear of
21     violating federal law. My CAP was being asked to
22     go against these procedures, our own academic
23     articles.
24 Q   What did you mean when you said she censored you?
25 A   I have an email from her telling her [sic] to

USDC IN/ND case 3:11-cv-00440-JVB-CAN    document 71-1    filed 10/29/14    page 92 of 108

---

Page 351

1    remove information from the documents I had sent my
2    CAP.
3  Q   Do you remember what it was -- what the information
4    was?
5  A   It was information supporting -- it was directly
6    from my original appeal and directly supporting
7    evidence of gender discrimination, and most of it
8    my CAP -- members of my CAP had already had it
9    anyway, but --
10  Q   So what ever happened?  Was she removed?
11  A   Yes.
12  Q   Okay.  And then you said ultimately the Appendix A
13    appeal process was followed?
14  A   After months of my -- so this was, you know,
15    January, February, March, April.  It was not.
16    January, February, March, April of -- and even
17    prior to that.  I mean, you know, from the
18    beginning they were violating it.  But certainly
19    then in terms of the personal hoops that I was
20    being asked to jump through, January through April,
21    and including being asked to change the formatting
22    of my documents from such-and-such single space to
23    double space, by Don Pope-Davis on Easter weekend,
24    calling my in-laws' house.
25  Q   Have you ever talked to her since, Ann Tenbrunsel?

---

Page 352

1    Since she was removed from your case --
2  A   No, I --
3  Q   -- have you talked to her?
4  A   -- have not.
5  Q   All right.  We've got a few more math professors
6    here.  Bruce Williams.  Did he give you any
7    information as far as his teaching or scores or --
8  A   No.  He was -- he's been a tenured full professor
9    for a long time, and so from that -- and I had not
10    taught with him.  Although, he is teaching under me
11    as course -- I'm course chair of a course this
12    semester, and I'm teaching with him.
13    But prior to that I had never taught with him
14    or had reason to make him a comparator in terms of
15    the pre-tenure data.
16  Q   Have you talked to him about your course
17    assignments?
18  A   I believe I showed him the data that I had
19    collected after being denied.  I don't recall
20    specifically.  But I showed most people -- or had
21    some conversation with most people.
22  Q   Do you remember his reaction?
23  A   No, I don't.
24  Q   Other than him witnessing you trying to have
25    professors get credit when they're invited to make

---

Page 353

1    presentations that they can't go to for one reason
2    or another, anything else you believe he knows
3    about your claims?
4  A   Yeah.  And he specifically told me that one
5    professor that we had hired, Israel Sigal, had put
6    in his CV -- he had in his CV invitations declined.
7    And he had wondered -- because he knew that I had
8    tried to put in invitations declined due to
9    maternity-related travel restrictions, into my
10    Dean's Report, and I had been told I could not,
11    that it had to be taken out.
12    He wondered to me, because he knew that Israel
13    Sigal had put those in his official CV to the
14    department with official documents, and he
15    questioned whether Israel Sigal would be allowed to
16    put those in.
17  Q   Who told you, you couldn't put --
18  A   Oh, right there (indicating).
19  Q   -- invitations declined?
20  A   My chair, Bill Dwyer.  And I brought it up at a
21    faculty meeting.
22  Q   And what happened at the meeting?
23  A   And he said at the faculty meeting -- and he said
24    in person -- that I could not do it, and he told
25    Patty to have them removed from my Dean's Report,

---

Page 354

1    Patty Stroud, our secretary.
2  Q   Okay.  So he said, don't put -- Bill Dwyer said you
3    can't put invitations declined.  And when you say
4    "official," this is the one that goes on the
5    website, the official Notre Dame CV?
6  A   No.  This is my Dean's Report that determines --
7  Q   Oh, your accomplishments.
8  A   -- my pay.
9  Q   Okay.  Do you know if Israel Sigal has his declined
10    invitations on his Dean's Report?
11  A   I do not know.  That's what Bruce Williams wondered
12    then.
13  Q   Did you ever find out?
14  A   I'm not privy to other people's dean's reports, so,
15    no, I did not.
16  Q   All right.  We're getting there with these math
17    professors.  Frederico --
18  A   Xavier.
19  Q   Xavier.
20  A   Frederico Xavier.
21  Q   Another professor in the math department?
22  A   Uh-huh.
23  Q   You have nothing for him.  What does he know?
24  A   He knows many things, but --
25  Q   About your case.

---

Page 355

1 A  Yeah. He knows -- he was on the Honesty Committee
2    when I went to him about Pit-Mann Wong's
3    facilitating cheating and my concern about his not
4    following the, you know, academic code and if there
5    was anything we could do about this case.
6         He's one of the people who let me know that it
7    was widely known that Pit-Mann Wong gave his
8    students basically a review of the exact exam the
9    day before and, thus, many people did not want to
10   teach with him, and he was sorry that I had to
11   teach with him.
12        And then later he came and said that there was
13   really nothing he could do about a full professor
14   such as Pit-Mann Wong.
15 Q  Does he know anything about the assignments that
16   you were given to teach courses?
17 A  Well, I would think -- you know, he certainly knew
18   that Karen Chandler and I had been put in this
19   really terrible course, in terms of who the course
20   chair was, and didn't lift a finger to do anything
21   about it in the future or subsequently.
22 Q  What course was it?
23 A  I believe Math 120.
24 Q  And that's one of the --
25 A  One of the hard-to-teach courses --

Page 356

1 Q  -- hard-to-teach courses?
2 A  -- yes.
3 Q  Okay. Any other information about your case you
4    believe he has?
5 A  Not specifically that I can think of now or that
6    I -- specifically, no.
7 Q  Other than what you've told her, do you believe
8    Katherine Zieman has any knowledge about your
9    claims?
10 A  Yes. She has been told various things about what
11   happened in the PAC meeting when they were
12   reviewing her case and my case.
13 Q  And what did she tell you that somebody told her
14   that -- wait. Let me back up.
15        She was told what happened in the PAC meeting
16   where they reviewed your and her cases; is that
17   right?
18 A  Uh-huh.
19 Q  Do you know who told her what happened in the PAC
20   meeting?
21 A  I'm not sure exactly who told her. At one point
22   she told me that I was collateral damage to her
23   case -- she used that term, "collateral damage" --
24   because Provost Burish had convinced Dean McGreevy
25   to oust her; and if they were going to oust her, in

Page 357

1    terms of how her case looked versus mine, they were
2    going to need to oust me.
3 Q  They what?
4 A  They were going to need to oust me. And, thus, she
5    called it collateral damage.
6 Q  She didn't say anybody said that? She called it
7    that?
8 A  I believe she was telling me that somebody had
9    described it as such to her.
10 Q  Okay.
11 A  I don't know if it was her chair, John -- who was
12   her chair at that time? I don't remember her
13   chair, but --
14 Q  Anything else she told you she heard about what
15   happened at the PAC meeting?
16 A  Oh, goodness. Not that I'm recalling right now.
17 Q  And what did -- what does that mean? I don't
18   understand the collateral damage thing.
19        Are they saying she was going to be denied
20   tenure, so you had to be denied as well?
21 A  Yes.
22 Q  Why is that -- I'm trying to make sense of that.
23 A  They had -- for various personal reasons, they
24   wanted to get rid of her, but in terms of our -- I
25   understood it to mean that in terms of our

Page 358

1    teaching, my teaching looked better than hers -- or
2    looked worse than hers -- I'm sorry. I'm going the
3    other way. That if they were -- they had to give a
4    reason for denial. They have to have a reason for
5    denial.
6         If it was -- since her research is stellar, it
7    would have to be teaching. But if her scores were
8    higher than mine, they would have to deny me too,
9    because they needed a reason to deny me tenure as
10   well, and it would have to be teaching, some such
11   calculus.
12 Q  She's not in your -- she's in medieval studies,
13   right?
14 A  Yes.
15 Q  So how could you even compare your scores versus
16   her scores?
17 A  That's what they do in these meetings, and they --
18   I've been told there are often territorial fights
19   that break out, in terms of what is good teaching
20   in one college versus the others, but, I mean --
21        MR. BARKES: Can we clarify real quick
22   that this is her understanding of a term
23   that Katherine Zieman told her was used at
24   a PAC meeting.
25        MS. CANTON: Correct. I know that.

