UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KATRINA BARRON,

      Plaintiff,

      v.

THE UNIVERSITY OF NOTRE DAME
Du LAC,

      Defendant.

Case No. 3:11-cv-440-JVB-CAN

## OPINION AND ORDER

Plaintiff Katrina Barron alleges that Defendant, the University of Notre Dame du Lac, discriminated against her because she is a woman, and that Defendant retaliated against her for complaining about this discrimination. Defendant moves for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (DE 67.) Plaintiff opposes the motion. For the reasons discussed below, Defendant's Motion is GRANTED IN PART and DENIED IN PART.

A.    **Factual Background**

Plaintiff is a woman who holds a Ph.D. in mathematics. (DE 56-2 at 371.) Defendant hired her as a tenure-track Assistant Professor in the Department of Mathematics in August 2001. (DE 67-2 at ¶ 1.) In fall 2008, Plaintiff applied for promotion to Associate Professor and tenure. (*Id.*) Defendant's President, Reverend John Jenkins, denied Plaintiff's request for tenure on May 4, 2009. (DE 71-3.) Because Plaintiff was denied tenure, the next school year was the final year of her contract with Defendant and her faculty appointment would terminate at the end of the spring 2010 semester. (*Id.*) At Notre Dame, regular teaching faculty members are only

employed for the academic calendar of August through May, but salaries to those employees are paid over twelve months, from July through June.[1] (Leigh Ann Roberts Aff't, DE 72-1, at ¶ 2.)

Gregory Crawford, the Dean of the College of Science (which includes the Math Department), sent Plaintiff a written explanation of the negative decision, as required by the *Academic Articles*.[2] (DE 71-4; DE 67-2 at 12.) Dean Crawford stated that the Provost's Advisory Committee ("PAC") had recommended against awarding tenure because the "quality of [Plaintiff's] teaching did not meet the standard of excellence expected of [tenure candidates]."[3] (*Id.*)

The *Academic Articles* provide that an associate professor should have a doctor's degree or an equivalent professional degree, and should have demonstrated "outstanding teaching ability, growth in knowledge and maturity, salutary influence upon students, and standing among colleagues." (DE 67-2 at 10.) Associate professors are ordinarily required to have notable scholastic achievement demonstrated by significant publication. (*Id.*)

Believing she met these criteria, Plaintiff pursued two, parallel, internal appeals of the tenure denial. One avenue focused on whether the denial of tenure was substantially affected by procedural error, personal bias, or academic freedom issues. (DE 71-6.) The Committee on Appeals determined that there was not enough evidence showing that the decision to deny tenure was affected by one of these subjective factors. (*Id.*) The second route is called the "Appendix

---

[1] Roberts then states that Defendant "pre-pays" the salaries during the months of June, July, and August. If salaries are paid "from July through June" the term "pre-pays" appears to apply only to July and August; salary payments made in June are better characterized as "post-paid".

[2] The *Academic Articles* "define the structure of academic governance" at Notre Dame. (DE 67-2 at 4.).

[3] The *Academic Articles* lay out the decision-making process for promotion and tenure candidates. Only the University President is authorized to take "final action" after receiving reports and recommendations of lower officials and committees. The *Articles* also state, "Whenever the ultimate decision concerning . . . promotion, or tenure is negative, the chairperson of the department, upon request of the faculty member concerned, conveys the reasons for the negative decision to the faculty member." (DE 67-2 at 12.) This statement seems to guarantee to the affected faculty member an explanation of the "ultimate decision" (that can only be made by the University President), and not an explanation for a mere committee recommendation on its way up the chain of command.

2

A" appeals process and applies to reviewing adverse promotion or tenure decisions that are allegedly the product of sex discrimination. (DE 71-2 at 30–31.)

As the foundation of her Appendix A appeal, Plaintiff conducted an independent study of teaching evaluations in the Math Department. She discovered that among assistant professors, the female professors were assigned introductory-level courses at a markedly higher percentage of their total number of courses taught, as compared to the male professors. Plaintiff used this evidence to show Defendant's perception of her teaching qualities was a result of gender discrimination. (DE 71-4.) Plaintiff had a history of receiving low TCE scores from students in introductory level courses. (DE 56-2 at 398–405.) She claimed that these lower evaluations resulted from the disproportional assignment of introductory-level mathematics courses. (DE 71-6.) Instructors in those courses notoriously receive lower student evaluations because many of the students in those classes are not math majors. (DE 71-1 "Pl.'s Dep." at 145–46; DE 56-2 at 404.) She argued that the disproportionate assignment of these low-level courses was the result of gender bias, and therefore, she was denied tenure because of her sex. (DE 71-6.) Plaintiff compiled statistical data to support these claims, and supplied the data to the Committee on Advancement and Promotions. (DE 14-7.)