---

Page 359

1    Yeah.
2        MR. BARKES: Okay. So we're kind of
3    far away from speculation and hearsay, I
4    think. But you can go ahead and answer it,
5    if you -- I think that was over, too, so --
6        MR. MYERS: She didn't say that that
7    was used in a PAC meeting. That was her
8    own term for describing the situation;
9    isn't that correct?
10       MS. CANTON: Yeah. That's --
11       MR. MYERS: She would say the
12   collateral damage --
13 A  I only --
14       MR. MYERS: -- term was used.
15 A  I only was told this by her.
16  BY MS. CANTON:
17 Q  "Her" being Katherine Zieman?
18 A  By Katherine Zieman. It may have been corroborated
19   by one or two other people who would know more, but
20   I don't recall, or who would have heard it from the
21   same people, but --
22 Q  And you don't remember who Katherine Zieman told
23   you had told her this? Because she wasn't there
24   either, right?
25 A  Well, but sometimes people leak things. So I don't

Page 360

1    know who -- who told her, but she -- she mentioned
2    it many times in talking with her chair at that
3    time, in talking to Dean McGreevy, in talking to
4    her -- the new chair of the English.
5        Somebody was adamant that there was some
6    discussion within -- within PAC about teaching
7    scores. I know that, you know, I was told that --
8    you know, various things out of PAC as well about
9    them talking about the number of calculus courses I
10   had taught, 100-level courses I had taught.
11 Q  All right. And who told you what happened in the
12   PAC meeting?
13 A  Chris Kolda told me about the 100-level courses
14   being discussed and that Ikaros Bigi expressed
15   extreme interest when he brought it up at a lunch,
16   that on Chris Kolda's advice, that I go look and
17   see what the 100-level assignments were of other
18   people, that I actually go look at the database.
19   Instead of relying on what my chairs and senior
20   male colleagues had told me, that I actually go
21   look at the data, and I did.
22       And he told Ikaros Bigi of the gender disparity
23   and that Ikaros Bigi was quite interested in this.
24   And I don't know at that point if they talked about
25   what had happened in PAC or not. But this was

Page 361

1    mainly through people in physics that I heard.
2 Q  Did Chris Kolda tell you anything about this
3    collateral damage or you and --
4 A  No.
5 Q  -- Katherine Zieman? He didn't say anything about
6    that?
7 A  No.
8        (Defendant's Exhibit 14 marked.)
9  BY MS. CANTON:
10 Q  All right. Let me give you Exhibit 14. Whole new
11   cast of characters here, some of whom we've already
12   talked about.
13       Just take a second and look at Exhibit 14 and
14   let me know if you've seen it before.
15 A  Are there dates on these things?
16 Q  On the last page.
17 A  Oh, on the last page. Okay.
18 Q  This one's dated February 22nd --
19 A  I see.
20 Q  -- 2013. That's the date it was sent to us.
21 A  Uh-huh. Okay. Uh-huh.
22 Q  Have you seen it before?
23 A  Yes. It does look vaguely familiar, yes.
24 Q  Did you prepare the information that's in
25   Exhibit 14?

Page 362

1 A  Yes.
2 Q  All right. Nancy Horvath.
3 A  I'm sorry, ma'am. What page are we on?
4 Q  Nancy Horvath. It's on page 2. But there's really
5    not much information in these, as far as what these
6    people know.
7        Who is Nancy Horvath?
8 A  I'm trying to recall. I don't recall at this time.
9 Q  Okay. David Murphy.
10 A  I don't recall.
11 Q  Was he ever one of your supervisors?
12 A  He may have been. I don't recall. In this
13   document, I put people such as who had heard my
14   regular appeal, people who had been involved in the
15   appeals process in some way or another, people
16   involved in the PAC, various people who had -- who
17   had had dealings with the Office of the Provost or
18   administrative people.
19       So it's been a while, and I don't recall with
20   that specific person.
21 Q  All right. How about Angela Kohlhaas?
22 A  She was a TA that worked -- she was a graduate
23   student in the department for five years when I was
24   on the tenure track. She was -- worked as a
25   teaching assistant for one of the joint-taught

Page 363

1    multi-section courses that I worked on.
2        Specifically, she was the TA for Matthew
3    Perlmutter, who was a visiting postdoc and was not
4    showing up for his classes or not showing up for
5    his exams, and I helped cover his classes, helped
6    her -- she helped -- we helped each other monitor
7    what was falling through the cracks or just not
8    being done, in order to keep this course moving
9    forward.
10 Q  Does she have any knowledge about your gender
11    discrimination claim?
12 A  I think she would have a general knowledge about
13    what it's like to be a woman in my department.
14 Q  Have you talked to her about that?
15 A  She and Sarah Quinn, who is right under there,
16    they -- I spoke to them both when I was denied
17    tenure and why I was denied tenure, and they
18    offered to write letters to the provost about how
19    valuable I had been to the department and how, in
20    particular, I had kept the wheels from coming off
21    the train for this one course, which is the one
22    that I got horrible TCEs in, and they all -- they
23    both got horrible TCEs in as well, which was
24    this -- again, I think it was 120 -- Math 120
25    possibly.  Yes, Math 120, I believe, spring of

Page 364

1    2007.
2 Q  When you said you got horrible scores, were you
3    teaching the class, or was the professor who wasn't
4    showing up teaching the class?
5 A  There were four professors and probably four TAs
6    all jointly teaching the class, and I was teaching
7    two sections of it, and Matthew Perlmutter was
8    teaching a section.  And each section has two
9    tutorial -- tutorial sessions that meet twice a
10    week and are run by teaching assistants, graduate
11    students.
12        And Sarah Quinn was one of my teaching
13    assistants, and Angela Kohlhaas was a teaching
14    assistant for Matthew Perlmutter.  Sarah Quinn
15    was -- also covered some of the -- she was a
16    teaching assistant for another professor, George E.
17    Comshasheelee (phonetic), who was a visiting -- a
18    visitor from Georgia, as in Russian Georgia, not
19    Georgia Georgia.  And she was having trouble with
20    his sessions -- sections too.  He was not preparing
21    exams.
22        So it had been widely believed that this course
23    was used to -- you know, these were my lowest
24    TCEs -- that they were the ones used to claim my
25    teaching was bad.

Page 365

1        But at -- Sarah and Angela had made it well
2    known, I had made it well known, that this was a
3    horribly managed course, that it was being
4    mismanaged, mis-run, the exams were badly put
5    together.
6 Q  And who did you make that known to?
7 A  Matthew Dyer who was course chair, Professor Dwyer
8    who was department chair, and I specifically had
9    complained that I had gotten this course coming
10    back -- I was returning from maternity leave that
11    semester, and I was -- I specifically said I wasn't
12    pleased that this was the course that they -- they
13    ended up giving me.  And Alex Himonas I said this
14    to as well.
15 Q  And was this a lower-level --
16 A  100 level.
17 Q  -- course?
18 A  One of the four hard-to-teach courses, the one in
19    which I really begged to have a linear -- two
20    semesters of Linear Algebra -- I mean, two sections
21    of Linear Algebra, rather than this course or, if
22    not, if it had to be the 100-level, I wanted to
23    teach the 125 or 126.
24        And they said, "No.  You need to teach this
25    one."

Page 366

1        And they knew it was with this postdoc Matthew
2    Perlmutter who had been not doing his job.  It was
3    new to me when I started the course, but certainly
4    Alex Himonas and a department chair knew.
5 Q  Did Perl --
6 A  Perlmutter.
7 Q  Perlmutter, did he ever work with any other
8    professors besides you?
9 A  Well, in this course he was working with me, George
10    Comshasheelee (phonetic) and Matt -- Matthew Dyer.
11    I don't recall exactly who it was that commented to
12    me after this had happened -- this course had run,
13    that this -- it was known that this postdoc was a
14    problem.
15 Q  So there were other professors besides you who were
16    teaching this course, though, Dyer and --
17 A  (Witness nodded head.)
18 Q  Okay.  Do you know what kind of TCEs they got?
19 A  No.  I'd love to know.
20 Q  All right.  Anything else any of these -- either of
21    these teaching assistants have knowledge of?
22 A  I would refer you to their letters that they wrote
23    to the provost.  I mean, other than that, I think
24    that they -- it was -- you know, they volunteered
25    that information with me only just telling them the

Page 367

1       circumstances of my being denied tenure.
2   Q   Did either one of them say they felt they were
3       discriminated against in their assignments?
4   A   Oh, their assignments, specifically?  I don't
5       recall.  But especially Sarah Quinn I had -- had
6       come to me several times, just informally, to
7       discuss the situation of being a woman in math.
8   Q   Did she say, I feel like I'm being discriminated
9       against here?
10  A   It's pretty much of a given that we get comments on
11      a regular basis about whether women can do math or
12      not.  So I -- I'm sure she made similar comments
13      and was upset at times in my office.
14  Q   Against any particular person or professor?  Or
15      just in general?
16  A   I could go back and rack my brain of all the times
17      that women have made complaints, but for her
18      specifically at this point, no, I -- nothing
19      specific comes to mind.
20  Q   All right.  I'm going to skip to page 4 because I
21      think we've covered the others.
22          David Nicholls, who is he?
23  A   He was a male professor that was hired when I was,
24      the same year, into the same position.
25  Q   In the math department?