Among the assistant professors in the Math Department eligible for tenure, from 1999–2009, Defendant granted tenure to eight males and one female. (DE 71-7 at 2.) The sole female, Professor Polini taught six courses, and three of the males, Professors Hind, Misiolek, and Diller, taught fifteen courses before tenure; Plaintiff taught sixteen courses. (*Id.*) However, eleven of Plaintiff's sixteen courses were 100-level introductory courses, while Hind and Misiolek each taught five 100-level courses, and Diller taught one 100-level course. (*Id.*)

Pursuant to Appendix A of the Defendant's *Academic Articles*, Plaintiff selected a tenured faculty member from an appointed panel to review her case, and this reviewer decided that the President's decision to deny tenure should be remanded to the PAC to be reconsidered. (DE 71-6.) This remand began in January 2010, but started in the Department of Mathematics Committee on Advancement and Promotion instead of the PAC. (DE 71-6; DE 14-7.)

During the internal appeals process, Plaintiff applied for numerous academic positions outside of Notre Dame. (Pl.'s Dep. at 8.) One of these positions was a full year of research grants from the Max Planck Institute for Mathematics in Bonn, Germany. (*Id.* at 11–12.) On December 2, 2009, Max Planck's managing director offered Plaintiff monthly research grants from July 2010 through June 2011, in exchange for Plaintiff's research and collaboration with other research fellows performed at the Institute. (DE 71-5.) Plaintiff did not immediately accept Max Planck's offer because she hoped for an employment opportunity to present itself Stateside. (Pl.'s Dep. at 15–17.) However, Plaintiff was reminded by Associate Provost Donald Pope-Davis's January 5, 2010, letter that it was her last year in Defendant's employ unless her Appendix A appeal succeeded. (DE 14-7.) She eventually accepted Max Planck's offer and began arranging to move her family to Germany for the 2010–11 school year. (Pl.'s Dep. at 15–19.)

On February 18, 2010, Plaintiff completed an EEOC intake questionnaire and indicated that she wanted to initiate a charge of sex discrimination against Defendant. (DE 71-13.) Plaintiff submitted a charge of sex discrimination and retaliation to the Indiana Civil Rights Commission on April 1, 2010. (DE 71-14.)

The 2009–10 school year ended in May 2010. (DE 72-1.) On June 9, 2010, Provost Thomas Burish sent Plaintiff a letter indicating that her Appendix A appeal was successful and

4

President Rev. Jenkins offered Plaintiff promotion and tenure. (DE 71-10.) Plaintiff accepted the offer for tenure on June 14, but also asked for a grant of paid leave in order to fulfill her commitment to Max Planck. (DE 71-11; DE 71-12; DE 56-2 at 307–17.) Defendant granted Plaintiff a year-long leave of absence, but the leave was unpaid because she had not accumulated the Department of Mathematics minimum six years of service since her last paid leave. (DE 71-12; DE 67-4.)

Plaintiff lived in Germany for the 2010–11 school year with her husband and children, and leased their Indiana home to another family. (Pl.'s Dep. 18–19.) She returned to her position with Defendant for the 2011–12 school year. She took a year-long paid sabbatical for 2012–13, and resumed full-time teaching and researching in 2013–14.

### B. Summary Judgment Standard

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it

thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**C.     Analysis**

Defendant claims that Plaintiff cannot establish a *prima facie* case of gender discrimination because she did not suffer an adverse employment action when President Rev. Jenkins denied her tenure in May 2009. Defendant also asserts that Plaintiff cannot show that the stated reasons for denying her tenure were pretextual covers for gender discrimination. Finally, Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation for making a claim regarding gender discrimination.