Page 368

1   A   Uh-huh.
2   Q   Okay.  And what happened to him?
3   A   He left the university to take a position with
4       tenure at UIC -- either with tenure or with the
5       understanding that he would go up soon for tenure
6       or some such.
7   Q   Did he get tenure here?
8   A   He didn't go up for tenure here.  He left before he
9       went.
10  Q   Would you consider him somebody who was comparable
11      to you, who was treated --
12  A   Yes.
13  Q   -- better?
14  A   Yes.  Absolutely.
15  Q   And why is that?
16  A   So, for instance, our first semester here, we were
17      given almost the exact same teaching assignment,
18      and then very quickly he was taken out of the
19      100-level courses and did not teach 100-level
20      courses at near the same level as me.
21          And I make this point in saying that we came in
22      at the exact same time.  We came in with the --
23      with almost the exact same requests for teaching.
24      And he came in with Claudia Polini and me.  And
25      Claudia Polini -- we were put in certain

Page 369

1       assignments here, and he was put in an entirely
2       different set of assignments, even though he had
3       lower TCEs than I did.  At least that first
4       semester I know he did.
5   Q   So what do you mean "the same requests"?
6   A   Similar requests in terms of courses we wanted to
7       teach, upper-level undergraduate, graduate, Honors,
8       these sorts of courses.
9   Q   And how do you know that long ago what he wanted to
10      teach?
11  A   We were hired at the same time.  Claudia, Dave, and
12      I regularly had lunch together, and we discussed
13      everything.
14  Q   So your recollection is that he wanted to teach the
15      same courses that you and Claudia wanted to teach?
16  A   Comparable courses.  That we did not want to be
17      teaching courses at the 100 level.  We wanted to be
18      teaching courses at the 300, 400 and graduate
19      level.
20  Q   Did he ever speculate why he didn't have to teach
21      them?  Did he say, I just refuse, like the other
22      professors?
23  A   No, absolutely not.  He -- he -- he complained, as
24      we did, about needing to get these high scores in
25      the 100-level courses, and yet he was not put in

Page 370

1       the 100-level courses.  He was taken out of them,
2       even though he had comparably low scores to me.
3   Q   Do you know why he was taken out of the -- those
4       classes?
5   A   I believe it's because he's male.
6   Q   Why do you say that?
7   A   Because I believe that he was -- that Steve
8       Buechler, in particular, wanted to ensure that he
9       was being on this track to get tenure.
10  Q   Well, he didn't get it, did he?
11  A   No.  He left.  But I'm sure he would have gotten
12      tenure.
13  Q   Even though he had really bad scores?
14  A   Well, he had a similar record to -- to Nicolae --
15      Liviu Nicolaescu, who had a fairly low score but
16      then was taken out of those courses, was allowed to
17      teach courses which did generally garner higher
18      scores and, thus, had a record of higher TCEs when
19      he went up for tenure, even though he had only
20      taught one course at the 200 -- at the 100-level.
21  Q   Okay.
22  A   And he -- Dave Nicholls was being groomed in that
23      same fashion as Liviu Nicolaescu, as Jeff Diller.
24      And Dave left only because they didn't want to put
25      him up for early tenure.

---

**Page 371**

1 Q Zhang. Yongtao Zhang.

2 A Yongtao Zhang.

3 Q Zhang. Okay. Is he a professor?

4 A He's an associate professor still, I think.

5 Q In the math department?

6 A Well, they split our department. He was in the
7 math department when he first came here, but they
8 split our department into math and applied math,
9 and he is now in the applied math department.

10 Q And what, if anything, does he know about your
11 gender discrimination claims?

12 A I think he was put in here just as a comparable
13 male professor, hired while I was here on the
14 tenure track, in the same type of position as I
15 was, and an example of somebody who was not
16 overburdened with 100-level courses as I was.

17 Q Did he give you his data for the courses he took?

18 A No, he didn't. By the time he was here,
19 everything, in terms of his actual assignments, was
20 online. In addition, I heard he -- he did get very
21 high T -- CIFs, I guess they were, by that point.
22 Maybe they were still TCEs.

23 Q Did he go up for tenure while he was here?

24 A Yeah, he's -- he went up for tenure, and he's
25 tenured. I don't recall whether he was tenured

---

**Page 372**

1 while in the math department or before or after we
2 split. I don't recall.

3 Q Have you talked to him about your lawsuit?

4 A No.

5 Q All right. Another faculty in the math department,
6 J. Derwent.

7 A Uh-huh.

8 Q Is he still in the department?

9 A No -- well, he's an emeriti.

10 Q What does he know about your lawsuit?

11 A Not much, I don't think. He was one of the people
12 I probably put down because I was told I should
13 probably put down everybody in my department.
14 But he certainly would have knowledge of things
15 such as whether Francis Castellino had indeed told
16 Alex Hahn to tell the department not to put junior
17 faculty in the 100-level courses.

18 Q Do you know that he knows that, or is that just a
19 guess?

20 A I would guess that he would from what Dennis Snow
21 and Nancy Stanton had said to me.

22 Q Have you ever talked --

23 MR. BARKES: Can we go off the record
24 real quick?

25 MS. CANTON: Sure.

---

**Page 373**

1 (Discussion held off the record.)

2 MR. BARKES: Okay.

3 A Yes. So he, as a --

4 MR. BARKES: Is there a question?

5 THE WITNESS: No.

6 BY MS. CANTON:

7 Q We were talking about J. Derwent.

8 A And the question was?

9 Q What he knows about your lawsuit. And you said you
10 just put him down because he's in the department,
11 and I asked you if you've talked to him about your
12 lawsuit.

13 A I have not. I'm sure -- I did probably tell him
14 that I was appealing. But as I said, he -- he is a
15 person that would have recollection of -- and
16 here's a relevant point, that he -- as Dennis Snow
17 and Nancy Stanton have told me, that they, as a
18 department at a faculty meeting, back even when we
19 took minutes, I think, were told that Frank
20 Castellino had told the department to not put
21 junior faculty in too many 100-level courses.
22 And he, in particular, was assigned to -- to
23 observe a couple of my 100-level courses -- or at
24 least one 100-level course when I first came to the
25 university. Yes.

---

**Page 374**

1 Q Okay.

2 A And he came to my course. He observed my course.
3 He talked to me. And at no time did he warn me
4 that I would be careful about in -- and not --
5 about how many 100-level courses I was teaching,
6 and never questioned why I was teaching so many.
7 And, you know, I find that interesting
8 considering when he was -- he was assigned by the
9 department to -- as all junior faculty have to have
10 their classes observed, he was assigned to observe
11 mine in a type of oversight mentoring capacity, and
12 in that capacity never took the time to make sure
13 that I was not being shortchanged in terms of my
14 teaching assignment, despite the fact that they had
15 just had a dean tell the department, Be careful how
16 many 100-level assignments you're giving your new
17 faculty.
18 So here's a senior male faculty that certainly
19 had knowledge of the situation and was put into an
20 oversight position of teaching for me at one point.

21 Q Was that -- you said that was in your first year?

22 A I -- it was my first or second year.

23 Q Okay. Did he ever observe you after that one time?

24 A I don't believe so, no.

25 Q Do you have any reason to know that he was aware of

---

USDC IN/ND case 3:11-cv-00440-JVB-CAN   document 71-1   filed 10/29/14   page 98 of 108

---

Page 375

1    what courses you were teaching at any given time?
2 A  He certainly could have -- as a senior member of
3    the department, wanting to ensure that junior
4    faculty are being well-treated, could have looked.
5 Q  But do you know whether he ever did look or --
6 A  No, I don't know.
7 Q  Okay. All right. One more -- no. There's more.
8    I was going to say one more math person. And I'm
9    not good with Chinese names. X-U.
10 A  Xu.
11 Q  Xu. Professor Xu.
12 A  Xu Zhiliang.
13 Q  Okay.
14 A  He was a junior male professor in my department,
15    hired when I was there, into a similar position as
16    mine.
17 Q  So he was hired after you?
18 A  After me.
19 Q  Okay.
20 A  We taught a 100-level course together. I believe
21    it was over the -- with the oversight of Qing Han.
22    And I was told that his TCEs were very, very low
23    for that course and it was questionable as to
24    whether he would get third-year renewal.
25 Q  Who told you that?