Plaintiff alleges that Defendant denied her tenure because she is a woman and retaliated against her for complaining about the gender discrimination. Title VII's anti-retaliation statute encompasses a broader range of prohibited conduct than the anti-discrimination statute, but the anti-retaliation statute requires a heavier burden of proof. This difference is the result of distinct statutory language. 42 U.S.C. §§ 2000e-2(a) (anti-discrimination) & 2000e-3(a) (anti-retaliation); *see Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 64 (2006). For her discrimination claim, Plaintiff must demonstrate that she suffered an adverse employment action, and that

6

gender discrimination was "a motivating factor" for the action. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e-2(m); *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In contrast, for the retaliation claim she need only show a materially adverse action that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe*, at 67–68 (internal quotation omitted). However, Plaintiff must demonstrate that her protected activity was the "but-for cause" of the materially adverse action. 42 U.S.C. § 2000e-3(a); *Nassar*, at 2528. With these statutory distinctions in mind, the Court addresses the discrimination claim and then the retaliation claim.

**(1)** *Title VII Sex Discrimination*

Plaintiff alleges that when she was denied tenure in May 2009 she suffered an adverse employment action caused by invidious gender discrimination, and argues that she can succeed under either the direct or indirect method of proof. Defendant insists that Plaintiff never suffered an adverse employment action because Defendant granted her tenure after her successful Appendix A appeal.

Title VII makes it unlawful for an employer, such as Defendant, "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). It is well-settled that Title VII is "fully applicable" to tenure decisions. *Blasdel v. NW Univ.*, 687 F. 3d 813, 815 (7th Cir. 2012) (citing *Univ. of Penn. v. EEOC*, 493 U.S. 182, 190 (1990)). Although, as the Seventh Circuit stated in *Blasdel*, "practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight." *Id.* Courts

should not sit as super-reviewers of decisions about academic work-product or career potential, but tenure decisions "should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars." *Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1243 (7th Cir. 1985).

A plaintiff may prove discrimination by using the direct or indirect method. The direct method requires evidence of intentional discrimination. Using this method, a plaintiff can use either direct evidence, such as an admission of discriminatory intent, or circumstantial evidence creating a "convincing mosaic" from which a jury could infer that intentional discrimination caused the adverse action. *Rudin v. Lincoln Land Comm'y Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). A plaintiff proceeding with the indirect method of proof must establish a *prima facie* case of discrimination using the *McDonnell Douglas* burden-shifting framework. *Id.* at 724.

(a)  *No* prima facie *case of sex discrimination under the direct method*

Plaintiff argues that her successful Appendix A appeal is the "proverbial smoking gun" admission of sex discrimination. Defendant argues that reversing the initial decision to deny tenure cannot be seen as an admission of intentional discrimination. Plaintiff discusses some of the direct method's circumstantial types of evidence, but only does so in the context of the indirect method. While the Court may reframe an argument to fit it within the proper analytical framework, that is unnecessary in this case and only direct evidence will be addressed.

There is no direct evidence of intentional sex discrimination. In reversing the initial denial of tenure, Defendant did not state that it had denied Plaintiff tenure or otherwise discriminated against her because of her sex, and there was no other direct evidence of a

discriminatory intent. Therefore, Plaintiff cannot establish a *prima facie* case of sex discrimination under the direct method of proof.

(b)   *Plaintiff makes out a* prima facie *case under the indirect method of proof*

Under the *McDonnell Douglas* indirect method of proof, a plaintiff always bears the burden of persuasion, but the burden of production shifts to the defendant if plaintiff establishes a *prima facie* case of discrimination. *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007). Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure. *McDonnell Douglas*, 411 U.S. at 802; *Sun*, 473 F.3d at 814. Once the *prima facie* case is established, if the defendant produces a legitimate, non-discriminatory reason for denying tenure, then the plaintiff must prove this reason is a mere pretext for sex discrimination. *Sun*, 473 F.3d at 814.

It is undisputed that Plaintiff was qualified for tenure (she must be, considering she is now tenured). Instead, Defendant claims that Plaintiff didn't suffer an adverse employment action because she was never denied tenure: President Rev. Jenkins's May 4, 2009, decision (denying tenure and promotion) was not final until the completion of the internal appeals process, on June 9, 2010. Also, Defendant argues that Plaintiff cannot show a similarly-situated male was granted tenure.