---

Page 376

1 A  I believe Claudia Polini has told me this -- or has
2    verified it. I don't recall who originally told
3    me. When we were teaching the course, there
4    were -- there was things we were hearing from the
5    students, that they didn't like him as a professor,
6    they didn't like his teaching. And then I'm not
7    sure who else told me, but other department members
8    said this.
9 Q  And did he get third-year renewal?
10 A  He did get third-year renewal, and then he was
11    taken out of teaching 100-level courses, and then
12    he was promoted to associate professor with tenure
13    after having taught, I believe, no more 100-level
14    courses.
15 Q  So you believe he just taught one 100-level course?
16 A  I don't know that he taught any after that one.
17    The statistics that I compiled would help at least
18    for some of the years that he was on the tenure
19    track. So he may have taught a couple, but he did
20    not teach very many.
21 Q  And his --
22 A  And I would like very much to compare his scores to
23    mine.
24 Q  And he -- as far as what courses he taught, that
25    would be online, because it was after you got

---

Page 377

1    there, right?
2 A  Yes.
3 Q  Okay.
4 A  And when he --
5 Q  Go ahead. And when he what?
6 A  There was no question. I apologize.
7 Q  Have you talked to him about your lawsuit?
8 A  No, I have not.
9 Q  Did you ask him for any of his data when you were
10    preparing your appeal?
11 A  No, I did not.
12 Q  Why didn't you ask him?
13 A  I had talked to him some when -- during that
14    semester when we taught together, and I knew he had
15    gotten very -- I had heard he had gotten very low
16    scores. He had -- he had actually talked -- wanted
17    to talk to me about improving his teaching.
18        At that time, he would not -- he did not
19    divulge to me what -- what types of scores he was
20    getting. And I felt, for him, it was a very
21    sensitive thing, that he was embarrassed at these
22    low scores. I don't think he would have told me
23    anyway, and I didn't want to -- I didn't want to
24    upset him as he's on the tenure track.
25 Q  After that, did you talk to him about your concerns

---

Page 378

1    with the 100-level courses?
2 A  You know, I -- I talked to him -- I was concerned
3    for him. I was concerned for his tenure case. And
4    I did have a conversation with him about -- about
5    him making sure that he looked out for his -- what
6    courses he was being assigned, that -- you know,
7    after I was denied tenure, I told him -- I remember
8    telling him I was denied tenure for my teaching
9    scores.
10        I'm trying to recall what else we talked about
11    in that conversation but I -- it was a -- I didn't
12    want to unduly worry him, but I wanted to let him
13    know that, you know -- what my scores -- the range
14    of scores that mine were and what the outcome of my
15    case was as -- to warn him but not unduly give him
16    too -- make him have too much anxiety.
17        So I had what I felt was a delicate
18    conversation with him, and I'm trying to recall
19    what I said, but something to that effect.
20 Q  Do you remember, what was his reaction?
21 A  He was very, very nice and very appreciative and --
22 Q  Okay. David Nicholls, in the math department.
23 A  We already did him. He's on here twice.
24 Q  Oh. Yeah, he is. You're right. These aren't in
25    alphabetical order, so -- okay. I think we've

---

Page 379

1   talked about Pit-Mann Wong plenty.
2       Let's go to page 8. I don't think we've talked
3   about M. Alber.
4 A  Mark Alber.
5 Q  He's in the math department?
6 A  Uh-huh.
7 Q  Okay. Have you talked to him about your lawsuit?
8 A  No.
9 Q  Have you talked to him about the assignment of your
10  courses?
11 A  I -- I joint taught a course with him, a 100-level
12  course, when I came to the university early on. So
13  he knew I was teaching a 100-level course. I don't
14  recall if I taught more than one with him.
15 Q  Was he a tenure-track faculty?
16 A  Tenured. He's been a tenured professor ever since
17  I came.
18 Q  Anything of note when you taught that 100-level
19  course with him?
20 A  This would have been with Larry Taylor, I believe.
21  So it was when I was early on, and I just -- I
22  appreciated the advice of him and Larry Taylor
23  about teaching such courses and learning the ropes.
24  And so we had conversations about teaching and
25  types of students that were in the course, that

Page 380

1   sort of thing, but that's about it.
2 Q  Any conversations about the assignment of the
3   courses, you and the hundred-level courses versus
4   anybody else?
5 A  No.
6 Q  Have you talked to him about your lawsuit?
7 A  No.
8 Q  J. Cao?
9 A  Cao.
10 Q  Cao, C-A-O.
11 A  Uh-huh.
12 Q  What's his first name?
13 A  Jianguo.
14 Q  Okay. And is he a tenured faculty?
15 A  He was a full professor when I came. I believe
16  full professor when I came, maybe associate, but he
17  was -- and he has passed away.
18 Q  Okay. Why did you put him on the list?
19 A  He was -- gosh, I'm going to cry thinking about
20  him. He died. He was young when he died, with
21  little kids, liver cancer. He was very sympathetic
22  when he found out I was denied tenure. And he had
23  made some comment about, you know, we always worry
24  that we -- we don't teach these courses well
25  because we -- I cannot talk about this man. I'm

Page 381

1   sorry. I will --
2 Q  That's okay. That's all right.
3 A  No. I can, but it's just -- it was very tragic
4   that he died. He made -- he was a very -- he joked
5   around a lot. He was a very nice man. And he said
6   something, we -- always worry about how we teach
7   these 100-level courses because of our English and
8   everything, and I always thought you would be good
9   at these 100-level courses.
10 Q  Was he a native --
11 A  He's Chinese.
12 Q  -- speaker?
13 A  He's Chinese.
14 Q  Okay.
15 A  And he had made one of those comments but not in a
16  mean way or anything like that.
17       MR. BARKES: Want to take a minute?
18       THE WITNESS: No. I'm good. Let's go
19  on.
20   BY MS. CANTON:
21 Q  All right. A. Sommese. Sommese? Sommese?
22  Another --
23 A  Andrew Sommese.
24 Q  Another faculty --
25 A  Andrew --

Page 382

1 Q  -- in the math department.
2 A  -- Sommese.
3 Q  Okay. Was he here when you got here?
4 A  Yes.
5 Q  Was he tenured?
6 A  Yes.
7 Q  Okay.
8 A  A chaired professor.
9 Q  And what does he know about your lawsuit?
10 A  He has knowledge of the background, of the history
11  in the department. In particular, his -- he was
12  chair when Mei-Chi was trying to get promoted to
13  professor, and he was giving her these adverse
14  teaching assignments.
15       He had the experience of then having to teach
16  one of those courses and not getting good TCEs.
17  And then he was the one professor that was adamant
18  that Karen Chandler should not get tenure, I
19  believe.
20 Q  Did somebody tell you that?
21 A  Yes.
22 Q  Okay.
23 A  I believe at that time we had an executive
24  committee, and he was on that executive committee,
25  and he was, I believe, the only person who voted

Page 383

1    against her and then convinced Steve Buechler to
2    side with him and deny her tenure, despite the fact
3    that she had wide support in the rest of the
4    department.
5  Q  Did you hear that from somebody?
6  A  Yes.
7  Q  Do you remember who?
8  A  There was -- at the time she was denied, there was
9    quite a lot of talk about the circumstances under
10   which she was denied, so I heard it from many
11   people.
12 Q  All right.  I --
13 A  And he is certainly a person who had experience in
14   understanding how damaging the course assignment
15   can be to TCEs, as professed by Mei-Chi Shaw.
16 Q  I imagine you haven't talked to him about your
17   lawsuit?
18 A  No, I have not.
19 Q  All right.  Anything -- what's Sigal's first name?
20 A  Oh, and it should be "I." Sigal.  I get Michael
21   Sigal and Israel Sigal -- I think it was Israel
22   Sigal.
23 Q  Okay.  We've talked about him.  Anything else,
24   besides what you've already told us, about him?
25 A  Not that I recall right now.