Seventh Circuit precedent in Title VII cases points in favor of finding that the initial denial of tenure in this case was an adverse employment action that satisfies the third prong of the *McDonnell Douglas* test. Importantly, if Plaintiff's internal appeals had been unsuccessful, the date of the adverse employment action for the purposes of filing a charge with the EEOC

9

would be the initial denial of tenure. *See Delaware St. Coll. v. Ricks*, 449 U.S. 250, 259 (1980) (holding that the EEOC limitations periods began to run when professor was denied tenure and notified); *Williamson v. Ind. Univ.*, 345 F.3d 459, 463 (7th Cir. 2003). Plaintiff's attempted internal appeals would not reset the 300-day filing window. *Williamson*, 345 F.3d at 463 ("[A]n employee cannot toll the limitations period by pursuing grievance proceedings."). To illustrate, if Plaintiff received notice on June 9, 2010, affirming the May 4, 2009, denial of tenure and then tried to file with the EEOC, her claim would be barred because it would have been more than 300 days since the adverse action, the initial denial of tenure.

The Seventh Circuit has repeatedly found that an employment action can be adverse even if it is not a "lasting" decision. *Molnar v. Booth* was, in part, a Title VII supervisor sexual harassment case, and the court held that a reasonable jury could have believed that the supervisor's negative evaluation of an intern was a "tangible employment action" even though the school board reversed that evaluation more than six months later. *See Molnar v. Booth*, 229 F.3d 593, 600–01 (7th Cir. 2000). An even shorter period of adverse action was present in the facts of *Ezell v. Potter*, 400 F.3d 1041, 1043 (7th Cir. 2005), where the plaintiff received a "Notice of Removal" indicating his employment would end the next month but that he was entitled to union grievance process. The Removal Letter was rescinded after Ezell completed the grievance process so Ezell was never actually terminated. *Id.* However, the court found "the Removal Letter constituted an adverse employment action" up until it was rescinded. *Id.*

Defendant directs the Court to *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009), to support the proposition it is not an adverse employment action to face the mere possibility of a suspension without ever actually serving it. Defendant wants to analogize *Nagle* with the evidence of this case, but Plaintiff's situation is more similar to the facts of

*Molnar* and *Ezell*, than it is to *Nagle*. Although, the internal grievance process eventually resolved in Plaintiff's favor, for more than one year her future with Defendant remained unresolved, and the presumption of both parties was that she would no longer be Defendant's employee at the end of the spring semester 2010. This presumption reasonably induced Plaintiff to seek and accept employment beginning the month after her paychecks from Defendant would presumably stop coming.

It's true that the initial denial of tenure is not actionable in all cases where that decision is reversed and tenure is eventually granted. Defendant urges the Court to follow the Sixth Circuit in *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542, 545 (6th Cir. 1999), and to apply the "ultimate employment decision" test for adverse action, but this test has never been adopted in the Seventh Circuit and it will not be used in this case. Moreover, although the Sixth Circuit has not expressly overruled *Dobbs-Weinstein*, subsequent decisions have retreated from the "ultimate employment decision" standard. *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 433 (6th Cir. 2014) (acknowledging that *Dobbs-Weinstein* has been overruled in part). In any event, *Dobbs-Weinstein* is unpersuasive in this case, and *Benison v. Ross*, 765 F.3d 649, 660 (6th Cir. 2014), is not on point because the plaintiff in that case voluntarily withdrew herself from the internal review process. Defendant fares no better in relying on various district court cases that have different facts than the case at hand.[4]

---

[4] In *Howse v. Virginia Polytechnic and State Univ.*, 901 F. Supp. 1091, 1094–95 (W.D. Va. 1995), the court held that the plaintiff's EEOC charges were untimely because they were filed before the "ultimate decision" was issued, but that contention is not before the Court. The defendant in *Negussey v. Syracuse Univ.*, No. 95-cv-7827, 1997 WL 141679, at *9 (N.D.N.Y. Mar. 24, 1997), included a lengthy notice regarding the available internal appeals process, and there was no such notice in either Provost Burish's May 4, 2009 letter, or Dean Crawford's May 11, 2009 letter. (DE 71-3 & 71-4.) The plaintiff in *Davis v. City Univ. of New York*, No. 94-cv-7277, 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996), only alleged that the initial denial caused her anxiety and inconvenience that the court ruled were not "materially adverse changes" within the meaning of Title VII, but in Plaintiff's case she claims the initial denial caused her to lose earnings, which is surely materially adverse.