Page 384

1  Q  All right.  Robert Bernhard, have you talked to
2    him?
3  A  I have talked to him in the past.
4  Q  About your appeal or your lawsuit?
5  A  No.
6  Q  Did you just put him on here because he was on the
7    PAC?
8  A  I probably put him because of that, but I may have
9    also put him on there because I know that he has
10   had complaints of gender discrimination and gender
11   harassment filed against him at the university.
12   It's one of the many examples that the university
13   continues to turn a blind eye to.
14 Q  Who's complained about him?
15 A  Tracey Poston.
16 Q  And was that a lawsuit?
17 A  I don't know if she ever actually filed with the
18   EEOC or not, but she filed several internal
19   complaints.
20 Q  Okay.  Do you know what happened to them?
21 A  They were not dealt with to her satisfaction, and
22   she has since left the university.
23 Q  And why do you say "they were not dealt with to her
24   satisfaction"?
25 A  Because she told me that.

Page 385

1  Q  Okay.  Other than being on the PAC, did he have
2    anything to do with your assignments?
3  A  No.  But as I said, sitting on the PAC, having had
4    a history of discrimination, I think, is relevant.
5  Q  Well, a history of discrimination.  Anything
6    besides --
7  A  Complaints.
8  Q  Okay.  Any other complaints besides this one that
9    you know of?
10 A  Well, me, personally, I didn't know who Tracey was
11   talking about for the longest time.  But then when
12   he was pointed out to me at a restaurant, I -- my
13   jaw fell, because he was this guy who -- I was in a
14   conversation with Mitch Wayne --
15 Q  Who is Mitch?
16 A  -- Dean Crawford -- Mitch Wayne is an associate
17   dean maybe.  He was -- oh, at the time he was chair
18   of the Department of Physics.  And -- and I was
19   talking with Dean Crawford and Mitch Wayne, and we
20   were in a conversation, and we were at a reception
21   for people who had gotten grants and --
22 Q  When was this?
23 A  2007, 2008 -- 2007 maybe, something around then.
24 Q  Okay.
25 A  I'd been invited to this reception here in the main

Page 386

1    building, and I was discussing tenure packets with
2    these -- these guys, and I was -- I think I --
3    maybe it was 2008, because I think I was preparing
4    my tenure packet.  And I was asking them questions
5    about it.
6        And I looked across the room, and this guy
7    caught my eye, and I turned -- you know, I turned
8    back, and I was talking with Dean Crawford and --
9    Dean Crawford and Mitchell Wayne.  And this guy,
10   who caught my eye from across the room, came over
11   and butted into our conversation, just interrupted
12   our conversation, wanting to shake my hand and
13   introduce himself.
14       And he proceeded to then dominate the
15   conversation, without me letting -- without letting
16   me talk to my two deans, while he stared at my
17   breasts.
18       And so when it was pointed out that that was
19   him and -- and Tracey had complained to me for so
20   many years about this -- that sort of thing, I was,
21   "Oh, okay.  Yeah."
22 Q  Did you ever report that to anybody?
23 A  If I reported every single time some instance like
24   this happened, then I'd spend all my time in
25   paperwork.

---

Page 387

1  Q   Did you know who he was at the time?
2  A   I did not.  I did not -- I'm sure he said his name,
3      but it just didn't occur to me to know who was the
4      head of the office of research at the time.  I just
5      remember him as being extremely rude and sexist
6      towards me and making me feel very uncomfortable.
7          And then it wasn't until years later and
8      after -- after I was friends with Tracey Poston and
9      she had been describing her boss and how awful he
10     was, it was not -- it was just recently, maybe
11     last -- in the past year, that he was -- it was
12     pointed out, when I was at a restaurant, that it
13     was this man.  And, like I said, my (indicating) --
14     my jaw dropped that that was -- I understood what
15     Tracey was talking about.
16 Q   Anything else about Mr. Bernhard you think is
17     applicable to your lawsuit?
18 A   Not that I can think of at this time, other than
19     the general pattern.
20 Q   We'll go to page 10.  Peter Kilpatrick, anything
21     with him?
22 A   Oh, I'm sorry.  What's the question?
23 Q   Peter Kilpatrick, other than he was on the PAC, any
24     other knowledge he has about your lawsuit?
25 A   I believe he has general knowledge about the

---

Page 388

1      hostile environment on campus for women in other
2      departments.
3  Q   And why do you believe that?
4  A   Because he's the dean of the College of
5      Engineering.  Isn't he?  Yeah.  I think.
6  Q   And what do you know that he knows about a hostile
7      environment?
8  A   Well, the Luce Foundation has put the Department of
9      Civil Engineering on probation for a hostile
10     environment towards their fellows.  Patricia
11     Maurice has complained to him for many, many years
12     about the hostile treatment of women and how
13     they're not supported in getting promotion, in
14     particular, to tenure.  He's had outside -- people
15     outside of the university complain about people
16     like Peter Burns.
17 Q   Who is Peter Burns?
18 A   He's a professor in the Department of Civil
19     Engineering who is notorious, I think worldwide,
20     for his treatment of women and, in particular, I
21     think recently there was a -- I was told that there
22     was a member of the National Academy of Sciences
23     that was appalled that a new assistant professor in
24     that department has had her office put inside his
25     lab and very upset about how the junior faculty are

---

Page 389

1      being treated in that department.
2          He certainly probably has knowledge of Patricia
3      Maurice and her treatment over more than a decade,
4      including recent bullying, pressure, harassment, to
5      try and sign a Memo of Understanding to step down
6      from her position, prior to her being prepared to
7      do such.
8          I don't know if he's aware or not of the chair
9      of the Department of Civil Engineering, Joannes
10     Westerink, telling Patricia Maurice not to talk to
11     me.
12 Q   And is all this information -- you got this from
13     Patricia?
14 A   I've gotten this from many, many people.  And one
15     thing I don't appreciate is people assuming that
16     it's only Patricia Maurice that knows this
17     information and her dean and her chair bullying
18     her, because this is widespread information.  And
19     the first that I heard about these two women --
20     junior women in the Department of Civil Engineering
21     being harassed was from somebody in the College of
22     Arts and Letters.
23 Q   All right.  Lykoudis.  Michael Lykoudis.  He was on
24     the PAC.  Let's just stick with what knowledge they
25     have about your situation.

---

Page 390

1  A   As far as I know, to my recollection, he is there
2      because he was on the PAC when they decided to deny
3      me tenure.  How about John McGreevy?
4  Q   Okay.  How about John McGreevy?
5  A   He was on the PAC when they decided to deny me
6      tenure.  In addition, he was dean -- he is
7      currently dean of the College of Arts and Letters
8      and flip-flopped back and forth in his support for
9      Katherine Zieman.  And it's either him or somebody
10     close to him that made these statements about my
11     case being denied due to their wanting to push out
12     Katherine Zieman.
13 Q   All right.  Patricia O'Hara.
14 A   It says she's on the PAC.  Other than that, I don't
15     know.
16 Q   All right.  Hugh Page.
17 A   I believe he was on the PAC too.  Yes, it says.
18     And other than that, I don't know what other
19     knowledge he has of my case.
20 Q   Everybody on here -- let's just do the last few.
21     Greg Sterling, Carolyn Woo, Cindy Bergeman, are all
22     on the PAC?
23 A   Yeah.  I have been told about Carolyn Woo, that she
24     hasn't -- she regularly does not want to support
25     women in tenure.  That's been told to me by

1    multiple people and, in addition, a couple of
2    people who left the College of Business -- the
3    business school due to what they felt was
4    discrimination against them by Carolyn Woo.
5 Q  Have you talked to Greg, Carolyn, or Cindy about
6    your lawsuit?
7 A  No, I have not.
8 Q  Mr. -- or Professor Bigi, other than what we've
9    already talked about?
10 A  Not that I know of, other than what we've talked
11    about.
12 Q  All right. Let me just see here. All right. PAC,
13    PAC, PAC, PAC.
14 A  PAC, PAC, PAC, PAC.
15 Q  I want to make sure we get these. So there's
16    Margaret Brinig, James Collins, Mike Crant,
17    Cornelius Delaney, Tom Fuja, Roger Huang, John
18    Renaud, David Severson, all on page 11, all -- the
19    only thing it says is they were on the PAC and they
20    might have some knowledge.
21        Have you talked to any of them about your
22    lawsuit?
23 A  Not to my knowledge.
24 Q  Do any of them have any knowledge, other than they
25    were on the PAC, as far as you know?