The initial denial of tenure in this case constitutes adverse employment action, despite the subsequent grant of tenure, because the initial denial caused Plaintiff to materially suffer. She got another position for the following year, as a prudent person likely would, while the internal appeals process began reconsidering her tenure candidacy in January 2010. And she was granted a leave of absence without pay that she would not have requested (or at least not for the same reasons) had she not been denied tenure in May 2009. Plaintiff is asking for, among other damages, the difference between the salary she would have made as an Associate Professor of Mathematics with tenure and the stipend she actually received from the Max Planck Institute for Mathematics for the 2010–11 school year. This loss of earnings is more than *de minimis* and constitutes a materially adverse effect of the initial denial.

For the fourth prong of the *McDonnell Douglas* test, Plaintiff presents evidence that similarly situated male professors were granted tenure where she was initially denied, notably Professors Hind, Misiolek, and Diller. Defendant does not dispute that these men received tenure, but argues that because another female, Professor Polini, also received tenure there should not be any inference of gender discrimination. Defendant also asserts that Plaintiff has failed to demonstrate that the men who were promoted are appropriate comparators.

An appropriate comparator is a "similarly situated" person who was treated more favorably. *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d at 812. In *Sun*, the Seventh Circuit considered another tenure candidate as "similarly situated" to Sun because he was in the same department as Sun, he was outside the protected class, and was considered for tenure the year before Sun. It would therefore be appropriate to view several of the men identified by Plaintiff as similarly situated to her if they had the same rank as her in the Math Department and were eligible for tenure within a reasonable time of her initial denial in May 2009.

12

At least one of the male professors promoted and given tenure is comparable to Plaintiff. Professor Hind, in particular, satisfies these requirements. Professor Hind is a male, Defendant gave Professor Hind tenure in 2007, and prior to receiving tenure he was an assistant professor in the Math Department. (Pl.'s Dep. at 300.) Prof. Hind is more appropriate than some other males because he taught almost the same number of courses as Plaintiff before the tenure decision. (DE 71-7 at 2.) The Court is satisfied that Professor Hind is an appropriate comparator.[5]

Because Plaintiff has carried her burden of demonstrating the *prima facie* case, the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for the action. *Sun*, 473 F.3d at 814. Defendant's only such reason is that the quality of her teaching "did not meet the standard of excellence" expected of tenure candidates. (DE 71-4.) However, the evidence supporting Plaintiff's *prima facie* case also shows that Defendant's proffered non-discriminatory reason could have been pretextual.

Therefore, a reasonable jury could conclude that sex discrimination was *a motivating factor* in the decision to deny Plaintiff tenure because of the disproportionate number of introductory courses assigned to women in the Math Department.

**(2)** *Title VII Retaliation*

Plaintiff's Amended Complaint (DE 14) alleges discrimination and retaliation, but Plaintiff's Response (DE 70) to Defendant's Motion for Summary Judgment (DE 67) makes only cursory references to retaliation. Plaintiff's failure to develop any argument regarding retaliation constitutes waiver of the claim. *See Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010)

---

[5] Defendant's argument, that the promotion and grant of tenure of Professor Polini indicates there should be no inference of gender discrimination in Plaintiff's case, is not well-supported. The fourth prong on *McDonnell Douglas* only requires Plaintiff to demonstrate that similarly situated males were promoted when she was not.

(stating that plaintiff waived certain claims by not making "any cogent argument" regarding them); *Ienco v. Angarone*, 429 F.3d 680, 684 (7th Cir. 2005) (holding that failure to develop claims in response to motion for summary judgment constituted waiver).

**D.      Conclusion**

For the reasons discussed in this Opinion, Defendant's Motion for Summary Judgment (DE 67) is GRANTED IN PART and DENIED IN PART. Count I of the Amended Complaint (DE 14) is DISMISSED only insofar as it makes a claim for retaliation.

SO ORDERED on March 13, 2015.

   S/ Joseph S. Van Bokkelen  
JOSEPH S. VAN BOKKELEN  
UNITED STATES DISTRICT JUDGE