1 A  I wouldn't know.
2 Q  How about Henry Weinfield? On the PAC?
3 A  On the PAC.
4 Q  Have you talked to him?
5 A  No.
6 Q  Any knowledge he has regarding your lawsuit as far
7    as -- other than being on PAC?
8 A  Other than being on the PAC, no, not that I know.
9 Q  How about Dennis Jacobs?
10 A  He was on the PAC. He is -- had specifically
11    overseen the redesigning of the teaching
12    assessment. In particular, there are many
13    statements he's made about the inadequacy of the
14    TCEs to capture -- to be a good metric for
15    assessing teaching.
16        But I've also been told that he's very
17    condescending and discriminatory towards women. I
18    was told this by Kathy Eberhard, who sat on a
19    committee with him that was designed to re-haul the
20    teaching metrics, institute these AC/PAC
21    guidelines, and she said that he was very
22    condescending to her, and he probably wouldn't in a
23    million years have supported a woman's case for
24    promotion, even if it was because of TCEs, that he
25    had made statements for that were -- anyway,

1    something to this effect of him -- him probably
2    being a negative person due to my gender.
3 Q  You haven't talked to him?
4 A  No.
5 Q  Who told you he'd be negative because of your
6    gender?
7 A  Kathy Eberhard.
8 Q  Okay. How about Christine Maziar?
9 A  I don't know -- I have not -- other than her being
10    on the PAC, I don't recall having any interaction
11    with her.
12 Q  Okay. Father Poorman?
13 A  No. Other than being on the PAC, I didn't have any
14    personal interaction with him that I recall.
15 Q  Or any knowledge that he has regarding your
16    lawsuit?
17 A  Other than, you know, being on the PAC.
18 Q  It's a big committee. Okay. Jennifer Younger --
19 A  No.
20 Q  -- ever talk to her? Any knowledge --
21 A  I have talked with her.
22 Q  About your case? Your application for promotion
23    and tenure?
24 A  No. No. I was on the Faculty Senate and on a
25    committee that reviewed the library when she was --

1    she was the -- I don't know what you call it -- the
2    head of the libraries here at Notre Dame. And
3    there was an issue of the quality of our libraries,
4    and I was put on a committee on the Faculty Senate
5    to look into that, and I believe that we -- we had
6    a meeting with her and we -- in which we discussed
7    the strategic plan for the Notre Dame libraries.
8 Q  Did you ever talk to her about your teaching
9    assignments --
10 A  No.
11 Q  -- or your concerns?
12 A  Not to my recollection, no.
13 Q  Valerie Sayers.
14 A  She -- there's some kind of weird thing here.
15    There's a mistake because it starts talking about
16    Jennifer Younger under Valerie Sayers. So that's a
17    typo.
18        Valerie Sayers is the current chair of the
19    Department of English.
20 Q  Was she on PAC?
21 A  No.
22 Q  Okay.
23 A  And that's why I'm saying that this is an
24    oversight. That is incorrect, this 91 on page 12.
25    It should say that she was -- so she was not on PAC

Page 395

1 at that time. I think she may have served on PAC
2 in the past, but she was -- she helped me and
3 helped Katherine Zieman write our appeals, just was
4 a supportive person and a set of eyes and ears to
5 help us understand what had happened and navigate
6 what was a very trying and emotional process.
7 She's been on campus for a long time and has
8 seen quite a lot of discrimination. She is one of
9 the people who started the WATCH organization,
10 which was an organization of women that they --
11 that she felt was necessary for the campus in order
12 to help support women, especially under
13 discriminatory environments that they would
14 experience here at Notre Dame.
15 Q  Was Jill Godmilow on PAC?
16 A  No. So I don't know how this just got repeated and
17 repeated and repeated.
18 Q  Okay. Well, who is Jill?
19 A  Jill Godmilow is now a retired professor. She was
20 a professor of film and television and also helped
21 form WATCH and helped support me through the
22 appeals process. She had been on PAC in the past,
23 I believe, when Kathy Eberhard was denied tenure.
24 So she knows of past discriminatory cases such as
25 that.

Page 396

1 Q  Mary D'Angelo.
2 A  She was not on PAC either.
3 Q  Okay.
4 A  And she was -- she is a professor in theology who
5 has been supportive of me and has told me in the
6 past what types of discriminatory things have gone
7 on that she's seen on the committee for women. A
8 lot of what she's told me was about students, you
9 know, in the Department of Engineering or
10 something, being discriminated against, but --
11 Q  Okay. John Affleck-Graves, now, this says member
12 of the academic council. Now we're getting to the
13 academic council.
14 A  Yeah, but he's also on the PAC. This is kind of --
15 I believe he sits on PAC. Maybe I'm wrong about
16 that, though. I'm not exactly sure.
17 Q  Okay. Have you talked to him about your lawsuit?
18 A  Not about my lawsuit, no.
19 Q  Do you think he knows anything, other than the fact
20 that he was on the academic council?
21 A  Pertaining to my lawsuit?
22 Q  Your lawsuit, right.
23 A  I don't know.
24 Q  Have you talked to Anita Allen?
25 A  No, I've not personally talked to her.

Page 397

1 Q  Is she in your department?
2 A  No.
3 Q  Any knowledge that you know she has regarding your
4 lawsuit?
5 A  Not -- I don't recall exactly what information she
6 or some of these others that were on academic
7 council had. It may be pertaining to TCEs or
8 something like this, but I don't recall
9 specifically.
10 Q  Panos Antsaklis.
11 A  Similarly. There's a reason I put them because of
12 the academic council, but I don't recall right now.
13 Q  Have you talked to anyone on this page specifically
14 about your lawsuit?
15 A  Well, here's Mary Rose D'Angelo again. So, yes,
16 I've talked to her.
17 Q  Okay. That's the same person as number 93?
18 A  Yes.
19 Q  All right. We'll cross her off. All right. The
20 rest of them are all -- I mean, is it accurate that
21 they were on the academic council?
22 A  Yes.
23 Q  Okay. And other than them being on the academic
24 council, is there any other reason that you've
25 listed them?

Page 398

1 A  Not that I can recall right now.
2 Q  And have you talked to anybody on page 13 about
3 your lawsuit?
4 A  I may have, in passing, talked to Colin Jessop or
5 Stephen Fallon.
6 Q  Wait. What page are you on? I was --
7 A  I'm on --
8 Q  -- on 13.
9 A  -- page 14. Oh.
10 Q  Back on 13.
11 A  No, not on page 13, other than Mary Rose D'Angelo.
12 Q  All right. Are any of them in your department?
13 A  No.
14 Q  Okay.
15 A  But I have sent a woman to talk to Laura Carlson.
16 I believe that's the new person in equity -- that's
17 dealing with equity issues. So I did send a young
18 woman to talk with her at one point last year.
19 Q  But you haven't talked to her?
20 A  No. This was a case of discrimination, though,
21 that was occurring against this young woman.
22 Q  A student?
23 A  No. A faculty member.
24 Q  Okay. In your department?
25 A  No.

Page 399

1 Q  Let's see. Page 14, these all say academic
2    council. To your knowledge, everybody on page 14,
3    were they on academic council?
4 A  I believe.
5 Q  Have you talked to any of them about your lawsuit?
6 A  As I was saying when I was on the other page, Colin
7    Jessop, I believe I talked to him some, in passing.
8    And I may have -- may have talked -- either talked
9    to Steve Fallon or I might have made some comments
10   on the ND PFSA LISTSERV that he is on.
11 Q  Comments about what?
12 A  I commented at one point on the LISTSERV about, I
13   think it was, pregnancy discrimination or something
14   on campus.
15 Q  Have you talked to any of these people and asked
16   them to be a witness?
17 A  No.
18 Q  And none of them are in your department?
19 A  No.
20 Q  Okay. Let's go to 15. All right. Every one of
21   these is listed as being on academic council. Is
22   that accurate?
23 A  You know, I cannot testify that that is accurate,
24   because it seems that there were some inaccuracies
25   before, so I would have to check.

Page 400

1 Q  Well, let's do them one at a time. Scott Monroe,
2    why did you list him?
3 A  Probably because he was on academic council and,
4    thus, had some oversight for the university in some
5    sense.
6 Q  Robert Nelson?
7 A  Same.
8 Q  William -- okay. We talked about him. Thomas
9    Noble?
10 A  Possibly because he was on university -- on the
11   academic council. I also had dealings with him
12   earlier on. I had signed up for a mentoring
13   program -- or a -- groups that got together and
14   talked about teaching, and we'd read books or put
15   together a syllabus to discuss issues around
16   teaching. And I hoped to better understand things,
17   such as why students give low TCEs, and he was the
18   facilitator for that group.
19 Q  Does he have any knowledge of your lawsuit?
20 A  No, not that I know of.
21 Q  All right. There's at least 35 that I counted that
22   you've listed were on academic council.
23 A  Uh-huh.
24 Q  Are they all on academic council at the same time?
25 A  Yes. Or maybe -- maybe it was -- yeah, I believe.

Page 401

1    Again, there were some -- some inaccuracies, so --
2 Q  Okay. Well, they're not -- academic council is not
3    a step in the tenure process. I mean, they don't
4    review an application and get a --
5 A  No. But they --
6 Q  -- vote, do they?
7 A  -- have general oversight of aspects of the
8    university, including treatment of women on campus,
9    I believe.
10 Q  Let's just -- let's just pick out the ones, if any,
11   that you think have any knowledge of your claims of
12   gender discrimination, not just general oversight.
13 A  Well, Seth Brown I spoke to about my tenure denial.
14   Judith Fox I've spoke to several times.
15 Q  Wait. Let's do it -- Seth Brown, when did you talk
16   to him?
17 A  We were on Faculty Senate together. So this would
18   have been 2009, 2010.
19 Q  Other than what you told him, does he have any
20   knowledge?
21 A  I don't know.
22 Q  How about -- you said Judith Fox, you talked to
23   her?
24 A  Uh-huh.
25 Q  When did you talk to her?

Page 402

1 A  Many times. She had preliminary copies of my
2    appeal.
3 Q  Did she help you with the appeal?
4 A  A little bit but not -- not -- maybe just a comment
5    here or there or just supportive. I know she's
6    spoken often of her fear of retaliation.
7 Q  For what?
8 A  She's not in a regular faculty position. She's not
9    in a tenured position. So she's been very fearful
10   that the university would fire her.
11 Q  Because she's not tenured?
12 A  Because she's not tenured and she's stuck her neck
13   out sometimes for people.
14 Q  Has she told you anything about the academic
15   council ever talking about you or discussing your
16   complaint or your tenure application?
17 A  No.
18 Q  Anybody else on this page who's on here for any
19   other reason other than they were on the academic
20   council?
21 A  No. And it may be that some of them are on the
22   Faculty Senate. I don't know. But these are
23   oversight bodies for various issues on campus.
24      For instance, I know Judy many times has asked
25   for statistics on women, studies to be done on

**Page 403**

1     women. I know that finally they did do a faculty
2     survey that was more comprehensive and compared to
3     outside universities and did ask issues about
4     equity of -- equitable treatment of women on
5     campus, and I know that Judy had pushed to have
6     that done.
7 Q  All right. On the next page, it looks like Scott
8     Van Jacob is the last one you've listed as being on
9     the academic council. What knowledge does he have
10     about your claims?
11 A  I don't know.
12 Q  All right. Now we have people from other
13     departments who may have knowledge -- this all says
14     knowledge of discrimination at the university. So
15     one, two, three of the -- six that are left,
16     starting with Julie, do any of them have knowledge
17     of your particular situation or your claims of
18     discrimination?
19 A  I believe Julie was the investigator on somebody's
20     appeal, if memory serves.
21 Q  Not your appeal, though, right?
22 A  No, but another case of -- a similar case of
23     discrimination.
24 Q  Have you talked to her about your lawsuit?
25 A  No.

**Page 404**

1 Q  How about anybody else on this page?
2 A  That I talked to specifically about my lawsuit?
3 Q  Or that you believe have knowledge about your
4     claims.
5 A  Not that I know of.
6 Q  Christine Wolbrecht, what knowledge does she have
7     of gender-based discrimination; do you know?
8 A  She's spoken to me in the past, and it's been
9     reported to me by other women that she's been upset
10     about discrimination within the university.
11 Q  Now, five years ago? Ten years ago? When was
12     this?
13 A  Couple years ago, a few years ago.
14 Q  And do you know what department she's in?
15 A  Political science, I believe.
16 Q  Okay.
17 A  Yeah.
18 Q  Any more details about any of her issues?
19 A  Not that I can think of right now.
20 Q  How about Steve Batill? Faculty member in the
21     engineering department.
22 A  Yes. I don't recall who gave me his name. I
23     would -- I would have to think. It was very likely
24     in response to this information I was given about
25     these Luce fellows in the department of -- in the

**Page 405**

1     College of Engineering and the reports of a hostile
2     environment.
3 Q  Have you ever talked to him?
4 A  No, not to my knowledge.
5 Q  Bob Bretz, what knowledge does he have about
6     gender-based discrimination at the university?
7 A  I don't recall.
8 Q  Bruce Bunker?
9 A  I don't recall.
10 Q  Where did you get -- you said you got these names.
11     Where did you get these names from?
12 A  I had been taking notes over the years, having
13     spoken to so many people about this horrible
14     instance of discrimination and that horrible
15     instance of discrimination, this guy did this,
16     this -- and I tried to take rough notes of people
17     to put down, but I wouldn't even know where those
18     are now. And there's a lot of women who made
19     complaints, when I was denied, to me.
20 Q  Well, now, these three, Steve, Bob, and Bruce, are
21     they people who discriminated, or are they -- I
22     guess you don't know. You can't remember any of
23     those three?
24 A  Yeah. This was prepared a long time ago. Most of
25     this happened long ago. So, yes, it's hard for me

**Page 406**

1     to recall.
2 Q  As you sit here now, you don't remember why you put
3     them on here?
4 A  No.
5 Q  Augustine Fuentes.
6 A  Uh-huh. I believe he was on an appeals committee
7     at one point.
8 Q  Not yours, though, right?
9 A  Not mine but similar appeals committee for somebody
10     else.
11 Q  Have you talked to him?
12 A  Not for a -- for a while and not about
13     discrimination per se.
14 Q  All right. Carolyn Nordstrom?
15 A  She is a member of the Kroc Peace Institute and
16     left because of Scott Appleby's hostile treatment
17     towards women.
18 Q  When did she leave?
19 A  I'm not sure exactly when. I mean, she's still at
20     the university. She just declined her fellowship
21     appointment within the Kroc Peace Institute. I
22     believe most of the women did over a two-year
23     period.
24     And I became aware of her and the
25     discrimination that she felt was occurring at the

---

**Page 407**

1     university because of the case of Pamina Firchow,
2     when Scott Appleby tried to fire her unilaterally
3     on the day that she was requesting maternity leave.
4 Q  Okay. I think you talked about her last time we
5     talked.
6        Have you talked to Carolyn Nordstrom?
7 A  Not personally, no.
8 Q  And any estimate when it was you think she left the
9     Kroc Peace Institute?
10 A  I mean, it was recent years, I think. There's been
11     recent problems with -- at the Kroc Institute under
12     Scott Appleby, and I believe he was going to step
13     down as director.
14 Q  Who's given you that information, if you haven't
15     talked to Carolyn?
16 A  I've talked to Pamina Firchow. I've talked to --
17     I'm drawing a blank -- George Lopez. And, for
18     instance, George Lopez was a candidate for the
19     directorship of the Peace Institute, so --
20 Q  All right.
21 A  -- I know, in fact, they were trying to have Scott
22     Appleby step down.
23 Q  Jaleh Dashti-Gibson, a former faculty member.
24 A  I imagine this is another one of the people that
25     left the Kroc Peace Institute. These all seem to

---

**Page 408**

1     be the women that left. Like Jackie Smith left at
2     that time.
3 Q  Have you talked to Jaleh-Dashti-Gibson?
4 A  No.
5 Q  Have you talked to Jackie Smith?
6 A  No.
7 Q  Cynthia Mahmood.
8 A  No.
9 Q  Do you know who she is?
10 A  I believe, again, she was part of the Kroc Peace
11     Institute, one of the people that stepped down, but
12     I don't recall exactly.
13        This was part of when I was trying to help
14     Pamina Firchow not be discriminated against by the
15     university for being pregnant.
16 Q  Have you talked to her, Cynthia?
17 A  No.
18 Q  All right. Julie Titone.
19 A  No.
20 Q  No, you haven't talked to her?
21 A  No, not to my knowledge.
22 Q  Do you know why she's on the list?
23 A  I believe she is another one of the women who were
24     discriminated against by Scott Appleby at the Kroc
25     Peace Institute, was reported to me.

---

**Page 409**

1 Q  By Pamina?
2 A  Yes.
3 Q  And then we've got Pamina there. All right.
4        Now, as you noted, one of these -- this
5     document we just looked at was prepared last
6     February. The other one we went through was
7     prepared last March. So that was a year ago.
8        Have you thought of anybody else that you need
9     to list, as far as somebody you forgot, who has
10     knowledge?
11 A  I don't know if I had put Katherine Sredl down
12     before, partly because she was very concerned about
13     retaliation. Let me go through here.
14 Q  I don't remember that name.
15 A  Okay. I'll put down Katherine Sredl since she now
16     has another position, and I don't know how much
17     damage the university could scare up against her.
18     Although, I'm sure they could try.
19 Q  How do you spell her last name?
20 A  S-R-E-D-L.
21 Q  And what department is she in?
22 A  Marketing.
23 Q  And does she have any knowledge about your lawsuit?
24 A  She knows about my lawsuit, yes.
25 Q  Was she involved at all or only just --

---

**Page 410**

1 A  She's also experienced discrimination due to her
2     family medical leave. There's a pattern of
3     discrimination in terms of family medical leaves or
4     pressure to return to work when they should be on
5     medical leave or denying of benefits, in the
6     department of marketing.
7 Q  And --
8 A  These involve Katherine Sredl and Tonya Bradford,
9     in addition to another woman who left, I believe.
10 Q  And why do you say there's discrimination in the
11     marketing department?
12 A  Their chair has repeatedly denied tenure extensions
13     to women who should have been afforded them.
14 Q  And how --
15 A  Once --
16 Q  -- do you know that?
17 A  -- to Katherine Sredl and once to Tonya Bradford.
18 Q  And how do you know that? Did --
19 A  Katherine --
20 Q  -- they tell you that?
21 A  -- Sredl, the reason I met her was she was trying
22     to get an extension of her tenure clock, that she
23     had been -- she should have been afforded when she
24     took family medical leave because her father was
25     dying of pancreatic cancer, and she requested

**Page 411**

1  family medical leave to care for him, and then he
2  died.
3       And under the university policy, she should
4  have been allowed to extend her tenure clock by one
5  year. And she put into her chair to just -- to
6  extend her tenure clock, and he never put it
7  through and then denied that she had -- that she
8  should have been afforded that, when she should
9  have.
10 Q  Did she complain about that?
11 A  Yes, she did. And I believe she went to Dean
12  Myers, and I believe that subsequently she did get
13  another year. But she's endured a hostile
14  environment in her workplace, in particular, things
15  such as when she was very ill, her chair did not
16  find a replacement for her for teaching, pressured
17  her to continue teaching. She subsequently wound
18  up in the emergency room and had to have an
19  emergency appendectomy. Last fall, when she had --
20  I don't know if she had been released from the --
21  just been released from the hospital or not yet,
22  but her chair -- she -- she informed her chair of
23  her situation and that she didn't think she could
24  come back to the classroom to teach. And he sent
25  her a series of bullying emails, trying to pressure

**Page 412**

1  her as to when she would come back to the
2  classroom.
3 Q  Okay. And this is all information you got from
4  Katherine, correct?
5 A  And I was forwarded the emails. Many of these
6  women have forwarded me the emails from, like, Dean
7  Myers or their chairs.
8 Q  Anybody else you need to add to the list of
9  witnesses?
10 A  Tonya Bradford.
11 Q  And is she also in the marketing department?
12 A  Yes, she is.
13 Q  And has she been -- any knowledge of your case
14  other than what you've told her?
15 A  No. But these are patterns, such as my case, in
16  which I was denied an extension of my tenure clock
17  that I had been promised while I was on the tenure
18  track by Bill Dwyer, and with knowledge of the
19  Office of the Provost, knowing that women are not
20  being afforded their rights under federal law or
21  under the academic policies and that there are
22  chairs that are perpetuating these policies,
23  repeatedly, without intervention by the Office of
24  the Provost, other than to try and fix it
25  afterwards, sometimes.

**Page 413**

1       So Tonya Bradford adopted a child, and under
2  policies set forth by the university, was told she
3  had the right to an extension of her tenure clock,
4  which she wanted to use. Having to get acquainted
5  with and care for a small child, she was supposedly
6  afforded this.
7       However, her chair did not give her that tenure
8  extension. Instead, started going through the
9  process of putting her up for tenure, including
10  contacting outside people, outside letters for the
11  department that they would normally request for
12  going up for tenure, except for she was not
13  supposed to be going up for tenure. And now they
14  say, okay, she doesn't have to go up for tenure,
15  but this, in some sense, poisons the outside
16  environment for her case. Because people in her
17  profession will wonder, why was this pulled back;
18  why was this -- did she not go up for tenure; is
19  there a problem.
20 Q  Okay. Anybody else to add to the list?
21 A  I'm sure there are. I -- I don't spend my time
22  trying to find these people. They're everywhere at
23  this university, and I'm sure I only know about a
24  few of them.
25 Q  Have you personally talked to anybody and asked him

**Page 414**

1  or her to be a witness for your case?
2 A  I've told some people that I was asked to put a
3  list of witnesses and that I wanted to let them
4  know that I was going to put them down.
5 Q  And that's the two lists that we've gone through?
6 A  Yes, by and large. And some people were very, very
7  scared to be put on that list, and I didn't put
8  them on one or more, such as Katherine Sredl or
9  Pamina Firchow, due to the hostile environment
10  they'd already encountered.
11       MS. CANTON: Okay. Let's take a break.
12  (Short recess taken.)
13       MS. CANTON: I don't have any more
14  questions. Thank you. We had to go back
15  on the record to say that.
16       MR. BARKES: And we have -- we'll read
17  the second half as well. So we have no
18  further questions, and we will read the
19  second half.
20  (Deposition concluded and Witness
21  excused at 5:54 p.m.)
22
23
24
25

Page 415

```
 1                    CERTIFICATE
 2         I, Melody M. Goodrich, a Notary Public, in
 3    and for the County of Cass and State of
 4    Michigan, do hereby certify there appeared
 5    before me on Tuesday, March 11, 2014, KATRINA D.
 6    BARRON, who was previously affirmed or duly
 7    sworn to testify the truth, the whole truth, and
 8    nothing but the truth to questions propounded at
 9    the taking of the foregoing deposition in a
10    cause now pending and undetermined in said
11    court.
12         I further certify that I then and there
13    reported in machine shorthand the proceedings at
14    the said time and place; that the proceedings
15    were then transcribed from my original shorthand
16    notes; and that the foregoing typewritten
17    transcript is a true and correct record thereof.
18         IN WITNESS WHEREOF, I have hereunto set my
19    hand this 24th day of March 2014.
20
21                    Melody M. Goodrich
22
23             Melody M. Goodrich
               Notary Public, State Of Michigan
24             Residence:  Cass County
               My Commission Expires:  4-11-14
25
```

Page 416

```
 1                   ERRATA SHEET
 2         DEPOSITION OF:  KATRINA BARRON
 3              Date:  March 11, 2014
 4
 5    Page   Line      Change       To      Reason
 6    ____|____|_____|_____|____
 7    ____|____|_____|_____|____
 8    ____|____|_____|_____|____
 9    ____|____|_____|_____|____
10    ____|____|_____|_____|____
11    ____|____|_____|_____|____
12    ____|____|_____|_____|____
13    ____|____|_____|_____|____
14    ____|____|_____|_____|____
15    ____|____|_____|_____|____
16    ____|____|_____|_____|____
17    ____|____|_____|_____|____
18    ____|____|_____|_____|____
19    ____|____|_____|_____|____
20    ____|____|_____|_____|____
21    ____|____|_____|_____|____
22    ____|____|_____|_____|____
23    [ ]  PLEASE CHECK HERE IF THERE ARE NO CORRECTIONS.
         RETURN ERRATA SHEET WITH SIGNATURE PAGE
24       BY:  April 29, 2014
25
```

Page 417

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF INDIANA
 2                  SOUTH BEND DIVISION
 3            Cause No. 3:11-CV-440
 4    KATRINA BARRON,              )
 5              Plaintiff,         )
                                   )
 6        vs.                      )
                                   )
 7    UNIVERSITY OF NOTRE DAME DU  )
      LAC d/b/a NOTRE DAME         )
 8    UNIVERSITY,                  )
                                   )
 9              Defendant.         )
10    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
11
12            JOB NO.  140110
13         I, KATRINA D. BARRON, state that I have read the
14    foregoing transcript of the testimony given by me at my
15    deposition on March 11, 2014, and that said transcript
16    constitutes a true and correct record of the testimony
17    given by me at said deposition except as I have so
18    indicated on the errata sheets provided herein.
19
20
21    KATRINA D. BARRON              DATE
22
23              Michiana Reporters
                  P.O. Box 122
24            Osceola, Indiana 46561
                 574.300.3885
25
```